UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | |
|---|---|
| JOHN DOE, | Case No. 20 Civ. 5019 (LAK) |
| Plaintiff, | |
| v. | |
| COLUMBIA UNIVERSITY, | |
| Defendant. | |

--------------------------------------------------------x

## AMENDED COMPLAINT AND JURY DEMAND

**PLAINTIFF JOHN DOE** (a pseudonym),[1] by his attorneys NESENOFF &
MILTENBERG LLP, as and for his Complaint against Defendant Columbia University,
respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      Plaintiff John Doe ("John Doe"), an expelled graduate student at Defendant
Columbia University ("Columbia"), brings this lawsuit alleging Title IX discrimination and related
state law claims.  John Doe was wrongly and falsely accused of violating Columbia's Gender-
Based Misconduct Policy and Procedures for Students governing sexual misconduct (the "Policy")
based on alleged non-consensual sexual intercourse with Jane Roe in the early morning hours of
August 26, 2017. As the result of Columbia's gender-biased, result-oriented investigation and
decision-making process, John Doe was found responsible for Policy violations and, despite a
previously unblemished disciplinary record, was permanently expelled from Columbia's graduate
program.

---

[1] Plaintiff John Doe and university complainant Jane Roe have been granted pseudonym status.

2.      The case arose from events during the night hours of August 25, 2017 and early morning hours of August 26, 2017, when John Doe -- who was then in his mid-twenties and had been friends with Jane Roe for over a year -- partied with Jane Roe, who was two years older.  At a dance club in Chelsea, New York City, Jane Roe was observed by one or more of Jane Roe's own eyewitnesses freely and voluntarily kissing John Doe, freely and voluntarily dancing with John Doe in a sexually explicit manner and freely and voluntarily engaging in other sexualized activities.  After 2:30 am, Jane Roe and John Doe went to John Doe's apartment, which Jane Doe admitted she did freely and voluntarily.  After entering the apartment, Jane Roe and John Doe engaged in consensual mutual foreplay in three different rooms and then they engaged in consensual sexual intercourse in three different positions. Jane Roe did not demonstrate any incapacitation, but rather demonstrated that she was a voluntary participant in each of the continuous, seemingly mutual, sexual activities.  Throughout the evening, Jane Roe did not show any difficulties in walking, or otherwise reflecting incapacitation generally. Further, Jane Roe gave verbal expression to wanting and enjoying sexual intercourse.

3.      Jane Roe later claimed that after she woke up, still disoriented and confused, she collected her things and quickly fled John Roe's.  Jane Roe also later claimed that she had a "black-out memory loss" of almost the entire time she was alone with John Doe and that she remembered almost no facts. Jane Roe thus had to recreate her after-the-fact story with the help of her cousin, her future roommate and her future boyfriend -- three individuals who were not with Jane Roe at any relevant time during the night hours of August 25, 2017 and early morning hours of August 26, 2017.

4.      Columbia's investigation and decision-making process was a one-sided, gender-biased, results-oriented process that produced an erroneous result and an excessive sanction in this

[2]

case.  Among the defects in the proceeding were: (i) the Columbia investigation team presumed that Jane Roe was telling the truth simply because she pursued her claim, a presumption that is dispositive as to guilt or innocence under a "more likely than not" standard where consent is challenged; (ii) as a result of presuming Jane Roe's story to be true, Columbia did not question Jane Roe's credibility, nor did it analyze inconsistencies and discrepancies in Jane Roe's story; (iii) as a result of presuming that John Doe's testimony was untrue where it differed from Jane Roe's testimony, Columbia did not analyze whether John Doe's testimony and Jane Roe's testimony were consistent with the objective evidence; (iv) Columbia prevented John Doe from questioning Jane Roe and refused John Doe's request for the Columbia investigation team and the Columbia hearing panel to ask about the main discrepancies between Jane Doe's narrative and the objective evidence in the record; (v) Columbia ignored the testimony of Jane Roe's witnesses which flatly contradicted Jane Roe's narrative in critical respects; (vi) Columbia gave the same weight to the testimony of Jane Doe's after-the-fact witnesses that it gave to the testimony of the three eyewitnesses, even though Jane Roe's statements to her after-the-fact witnesses were not based on her recollection of the events but, because of her "blackout memory loss," reflected the narrative Jane Roe reconstructed with the help of her three friends who were not present at any relevant time; (vii) the Columbia investigation team refused to consider expert opinions on the two medically-related issues presented by this case because John Doe had hired the experts and, at the same time, refused to hire their own expert; (viii) the Columbia hearing panel rubber-stamped the Columbia investigation team's report because it did not have the time to carefully review and consider the record; and (ix) the Columbia appellate panel summarily denied the appeal on the ground the appellate panel was not permitted to examine the facts.

5.      To redress the erroneous result and excessive sanction, John Doe brings this action.

[3]

## THE PARTIES

6.      John Doe is a natural person residing in New York City, New York.  John Doe attended and graduated from college with an undergraduate degree.  In August 2016, John Doe matriculated as a Columbia University graduate student.  At the time of the events relevant here, including the disciplinary proceeding, John Doe was a second-year student and had never before been involved in any other disciplinary matters.

7.      Columbia is an elite private Ivy League University located in the City and State of New York.  Upon information and belief, Columbia receives nearly $645,000,000 in federal funding for research and development and operates under a 1787 charter that places the institution under the Trustees of Columbia University ("Board of Trustees").

## JURISDICTION AND VENUE

8.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

9.      This Court has personal jurisdiction over Columbia on the grounds that Columbia is conducting business within the State of New York, is a resident of the State of New York and whose actions that are the subject of this action took place in the Southern District of New York.

10.      Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.**    **Background: The "April 2011 Dear Colleague Letter" Of**
     **The Department of Education's Office for Civil Rights.**

11.    On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter," while now revoked, was in effect when Columbia's disciplinary procedures were put in place and the alleged sexual assault occurred in this case.  Before the April 2011 Dear Colleague Letter, colleges and universities did not use its disciplinary procedures to adjudicate sexual misconduct cases in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter.  The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action:  http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

12.    The April 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which sexual harassment was defined to include acts of sexual violence.  The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

13.    The April 2011 Dear Colleague Letter effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment.  For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S.

[5]

Department of Justice's Office on Violence against Women, which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15).

14.     The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample.  Schow, "No, 1 in 5 Women Have Not Been Raped on College Campuses," *Washington Examiner*, August 13, 2014, http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

15.     A Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014 found that college-age female students on campus were less likely to be victims of sexual assault than non-students and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against *women*.  *Rape and Sexual Assault Victimization among College Age Females, 1995-2013* (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

16.     The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves.   The "April 2011 Dear Colleague Letter" (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault.

Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."  The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The "April 2011 Dear Colleague Letter" stated (p. 12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures.  Additionally, the "April 2011 Dear Colleague Letter" stated (pp. 15-16) that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

17.    Prior to the issuance of the April 4, 2011 Dear Colleague Letter, the Columbia Gender Based Misconduct Policy in effect can be found at https://web.archive.org/web/20110303093450/http://facets.columbia.edu/sexual-assault-policy-and-disciplinary-procedure.  The pre-April 4, 2011 Dear Colleague Letter Columbia Gender Based Misconduct Policy provided that a hearing panel would consider the evidence and base its determination based on a "clear and convincing" standard of evidence with the burden of proof on the university to prove by "clear and convincing" evidence that the university respondent committed the violation of the disciplinary rules.  Also, under the Columbia Gender Based Misconduct Policy in effect prior to the issuance of the April 4, 2011 Dear Colleague Letter, at the initial meeting the university respondent has with a Public Safety manager concerning the accusations of the violation of the disciplinary rules, the respondent was to receive a written copy of the complaint, a letter stating the date of the hearing, a written copy of the disciplinary procedures, a written copy of the parties' rights and responsibilities, and a written list of possible

range of sanctions.  Further, at the hearing, both complainant and respondent would have the opportunity to submit questions before a witness testifies, during a break in testimony and after a witness has testified; witnesses may be recalled and questioned by the hearing panel as deemed necessary.

18.     Implementation of the April 4, 2011 Dear Colleague Letter meant at Columbia a reduction of procedural protections for university respondents.  The Columbia Gender Based Misconduct Policy that went into effect after the April 4, 2011 Dear Colleague Letter can be found at  https://web.archive.org/web/20111025104045/http://www.essentialpolicies.columbia.edu:80//sexual-assault-policy-and-disciplinary-procedure.  The post-April 4, 2011 Dear Colleague Letter Columbia Gender Based Misconduct Policy provided that the hearing panel will use "preponderance of evidence" as the standard of proof to determine whether a policy violation occurred. Preponderance of evidence means that a panel must be convinced based on the information provided that a policy violation was more likely to have occurred than to not have occurred in order to find a student responsible for violating a policy.  Also, under the post-April 4, 2011 Dear Colleague Letter Columbia Gender Based Misconduct Policy, the hearing panel had the right to determine which written questions submitted by the parties are relevant and not duplicative, and the hearing panel reserved the right to revise or remove submitted questions.

19.     On April 29, 2014, the  OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and bearing the title "Questions and Answers  on  Title  IX  and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf.  The 2014 Q&A continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the  ability to expose credibility flaws in the allegations made against them.  For

example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

20.     Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

21.     The August 15, 2014 Columbia Gender Based Misconduct Manual can be found at https://web.archive.org/web/20140820201156/https://sexualrespect.columbia.edu/.         Columbia President Lee Bollinger, when announcing the new Columbia manual, stated:

> "The changes we've made also reflect recent guidance from the White House, the U.S. Department of Education, and federal legislation, as well as our own community's recommendations."
>
> "Our investigators will be taking on a larger role in determining credibility and responsibility, and they will possess the requisite professional background and training to do so.  Individuals serving on the hearing panels will be drawn from a designated pool of Columbia professionals with expertise in student life who have been tasked with this duty as part of their job."

Under the August 14, 2014 Columbia Gender Based Misconduct Manual, both the complainant and respondent would have the opportunity to suggest questions of the other and of witnesses by submitting suggested questions to the panel in writing, but that the hearing panel may revise or not ask any or all submitted questions.

22.     In a letter dated December 30, 2014, the OCR informed the Harvard Law School that the sexual misconduct policy it continued to use after issuance of the April 2011 Dear Colleague Letter "*improperly* used a 'clear and convincing' evidence standard of proof in its

[9]

Title IX grievance procedures, *in violation of Title IX*." (Emphasis in original.) The O C R letter stated that the higher clear and convincing standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence and directed the Harvard Law School, by January 15, 2015, to adopt procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include "[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence." https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf.   Other schools, including State University of New York-Buffalo and Princeton University, were required by the OCR to use the preponderance of the evidence standard in adjudicating sexual misconduct cases.

23.     The April 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial; and the reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants.  Almost all complainants are females and almost all respondents are males.  An United Educators study showed 99% of the accused are male. "Confronting Campus Sexual Assault: An Examination of Higher Education Claims," https://web.archive.org/web/201701225139/https://www.ue.org.uploadedFiles/Confronting%20Campus%20Sexual%20Assault.pdf.

24.     The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.  Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE")

in charge its Office for Civil Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

25.     In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

26.     In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."  Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.  Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.  Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

27.     In July 2014, then Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," then Assistant Secretary Lhamon warned.  She went on to describe that

enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce."  Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

28.     Then Assistant Secretary Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

29.     To support making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of additional investigators for Title IX enforcement.  The Federal Government has investigated over 250 schools for possible Title IX violations, including notable schools.

30.     Colleges and universities, including Columbia, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds," that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools and that if a voluntary resolution cannot be reached, the DOJ may initiate litigation.  In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden

Won't Visit Universities That Fall Short In Addressing Sexual Assault," *Huffington Post*, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

31.     To revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

32.     The DOE and OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

33.     Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and

universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

34.     In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as Columbia, limited procedural protections afforded to male students, such as John Doe, in sexual misconduct cases.

35.     Columbia was also under campus pressures to vigorously prosecute males accused of sexual assault.  The publicized case of Emma Sulkowicz, who carried around campus her mattress on which she claimed she had been raped by a male Columbia student, brought pressure on Columbia's administration to pursue vigorously sexual misconduct cases against male students, even though the male student was found not responsible with respect to Emma Sulkowicz's university complaint and the criminal law authorities refused to prosecute.

36.     Under the guise of "performance art," a Columbia professor and Emma Sulkowicz jointly designed Emma Sulkowicz's senior thesis project (the "Mattress Project").  The Mattress Project, named "Carry That Weight," involved Emma Sulkowicz carrying a mattress around campus at all times during her senior year.  In her words, "*I will carry the mattress with me to all of my classes, every campus building, for as long as my rapist stays on the same campus with me.*" She also publicly called the male student a *"serial rapist"* and vowed to carry the mattress to hers and the male student's graduation if the male student was in attendance. A "Carry That Weight National Day of Action" campus rally took place on October 29, 2014, organized by Emma Sulkowicz and her supporters from the "No Red Tape" and the "Carry That Weight" organizations. The rally centered on a list of ten demands that were read to the public and were published in writing on one of the mattresses which was signed by the activists, including Emma Sulkowicz. Also, on October 29, 2014, Columbia President Lee C. Bollinger co-authored an article in *The*

[14]

*New Republic* that opened with a large picture of a smiling Emma carrying her mattress.  In December 2014, Columbia student activists from "No Red Tape" and "Carry That Weight" organizations read a letter at Columbia President Lee C. Bollinger's office containing the following passage:

> Since then, Emma Sulkowicz's senior thesis Mattress Project: Carry That Weight has called national attention to the injustices survivors have been forced to carry alone for too long. You have not responded once to this piece, and her serial rapist remains on campus today.

37.     From May 11, 2015 to May 15, 2015, Columbia had on display, at the Columbia University Visual Arts Program in the Leroy Neiman Gallery in the Dodge Building on Columbia's campus, Emma Sulkowicz's pornographic prints depicting the male student (whose name was shown) raping Emma Sulkowicz.  Also, Emma Sulkowicz was permitted by Columbia to carry the mattress to her and the male student's graduation.  In the keynote address at the Columbia graduation ceremony, Los Angeles Mayor Eric Garcetti, CC '92, SIPA '93, stated "You've held contrary opinions, held die-ins and sit-ins, <u>carried mattresses</u>". He also said in his speech. "It is the responsibility of an active citizen to engage with one another… Never stop being academics, and never stop being activists."  Columbia bestowed Magna Cum Laude honors on Emma Sulkowicz not for her G.P.A. but for her "academic achievement" in her performance art - - the Mattress Project.

38.     The campus pressures at Columbia to rule for women in sexual misconduct cases were noted by the U.S. Court of Appeals for the Second Circuit in *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) (Leval, J.).

39.     Columbia thereafter continued to be under student pressure to rule for women in sexual misconduct cases.  In March 2017, a Reuters report stated: "A student at Columbia University sued the school on Tuesday, claiming officials showed indifference and apathy after

she reported two separate incidents of sexual assault on the school's New York City campus in 2015." In October 2017, Reason reported that activist students at Columbia University barged into a Sexuality and Gender Law class to protest the professor, a vice president and Title IX administrator who is insufficiently committed to the cause, according to the protesters. In December 2017, the New York Times reported that a renowned Greco-Roman historian and longtime professor at Columbia retired that month as part of the settlement of a sexual harassment lawsuit; the retirement, which Columbia announced in an e-mail to students and faculty members on Monday afternoon, came nearly three months after an anonymous graduate student filed a lawsuit against Dr. Harris alleging that he had kissed and groped her repeatedly while he was her academic mentor, and then disparaged her to colleagues when she rebuffed his advances; the student, identified only as Jane Doe, also sued the university for what she called its "deliberate indifference" to her complaints about him.

40.     In August 2017, Columbia issued revised Gender Based Misconduct Policies which were supposedly in effect in John Doe's case. Those revised Gender Based Misconduct Policies included, among others: (i) the requirement that investigators be impartial and unbiased; (ii) investigators interviewing all witnesses with relevant information; (iii) during the investigation, complainants and respondents may ask questions of each other through the investigators; (iv) credibility is to be determined by the consistency of accounts over time, demeanor, corroborating evidence, motive to lie and reasonableness of detail; (v) the burden of proof is the preponderance of the evidence, which means that it is more likely than not the respondent engaged in the conduct for which the respondent was charged as Gender Based Misconduct under Columbia's Gender Based Misconduct Policies; (vi) a pre-determination conference as to which it was the last opportunity for the parties to offer evidence and ask questions of each other through the

[16]

investigators; (vii) a hearing panel that is tasked to evaluate and analyze the relevant information; and (viii) at the hearing, no cross-examination questions asked by the parties of each other.

41.   In September 2017, the Department of Education took first steps toward restoring procedures that would provide basic fairness to both accusing and accused students in Title IX proceedings.  On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying due process in a manner that is wholly un-American:   www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement enforcement.   A few weeks later, the September 22, 2017 Dear Colleague Letter, https://www.cmu.edu/title-ix/colleague-title-ix-201709.pdf, formally revoked the April 2011 Dear Colleague Letter and criticized it for directing that schools use sexual misconduct procedures with reduced protections for the accused, which have almost always been males.  Among other things, the September 22, 2017 Dear Colleague Letter called upon colleges and universities to use the higher standard of proof of clear and convincing evidence if the school uses that standard for their regular misconduct cases.

42.   Recognizing the harmful results of the April 2011 Dear Colleague Letter, the Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from— Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many."  On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying   due   process   in   a   manner   that   is   wholly   un-American: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

43.     Stating that "the era of 'rule by letter' is over" and "[t]here must be a better way forward," Secretary DeVos announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence."

44.     Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers on Title IX Sexual Violence, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused."

45.     A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, reflects a return to the original principles of Title IX, the Clery Act, and their implementing regulations, stating among other things that "the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred…;" that "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school;" that "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially;" and that "[a]n equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence -- including both inculpatory and exculpatory evidence -- and take into account the unique and complex circumstances of each case."

46.     Despite a different direction formally effected by the prior White House Administration, colleges and universities mostly continued with practices and policies in place created to comply with the April 2011 Dear Colleague Letter leading to gender biased enforcement of Title IX.  Columbia was one such college, as the August 2017 Gender Based Misconduct Policies remined in effect and were applied to John Doe.

47.     In May 6, 2020, Secretary Betsy DeVos announced that, after a rule-making process conducted pursuant to the Administrative Procedure Act, new Title IX regulations would go into effect on August 14, 2020.

48.     The Title IX regulations effective August 14, 2020 state that the university or college disciplinary process shall treat complainants and respondents equitably, objectively evaluate the evidence, not have conflicts of interest or bias, presume respondents are not responsible, have prompt time frames, identify the burden of proof that is to be applied uniformly and have support services for both complainants and respondents. 34 C.F.R. 106.45(b)(1).

49.     The Title IX regulations effective August 14, 2020, require formal written notice of allegations that contains "sufficient details known at the time and with sufficient time to prepare a response before any initial interview" – "[s]ufficient details include the identities of the parties involved in the incident, if known, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known."  34 C.F.R. 106.45(b)(2).  That written notice "must include a statement that the respondent is presumed not responsible for the alleged conduct" and must be amended if additional allegations are made later in the proceeding. 34 C.F.R. 106.45(b)(2).

50.     The Title IX regulations effective August 14, 2020, require that the university or college conduct investigations that:

(i)      "Ensure that the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding responsibility rest on the recipient and not on the parties," 34 C.F.R. 106.45(b)(5)(i);

(ii)     "Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence," 34 C.F.R. 106.45(b)(5)(i);

(iii)    "Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence,," 34 C.F.R. 106.45(b)(5)(iii);

(iv)     "Provide the parties with the same opportunities to have others present during any grievance proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice, who may be, but is not required to be, an attorney," 34 C.F.R. 106.45(b)(5)(iv);

(v)      "Provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings, with sufficient time for the party to prepare to participate," 34 C.F.R. 106.45(b)(5)(v);

(vi)     "Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient [university or college] does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source" and "[p]rior to completion of the investigative report, the recipient [university or college] must send to each party and the party's advisor, if any, the evidence subject to inspection and

[20]

review in an electronic format or a hard copy, and the parties must have at least 10 days to submit a written response, which the investigator will consider prior to completion of the investigative report," 34 C.F.R. 106.45(b)(5)(vi);   and

(vii)    "[c]reate an investigative report that fairly summarizes relevant evidence and, at least 10 days prior to a hearing . . . send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response," 34 C.F.R. 106.45(b)(5)(vii).

51.    In response, effective August 2020, Columbia revised its Policies to have two side-by-side sets of procedures, one a Title IX "interim" process for sexual misconduct to give the appearance of compliance with the Title IX regulations and one a Gender Based Misconduct process for gender-based misconduct that continued the kind of procedures that Columbia had been using since conforming its procedures to the April 4, 2011 Dear Colleague Letter.   Under the Title IX Policies, an Advisor was permitted to conduct cross-examination at the hearing.  The Gender Based Misconduct and Title IX Policies effective August 2020 were issued after John Doe's university disciplinary case and were not applied to John Doe.

**B.    Columbia's Title IX Program and Anti-Male Gender Bias.**

**(i)    Victim Centered, Trauma Informed**

52.    Columbia has adopted policies and procedures that favor students who file complaints of sexual misconduct and deny fundamental protections to accused students, and trains its officials to assume complaints of sexual misconduct are valid.  Columbia is aware that almost all persons who file complaints of sexual misconduct are female and almost all of the accused students are males.

53.     Sexual Violence Response (known as "SVR") is part and parcel of Columbia's gender-based misconduct response.   Defendant's annual publication *Student Gender-Based Misconduct Prevention & Response* 2019-2020, pp. 2-7, lists SVR along with the Title IX office as part of Columbia's gender-based misconduct response with a whole section discussing what SVR does, including sexual violence response training.   SVR reached 16,511 students, faculty, staff and others at Defendant for 2018-2019 and had and has content linked to Columbia's general website:   *see*, *e.g.*, "Sexual Assault Awareness Month," https://web.archive.org/web/ 20190407185307/https://health. columbia.edu/saam. The content found in Columbia's social media done by SVR did not spontaneously generate; that content was consciously posted on Columbia's social media without disclaimer.  *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356 (D.C. Cir. 2014) (disclaimer aided warding off liability). Columbia assumed the inherent liability of a user on Facebook.  *Force v. Facebook, Inc.*, 934 F.3d 53, 58 (2d Cir. 2019).  Right on point is *Doe v. Purdue*, 928 F.3d 652, 669 (7th Cir. 2019), in ruling that proof of Purdue's gender bias as an institution affecting the disciplinary decision was found in the social media posting of a *Washington Post* article shared by Purdue's Center for Advocacy, Response and Education ("CARE").  Purdue's CARE is roughly equivalent to Defendant's SVR.

54.     Based on the information and statements available on Columbia's website, statements by university officials, the pressure from the federal government to adopt "victim"-centered, trauma-informed approaches, and the conduct and statements of Columbia's decision makers in John Doe's disciplinary proceeding, Columbia trains its Title IX personnel in accordance with the federally-funded "Start by Believing" model. Columbia has touted that it provides "trauma-informed" training to its investigators and adjudicators. The "trauma-informed" approach presumes that allegations made by a complainant occurred, focuses on a complainant's

thoughts and feelings in determining whether alleged conduct was sexual harassment or assault, make credibility determinations based on presumptions about complainants and respondents generally and not on the evidence in a specific case, and disregards fair process protections for the accused.

55.    "Trauma-informed" techniques are based on pseudoscience, allow authority figures to encourage alleged victims to create exaggerated or false memories, and unjustly undermine the accused's ability to defend against allegations. Investigators are taught that an alleged victim's inability to recall crucial events and changing stories should not raise doubts about the veracity of an allegation, but should instead be viewed as evidence that an assault occurred.

56.    Columbia has been and is in disagreement with the U.S. Department of Education's 2017 interim guidance and the 2020 issued Title IX regulations. Columbia has questioned the value of procedural rights for the accused: "How often are we manipulated into prioritizing the abuser over the abused? How often are we…suckered into a side of a debate that we shouldn't even be having?"[2] Columbia's leadership expressed similar reservations regarding procedural rights, especially when it concerns cross-examination of parties and their evidence.

57.    In a February 2020 *Washington Post* article published on February 24, 2020, and re-tweeted by Columbia on March 11, 2020, Columbia Vice President Suzanne Goldberg disparaged "cross-examinations of victims that tap into sexual assault myths -- "She couldn't have been raped because she stayed friendly with him" or "She was using him just as much as he was using her" -- [as] barriers to justice."[3] Columbia Vice President Goldberg called cross-

---

[2] Sexual Violence Response (SVR), facebook post, 12/2/2017. Columbia re-published "Due Process is Needed for Sexual Harassment Accusations—But for Whom?" written by theestablisment.co

[3] Suzanne Goldberg "metoo is just the beginning," *Washington Post*, 2/24/2020. Columbia and CLS tweeted this article on March 11, 2020.

examination, or any mode of thoroughgoing scrutiny, too personal, confrontational, or harmful if implemented,[4] as if investigating and prosecuting sexual-assault charges against a student were impersonal, reconciliatory, and harmless.

58.     Columbia Vice President Goldberg also expressed concern that "Individual educators, as well as the college [*i.e.*, a given institution subject to Title IX], may see this [providing cross-examination] as conflicting with their responsibility to support all students."[5] This concern raises the prospect that perhaps school administrators and faculty are not well-equipped or dispassionate enough to contribute to a school's compliance with Title IX. "Students already face many unofficial barriers to seeking out a campus rape crisis center or deciding to file a disciplinary complaint. Fears that their classmates or professors will find out…worry that information…will 'go public' on social media, are stoked by the stubborn persistence of stigma associated with sexual violence."[6] Columbia apparently never cared that students accused of sexual misconduct would face these problems and worse -- social opprobrium from friends and faculty alike, something that accusers rarely receive.  Instead, Columbia Vice President Goldberg has insisted that "questions need not be adversarial to assess credibility,"[7] but does not explain how that is so when the sexual misconduct disciplinary process is victim-oriented.

59.     Columbia's victim-centered, trauma-informed approach is complimented by the view that objective truth, at least when it comes to testimony regarding sexual assault, does not

---

[4] "Keep cross-examination out of college sexual-assault cases," Suzanne Goldberg, *The Chronicle of Higher Ed*.1/10/2019.

[5] "Keep cross-examination out of college sexual-assault cases," Suzanne Goldberg, *The Chronicle of Higher Ed*.1/10/2019.

[6] "3 Takeaways from covering sexual assaults on campus," Suzanne Goldberg, Gender and Sexuality Law Blog, Columbia Law School, originally published in Columbia Journalism Review, 4/6/2015.

[7] "Keep cross-examination out of college sexual-assault cases," Suzanne Goldberg, *The Chronicle of Higher Ed*.1/10/2019.

[24]

exist; "truth is defined by those in power," so instead,  CU substitutes 'narrative' for truth and then determines which is more credible, an interpretation made according to their biases.[8] These biases have found consistent and vigorous expression not only in op-eds authored by Columbia leadership, but through the institution's social-media activity and enforcement of Title IX as well.

**(ii)     Believe All Women**

60.     An outgrowth of concern that abused women were being ignored,[9] or rapes were "substantially underreport[ed],"[10] the saying "believe all women" first appeared in 2013,[11] though it only began to gain recognition two years later.[12] The proposition "believe all women" gained political support from the Obama White House, which among other things issued a January 5, 2017 press release: "Since the beginning of this [Obama] Administration, the President and Vice President have made it a priority to root out sexual misconduct wherever it exists, especially on our nation's college campuses."[13]

---

[8] Center for Study of Social Differences, facebook post, 10/2/2019. Columbia re-published: "Men in power and the lies they tell," lithub.com, 10/2/2019.

[9] Sexual Violence Response, 8/9/2017 Columbia re-published the *Denver Post*, saying: "Our culture has a tendency to blame the victim, picking apart her behavior and history instead of the offender's." Ideally, rather than 'turn the tables,' both parties would face equal scrutiny.

[10] "Universities Responsibilities in addressing campus sexual assault," Lee Bollinger and Suzanne Goldberg, 11/3/2014, on Gender and Sexuality Law Blog, Columbia Law School, re-published after original publication in the New Republic dated 10/29/2014.

[11] Victim Blaming, 5/31/13, tweet.

[12] End Rape on Campus, 10/14/15, tweet. This tweet advertised *The Hunting Ground*, a 'docudrama' film that supported a narrative of a crisis in campus rapes.

[13] White House Press Release: "Fact Sheet: Final It's On Us Summit and Report of the White House Task Force to Protect Students from Sexual Assault," 1/5/2017. https://obamawhitehouse.archives.gov/the-press-office/2017/01/05/fact-sheet-final-its-us-summit-and-report-white-house-task-force-protect.

61.     On March 22, 2015, Columbia posted: "It is possible to have been sexually assaulted no matter what the details of your narrative are. There's no such thing as a 'perfect victim' #noperfectvictim."[14]

62.     The phrase "believe all women" became prominent during the Fall of 2017 as a result of the advocacy of the #MeToo movement. The phrase "believe all women" effectively means that when a female accuses a male of sexual misconduct, she is a "survivor," and her accusation of sexual misconduct is to be treated as true until proven otherwise. Columbia Vice President Goldberg acknowledged that the #metoo movement had made it easier for accusers to file complaints.[15]

63.     On November 10, 2017, Columbia posted on Facebook: "Every survivor deserves equal amounts of credence and empathy. As survivors' voices finally begin to be heard, we should all think critically about where we direct our emotional energies and which groups of people we may be neglecting."[16]

64.     On February 26, 2020, Columbia expressed the position in a Facebook post that female accusations of sexual assault, regardless of evidence, consistent narration, or logical plausibility should be believed.[17]

---

[14] Ibid., 3/22/2015. Columbia re-published a flow-chart from an undisclosed *Huffington Post* article that holds all accusations as equally credible.

[15] Valeria Escobar, "University pledges to maintain support for students as Trump administration announces new sexual misconduct rules," Columbia Daily Spectator, 11/20/2018. "'I think it's hard to see that new federal regulations will have a greater impact on student's willingness to report sexual misconduct than the #MeToo movement,' Goldberg said."

[16] Sexual Violence Response, facebook post, 10/10/2017.

[17] Sexual Violence Response, facebook post, 2/26/2020. Columbia re-published a Washington Post style section article, "Harvey Weinstein's Conviction Allowed Victims to Have Messy Stories. That's Revolutionary." The article exposits and praises how inconsistencies in the accusers' testimony did not sink their credibility.

65.   Columbia has adhered to the proposition of "believe all women" rather than the text of Title IX prohibiting sex discrimination.[18] Columbia has practiced what it stated in an April 24, 2019 Facebook post, "Remember: there is no place for sexual assault in our community. BELIEVE SURVIVORS."[19] Columbia has admonished: "Be there without judgment, without questions, and a whole lot of care. BE THERE FOR SURVIVORS."[20]   Columbia, when enforcing Title IX, treats all accusers as survivors, all accusations as true, and prosecutes accordingly. Columbia takes this position so seriously, that it has thought, "the risk of emphasizing steps the victim can take is that it will shift responsibility from the perpetrator…to the morally blameless victim."[21]

**(iii)   Rape Culture**

66.   "Believe all survivors" reflects a view that women are victimized by men and that rape and the threat of rape are pervasive in society. Columbia in December 2017 published with approval an article from the *Huffington Post* that praised a Saturday Night Live skit which portrayed women who lamented "a list of stuff that's ruined for us [that]…includes parking, walking, Uber, ponytails, bathrobes, nighttime, drinking, hotels, vans."[22] Columbia in January 2018 published that casual dating be added to that list.[23]

---

[18] 20 U.S. Code § 1681.

[19] Sexual Violence Response, facebook post, 04/24/2019. CU ordered bracelets with this message, presumably with intent to distribute.

[20] Sexual Violence Response, facebook post, Sexual Violence Response, facebook post, 4/7/2020.

[21] Sexual Violence Response, facebook post, 8/9/2017. Columbia expressed this concern again, on 1/27/2018, when it shared an MTV video entitled "How to stop victim-blaming."

[22] Sexual Violence Response, 12/4/2017. Columba re-published an article by *Huffington Post* that praised Saturday Night Live's "Welcome to Hell" skit.

[23] Sexual Violence Response, 1/27/2018. Columbia shared a post from a page named "3wF- 3rd Wave Feminism" which is a picture of a tweet that equates a bad date with rape and murder. On 8/30/2018, Columbia re-published a story from everyday feminism.com, "The impossible demands of dating under the pressures of rape-culture."

67.     "Rape-culture" is a gendered concept that is premised on notions of "toxic masculinity" and "sexism."[24] In Columbia's eyes, "No dystopic [sic] fiction can trump what has been done to women."[25] Per dystopian fiction, Columbia prefaced a re-publication of a *Washington Post* article with the statement: "We would emphasize that narratives like #FiftyShadesFreed should be challenged, since fiction is most definitely a part of rape culture, but this article makes a great point that 'women can enjoy both rape fantasies and expect to not actually be raped or pursued without your consent.'"[26]

68.   In the aftermath of the *Rolling Stone*'s University of Virginia scandal, Columbia boasted that, "Scholars from Columbia Journalism School contribute to this *Washington Post* article on why it's valuable to dig deeper in cases of false rape accusations.[27]" Columbia, by way of that article, suggested that false rape allegations exist but are extremely rare; even then, the argument goes, such allegations signal that real rape has been done by the falsely accused or that the accuser just needed to express their feelings: "Maybe [accusers] [a]re using a term (*i.e.*, rape) to describe something that isn't sexual assault, but makes them feel totally powerless, vulnerable, that makes them feel like they've been raped."[28] Columbia acknowledged that the '#metoo movement# was centered on "complaint[s] based on feelings, hurt feelings"[29] and sought

---

[24] Sexual Violence Response, facebook post,, 3/17/2018. CU shared a story from bustle.com, "Here's how sexism can affect your mental health," and quoted: "If you're wondering whether being a woman is making you lose it, the answer might be yes."

[25] Sexual Violence Response, facebook post,, 3/16/2018. CU shared an article from msmagazine.com, "A Red Dystopia," and quoted: "The dystopic [sic] futures dreamed up by writers…have historical precedent. No dystopic [sic] fiction can trump what has been done to women." CU added, "#womenshistorymonth."

[26] Sexual Violence Response, facebook post,, 2/9/2018.

[27] Sexual Violence Response, facebook post,, 4/18/2015.

[28] Sexual Violence Response, facebook post,, 4/18/2015.

[29] Katherine Franke, The center for gender and sexuality law, "#MeToo: A community discussion from #Timesup to #Toomuch?" 6'-6'12," 2/14/2018.

[28]

vindication via revenge by virtue of humiliation[30] or demotion of the accused.[31]   Columbia has

published that false rape allegations are given too much attention[32] and that a real case of sexual

assault lies behind a false allegation or that the rape accusation only appears false because it lacks

proof to satisfy an evidentiary standard.[33]   Columbia Vice President Goldberg has stated that a

sufficient quantity of unverified accusations likely amount to a true accusation.[34]

69.   Columbia has published that "everyone is trapped by rape-culture,"[35] which sees men

as potential rapists in the mold of Louis CK, Matt Lauer, Harvey Weinstein, Charlie Rose, Bill

Cosby[36] or the stereotype of a sexually harassing male superior.[37] To Columbia, "sexism has no

bounds.[38]" and "sexism is everywhere.[39]"   Columbia has published that "ousting 'bad men' is not

enough,"[40] since "rape-culture" is, "a pyramid, and at the top is rape and sexual violence, and at

the bottom are the other abuses of power that when they continue to happen over and over build

Franke, [30] Ibid., 3'-4.'

[31] "What Makes powerful men behave like pigs?," Tanya L. Domi, Columbia Law School Gender and Sexuality Law Blog, 5/25/2011. Blog post lauds 'public-shaming' effect that accompanies accusations of sexual assault.

[32] Sexual Violence Response, facebook post, 9/29/2017. CU re-published a story from metro.co.uk, "the myth that false rape accusations are common is dangerous and damaging."

[33] Columbia Law School, tweet, 2/18/2020. "Prof. Suzanne Goldberg on why Harvey Weinstein's accusers find strength in numbers: "it may be easy to be skeptical of one or two reports, but as reports pile up, it becomes hard for a thinking person to think that all of these reporters are lying."

[34] "Key Question in Weinstein Trial: Do you believe the women?" New York Times, 2/6/2020. "It may be easy to be skeptical of one or two reports, "but as the reports pile up, it becomes hard for a thinking person to think that all of these reporters are lying." Goldberg posits that a sufficient quantity of unverified accusations equal at least one true accusation.

[35] Sexual Violence Response, facebook post 4/27/2020. Columbia re-published a digital poster, accredited to "@amitaswadhin."

[36] Sexual Violence Response, facebook post, 8/17/2018.

[37] Sexual Violence Response, facebook post, 8/10/2018. This post shows a faceless, male boss with his hand on a woman's shoulder.

[38] Sexual Violence Response, facebook post, 11/5/2017. Columbia re-published "Turns out girls are taught these specific stereotypes in almost every culture" and wrote "Sexism has no bounds."

[39] Center for Gender and Sexuality Law, tweet, 3/8/2019.

[40] Sexual Violence Response, facebook post, 8/17/2018.

and build and build and create a culture that allows the most heinous examples of sexual violence and misogyny and discrimination to happen. So, if we allow any of them, we allow all of them."[41] Columbia also published that "rape culture is rampant,[42]" that "sexism is everywhere,"[43] that men are the perpetrators of "rape-culture"[44] and that "Misogyny has been openly tolerated by American society and its culture, writ large for a very long time."[45]

70.   Columbia has expressed a belief in "rape culture" with: supposed anecdotes ("Rape culture has numbed me to danger"[46]); questionable statistics ("Fact: 90% of sexual assaults aren't reported[47]); questionable generalizations ("It is normal for women to experience [sexual violence]"[48]); and "outreach" (If you need to talk to someone about something scary or ambiguous that happened to you…you can reach SVR's 24/7 helpline…"[49]). In Columbia's eyes, "Whether you are a Columbia student, faculty member, or staff person, a partner, a peer, a friend, sexual violence impacts your life" and that "every 98 seconds, someone is sexually assaulted."[50] Columbia opined that "sexual violence is prevalent across all ideologies and industries. It does not know party politics. This is yet another example of someone in power taking adv[antage] of his

---

[41] Sexual Violence Response, facebook post, 1/24/2018. Columbia quoted that excerpt from the refinery29.com article.
[42] Sexual Violence Response, facebook post, 11/26/2018. Columbia re-published Vox's, "Why 'feminist 'advertising doesn't make us better feminists," and quoted the above.
[43] Center for Gender and Sexuality Law, tweet, 3/8/2019.
[44] Sexual Violence Response, facebook post, 12/24/2017. Columbia re-published, "This YA Novel Aims to Teach Men how to stop perpetuating Rape Culture," and praised this novel as, "A stunning exploration of the dark side of tradition, the toxicity of male privilege, and dangerous effects of rape culture;""
[45] "The GOP war on women demands a new women's rights agenda for America," Tanya L. Domi, Gender and Sexuality Law Blog, Columbia Law School, 3/22/2012.
[46] Sexual Violence Response, facebook post, 8/28/2018.
[47] Sexual Violence Response, facebook post, 4/12/2019.
[48] Sexual Violence Response, facebook post, 10/18/2018.
[49] Sexual Violence Response, facebook post, 8/28/2018.
[50] Sexual Violence Response, facebook post, 4/1/2018.

position."[51] Columbia warned "that there are [Harvey] Weinsteins [sic] in every corner of American society"[52]

71.   Columbia sees "rape-culture" in pop culture: "Come to our final screening…[where] we will examine instances of rape culture in the 2007 series *Gossip Girl* (aka Chuck, Chuck, and more Chuck)."[53] Columbia has characterized children's fairy-tales such as Disney's *Sleeping Beauty*, *Beauty and the Beast*, *Snow White and the Seven Dwarves*, *Little Red Riding Hood*, and *Little Mermaid* as permeated by rape-culture.[54] Columbia not only dislikes traditional fairy tales, they dislike any movie that falls afoul of their misandrist worldview.[55] To counteract, Columbia recommends the Charlie's Angel's remake, as it "offers a thoughtful critique of male leadership" and "girl power," wrapped in a "sheen of empowerment.[56]" Columbia has said "There's nothing like a show with strong feminist themes to give you a much needed reminder that there's good in the world[57]" and also shared "an updated list of TV lady-loving ladies who kick

---

[51] Sexual Violence Response, facebook post, 11/16/2017. Columbia said this coterminous to their re-publication of the story, "Sen. Al Franken kissed and groped me without my consent, and there's nothing funny about it," from KABC.

[52] Sexual Violence Response, facebook post, 11/5/2017. Columbia re-published the story, "How do we prevent another Harvey Weinstein? Burn down the system that created him," from theundefeated.com.

[53] Sexual Violence Response, facebook post, 4/16/2018.

[54] Sexual Violence Response, facebook post, 3/21/2018. Columbia quoted the article cited: "when it comes to perpetuating toxic masculinity or rape culture, promoting sexism and the patriarchy, why can't we create new fairy tales, too?" On 10/20/2017, Columbia re-published a *Teen Vogue* article with this identical message.

[55] Sexual Violence Response, facebook post, 7/14/2018. Columbia re-published bustle.com's "15 female characters who deserved *so* much better" and wrote "I'd try to set Rochester on fire too, Bertha." Their list includes, Ophelia from *Hamlet*, Eponine from *Les Misérables*, Rue from *Hunger Games*, Lydia Bennet from *Pride and Prejudice*, Susan Pevensie from *Narnia* series, and Dido from the *Aeneid*.

[56] Sexual Violence Response, facebook post, 12/3/2019. Columbia re-published bitchmedia.org's "Charlies' Angels' offers a thoughtful critique of male leadership."

[57] Sexual Violence Response, facebook post, 7/18/18. Columbia re-published bustle.com's, "Watch these feminist series on Netflix when you need some serious inspiration."

a**, survived stray bullets…and are still around to steal your girl.[58]" Similarly, Columbia bemoaned that no women were nominated for best director during the 2018 Golden Globes[59] and 2019 Golden Globes.[60]

72.     Columbia, as part of its embrace of "rape culture" has given expression to the view that men are only interested in women due to their anatomy[61] and that reality resembles HBO's Westworld: "The question posed by Westworld is: Are we doomed to live within the confines of toxic masculinity and patriarchy forever?"[62] Columbia opined that "Men of all backgrounds need to collectively reimagine their masculinity. We desperately need cis (non-transgender) men to dismantle…toxic masculinity.[63]" Columbia has asserted that "men continue to be the worst"[64] and has scolded "Men, especially the most liberal, caring, and self-aware among us: look harder at

---

[58] Sexual Violence Response, facebook post, 11/3/2017. Columbia re-published moviepilot.com's "13 powerful lesbian & bisexual TV characters who are still kicking ass," and wrote the quotation cited.

[59] Sexual Violence Response, facebook post, 12/11/2017. Columbia re-published themarysue.com's "Zero Women are nominated for best director and other terrible decisions from the 2018 Golden Globes." Columbia editorialized: "Lady Bird is the best-reviewed film ever on Rotten Tomatoes, but Greta Gerwig still wasn't nominated." In fact, according to Rotten Tomatoes, several other films have the same rating or better than Lady Bird that year in terms of critics (e.g., *Citizen Kane, Selma*, and many others.) and myriad others have better audience reviews.

[60] Sexual Violence Response, facebook post, 12/11/2017. Columbia re-published "Golden Globes once again nominates only [5] male directors" from *Variety*.

[61] Sexual Violence Response., 4/4/2018. Columbia re-published, *'Describe yourself like a male author would' is the most savage twitter thread in ages,"* from electricliterature.com, and quoted: "Her breasts entered the room before her far less interesting face… As his gaze dropped from her mouth (still talking!) to her cleavage, he wondered why feminists were so angry all the time."

[62] Sexual Violence Response, facebook post, 4/22/2018. Columbia re-published a blog post, "Westworld, a Utopia for Toxic Masculinity?"

[63] Sexual Violence Response, facebook post, 8/8/2017. Columbia re-published an op-ed., "Analysis: How "toxic masculinity" fuels transgender victimization [sic]," from nbcnews.com.

[64] Sexual Violence Response, facebook post, 12/8/2017. Columbia re-published *the daily beast's*, "Facebook is banning women for calling men scum."

yourselves. Rape culture ends when we stop raping."[65]    The belief in "rape culture" as described above was, however, a belief in an ideology that defies and departs from reality on college campuses.

      **(iv)**    **#MeToo Movement**

73.    The belief in "rape culture" spawned the #MeToo movement.[66] Columbia in October 2017 expressed support of the #MeToo movement,[67] quoting Gloria Allred that women have "reached their tipping point" and writing "Indeed, they have—and they may take down not just the powerful men who wronged them, but the entire system with them."[68] Columbia encouraged students to tune into a live-stream panel on the topic hosted by Chirlane McCray.[69]

74.    On October 16, 2017, in advocacy of the #MeToo movement, Columbia posted on Facebook a photo of a blindfolded girl, with the words, "believe survivors" superimposed over her and wrote: "To all of the survivors who are posting in the "Me Too" campaign: we hear you, we believe you, and we applaud your courage for speaking out. To all of the survivors who have not posted, we applaud your courage as well -- for knowing yourself, for being brave each and every day."[70]

75.    Columbia noted that "Of course, being accused of sexual assault hurts. And there are things that we can and should do to help accused students -- namely, providing them with

---

[65] Sexual Violence Response, facebook post, 2/8/2018.
[66] Sexual Violence Response, facebook post, 3/27/2018.CU shared a NYT advice column, "How do I deal with my anger towards men?," and CU pulled a quote to the effect that that reader should release their anger in a constructive way to diminish patriarchal power or 'empower oneself' and not let it endlessly simmer.
[67] Sexual Violence Response, facebook post,, 10/15/2017. Columbia "loved" a post someone made on their page that promoted the Alyssa Milano's tweet that signaled the start of #metoo movement.
[68] Sexual Violence Response, facebook post, 10/11/2017.
[69] Center for Gender and Sexuality Law, facebook post, 4/25/2018.
[70] Sexual Violence Response, facebook post, 10/16/2017.

psychological counsel. But accused men's pain does not excuse rape, and men shouldn't be the ones defining it."[71]  Columbia further opined that "Rape laws and definitions have…been defined not only from a male perspective, but from a patriarchal lens" and that "a consent-based rule makes a lot of sense…It's something [college kids] feel is reasonable."[72]  According to Columbia, sex is consensual upon the determination of the woman, even if retroactively revoked,[73] and good sex is whatever and only what the feminist, female partner decides.[74]

76.     Columbia's embrace of the #MeToo# movement was anti-male, recommending that males "talk less. In all spaces. At all times. At a lower volume."[75] Columbia asserted that "a patriarchal world oppresses everyone."[76]   Columbia has lamented "how damaging toxic

---

[71] Sexual Violence Response, fsacebook post, 9/9/2017. Columbia re-published an op-ed and pointed out with pride that the author was a Barnard alum.

[72] Sexual Violence Response, facebook post, 9/9/2017. Columbia re-published the story, "The conversation about campus rape is so much bigger than Title IX," from usatoday.com. Columbia has a habit of deferral to what college students consider reasonable; see, conclusion.

[73] Sexual Violence Response, facebook post, 7/17/2018; 3/13/2018; 2/5/2019, here Columbia emphasized: "We tend to think of consent as this very binary thing," Popova tells Bustle. "It was either consent or it was rape, and there's a very sharp dividing line between them. That's the way the law thinks about it: If we can't prove it was rape, then it must have been consent, the end. But actually, like pretty much anything to do with sex, consent can be quite messy. It involves humans and emotions. And it's enmeshed in all sorts of social and power structures;"  2/6/2020: Columbia re-published an article from bustle.com, that repudiates a bipartite rendition of consent.

[74] Sexual Violence Response, facebook post, 2/21/2018. Columbia re-published a New York Times op-ed., "The Feminist Pursuit of Good Sex," and reiterated that, "Women's liberation should not be "about fending off men's sexuality," she said, "but being able to embrace your own."

[75] Sexual Violence Response, facebook post, 10/16/2017. Columbia quoted the citation from a blog post, "20 things men can do right the fuck now to support women," they re-published.

[76] Sexual Violence Response, facebook post,, 4/11/2018. Columbia re-published "Netflix's Queer Eye Reboot is Redefining Masculinity," from ravishly.com, and quoted the above.

masculinity can be."[77]   Columbia has urged women to "feel how you feel"[78] and channel rage against men[79] by lashing out.[80]

77.   As the "#MeToo# movement progressed, Columbia expressed its opinion on nearly every aspect about the "#MeToo# movement and the people it involved. Columbia championed Linda Vester, who accused Tom Brokaw of sexual misconduct, solely to demonstrate that good men might misbehave,[81] praised Moira Donegan's "shitty media men list,[82]" deflected criticism against Asia Argento,[83] and seethed with bewilderment at Justice Kavanaugh.[84]  In general, Columbia expressed concern that men accused during the #MeToo movement -- regardless of their guilt or innocence -- would recover from such allegations.[85]   Columbia has expressed that men

---

[77] Sexual Violence Response, facebook post, 2/5/2018. Columbia re-published Huffington Post's, "Feminist: the F word I refused to say."

[78] 4/26/2020; Columbia re-published scarleteen.com's "Getting through a breakup without ac Sexual Violence Response, facebook post, tually breaking;"

[79] Sexual Violence Response, facebook post, 3/27/2018. a NYT advice column, "How do I deal with my anger towards men?"

[80] Sexual Violence Response, facebook post, 2/3/2018. Columbia re-published an op-ed. on nbcnews.com, "What the world would look like if we taught girls to rage."

[81] Sexual Violence Response, facebook post, 5/11/2018. Columbia re-published Huffington Post's, "The powerful reason Linda Vester publicly accused Tom Brokaw of sexual misconduct," and quoted it: "I came forward for a simple reason: to let the public know that otherwise good men—men who treat women well …can also commit acts of sexual harassment."

[82] Sexual Violence Response, facebook post, 1/11/2018. Columbia re-published a story from thecut.com, "I started the Media Men List."

[83] Sexual Violence Response, facebook post, 9/2/2018. Columbia re-published Vox's story, "The Asia Argento allegations reveal our damaging misconceptions abut sexual assault survivors." and paraphrased it as: "survivors" can be both correct in their allegation and 'terrible people' themselves. See also, 8/29/2019 entry, when Columbia republished an article from LA Times, "Why the claims [of rape] against Asia Argento don't invalidate the #MeToo Movement."

[84] Sexual Violence Response, facebook post, 10/3/2018; 10/5/2018: Columbia shared stories from Vox that tarnished the Justice and treated his accusers with credulity.

[85] Sexual Violence Response, facebook post, 5/17/2018: Columbia re-published a story from Vox, "Men like Bill O'Reilly get to make a comeback. Women who speak up about harassment lose their jobs;" Sexual Violence Response, facebook post, 6/19/2018: Columbia re-published Huffington Post's "let's not give alleged harassers a comeback narrative;" Sexual Violence Response, facebook post, 7/30/2018: Columbia re-published Vox's story, "Mel Gibson has set the blueprint for a #metoo comeback. Expect other men to follow it;" Sexual Violence Response,

should apologize once accused, regardless of their guilt or innocence,[86] should when accused to prove their innocence, should expect the accusers to advance in their careers as a result of their allegation, and should expect men to be demoted in or barred from theirs.[87]

        **(v)**     **Columbia and Culture**

    78.    Columbia has a record of encouraging and submitting to cultural movements such as #MeToo# and rape culture ideology, especially when advocated by students.[88] On December 31, 2017, near the first peak of media attention for "#MeToo#, Columbia proclaimed: "2017 has been a challenging year, but SVR [Sexual Response Violence] and like-minded activists have been hard at work trying to make the world a better place."[89] The "like minded activists" were part of No Red Tape ("NRT"), a student group that agitates for more vigorous prosecution of sexual harassment and more comprehensive services for "survivors." After one NRT request in March 2017 that Columbia change their gender-based misconduct policy, Columbia acquiesced just three months later.[90] Columbia submitted to pressure in 2017-2018 from #MeToo# and NRT just as

---

facebook post, 9/15/2018: Columbia re-published the Federalist's story, "Do the men struck down by #MeToo deserve a second chance?"

[86] Sexual Violence Response, facebook post, 1/11/2018. Columbia re-published Slate's "Dan Harmon acknowledges he sexually assaulted Community Writer Megan Ganz in a 7-minute monologue;" 1/24/2018: Columbia-republished a blog post, "Women ask [James] Franco to 'Just Apologize' for Alleged Sexual Misconduct."

[87] Sexual Violence Response, facebook post, 6/19/2018.

[88] See *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016); see also "At Columbia, Revisiting the Revolutionary Students of 1968," 3/21/2018, New York Times. A decent summary of that famous series of incidents.

[89] Sexual Violence Response, facebook post, 12/31/2017. Columbia published a video that summed up their events that year in relation to "#metoo.

[90] No Red Tape, facebook post, 8/30/2017.

they did in 2014-2015, with respect to mattress-carrying Emma Sulkowicz's defamation of Paul Nungesser, which is precisely what student activists seek.[91]

79. In 2014, Emma Sulkowicz's visual arts senior thesis *Mattress Performance* (*Carry That Weight)* brought the scrutiny of the national media.  In an introduction to Columbia's landmark study of sex on campus, known as "SHIFT:" Columbia Vice President Goldberg stated  SHIFTwas born from a particularly fraught moment in the conversation regarding campus sexual assault at Columbia[92] and became an opportunity to "understand what's happening in our community."[93]   Accordingly, Columbia interpreted John Doe's case through the lens of its worldview and were eager to indulge their opinions, as expressed by their social media activity, and make an example out of John Doe to prove that they sided with the activists, to whom they increasingly make concessions and whose views they emulate.

80. Columbia has a checkered past of documented and alleged noncompliance with Title IX since 2001, per Foundation for Individual Rights in Education, due to their "unjust, draconian, and irrational sexual misconduct policy.[94]"

---

[91] Taylor Grasdalen, "Speaking with Emma Sulkowicz," 9/5/2014. E.g., "It frustrates me [i.e., Sulkowicz] that No Red Tape, the Coalition Against Sexual Violence, and so many other people are working our butts off to create as comprehensive a set of policy changes as we can — which we gave to the Columbia administration — but they haven't listened to us."

[92] Lee Bollinger and Suzanne Goldberg, "Universities Responsibilities in addressing campus sexual assault," 11/3/2014, on Gender and Sexuality Law Blog, Columbia Law School, re-published after 10/29/2014 debut in the *New Republic*. In part: "we must measure our efforts not by how we fare in the context of short-term media coverage focused on individual cases [eg, Sulkowicz], but rather by the lasting quality of the initiatives we launch now and continue to develop [eg, SHIFT study]…long after the attention of the press has waned."

[93] Isabel Sepulvéda, "'We have failed them:' Building a world of better sexual citizens," Bwog, 1/26/2020. Columbia re-published and promoted this coverage here: Center for Study of Social Differences, facebook post, 2/2/2020.

[94] FIRE Staff, Columbia: New Year, Same Injustice. Foundation for Individual Rights in Education.10/19/2001.

C.      **August 2016-August 2017: John Doe and Jane Roe Become Friends.**

81.      In August 2016, John Doe enrolled as a Columbia graduate student.   At an orientation gathering in August 2016, John Doe met Jane Roe, and they became friends.

82.      At the time, John Doe was in his mid-twenties, and Jane Roe was two years older. John Doe and Jane Roe were in a few classes together, would frequently talk about the classes, send each other funny articles and pictures and went out together to have drinks at Columbia graduate school mixers.

83.      Jane Roe was from another country, was struggling with English and was homesick. As time progressed, John Doe became a supportive friend to Jane Roe.  For his birthday, John Doe invited only his close friends to a birthday party and Jane Roe was one of the invitees.  Throughout this time, the friendship between John Doe and Jane Roe remained platonic.

84.      During the summer of 2017, John Doe and Jane Roe were not in New York together. Jane Roe was in her home country, but John Doe and Jane Roe nevertheless communicated regularly over Facebook.

85.      In August 2017, John Doe returned to New York for another year of graduate school.  In mid-August 2017, Jane Roe also returned to New York for another year of graduate school.

D.      **The Night of Friday, August 25, 2017.**

86.      On Friday, August 25, 2017, John Doe was in his Manhattan apartment intending to spend the night at home.  At 8:01 pm, John Doe texted Jane Roe to find out whether she had returned to New York and ask what she was going to do that weekend.  Jane Roe responded by text that she and some friends were out socializing and invited John Doe to join them.  John Doe texted back to say he had planned to stay home and to invite Jane Roe and her friends to come

over to John Doe's apartment.  Jane Roe, after initially saying no, texted John Doe asking if he still wanted them to come to his apartment.  John Doe replied, "Yeah come."  About nine people, including Jane Roe, went to John Doe's apartment, arriving around 10:00 pm, and John Doe hosted his guests with food and drink.

87.     The gathering lasted for about an hour and as a result, not much alcohol was consumed by anyone and what alcohol was consumed was accompanied by food.  During the time at John Doe's apartment, John Doe talked with Jane Roe and her friend, a Columbia graduate student who hailed from the same country as Jane Roe and who presently became Jane Roe's roommate.   In one conversation, Jane Roe asked John Doe if he would be married soon to John Doe's girlfriend, and John Doe said "maybe."  Jane Roe's response was "Imagine if we were married."  John Doe "left it at that" and did not say anything.

88.     Soon after that conversation, Jane Roe and her future roommate convinced John Doe to accompany them to a housewarming party.  Jane Roe, John Doe and approximately eight other guests left John Doe's apartment without straightening up the party mess.  Jane Roe's future roommate confirmed that John Doe still "wanted to stay" home in his apartment, but he was persuaded to go out.

89.     John Doe, Jane Roe and her future roommate rode together in an Uber.  When the three arrived at what was thought to be the location of the housewarming party, they learned it was at a nearby address to which they walked.  John Doe, Jane Roe and her future roommate all walked to that location.   Jane Roe walked normally without difficulty and without any apparent impairment.

90.     John Doe and Jane Roe spent about a half hour at the housewarming party during which time John Doe talked with two guests from another country. When it came time to leave,

John Doe, while initially expressing a desire to go home, was persuaded to go to a dance club in Chelsea with a group of six people, including Jane Roe and her future roommate.

91.     The group arrived at a dance club in Chelsea, New York, at approximately 11:30 pm.  To enter the dance club, it was necessary to walk down a ramp, which Jane Roe did without any difficulty.

**E.     The Early Morning Hours of Saturday, August 26, 2017.**

92.     When John Doe, Jane Roe and the others first arrived at the Chelsea dance club, John Doe purchased a drink and opened a tab at the bar.  At the dance club, John Doe socialized with several people, chatted with the bartender and danced in a group with others.  Sometimes, Jane Roe was involved in the dancing; sometimes, she was not.

93.     At approximately 12:30 am, John Doe and Jane Roe began talking and joking with one another, and their hands brushed against each other.  John Doe noticed and believed sexual energy might be building between them, but otherwise didn't think anything of it at the time. The two then went outside for a cigarette together, walking up the ramp without difficulty or assistance.

94.     After John Doe and Jane Roe returned to the dance club, they again separated for a period of time. At 1:12 am, Jane Roe sent John Doe a text searching for him.

95.     At about 1:15 am, Jane Roe's future roommate left the Club and went home.  After Jane Roe's future roommate left the dance club, Jane Roe found John Doe almost immediately. John Doe and Jane Roe found themselves standing face to face next to a couch near the bar and they began "mutual kissing" and "French kissing."  After kissing for some time, Jane Roe paused to ask about John Doe's girlfriend and said that John Doe responded that she was not here right now.

[40]

96.     Jane Roe and John Doe kissed some more until Jane Roe suggested a toast to the new school year.  Jane Doe ordered two glasses of champagne at the bar on John Doe's tab, and John Doe and Jane Roe joined in a celebratory champagne toast.

97.     After the toast, John Doe and Jane Roe danced together on the dance floor in full public view. As later confirmed by numerous witnesses, Jane Roe danced in a sexually-charged manner with John Doe, grinding her body against John Doe, first with John Doe behind Jane Roe and then face-to-face.

98.     At approximately 2:15 am, one of Jane Roe's friends told Jane Roe that everyone was leaving the dance club and asked if Jane Roe wanted to go with them.  Jane Roe told the witness that she wanted to stay at the dance club alone with John Doe.

99.     At approximately 2:20 am, alone together, John Doe asked Jane Roe whether she wanted to go back to John Doe's apartment. Jane Roe replied, "Yes."

100.     At approximately 2:30 am, John Doe and Jane Roe left the Chelsea dance club, walking up the ramp.  Jane Roe walked up the ramp easily and without assistance.  The two then took a cab and in the cab they resumed kissing, as they were doing in the dance club.  Jane Roe put her hand over John Doe's pants on his penis, rubbing it, while John Doe digitally penetrated Jane Roe.  This sexual activity was consensual, with Jane Roe responding with heavy breathing and kissing.

101.     At some point between 2:40 am and 2:50 am, John Doe and Jane Roe arrived by taxi at John Doe's apartment building.  The two walked up two flights of stairs together to John Doe's apartment, and Jane Roe walked without assistance. Jane Roe was smiling and seemed relaxed.

102.     Once inside the apartment, Jane Roe kicked off her shoes and went with John Doe to the couch, where the two continued kissing.  Jane Roe explicitly consented to moving to John Doe's bedroom where the two lay down together on his bed and continued kissing.  There, Jane Roe touched John Doe's penis over his pants and then undid the belt on John Doe's pants.  Jane Roe did this on her own accord without any prompting from John Doe.

103.     At some point, John Doe suggested moving to the master bedroom, which was larger and had a larger bed.  Jane Roe verbally affirmed she wanted to move to that bedroom, and the two walked to the master bedroom.  On the way to the larger bedroom, John Doe again observed that Jane Roe did not have any difficulty walking.  John Doe took his clothes off. Jane Roe took off her underwear on her own accord.  John Doe requested that she keep her dress on, which she did.

104.     In the larger bedroom, John Doe and Jane Roe got into bed.  Jane Roe indicted that she was ready for sexual intercourse, and so with no physical force and without much additional foreplay, John Doe got on top of Jane Roe and the two engaged in sexual intercourse. Throughout the ensuing sexual intercourse, Jane Roe exhibited enjoyment and was moving her hips in rhythm with John Doe.  At one point, Jane Roe got on top of John Doe.  While engaged in sexual intercourse in this position, Jane Roe exhibited enjoyment and said to John Doe "you're so sexy." John Doe and Jane Roe then switched positions to John Doe having sexual intercourse from behind Jane Roe.  But then John Doe felt performance anxiety and lost his erection.

105.     John Doe and Jane Roe switched to performing oral sex mutually upon each other, which caused John Doe to become erect again.  The two resumed sexual intercourse in the missionary position and continued until John Doe asked Jane Roe if he could climax inside her, to

which she verbally responded "yes."  After the intercourse, John Doe and Jane Roe kissed and fell

asleep lying side by side next to each other in bed.

**F.**     **The Next Day Saturday, August 26, 2017: John Doe.**

106.     At about 10:00 am on Saturday, August 26, 2017, John Doe woke up and noticed

that Jane Roe was not there with him.  He also heard the porter of his building banging on the door

and yelling that there had been a gas leak in John Doe's apartment.  The porter told John Doe that

the porter and a resident had entered the apartment earlier that morning because the upstairs tenants

reported the smell of leaking gas.  At that time, the porter and a resident discovered and closed a

gas valve in John Doe's bedroom (the bedroom had been a kitchen before the apartment was

redone) that had been jarred open and was leaking gas.  They did not go into the larger bedroom

where John Doe and Jane Roe had been sleeping.  After dealing with this second visit by the porter,

John Doe texted Jane Roe because he wanted to make sure it would not be awkward between them

and they would remain friends.  Jane Roe did not respond.

107.     Later that same evening, John Doe again tried to reach Jane Roe, texting her "How

u feeling today?  I have been tired all day lol."  But John Doe received no response. The next day,

through Messenger, John Doe tried to send Jane Roe the message "Hey . . . Whatsup . . .How r u."

But upon trying to send the message, John Doe discovered that Jane Roe had blocked him.  John

Doe called his sister and asked for advice. John Doe told his sister that he had slept with a friend

of his who had since blocked him on Messenger and asked why she would do that. John Doe's

sister told John Doe that the woman probably feels ashamed and guilty about what happened.  John

Doe concluded that Jane Roe's blocking him on Facebook meant she did not want to talk with him

for now. John Doe respected Jane Roe's decision and made no further attempts at contact.

[43]

G.      **The Next Day Saturday, August 26, 2017: Jane Roe.**

108.    Sometime in the morning after the sexual encounter, Jane Roe woke up and found herself lying in bed next to John Doe.  Jane Roe decided to leave, but realized she needed first to find her underwear, her keys, her cell phone and her new shoes.  Jane Roe quietly left the bedroom and looked for her missing items, which she found in various places in the apartment where she left them – her shoes where she kicked them off; her cell phone in the couch cushions where she initially sat down; her backpack in John Doe's bedroom where she brought it before moving to the master bedroom; and her keys and wallet in her backpack where she put them.  Jane Roe, after retrieving her belongings, left the apartment and walked to her apartment, which was seven blocks away from John Doe's apartment.

109.    On her way home the next morning, after sleeping a few hours with John Doe, Jane Roe noticed that a fellow Columbia student, with whom she had been intimate for the first time the immediately preceding night and who later became her boyfriend, had responded at 8:08 am Saturday morning to Jane Roe's text to him very early Saturday morning at 12:53 am.

110.    Jane Roe had, beginning at 8:23 pm on the prior Friday night, sent a series of texts to the future boyfriend, referring to their previous night romantic encounter, asking whether he regretted the encounter and admitting being "paranoid and insecure" about "intimate connections." Jane Roe's future boyfriend had responded in a text at 12:20 am, but then did not communicate further with Jane Roe until his 8:08 am Saturday morning text.

111.    The text that Jane Roe had sent her future boyfriend at 12:53 am early Saturday morning asked if she could come over to his apartment.  Beginning about 1:15 am, Jane Roe sent location updates to her future boyfriend.  At 2:13 am, Jane Roe sent a three-word text in her native language again inviting herself over to her future boyfriend's apartment.  Throughout the evening,

[44]

Jane Roe also made a series of 16 or 17 telephone and Facetime calls in unsuccessful efforts to reach her future boyfriend.  Finally, at 8:08 am Saturday morning and in response to Jane Roe's 12:53 am text, Jane Roe's future boyfriend texted: "Hahahaha. Thanks for those location updates."

112.    Jane Roe responded at 10:33 am by texting her future boyfriend, including two different types of smiling, happy emojis in her texts. One of these emojis was a simple smiling face, and the other was a smiling, happy face with a little suggestive sweat droplet on its brow.   At the same time, Jane Roe sent a second text to her future boyfriend apologizing for all of her prior night texts/pin drops/Facetime calls.

113.    After not getting a response to her 10:33 am text, then, 20 minutes later at 10:53 a.m., Jane Roe sent two additional texts to her future boyfriend stating: "You wanna hang out today?" and "I really want to see you."  Jane Roe later testified to the Columbia investigation team that she originally intended to simply "just go into [her] bed" and then hopefully see the future boyfriend later that same day.  Jane Roe's texts from 10:33 am to 10:53 am and her later stated intentions are completely consistent with Jane Roe spending a night out dancing with John Doe and others, engaging in consensual sexual intercourse with John Doe until after 3:00 am, having only a few of hours of sleep and then, after resting/napping in her room, hoping to hang out later that same day with the person with whom she was intimate the immediately preceding night.

114.    Jane Roe told the Columbia investigation team that while walking home, she had decided to go into her room and "not talk about what occurred the previous night." Thus, after entering her home with her shoes in her hands (because of the "crazy" blisters on her feet), disheveled hair, little sleep and showing discomfort from walking multiple Manhattan blocks with blistered feet, Jane Roe sat with her cousin for a few moments and, according to her cousin, said nothing about the prior evening. Jane Roe then went alone into her room ready to rest/take a nap.

[45]

115.     At 11:02 am, Jane Roe finally received a response text from the future boyfriend rejecting her attempt to get together that day because he was going to Central Park for another woman's birthday. One minute later, Jane Roe called her future boyfriend. This was just 10 minutes after her casual, breezy text asking him if he wanted to hang out later that same day. The future boyfriend later told the Columbia investigation team that Jane Roe was upset and crying hysterically on the phone and that she said she was going to the hospital with her cousin, but she did not tell him why and he did not press the point.

116.     Around noon, Jane Roe agreed with her cousin to go to the hospital and did.   At the hospital, Jane Roe wanted her cousin to do most of the talking.   There, Jane Roe received medical care, including a sexual assault forensic examination.   The hospital nurse recorded that Jane Roe was on Prozac and that Jane Roe admitted to a history of "loss of inhibitions."  Jane Roe then went back to her apartment where she deleted everything as to John Doe and blocked him on Facebook.

117.     Later that same day, Jane Roe's future roommate, who had accompanied Jane Roe the previous evening, sent a Facebook message to John Doe, asking him if he had heard from Jane Roe and saying she was trying to reach Jane Roe but that Jane Roe's phone was off and she was not replying on Messenger.   The future roommate later wrote John Doe, "No worries she's at home."

**H.     August 27-31, 2017: Jane Roe and John Doe.**

118.     On Sunday afternoon, August 27, 2017, Jane Roe and her cousin met at the cousin's apartment with Jane Roe's future roommate. Jane Roe would later claim that she had "blackout memory loss" and remembered little of what happened the prior evening.  Consequently, the three

[46]

women spent the afternoon recreating the events of Friday night and Saturday morning and began

developing what eventually became Jane Roe's narrative in her Title IX complaint.

119.    On Monday evening, August 28, 2017, Jane Roe got together with her future

boyfriend and discussed the incident.  According to the future boyfriend's testimony, Jane Roe

told him that at the time "she didn't think there was any problem in going back to John Doe's place

because [we] are so close and are friends."

120.    A few days later, John Doe saw Jane Roe on the Columbia campus. John Doe was

talking with a friend.  John Doe did not approach Jane Roe and did not have any face-to-face

interaction with her that day or any day thereafter.  John Doe believed that Jane Roe felt guilty or

embarrassed about their sexual encounter, and he did not want to press the issue with her.

**I.      September 17, 2017-March 2018: Incident Report,
        Investigation, Draft Investigation Report.**

121.    On September 17, 2017, Jane Roe made a sexual misconduct complaint (Incident

Report) to Columbia concerning the night of August 25, 2017 and early morning hours of August

26, 2017, accusing John Doe of nonconsensual sexual assault.

122.    Based on Jane Roe's reconstruction of events with her cousin, her future roommate

and her future boyfriend, Jane Roe claimed to have a different "memory" of the events at the

Chelsea dance club than did John Doe.  In the Incident Report, Jane Roe reported that, shortly after

her future roommate left the Club at 1:15 am, John Doe started being "inappropriate" with her.

According to Jane Roe's Incident Report, after her future roommate left the Chelsea dance club,

John Doe "tried to kiss" her and "stroked his crotch against [her] thigh."  Jane Roe claimed that she

laughed it off, but otherwise voiced her displeasure.  Jane Roe also claimed in her Incident Report

(and later in her statements to the Columbia investigation team) that after her future roommate left

[47]

the Chelsea dance club, John Doe's "presence was scaring" her and "What I remember most clearly is a strong feeling of fear and powerlessness."

123.    Thus, Jane Roe made two fundamental claims: *first*, that all sexual activities at the Chelsea dance club were one-sided, uninvited and unwanted; and *second*, that there was an atmosphere of fear beginning in the Chelsea dance club at around 1:15 am.  As will be discussed below, each of these fundamental tenets of Jane Roe's narrative is inconsistent with the evidence.

124.    By letter dated September 20, 2017, John Doe was notified of the commencement of the Columbia investigation of Jane Roe's report of sexual assault. The investigation would be conducted by Columbia Title IX Investigators Benjamin Marzolf and Jennifer Kelly.

125.    The investigation began with an interview of Jane Roe on October 5, 2017, and John Doe on October 11, 2017.  The initial phase of the investigation continued through the interviews of eleven other witnesses from October 12, 2017 through November 21, 2017.  During that period, documents were obtained by the investigators.  (A twelfth witness was interviewed on March 27, 2018 after the draft Columbia investigation team report was furnished to John Doe and Jane Roe.)

126.    On or about December 27, 2017, the investigators provided John Doe and Jane Roe with a copy of the draft Columbia investigation team report.  The draft report consisted of fifty-three pages of text and several hundred pages of exhibits.  The substantive text (forty-four pages) recounted the Columbia investigation team's interviews with John Doe, Jane Roe and the ten witnesses offered by Jane Roe and the one witness (his sister) offered by John Doe, without any analysis of the overt, fundamental inconsistencies and discrepancies contained in the report.

127.    Jane Roe's witnesses consisted of her cousin and then roommate, her future roommate, her future boyfriend, three eyewitnesses who accompanied the group to the Chelsea

dance club, one additional witness who was at the Chelsea dance club (who had very little to say) and three after-the-fact witnesses, each of whom stated they were among Jane Roe's best friends. John Doe's only witness at this point was his older sister whom he had called for advice when Jane Roe had unfriended him on Facebook.  John Doe had never before met anyone who was present during the night of August 25 and early morning of August 26, and so he had no additional eyewitnesses to the events. Notably, Jane Roe's three eyewitnesses who were the only persons who witnessed the evening's events at the Chelsea dance club, *supported John Doe's narrative of what happened at the Chelsea dance club and disputed Jane Roe's narrative*.

128.    Upon receiving the draft Columbia investigation report, John Doe realized and pointed out to the Columbia investigators that the incident with Jane Roe raised two medically-related issues.  The first issue concerned the nature of, and cause for, Jane Roe's bruising that she reported to the investigators.  The second issue concerned the ramifications of Jane Roe's self-reported "blackout memory loss."   After five weeks of foot-dragging by the Columbia investigation team, John Doe received permission to, and ultimately did, submit expert reports on these issues from two well-regarded and distinguished medical experts.

129.    John Doe's bruising expert confirmed that in terms of timing, size, shapes, locations, colors and causation, Jane Roe's bruising was not indicative of a sexual assault. John Doe's memory expert raised serious questions about the credibility of Jane Roe's reconstructed memory.

130.    Despite the impressive credentials of John Doe's experts and their carefully considered expert reports, the Columbia investigation team concluded that the expert reports were not reliable because the experts were paid for by John Doe.  At John Doe's insistence, the expert

reports were grudgingly included in the record for the Columbia hearing panel's consideration, but the Columbia investigation team dismissed their significance.

**J.      John Doe's March 13, 2018 Response To Draft December 2017 Investigation Report.**

131.     On March 13, 2018, John Doe submitted a 50-page response with 11 exhibits (A through K) to the draft Columbia investigation team report, raising questions about the many overt fundamental inconsistencies and discrepancies between Jane Roe's narrative and the evidence in the record.  Attached as Exhibit A is a copy of John Doe's March 13, 2018 response document with redactions to preserve pseudonym status.

132.     John Doe's March 13, 2018 response document states at the beginning that John Doe analyzed the evidence and documentation contained in the draft investigation report dated December 2017 to demonstrate that the sexual intercourse between Complainant Jane Roe and Respondent John Doe on August 26, 2017 was a knowing, voluntary and mutual decision by Complainant Jane Roe and Respondent John Doe to engage in sexual intercourse, that Complainant Jane Roe and Respondent John Doe had the capacity to make a rational decision and that there was no force, intimidating behavior or coercion involved.  John Doe's March 13, 2018 response document continued in the introduction to point to two attached exert reports, one from a clinical psychologist on assessing individual responses to alcohol and one from an expert in bruising.  John Doe's March 13, 2018 response document further continued in the introduction to describe how the false allegations of nonconsensual coerced sexual activity and adversely affected him personally and in his educational experience at Columbia.

133.     John Doe's March 13, 2018 response document contained twelve major responsive points:

i.      John Doe's account of the events of August 26, 2017 has been consistent throughout the investigation and is detailed, candid and based on his recollection alone, whereas Complainant Jane Roe's various accounts were "reconstructed" with the help of her friends because of Complainant Jane Roe's "blackout" memory loss, have been inconsistent, and are at odds with the statements and evidence provided by her own witnesses.

ii.      Complainant Jane Roe convinced John Doe to go with her bar/party hopping during Friday night, August 25, 2017.

iii.      Despite Complainant Jane Roe's denials, disinterested witnesses observed Complainant Jane Roe and John Doe engage in consensual sexual behavior at the Chelsea night club, including kissing, touching, bugging and sexually grinding on the floor.

iv.      Complainant Jane Roe's "reconstructed" allegations of strong feelings of "fear" are patently and knowingly false; Complainant Jane Roe "reconstructed" her "fear" narrative with Witness #1 on Monday night, August 28, 2017 (almost three days after the morning in question).

v.      Complainant Jane Roe and John Doe were two mature adults voluntarily agreeing to a sexual encounter; Complainant Jane Roe and John Doe agree that they engaged in multiple sexual activities in multiple rooms in multiple beds in John Doe's apartment.

vi.      Complainant Jane Roe's claimed recollection of the brief exchanges at John Doe's apartment is at odds with John Doe's recollection; Complainant Jane Roe and John Doe each had the capacity to, and did, give mutual consent; John Doe did not have actual knowledge of, or reason to know of, Complainant Jane Roe's "blackout" memory loss.

vii.     John Doe's expert clinical psychologist witness provides context for Complainant Jane Roe's narrative in light of Complainant Jane Roe's "blackout" memory loss; the expert clinical psychologist explained that "blackout" is not the same as "passed out," that a person suffering from "blackout" is fully conscious, aware of his or her surroundings and is able voluntarily to engage in a variety of complex behaviors, that Complainant Jane Roe's "blackout" memory and her need to "reconstruct" events with the assistance of others impacts the reliability of Complainant Jane Roe's narrative and that Complainant's "reconstructed" memory was tainted by the conjecture of others.

viii.     No force, intimidating behavior or coercion was involved; Complainant Jane Roe's bruises were not the result of nonconsensual sexual activity, that Complainant Jane Roe's narrative was noteworthy because of the absence of any struggle or a forced sexual encounter, that Complainant Jane Roe did not allege that John Doe caused her bruises, that John Doe's expert pathologist concluded that the size, shape and distribution of Complainant Jane Roe's bruises were not consistent with forced sexual activity, not consistent with bruises from hands and fingers, and not consistent with what Complainant Jane Roe described as her encounter with John Doe, and that John Doe's expert pathologist also concluded that given the coloration of the bruises, the bruises on Complainant Jane Roe's thigh were not caused during the time she was with John Doe.

ix.     Complainant Jane Roe's claim that John Doe's apartment had the appearance of a violent scene the next morning is belied by the objective facts: any disarray in the apartment was due to the mess created by the large group of people that Complainant Jane Roe brought to John Doe's apartment earlier in the evening of August 25, 2017, that each of Complainant Jane Roe's belongings were exactly where she left it earlier in the

morning and that it is not in dispute that Complainant Jane Doe and John Doe moved throughout the apartment undressing in stages and engaging in sexual interactions.

     x.     Complainant Jane Roe's course of conduct the next morning is not consistent with a violent sexual assault -- Complainant Jane Doe's texts to Witness #1 tell a different story, that Complainant Jane Roe's course of conduct were more in line with someone who regretted the previous night's sexual encounter and hoped it would not jeopardize her incipient relationship with someone else.

     xi.     John Doe's course of conduct over the days after the sexual encounter with Complainant Jane Roe was consistent with caring for a friend with whom he had consensual sexual intercourse.

     xii.     Great pressure on Complainant Jane Roe to report the encounter because of her allegations of rape and beating made to non-eyewitness witness friends of Complainant Jane Roe, but Complainant Jane Roe's eyewitnesses and her documentary evidence vindicated John Doe.

134.    As described in more detail below, the Columbia investigation team chastised John Doe for submitting such a response and effectively said it would not be considered.

135.    The Columbia investigation team never asked Jane Roe about the many matters John Doe raised in his March 13, 2018 report and it was not included in the record provided to the Columbia hearing panel or the Columbia appellate panel.

136.    The Complaint beginning at paragraph 173 discusses these facts (and more) in great detail and highlights the many fatal flaws in the investigative process and the Final Investigation Report.

**K.**     **March 20, 2018:  Pre-Determination Conference.**

137.     The Columbia investigation team gave John Doe the opportunity to submit written questions to be asked of Jane Roe at the upcoming pre-determination conference. In addition to all the matters John Doe highlighted in his March 13, 2018 response, John Doe submitted five additional questions for Jane Roe in an effort to establish facts showing consensual sexual activity by Jane Roe with John Doe. John Doe assumed that a fair and impartial investigation team would follow up on the questions raised in his response.

138.     Columbia's disciplinary procedures provide for a conference to be held by the investigators with the parties before a decision is made in the case.  On March 20, 2018, the Columbia investigation team held a pre-determination conference with John Doe.

139.     John Doe was surprised that, during the conference, the Columbia investigation team pressed hard on John Doe's assertion that he and Jane Roe had spent the night in the larger bedroom rather than in his much smaller bedroom. At the time, John Doe did not understand why this detail was important. But this seemingly minor detail ultimately became a major factor that both the Columbia investigation team and later the Columbia hearing panel relied on in questioning John Doe's credibility. The record is quite clear that John Doe and Jane Roe in fact spent the night in the larger bedroom.  Had John Doe and Jane Roe spent the night in John Doe's bedroom, as Jane Roe contended, the building porter would have come across John Doe and Jane Roe when the building porter was investigating the gas leak in the apartment.  The building porter did not come across John Doe and Jane Roe in John Doe's smaller bedroom.

**L.**     **April 12, 2018:  Final Investigation Report.**

140.     Late Thursday evening, April 12, 2018, the Columbia investigation team provided John Doe and Jane Roe with the final Columbia investigation team report.  The final Columbia

investigation team report was in part the same as the draft investigation report in terms of the party and witness interview summaries, but was expanded with the addition of another twenty-seven pages of "Findings and Analysis."  Attached as Exhibit B is a copy of April 12, 2018 investigation report with redactions to preserve pseudonym status.

141.    The Columbia investigation team found (erroneously), based on the preponderance of the evidence, that John Doe had vaginal intercourse with Jane Roe and that Jane Roe was not incapacitated. The Columbia investigation team report then asserted (erroneously) that Jane Roe did not provide affirmative consent to sexual intercourse and that John Doe used physical force to engage in sexual intercourse.

142.    The first major part of the final Columbia investigation team report, entitled "Factual Summary," consisted of a recitation of what Jane Roe, John Doe and each witness said in the interviews conducted by the investigators.

143.    The next major part of the final Columbia investigation team report was "Findings and Conclusions," which consisted of a statement of the issue, an "analysis" of the expert reports, a discussion of credibility of the parties and each witness, and recommended findings.

144.    The statement of the issue was which party's version of the facts was more credible as to the two acts of alleged non-consensual sexual intercourse.  The report identified the factors for assessing credibility as: (i) consistency or inconsistency of accounts; (ii) demeanor when interviewed; (iii) motive to lie; (iv) corroborating evidence; and (v) specific reasonable details.

145.    The "analysis" of the expert reports discussed the one report of a registered nurse submitted by Jane Roe and the two reports submitted by John Doe one from a clinical psychologist on assessing individual responses to alcohol and one from an expert in bruising.  The investigation report questioned the probative value of the expert reports because they supported the side that

submitted them.  The opinion of the registered nurse that the hospital records were consistent with forced sexual intercourse did not take into account that Jane Roe had sexual intercourse with two different young men on two successive nights.  The investigation report had no substantive answer to the opinion of John Doe's bruising expert that in terms of timing, size, shapes, locations, colors and causation, Jane Roe's bruising was not indicative of a sexual assault; and the investigation report had no substantive answer to the opinion of John Doe's memory expert that raised serious questions about the credibility of Jane Roe's reconstructed memory.

146.    The discussion of credibility consisted of stringing together party-by-party and witness-by-witness interview summaries and credibility assessments with few citations to the record.  In that "Factual Summary" part, there was no summary analysis providing a clear picture of each party's narrative and no synthesis of each party's multiple interviews, and there was no reconciliation of the testimony of all the witnesses and evidence and no analysis of inconsistencies in the party and witness statements and documents.

147.    The investigation team report's stringing together in the "Findings and Conclusions" party-by-party and witness-by-witness interview summaries and credibility assessments obscured the fact that the Columbia investigation team had simply accepted Jane Roe's narrative uncritically without asking proper follow up questions about either (a) Jane Roe's credibility issues or (b) inconsistencies raised by the statements of Jane Roe's eyewitnesses and the documentary evidence she had submitted.  The whole discussion in the section on credibility in the "Findings and Conclusions" was based on rationalizing supporting Jane Roe's credibility while avoiding what established the unreliability of Jane Roe's reconstructed narrative. The investigation report at the same time rationalized against John Doe's credibility based on specious grounds: the investigation report discussed at length that John Doe gave consistent testimony, was

respectful in his demeanor, had no specific motive to lie and had much corroborating evidence, but then the investigation report purported to find, however, that details of John Doe's story did not make sense, that John Doe referred to Jane Roe wearing high heels when she wore sandals, and that either John Doe did not know how Jane Roe was bruised because he was too intoxicated or he was not truthful because he caused the bruising on Jane Roe.  The individual witnesses were assessed in terms of their credibility, but missing was consideration whether each witness was an eyewitness to events or a non-percipient witness friend to Jane Roe who testified based on after-the-fact conversations and purported perceptions.

148.     The recommended findings were that the investigative team had insufficient information from which to conclude that Jane Roe was incapacitated, that Jane Roe was more credible about what happened in John Doe's apartment (never mind the reconstructed memories) and thus John Doe did use physical force, that Jane Roe was bruised during the sexual intercourse with John Doe (never mind the bruises did not match up with what Jane Roe had described) and that had Jane Roe been bruised during consensual sexual intercourse, then John Doe would have been bruised also from the gas valve and that Jane Roe did not give affirmative consent to the sexual intercourse.  The investigation report also ignored the fact that Jane Roe's after-the-fact witnesses made inflammatory allegations which Jane Roe must have thought better of by the time the investigation began because she did not make the same allegations to the Columbia investigation team nor had she made them to the witnesses who whom she met the next day. It is not clear why that did not merit a comment by the Columbia investigation team on the creditability of those witnesses.

**M.**   **April 17, 2018: John Doe's Written Response To Final Investigation Report.**

149.   John Doe was given until only Tuesday, April 17, 2018 to provide his written response.  This was a mere three working days to respond to an 83-page single-spaced report having several hundred pages of exhibits.  Further, John Doe's response was limited to only ten single-spaced pages.

150.   The time table and page limitation underscored Columbia's lack of interest in receiving a meaningful response.  The Columbia investigation team took *seven months* to prepare a 90+-page report (with hundreds of pages of exhibits), but limited John Doe to respond in three working days in ten pages, which was not a fair and impartial truth-seeking process.

151.   Still, John Doe met the deadline and on Tuesday, April 17, 2018, John Doe submitted a written response to the final Columbia investigation team report stating he had been wrongly and falsely accused.  Attached as Exhibit C is a copy of John Doe's April 17, 2018 response document with redactions to preserve pseudonym status.  The page limitation, however, made it impossible for John Doe to pull all of the witness statements together in a concise summary and to point out the many errors in the final April 12, 2018 investigation report.

152.   John Doe's April 17, 2018 response document begins:

I have been falsely accused.  The Findings provide that the question for you [the hearing panel] is "which party's version of events is more credible, as the details are irreconcilable."  See Findings p. 57 ("F57").

Many of the details that the Parties provided to the Investigative Team ("IT") are not "irreconcilable" as Complainant simply does not offer a full and complete narrative as to what actually happened in my apartment.  In fact, Complainant concedes that towards the end of the night her "memory becomes . . . blackout with like glimpses of memory" and that her memory becomes "weird."  She has no recollection of important details and, with respect to another "memory" she concedes, "I don't even know if that's a real memory anymore."

All of her "memories" and other evidence call into question the reliability of Complainant's narrative because (1) the "blackout" state of memory los renders her

unable to provide reliable testimony, (2) her memories were constructed after the fact with the help of 3 friends, none of whim whom witnesses the relevant events, (3) all eye witness testimony contradicts her assertion that no sexual activities occurred at the Club, (4) her "clearest memory" fear narrative didn't surface until days after the morning in question, (5) her course of conduct is entirely inconsistent with her allegations and (6) qualified experts refute her allegations.  Once this is fully examined, it becomes clear that a decision should be rendered in my favor.

153.     John Doe's April 17, 2018 response document then recounted John Doe's version of what happened the night of August 25, 2017 and August 26, 2017, pointing out, among other things, Complainant Jane Roe's touching and kissing John Doe at the Club, the sexualized dancing done at the Club, Complainant Jane Roe's decision to stay at the Club with John Doe instead of leaving with friends, Complainant Jane Roe's decision to not to ask to be dropped off at her own apartment, Complainant Jane Roe's decision to accept John Doe's invitation to go to his apartment, Complainant Jane Roe's decision to not to ask to be dropped off at her own apartment, Complainant Jane Roe's decision to engage consensually in sexual activities at John Doe's apartment and communication of that consent verbally and by conduct, Complainant Jane Roe's bruises not being caused by John Doe, John Doe's expert on bruising opining that Complainant Jane Roe's bruises were inconsistent with Complainant Jane Roe's allegations due to their size, shapes, locations and colors, and Complainant Jane Roe's allegations were built on two flawed tenets: (i) the denial of consensual sexual activities at the Club and (ii) Complainant Jane Roe became afraid of John Doe and what might happen after 1:15 am.

154.     John Doe's April 17, 2018 response document turned to reviewing the evidence in terms of 12 points (not the exact same as the March 13, 2018 response document):

i.     John Doe's account of the events of August 26, 2017 has been consistent throughout the investigation and is detailed, candid and based on his recollection alone,

[59]

whereas Complainant Jane Roe's various accounts were "reconstructed" with the help of her friends who were not with her at any relevant time.

  ii.  eye witnesses observed Complainant Jane Roe and John Doe engage in consensual kissing, hugged, sexually grinded on the dance floor.

  iii.  Complainant Jane Doe's allegations of fear were constructed days later and are proven false by the objective evidence.

  iv.  Complainant Jane Roe would have gone home if she were afraid.

  v.  Complainant Jane Roe and John Doe voluntarily consented to sexual intercourse in multiple rooms in multiple beds in John Doe's apartment.

  vi.  Complainant Jane Doe's memory is inaccurate and unreliable -- Complainant Jane Roe's "blackout" memory and her need to "reconstruct" events with the assistance of others impacts the reliability of Complainant Jane Roe's narrative and that Complainant's "reconstructed" memory was tainted by the conjecture of others.

  vii.  John Doe did not use physical force and did not cause Complainant Jane Doe's bruises -- Complainant Jane Roe did not allege that John Doe caused her bruises, and the size, shape and distribution of Complainant Jane Roe's bruises were not consistent with forced sexual activity during the time she was with John Doe.

  viii.  the investigators in the Findings searched for ways to discredit John Doe and strained to attack John Doe's credibility over his saying that Complainant Jane Doe wore high heels (the Findings say Complainant Jane Doe wore sandals), that someone must have bumped into the gas valve to cause the gas leak (the Findings misrepresent what John Doe told them), and that Complainant Jane Doe and John Doe had intercourse in the master bed

where they fell asleep (the Findings insisted they had sexual intercourse in John Doe's own bedroom).

  ix. Complainant Jane Roe's claim that John Doe's apartment had the appearance of a violent scene the next morning is contradicted by the objective facts -- any disarray in the apartment was due to the mess created by the large group of people that Complainant Jane Roe brought to John Doe's apartment earlier in the evening of August 25, 2017, and each of Complainant Jane Roe's belongings were exactly where she left it earlier in the morning.

  x. Complainant Jane Roe's course of conduct the next morning is not consistent with a violent sexual assault -- Complainant Jane Doe's texts to Witness #1 tell a different story, that Complainant Jane Roe regretted the previous night's sexual encounter.

  xi. John Doe's course of conduct over the days after the sexual encounter with Complainant Jane Roe was consistent with caring for a friend with whom he had an intimate encounter.

  xii. Great pressure on Complainant Jane Roe to report the encounter because of her allegations made to non-eyewitness witness friends of Complainant Jane Roe, but Complainant Jane Roe's eyewitnesses and her documentary evidence vindicated John Doe.

155. The Complaint beginning at paragraph 173 develops these facts (and more) in great detail and highlights the many fatal flaws in the investigative process and the Final Investigation Report.

**N.** **April 18, 2018-April 24, 2018:  The Hearing and Hearing Decision.**

156. On April 18, 2018, the Columbia hearing panel received the complete record consisting of the final Columbia investigation team report and party response statements.   On

April 19, 2018, the Columbia hearing panel held a "hearing."  By letter dated April 20, 2018, the Columbia hearing panel announced its finding that John Doe was responsible for sexual assault involving two instances of non-consensual sexual intercourse.

157.    The April 20, 2018 Columbia hearing panel decision was issued only two days after the Columbia hearing panel received the complete voluminous written record and only one day after the hearing.  The Columbia hearing panel simply adopted the Columbia investigation team findings, including as to the point that John Doe lacked credibility because he contended that he and Jane Roe spent the night in the master bedroom and not his smaller bedroom. The Columbia hearing panel ignored, as had the Columbia investigation team, that there was a gas leak in John Doe's bedroom that night and the building porter would have -- but did not -- come across John Doe and Jane Roe in that bedroom if that had been where John Doe and Jane Roe were.

**O.    April 24, 2018: The Sanction: Expulsion.**

158.    Only four days later, on Tuesday, April 24, 2018, Jeri Henry, Columbia's Vice President of Student Conduct and Community Standards, sent John Doe a sanction letter issued from the Dean for the Columbia graduate school which John Doe was attending.

159.    The sanction letter stated that the Dean had reviewed the entire file and had concluded that in light of the serious nature of the violations, John Doe should be expelled from the Columbia graduate school program.

160.    The sanction letter further stated that John Doe's transcript would reflect the notation of "*Disciplinary Expulsion*," that expulsion was a permanent separation from Columbia rendering him ineligible to return to Columbia at any time and that he was not permitted to be on Columbia's campus at any time for any reason.

161.

[62]

**P.**     <u>May 1, 2018 - May 14, 2018: The Appeal.</u>

162.     Under Columbia procedures, John Doe was entitled to seek a review of the Columbia hearing panel disciplinary decision and the sanction only on the grounds of (i) procedural error, (ii) new information that would alter the decision and/or (iii) excessive sanction.

163.     On May 1, 2018, John Doe submitted his appeal. John Doe's appeal stated that he had engaged in consensual sexual intercourse with Jane Roe. John Doe also argued that the sanction was excessive and should be reduced to a suspension.  John Doe noted that he had an unblemished record at his undergraduate college and elsewhere and that he had provided the names of five faculty members to serve as character references.

164.     The Columbia appellate panel summarily denied the appeal by letter dated May 14, 2018, leaving in place the responsibility decision and expulsion sanction.  The Columbia appellate panel stated that the Columbia hearing panel decision can be changed only if there is a procedural error or new information, and that John Doe was asking for a *de novo* review of the substantive issues of fact, which was stated not to be grounds for an appeal as recognized by Columbia.  The Columbia appellate panel went on to cite some of the facts but in doing so simply repeated the Columbia investigation team's misstatements.

165.     The Columbia investigation team had accepted Jane Roe's narrative uncritically and conducted a palpably inadequate investigation.  The Columbia hearing panel was pressed by time and rubber-stamped the Columbia investigation team report; as a consequence, John Doe never received a fair and impartial hearing.  The Columbia appellate panel rubber-stamped the Columbia hearing panel decision because it considered itself bound by the Columbia hearing panel's conclusion on the substantive issues of fact.

166.     At the time of the expulsion, John Doe was about one month short of graduating and receiving a Columbia graduate diploma.  The terms of the expulsion meant that John Doe was deprived of his Columbia graduate degree and thus the benefit of the two years of work and tuition that he had put into the program.

## FIRST CAUSE OF ACTION:
### (Violation of Title IX of the Education Amendments of 1972)

167.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**A.     Title IX and Its Application.**

168.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

169.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

170.     In its fiscal year ending June 30, 2017, Columbia received nearly $645,000,000 in federal funding for research and development.

171.     Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

172.     Challenges to university disciplinary proceedings for sex discrimination generally fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was

innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "undue severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender. *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

173.    An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault and the totality of the circumstances establish gender bias was a motivating factor.   An "undue severity of penalty" occurred in this case because John Doe, who had no prior disciplinary history and who believed he had consent for the non-intercourse sexual conduct that occurred, was expelled from Columbia and this "unduly severe penalty" was affected by John Doe's male gender.

**B.      John Doe Has Been Wrongly Found Responsible
In A Gender-Biased Process: The Evidence.**

**(i)      John Doe's memories are clear; Jane Roe claims that she had a "black-out"
memory loss and therefore had to recreate her memories with the help of
friends who were not with her at any relevant time.**

174.    John Doe has a clear recollection of the events that took place on August 25, 2017 and August 26, 2017, and provided the Columbia investigation team with a comprehensive and coherent account that is consistent with the other evidence in the investigation record.  The sexual intercourse between John Doe and Jane Roe on August 26, 2017 was the result of a knowing, voluntary and mutual decision to engage in sexual intercourse, Jane Roe had the capacity to make a reasonable, rational decision because she had the ability to understand her decision, and no force, no intimidating behavior and no coercion was involved.

175.    Jane Roe, on the other hand, had virtually no recollection of the evening's events because she claims to have had "blackout memory loss." Jane Roe admitted that she had therefore

recreated the events of the early morning with the help of three friends who were not present at any relevant time.  Jane Roe conceded that toward the end of the night her "memory becomes …blackout with the glimpses of memory" and that her memory became "weird."  She had no recollection of important details and, with respect to one "memory" the Columbia investigation team found significant, she conceded, "I don't even know if that's a real memory anymore."

176.     As will be described herein, Jane Roe's reconstructed narrative is based on two principal claims -- (i) that Jane Roe engaged in no mutual sexualized activity with John Doe at the Chelsea dance club and (ii) that Jane Roe's "clearest memory" of the evening was that she was afraid of John Doe before entering his apartment.  Jane Roe tries to support her "fear narrative" by also claiming that she was afraid when she woke up in John Doe's apartment early the next morning. As will be shown in detail herein, the documentary evidence, testimony of all the eyewitnesses, and Jane Roe's course of conduct contradicts Jane Roe's narrative and clearly establishes that both of Jane Roe's principal claims are false.  Accordingly, Jane Roe's testimony lacks credibility.

**(ii)   The evidence showed that Jane Roe and John Doe engaged in consensual sexual activities at the Chelsea dance club; Jane Roe's claim that she engaged in no consensual sexualized activity with John Doe at the club was false.**

177.     Jane Roe contended, as one fundamental pillar of her Incident Report and in her narrative to the Columbia investigation team, that there were no consensual sexual activities between her and John Doe at the Chelsea dance club.  John Doe's memories are to the contrary, and the investigation record backs him up.

178.     Jane Roe's Incident Report states, in relevant part:

"Between 1 and 1:30 am my roommate decided to leave the club. At this point I did not feel anything more than lightly drunk, I am not the kind of person that tends to blackout but this night I did…. When my roommate left I only remember having

[66]

one glass of sparkling wine and my attacker suddenly becoming inappropriate with me. He tried to kiss me at the bar and stroked his crotch against my thigh. I laughed it off and said "hey, no, what are you doing? We are friends and you are engaged. What about [John Doe's girlfriend]?" For the entire year of us knowing each other I had always assumed he was in a committed relationship and therefore it had never crossed my mind that something like this might happen."

179.     Notwithstanding this statement, the testimony of Jane Roe's three eyewitnesses (using the Columbia investigation team's nomenclature of Witness #5, Witness #6 and Witness #8) unequivocally contradicted Jane Roe's narrative and, together, their testimony establish that Jane Roe freely and voluntarily kissed and engaged in sexualized dancing with John Doe at the Chelsea dance club for an extended period of time (i.e., over one hour), and appeared to enjoy what she was doing.

180.     John Doe told the Columbia investigation team that, despite the fact that he was at the Chelsea dance club with no friends of his own and despite the crowded conditions on the dance floor, he assumed others who accompanied Jane Roe to the Chelsea dance club observed Jane Roe kissing him and engaging in other mutual sexualized activities, but he had no way of knowing for sure.

181.     Indeed, *each* of Jane Roe's three eyewitnesses who were still at the Club after 1:15 am gave statements entirely consistent with John Doe's testimony about the mutual sexualized activities between John Doe and Jane Roe at the Chelsea dance club.  These eyewitness statements flatly contradict Jane Roe's narrative that the sexual activities at the Chelsea dance club were one-sided, uninvited and unwanted.  Together, these three eyewitnesses (Witness #5, Witness #6 and Witness #8) observed Jane Roe and John Doe mutually and consensually kissing, hugging and/or touching, and Jane Roe voluntarily grinding sexually against John Doe on the dance floor:

      i.     Witness #8 confirmed that he observed Jane Roe and John Doe kissing, didn't see Jane Roe disagreeing with what was happening, didn't see Jane Roe trying to

[67]

reject John Doe and didn't see Jane Roe moving her head when John Doe was trying to kiss her;

    ii.      Witness #6 denied observing Jane Roe looking uncomfortable with the dancing that he witnessed;

    iii.      Witness #5 believed that towards the end of the night Jane Roe looked like she was having "a really fun time" with John Doe; and

    iv.      Witness #5 and Witness #6 observed Jane Roe towards the end of the night and thought she looked "romantically involved" and "romantically or sexually interested" in John Doe and observed seeing "sexual tension" between Jane Roe and John Doe.

182.    John Doe had never met these witnesses before, and each of these witnesses already knew about Jane Roe's abhorrent allegations when they spoke to the Columbia investigation team. Yet, each still supported John Doe's narrative, refuted Jane Roe's narrative, and testified to seeing Jane Roe engage in consensual sexualized activities with John Doe at the Club.

183.    Accordingly, the first fundamental tenet of Jane Roe's narrative -- no consensual sexualized activity at the Chelsea dance club -- was false.

  **(iii)**    **The evidence showed that Jane Roe was not afraid of John Doe prior to entering John Doe's apartment; Jane Roe's claimed "clearest memory" of the evening, the "fear of John Doe" narrative, was false.**

184.    Jane Roe contended, as the second fundamental pillar of her Incident Report and in her narrative to the Columbia investigation team, that she became afraid of John Doe shortly after her future roommate left the Chelsea dance club at around 1:15 am. This "fear of John Doe" narrative is contradicted by the preponderance of the evidence and is clearly false.

185.     Jane Roe told the Columbia investigation team that her "clearest memory" of the evening was a "strong feeling of fear," but it is clear that this "fear of John Doe" narrative was not part of Jane Roe's original story and was created several days later:

(i)     in their statements to the Columbia investigation team, neither Jane Roe nor her cousin mentions Jane Roe's "fear" when recalling their conversations in their apartment on Saturday morning;

(ii)     neither Jane Roe nor her cousin testified that they mentioned Jane Roe's "fear" to the hospital nurse and the hospital nurse's written report does not mention anything about "fear"; and

(iii)     in their statements to the Columbia investigation team, neither Jane Roe, her cousin nor her future roommate mention Jane Roe's "fear" when recalling their discussions on Sunday.

186.     Instead, the record is clear that Jane Roe's "fear narrative" was not created until she was alone with her future boyfriend, on Monday night, August 28. According to Jane Roe's future boyfriend, he looked at her texts/calls to him and "suddenly" *he* decided they had significance.

187.     By the time Jane Roe filed her Incident Report three weeks later on September 17, 2017, this "fear of John Doe" narrative was central to her story.  In her Incident Report, Jane Roe states:

> *What I remember most clearly is a strong feeling of fear and powerlessness. It can also be seen by the fact that I called a friend that I trust completely around 17 times that night, sent him updates of my location and a voice recording from my phone where my attacker's voice can be heard. That is not something I would do unless I felt less than safe.*

188.     The Columbia investigation team simply accepted Jane Roe's story without any critical analysis, ignoring the compelling evidence to the contrary such as the prior occasions Jane Roe called/texted the future boyfriend.

189.     The only plausible explanation for the Columbia investigation team's failure to question Jane Roe about her "fear of John Doe" narrative is that the Columbia investigation team presumed that Jane Roe was telling the truth (the Columbia investigation team report said as much) and had already made up its mind that John Doe was going to be found responsible. To any fair-minded observer, the Columbia investigation team's lack of analysis of Jane Roe's "fear of John Doe" narrative points to the result-oriented nature of their investigation.

190.     Far from demonstrating that Jane Roe was afraid of John Doe, the record of Jane Roe's "17" texts/calls to her future boyfriend unequivocally indicated that most of the 17 texts/calls explicitly show that (i) Jane Roe and her future boyfriend had been sexually intimate for the first time the preceding night, as was discussed in the texts, (ii) Jane Roe was upset her future boyfriend did not follow-up the next day and (iii) Jane Roe wanted to get her future boyfriend to invite her to his apartment during the early hours of Saturday morning. Indeed, Jane Roe did not mention her "fear" a single time in these texts, not even at 2:13 am when she texted him "Can I come over?"  Instead, the text record showed that Jane Roe attempted to contact her future boyfriend not because she was afraid of John Doe, but rather because she would have preferred to be with her future boyfriend again.

191.     The text log indicated that Jane Roe was in constant contact with the future boyfriend throughout the night until 12:20 am when the future boyfriend sent his last text before he fell asleep. However, Jane Roe could not have known at that time that this would be the future boyfriend's last text of the night. Thus, Jane Roe continued to pursue the future boyfriend for

almost two hours after his last text, finally culminating with a direct question at 2:13 am inviting herself over to his apartment. Shortly after texting the future boyfriend one last time, but not hearing back from him, Jane Roe agreed to accompany John Doe back to John Doe's apartment.

192.    The future boyfriend told the Columbia investigation team that Jane Roe had made similar numerous late night texts/calls to him after a different night out when she was not fearful or in trouble and that Jane Roe was later embarrassed by her conduct and apologized to him (as she does again here in her texts the next morning) for the numerous "drunk-dials." Thus, despite Jane Roe's claim in her Incident Report "that is not something I would do unless I felt less than safe," it is clear that this is in fact something she would do when she felt safe and that on August 26, 2017, Jane Roe simply repeated her prior course of conduct.

193.    Jane Roe's "fear of John Doe" narrative is also inconsistent with the fact that Jane Roe never expressed any concern for her safety – not once - in any one of the numerous texts and voicemails she sent (and could have sent) to multiple people during the entire morning.

194.    Furthermore, Jane Roe's "fear of John Doe" narrative is inconsistent with her explicit words and actions, including the following:

i.      Jane Roe made no mention of her "fear" at 1:15 am when her future roommate left the Chelsea dance club;

ii.     Jane Roe made no mention of her "fear" at 1:27 am when Jane Roe sent a text message to her future roommate;

iii.    Jane Roe expressly told one of the eyewitnesses at around 2:15 am that she wanted to remain alone with John Doe at the Chelsea dance club even though everyone else she came with either left or was leaving;

iv.      Jane Roe engaged in publicly-observed sexual activity with John Roe (kissing, touching, hugging, and grinding on the dance floor) way past 1:15 am when she claims that her "fear" began;

v.       Witness #5, Witness #6 and Witness #8 did not believe Jane Roe was afraid of John Doe and believed they grew demonstrably closer as the night wore on;

vi.      Jane Roe did not attempt to reach her cousin or anyone else after it became clear that her future boyfriend was not responding to her texts;

vii.     At about 2:30 am, Jane Roe voluntarily agreed to accompany John Doe to his apartment by taxi;

viii.    During the taxi ride, John Doe and Jane Roe continued to engage in mutual sexual activity; and

ix.      Jane Roe never asked John Doe to drop her off at her nearby apartment (only seven blocks away) where her cousin was physically present at the time.

195.     The Columbia investigation team findings also left unanswered why Jane Roe did not simply tell the taxi driver to drop her off at her apartment a mere seven blocks away from John Doe's apartment if she was so afraid of John Doe. Surely, Jane Roe would have asked the driver to drop her at her nearby home if she was afraid of being alone with John Doe.

196.     Silence did not equal fear in this case, particularly since Jane Roe was sending texts throughout the night. Indeed, Jane Roe herself contradicted her "fear" narrative.  According to the testimony of the future boyfriend, Jane Roe told him that at the time "she didn't think there was any problem in going back to John Doe's place because [we] live so close and are friends."

197.     Jane Roe claimed that the text she sent to the future boyfriend at 2:13 am inviting herself over was in her native language because of the "John Doe fear" factor. That was not true

given that two minutes later, she told one of the witnesses that she wanted to stay alone at the Chelsea dance club with John Doe.  Moreover, there is a much simpler explanation for the text language: the text was sent less than an hour after Jane Roe sent a text to her future roommate in their native language at 1:24 am.  Thus, the more likely explanation for the text is Jane Roe simply failed to reset her iPhone to English.

198.    Jane Roe also claimed that she consciously sent her future boyfriend a recording of John Doe's voice at 2:44 am as a precaution while she and John Doe were riding in the taxi. Jane Roe's future boyfriend undercut Jane Roe's narrative when he told the Columbia investigation team that they both actually later "surmised" that this call was "essentially a butt dial."

199.    As noted, Jane Roe asserted that her "fear" started at about 1:15 am and that she was entirely *conscious* of this fear, but despite texting/calling her future boyfriend numerous times throughout the night and despite being in contact with others throughout the night, Jane Roe never left a Facetime audio message or a text expressing her "fear" to anyone, not one single time. Further, Jane Roe claimed to have consciously made "17" calls, updates of her locations and Facetimes message out of "fear," but then failed to ask the taxi driver to take her home and instead agreed to accompany John Doe back to his apartment.

200.    When the Columbia investigation team sought to clarify why, if she was so scared of John Doe, Jane Roe chose to ride in a cab with John Doe, Jane Roe immediately changed her story.  In an attempt to align her claims with her actual conduct, Jane Roe asserted she was only "really scared" of the situation, but was not scared of John Doe -- even though the "situation" was limited to being alone with John Doe in a taxi heading to John Doe's apartment.  By shifting her "fear" from John Doe to "the situation," it was still illogical for her to go home with John Doe instead of being dropped off at her home where her cousin was physically present at that time.

Yet, the Columbia investigation team did not find it necessary to question Jane Roe further on this point.

201.    Later in the Columbia investigation process, Jane Roe made a different claim: that she felt "safer with John Doe" than going home to her apartment where her cousin was physically present.  The Columbia investigation team was unjustified in ignoring in their findings this explanation of why she accompanied John Doe in the taxi and went into his apartment even though she "feared" him.

202.    The Columbia investigation team was unjustified in accepting Jane Roe's assertion that her 17 texts/calls reflected a dramatic outreach attempt to a trusted friend because she was fearful that John Doe would later become a sexual predator, when those 17 texts/calls tell a different story.  The Columbia investigation team was unjustified in accepting Jane Roe's narrative that she became afraid of John Doe at around 1:15 am, even though she stated that she felt comfortable going back to John Doe's apartment. The Columbia investigation team was wedded to Jane Roe's narrative and did not pursue any angle that suggested or implied that they did not believe her story

203.    Jane Roe's "fear of John Doe" narrative, which was created days later with the help of Jane Roe's friends, cousin and future boyfriend, was simply not true.

204.    Accordingly, both fundamental tenets of Jane Roe's Incident Report and narrative, which were embraced as true and relied upon by the Columbia investigation team – no consensual sexual activity at the Chelsea dance club and "fear of John Doe" -- were demonstrably false. That covers almost all of what Jane Roe said she remembers about the evening's events.

**(iv)    John Doe and Jane Roe agreed they engaged in multiple sexual activities in multiple rooms in multiple beds in John Doe's apartment; these sexual activities were shown by the evidence to have been mutually consensual.**

205.    John Doe (in his mid-twenties) and Jane Roe (two years older) voluntarily and mutually agreed to go back to John Doe's apartment at about 2:30 am in the morning after kissing, hugging, dancing, sexually grinding and staying exclusively together at the Chelsea dance club for about 1.25 hours after 1:15 am.  According to John Doe, Jane Roe and John Doe accelerated their sexual activities in the privacy of the back seat of the taxi. Jane Roe did not deny this; instead, she only stated that she didn't "recall" kissing or other sexual activities occurring in the taxi, not that none occurred.  John Doe's recollection of the taxi ride is consistent with the observed sexual behavior of John Doe and Jane Roe in the public confines of the Chelsea dance club.

206.    Jane Roe voluntarily got out of the taxi when it arrived at John Doe's apartment and climbed two flights of stairs to get into John Doe's apartment.  Once in John Doe's apartment and after kicking off their shoes, Jane Roe and John Doe moved to the couch and began kissing. Then, they moved to John Doe's bedroom continuing sexual foreplay in his small bed. When John Doe asked if Jane Roe wanted to move to the master bedroom where the bed was larger, Jane Roe immediately agreed.  The larger bed was more conducive to comfortable sexual intercourse. After switching beds, Jane Roe and John Doe engaged in vaginal intercourse, first with John Doe on top and then with Jane Roe rolling on top. They then switched positions again and had sexual intercourse from behind with Jane Roe up on all-fours. After John Doe experienced erectile dysfunction, they engaged in mutual oral sex, and eventually resumed intercourse in the missionary position. John Doe asked Jane Roe if she was on birth control and she said yes before John Doe ejaculated.  Jane Roe was an enthusiastic consensual partner.  Jane Roe and John Doe then fell asleep in the master bedroom.

207.     Jane Roe alleged in her Incident Report that due to her "blackout memory loss," her memory became "less clear" once she arrived at John Doe's apartment.  Specifically, due to her "blackout memory loss," she had only three memories.  These memories were somewhat consistent with John Doe's memories. They both remember being together in two separate beds in two separate rooms and having sexual intercourse in at least two different positions.

208.     Jane Roe's first claimed memory, according to the Columbia investigation team report and Jane Roe's Incident Report, was being in the master bedroom with its tall bedposts and having her dress on but no underwear. She then "thought" John Doe "pushed [her] on the bed and [she] got up on all fours…[and John Doe] flip[ed her] dress up." John Doe's memories are different. John Doe didn't lift her onto the bed in an all-fours crawling position. They were already on the bed and just naturally moved into a new position. Further, Jane Roe's own description of her body positioning confirmed she was an active and engaged participant. For instance, she stated she "got up on all fours" in a crawling position on top of the bed. This description reflected the fact she was acting under her own power. She was not on her back or on her stomach where she couldn't twist or crawl away. She was supporting and positioning herself up on all fours to enable the consensual encounter to unfold.

209.     Jane Roe's second claimed memory, according to the Columbia investigation team report and Jane Roe's Incident Report, was that she and John Doe had a verbal exchange in conversational tones about what they were doing as they walked from one bedroom to the other. Jane Roe did not claim that her words were shouted, spoken with anger or otherwise in a raised voice or confrontational tone, and she didn't remember crying. John Doe did not recall that any such conversations occurred. Further, John Doe did not and does not agree that the two went from

the master bedroom with its larger bed to John Doe's bedroom in order to have sexual intercourse in its smaller bed.

210.    Jane Roe's third claimed memory, according to the Columbia investigation team report and Jane Roe's Incident Report, was that she and John Doe engaged in sexual intercourse in the missionary position, but this time in John Doe's bedroom.  Jane Roe claimed that she "put up [her] hands to push [John Doe] away," but [John Doe] "took [her] hands and put them like this," after which Jane Roe demonstrated John Doe pinning down her arms and hands above and to the side of her head. John Doe disagreed, however, that Jane Roe said "no" with either her words or actions. Instead, according to John Doe's testimony, Jane Roe expressed multiple times her consent verbally and by her conduct in numerous ways.

211.    Jane Roe unequivocally and voluntarily provided her consent verbally multiple times. After engaging in foreplay crowded in a small bed, Jane Roe verbally consented to switch to the master bedroom where there was a larger bed.  Jane Roe said "yes" again when John Doe asked if Jane Roe was on birth control and Jane Roe said "yes" again when John Doe asked whether he could "finish inside her."

212.    Jane Roe also unequivocally and voluntarily provided her consent through her conduct in numerous ways, including by accepting John Doe's invitation to go home with him at 2:30 am after a night of kissing and sexual grinding on the Chelsea dance club floor; by mutually and enthusiastically participating in sexual activities in the taxi; and then by willingly and enthusiastically engaging in sexual activities with John Doe in his apartment in two different beds in two different rooms and in multiple different positions (including mutual oral sex and sexual intercourse with Jane Roe on top).

[77]

213.     According to John Doe, Jane Roe never said "no" or anything similar to "no" at any time during their entire time together.  If Jane Roe had said "no," John Doe would have immediately complied with her wishes and stopped what they were doing. Jane Roe and John Doe were friends, they were in the same university, and John Doe had and has personal integrity and respect for women.  John Doe would not engage in sexual assault against Jane Roe.

     **(v)     John Doe did not cause Jane Roe's bruising; Jane Roe never accused John Doe of specific conduct that could have caused her bruises.**

214.     According to the Columbia investigation team's findings, throughout the entire interview process, Jane Roe made only two specific claims relating to physical force: (1) she was pushed/thrown onto the bed and (2) at one point she placed her hands on John Doe's chest and John Doe pinned her arms and hands above and to the side of her head.  John Doe denied each of these claims but, in any event, there were no bruises on Jane Roe's hands or wrists.  Yet, the Columbia investigation team used the bruises on Jane Roe to find John Doe responsible for sexual assault.  The evidence did not support that finding, and the evidence did not support finding that John Doe caused the bruises.

215.     Jane Roe unequivocally testified in the investigation that she "did not specifically recall physical force being used by [John Doe]." Jane Roe also testified in the investigation that her "strategy" was to not physically resist or try to fight; instead, she claimed to the Columbia investigation team that her strategy was to reason verbally with John Doe by mentioning his girlfriend.

216.     Jane Roe also testified that she did not know what caused her specific bruises. Throughout the entire disciplinary case, Jane Roe never accused John Doe of specific conduct that could have caused the specific sizes, shapes, locations and colors of her bruises. The only specific

allegation -- relating to her arms being held above her head during sex -- could not have caused her specific bruises.

217.    Jane Roe did not describe a violent struggle between her and John Doe.  Rather, Jane Roe claimed that she was unable to resist.  Jane Roe returned to her apartment in the same dress that she and John Doe acknowledged she wore during the entire night, during sexual intercourse and while she was sleeping. There was no testimony from anyone that the dress was even slightly torn, stretched or compromised in any way whatsoever.

218.    John Doe did not know how Jane Roe acquired her bruises. During the Columbia investigation, John Doe could only guess how Jane Roe, who has fair skin, acquired them. Nevertheless, John Doe unequivocally denied that Jane Roe's bruises occurred as a result of their sexual activity.  Jane Roe did have two sexual encounters in two nights; there were possibilities for Jane Roe to have been bruised other than by her sexual activity with John Doe.

219.    According to the hospital nurse's report, seven of Jane Roe's bruises (including the one on her thigh which was the focus of the Columbia investigation team) *already* contained "green," "purple" or "brown" a few hours after Jane Roe had sexual intercourse with John Doe. Bruises do not turn green, purple or brown only a few hours after their trigger event. Thus, whatever caused at least these seven bruises already occurred before Jane Roe went back to John Doe's apartment early Saturday morning.

220.    John Doe's expert witness, a well-respected pathologist, opined that in terms of timing, size, shapes, location, colors and causation, the bruises were not consistent with a violent sexual attack or coerced sexual encounter just a few hours earlier and, additionally, that the sizes and locations of the bruises were not consistent with bruises from the hands and fingers.

**(vi)     Jane Roe attempted to bolster her "fear" narrative by claiming that John Doe's apartment resembled a violent scene the next morning; this claim was demonstrably false.**

221.     The Columbia investigation team found great significance in Jane Roe's account that John Doe's apartment had the appearance of a "violent scene" the next morning because her belongings were scattered.  Jane Roe used this claim to reinforce her story and the Columbia investigation team accepted it without question.

222.     Jane Roe's claim relating to the violent aftermath in John Doe's apartment is contradicted by the objective facts.

223.      *First*, John Doe's apartment contained the typical "after-party" mess created by *Jane Roe's* group of friends the prior evening.

224.     *Second*, there was no testimony that John Doe's furniture was out of place or turned over.

225.     *Third*, Jane Roe's belongings were exactly where she left them earlier that morning: one shoe where she kicked it off near the front door; one shoe a few feet away near John Doe's bedroom, her phone on the couch where John Doe and Jane Roe started kissing; and her backpack (containing her keys and wallet) in John Doe's bedroom where she left it before moving to the master bedroom.

**(vii)     Jane Roe's state of mind and course of conduct later the morning of August 26, 2017, including her texts to her future boyfriend, is inconsistent with a violent sexual assault; pressure was placed upon Jane Roe to report her allegations.**

226.     Jane Roe's course of conduct immediately after she left John Doe's apartment and later during that morning is inconsistent with a violent sexual assault.

227.     At 10:33 am and on her way home after leaving John Doe's apartment, Jane Roe texted her future boyfriend. In her text, Jane Roe informed her future boyfriend that she tried to

invite herself over to his apartment at 12:53 am the night after she was intimate with him.   In doing so, Jane Roe explicitly provided insight into her true state of mind at this critical moment in time by including two different types of smiling, happy emojis in her texts: one of these texts was a smiling, happy face and the other was a smiling, happy face with a little suggestive sweat droplet on its brow.  These smiling emojis were embedded in a text that Jane Roe sent after her now-claimed escape from the scene of a sexual assault.

228.    Then, 20 minutes later at 10:53 am, Jane Doe sent two additional texts to the future boyfriend stating: "You wanna hang out today?" and "I really want to see you."

229.    Jane Roe would not be texting happy, smiling emojis if she were emotionally distraught at this moment after leaving the scene of a sexual assault.  Jane Roe would not be sending casual, breezy texts requesting a meet-up later that same day with a man who she was personally interested in if she had just been sexually assaulted, particularly because she admitted to this man that she was "paranoid" and "insecure" about their budding relationship. To the contrary, Jane Roe's texts at 10:33 am and 10:53 am are completely consistent with spending a night out clubbing with John Doe and others, engaging in consensual sexual intercourse with John Doe, having only a few hours of sleep and, then after resting/napping in her room, hoping to hang out later that same day with the future boyfriend, a man with whom she was intimate the immediately preceding night.

230.    Neither the Columbia investigation team, nor the Columbia hearing panel, nor the Columbia appellate panel asked Jane Roe about her texts to the future boyfriend before and after the alleged incident, nor did they question Jane Roe about her emojis. Moreover, the Columbia investigation team failed to ask Jane Roe why the 17 texts/calls were completely devoid of

reference to fear. John Doe pointed out these differences in his submissions, but the differences were ignored by the Columbia investigation team.

231.    Jane Roe also decided while walking home "to just go into [her] bed and not talk about what occurred the previous night." Jane Roe told investigators that when she returned to her apartment sometime before 11:00 am, the idea of going to the hospital "wasn't something that had crossed her mind." After entering her apartment with her shoes in her hands (because of the "crazy" blisters on her feet), disheveled hair, little sleep and discomfort on her face from walking multiple Manhattan blocks with blistered feet, Jane Roe sat with her cousin for a few moments, said nothing initially according to her cousin and then went alone into her room ready to rest and take a nap.

232.    At 11:02 am, Jane Roe finally received a response text from her future boyfriend declining her attempt to get together that day because he was going to Central Park for another woman's birthday. The telephone log indicates that Jane Roe called him one minute later (and just 10 minutes after her unemotional, breezy text asking him if he wanted to hang out later that same day). The future boyfriend told the Columbia investigation team that Jane Roe was upset and crying hysterically, and that she said she was going to the hospital with her cousin, but she did not tell him why and he did not press the point.

233.    The Columbia investigation team findings ignore the pressure Jane Roe's cousin placed on Jane Roe. After Jane Roe went to her bedroom, Jane Roe's cousin admittedly took charge. According to the Columbia investigation report, her cousin then came into Jane Roe's room and sat down next to Jane Roe on the bed. Her cousin asked about the bruises, but no names were discussed. According to the Columbia investigation report, her cousin eventually guessed

what had happened. Jane Roe's cousin testified that she thought she then asked Jane Roe "you were with someone and you didn't want it?" and Jane Roe "nodded" in agreement.

234.   At this point in time, Jane Roe appeared to have experienced regrets about having had sexual intercourse with John Doe.  During the morning after, Jane Roe would have been in a position to consider the two one-night sexual encounters with two non-exclusive friends on two consecutive nights and at that point did not appear to have future romantic prospects with either one of them.

235.   Jane Roe's cousin then researched local hospitals and then went back into Jane Roe's room and pressed Jane Roe to go to the hospital for Jane Roe's "own health and safety," to which Jane Roe ultimately agreed. Jane Roe did not intend to discuss the night before when she got home and did not intend to go to the hospital because she knew that her sexual activities with John Doe were wholly consensual.

236.   Jane Roe asked her cousin to do the talking for Jane Roe at the hospital. It was the cousin therefore, not Jane Roe, who told the nurse that Jane Roe was the victim of a sexual assault and who filled out all of the paperwork at the hospital on behalf of Jane Roe.

237.   The next day, Sunday, August 27, 2017, Jane Roe sat together with her cousin and her future roommate and attempted to reconstruct the events of the prior night, even though neither her cousin nor her future roommate were present or communicating with Jane Roe at any relevant time. Similarly, on Monday evening, August 28, 2017, Jane Roe attempted to reconstruct the events of early Saturday morning with her future boyfriend.

238.   Once Jane Roe "recreated" the events with the help of her friends and then told many others, including her mother, the story of her sexual assault, she was subject to the pressure of her friends and mother to file the Incident Report.  Put another way, if Jane Roe's recreated

narrative were true (which it is not), then everyone she told would expect her to file the Incident Report to maintain her credibility.

239.    It is difficult to know what motivates people to act in a certain way. We do know that Jane Roe had few friends in the United States before the alleged incident on August 26, 2017, but thereafter Jane Roe became somewhat of a campus folk hero as evidenced by her more than 1,000 Twitter followers who in December 2017 received tweets from Jane Roe about the alleged sexual assault and her travails. Jane Roe also established a boyfriend relationship with someone who had previously ignored her many entreaties that evening.

**B.    John Doe Has Been Wrongly Found Responsible In A Gender-Biased Process: The Procedural Defects.**

240.    The April 2011 Dear Colleague Letter had ostensibly recognized and the September 2017 Dear Colleague Letter unequivocally recognizes that the procedures adopted by a school such as Columbia covered by Title IX must accord due process to both parties involved.  The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

241.    Columbia University's one-sided, gender-biased, result-oriented investigation and decision-making process is fundamentally unfair and produced a clearly erroneous result in finding John Doe responsible for non-consensual vaginal intercourse.  The "procedural errors" complained of by John Doe resulted in an "erroneous outcome" based on erroneous and distorted conception of the facts.

(i)    **Gender-Based Result-Oriented Dispositive Presumption: the Columbia investigation team inappropriately shifted the burden of proof to John Doe by explicitly presuming that Jane Roe was truthful.**

242.    The Columbia investigation team's findings expressly stated that Jane Roe would not put herself through the ordeal of reporting the incident if it were not true. The findings say that if an individual makes a sexual assault claim and goes through the arduous process, "it is hard to fathom" that the allegations are not true. This statement shifted the burden of proof to John Doe, thereby conveying a fundamental gender-based result-oriented bias against John Doe.  Columbia's sanction letter indicated that the Dean also explicitly believed that this presumption in Jane Roe's favor is appropriate -- that Jane Roe would not pursue her claims unless she was telling the truth.

243.    This presumption that Jane Roe was telling the truth unfairly prejudiced John Doe. For example:

i.    the Columbia investigation team did not question Jane Roe about her written claim in her Incident Report that her "17" texts to her future boyfriend were evidence of her "fear" even though the content of the texts themselves refuted this carefully written claim;

ii.    the Columbia investigation team did not ask Jane Roe about the irreconcilable inconsistencies between her testimony and her future boyfriend's testimony about these same texts, about her multiple texts on a prior night out alone when she was not afraid and about her statement that she felt it was safe to go back to John Doe's apartment;

iii.    the Columbia investigation team did not ask Jane Roe about the irreconcilable inconsistencies between her testimony and the testimony of Witness #5, Witness #6 and Witness #8;

iv.      the Columbia investigation team did not ask Jane Roe about her explicit statement to Witness #5 that she wanted to stay at the Chelsea dance club alone with John Doe.

244.    This gender-biased result-oriented presumption that Jane Roe was telling the truth virtually guaranteed a finding of responsibility against John Doe, eliminated the possibility of a fair and impartial process and pre-ordained the result.

**(ii)    Gender-Biased Result-Oriented Evaluation of Jane Roe's Credibility: as a result of its presumption that Jane Roe was telling the truth, Columbia University did not critically analyze the fundamental inconsistencies and discrepancies in her story.**

245.    The final Columbia investigation team report characterized the critical question as "which party's version of events is more credible, as the details are irreconcilable."  Yet, the Columbia investigation team credited Jane Roe's account even though Jane Roe's Incident Report and her statements to the Columbia investigation team are fundamentally inconsistent with the testimony of Jane Roe's three eyewitnesses relating to her kissing/sexualized activities at the Chelsea dance club, the exculpatory evidence relating to Jane Roe's "fear narrative," the exculpatory evidence relating to Jane Roe's true state of mind set forth in her texts to the future boyfriend soon after leaving John Doe's apartment, and most of the other evidence in the record.

246.    The Columbia investigation team failed to analyze critically Jane Roe's credibility, going so far as to cite Jane Roe's refusal to address the five questions John Doe sought to be asked as a *positive* in assessing her credibility.  In presuming that Jane Roe was telling the truth simply because she pursued her complaint, the Columbia investigation team intentionally avoided asking Jane Roe serious questions that suggested or implied that they did not wholeheartedly embrace her story.

247.    In contrast, John Doe told a consistent narrative of the events that culminated in mutually consensual sexual intercourse between John Doe and Jane Roe. Yet, the Columbia investigation team assailed John Doe's credibility based on relatively insignificant side points.

248.    The only inconsistency the Columbia investigation team found in Jane Roe's testimony was her contention regarding the number of people who rode with her in the first taxi. This was a transparently flimsy attempt to show an even-handed assessment of Jane Roe's credibility even while ignoring all of the inconsistencies and discrepancies between Jane Roe's story and the eyewitness statements and documentary evidence.

249.    Due to its gender-biased result-oriented investigation and presumption, the Columbia investigation team ignored all of the exculpatory evidence, mischaracterized the statements of witnesses, made up quotes on material matters, and misread key elements of the documentary evidence, including the evidence relating to:

    i.      Sexualized activities at the Chelsea dance club: the Columbia investigation team completely ignored, in assessing Jane Roe's credibility, Jane Roe's denial of Jane Roe's and John Doe's mutual sexualized activities at the Club even though the only eyewitnesses confirmed John Roe's testimony.

    ii.     Jane Roe's "fear of John Doe" narrative: the Columbia investigation team spent more than a page describing how the call logs, text messages and audio recording between Jane Roe and her future boyfriend substantiated her "fear of John Doe" narrative. The Columbia investigation team knew it must take this position because Jane Roe's "fear" was a fundamental tenet of her narrative. Jane Roe's "fear of John Doe" narrative goes straight to the heart of her credibility.   Yet, the Columbia investigation team never

questioned Jane Roe regarding the overt fundamental inconsistencies and discrepancies between her testimony and the evidence.

      iii.     Jane Roe's texts to her future boyfriend the next morning: the Columbia investigation team ignored the happy, smiling emojis and casual texts sent by Jane Roe to her future boyfriend soon after leaving John Doe's apartment, even after John Doe pointed them out in each of his submissions. These happy, smiling emojis shed light on Jane Roe's state of mind at this critical time period.

      iv.     The after-party mess in John Doe's apartment: the Columbia investigation team used Jane Roe's account that John Doe's apartment the next morning had the appearance of a "violent scene" the next morning to support its decision, even though the after-party mess resulted from the guests Jane Roe brought to John Doe's apartment and Jane Roe's belongings were scattered where she left them a few hours earlier.

      v.     Other exculpatory evidence: the Columbia investigation team ignored all of the other exculpatory evidence and never questioned Jane Roe regarding the condition of Jane Roe's dress, the colors and locations of Jane Roe's bruises, or any of the other overt fundamental inconsistencies and discrepancies pointed out herein. The Columbia investigation team presumed that Jane Roe was telling the truth.

250.    The Columbia investigation team treated as a positive in assessing Jane Roe's credibility her "black out memory loss."  Jane Roe conceded that she was in a state of "blackout memory loss," she had very little memory of the evening's events and she had even less memory of specific details. Jane Roe does not describe what happened, concisely or otherwise. Instead, she essentially says -- I remember saying "no" but I cannot remember much else because I was in a state of "blackout memory loss."  And, Jane Roe concedes that toward the end of the night her

"memory becomes . . . blackout with like glimpses of memory" and that her memory became "weird." She also confessed at one point that because of her blackout memory loss, "I don't even know if [one of the three things at the apartment she says she remembers is] a real memory anymore." Nevertheless, despite Jane Roe's expressed inability to determine which of her memories were real, the Columbia investigation team concluded that her admitted uncertainty serves as corroborative evidence that her "fragments" are inherently credible. The Columbia investigation team did not indicate how it distinguished between what it believed to be Jane Roe's "true" memories and those of Jane Roe's memories that were recreated.

251. Further, the Columbia investigation team never questioned Jane Roe's credibility even though she admitted that her fragmented "memories" were *created* over the course of several days with the help of her friends/future boyfriend who *were not with her at any relevant time*.

252. The Columbia investigation team thus applied a gendered double standard: it concluded that Jane Roe's account should be presumed to be accurate because she could not remember what happened, but John Doe's testimony was untruthful because he could not recall specific details on a few relatively insignificant side issues.

253. Columbia's conclusions regarding Jane Roe's credibility were reached after a gender-biased result-oriented investigation, substantive evaluation of the record and hearing procedure. Jane Roe's credibility could not be accurately determined without questioning Jane Roe about the fundamental inconsistencies and discrepancies between the key tenets of her narrative and the eyewitness statements and documentary evidence. Had the Columbia investigation team conducted a fair and impartial gender-neutral investigation, Columbia would have concluded that the details are not "irreconcilable" and that John Doe had been wrongly and falsely accused.

[89]

### (iii) Gender-Biased Result-Oriented Evaluation of John Doe's Credibility: Columbia presumed that John Doe's testimony was untrue and therefore did consider the consistencies between his testimony and the objective evidence.

254. As indicated, the Columbia investigation team said the case turns on credibility. But the Columbia investigation team presumed that Jane Roe's story was truthful and conversely presumed that John Doe's testimony was untruthful where his testimony was in conflict with Jane Roe's.

255. The Columbia investigation team challenged John Doe's credibility wherever possible, but could only do so based on three minor points.

256. *First*, the Columbia investigation team spent a *full-page* in its findings assailing John Doe's credibility and for being "deliberately untruthful" because he allegedly stated that Jane Roe was wearing "high-heels." Despite the Columbia investigation team stating six times John Doe said "high-heels," the investigative report itself says that John Doe said she was wearing "heels," which he clarified as "shoes that had some height." Jane Roe is fairly tall, her shoes had open backs and open straps in the front (like women's pumps) and were not flat sandals, and John Doe said they looked like heeled shoes from his vantage point. John Doe's statements relating to Jane Roe's shoes were arguably not error at all. The Columbia investigation team said what kind of shoes Jane Roe was wearing played a major role in supporting their conclusion that John Doe was not credible. It is very telling that the Columbia investigation team had to use something this minor to assail John Doe's credibility.

257. *Second*, the Columbia investigation team attacked John Doe's credibility based on a misrepresentation of what John Doe said about the gas valve in his room. John Doe told the Columbia investigation team that someone must have bumped into the gas valve to cause the gas leak but never said, as the Columbia investigation team suggested, that Jane Roe must have

bumped it repeatedly or hit her thigh.  This credibility attack was also misconceived because one of John Doe's experts concluded that Jane Roe's shoulder bruise matched the gas valve and that it could have happened from one bump.

258.    *Third*, the Columbia investigation team attacked John Doe's credibility about where he said sexual intercourse occurred. John Doe said he and Jane Roe had intercourse and slept in the larger master bedroom.  Jane Roe's contrary assertion was that the sexual intercourse occurred in John Doe's bedroom where she said they also slept.  The Columbia investigation team assailed John Doe's credibility on this issue, which was a major factor that the Columbia investigation team (and later the Columbia hearing panel) relied on in questioning John Doe's credibility.  The Columbia investigation team went so far as to speculate that John Doe might have opened the gas valve after Jane Roe left, a senseless assertion because John Doe and Jane Roe were sleeping when the gas leak began and such an act would have endangered John Doe, Jane Roe and everyone else in the building.  If John Doe and Jane Roe had spent the night in John Doe's smaller bedroom, the building porter would have come across them when checking on the gas leak.

259.    The fact that the Columbia investigation team found it necessary to invent and overstate facts, elevate minor points into major credibility issues and ignore material exculpatory facts exemplified the Columbia investigation team's bias against John Doe.

   **(iv)    Gender-Biased Result-Oriented Evaluation Of The Witnesses: the Columbia investigation team gave the testimony of Jane Doe's after-the-fact witnesses the same weight it gave to the eyewitness testimony.**

260.    The Columbia investigation team report also presented a distorted story because the Columbia investigation team accorded the hearsay statements of all of Jane Roe's after-the-fact "witnesses" the same weight as it gave to the testimony of the actual eyewitnesses in judging the credibility of Jane Roe's and John Doe's narratives.

[91]

261.     The Columbia investigation team report devoted 10 of the 44 pages of substantive writeup to the hearsay statements of Jane Roe's after-the-fact "witnesses."   The Columbia investigation team also spent another page in its findings on how Jane Roe's after-the-fact "witnesses" all corroborated Jane Roe's narrative.  These after-the-fact "witnesses" were three of Jane Roe's good friends and their loyalty to Jane Roe was evident from their statements.

262.     The hearsay statements of these after-the-fact "witnesses" were not probative.  The statements were not recounting a spontaneous and unedited first-hand report given soon after an incident by a person who could remember the details of the actual events.  Jane Roe claimed to have no real memory of most of the events that she claims transpired. Instead, these witnesses simply played back the *reconstructed* narrative told to them by Jane Roe, which Jane Roe had admittedly reconstructed with the help of her cousin, her future roommate, her future boyfriend and others who also had no first-hand knowledge of the facts.

263.     Jane Roe's statements to her after-the-fact witnesses were neither spontaneous nor unrehearsed and, therefore, should not be considered good corroborative evidence. Under the circumstances, the fact that these after-the-fact "witnesses" were able to repeat back to the Columbia investigation team the unspontaneous and carefully reconstructed narrative told to them by Jane Roe should have no corroborative weight.

264.     The Columbia investigation team, however, cited the statements of these after-the-fact "witnesses" as corroboration for the credibility of Jane Roe's narrative.  For one example, the Columbia investigation team thought it particularly relevant that some of these after-the-fact witnesses mentioned the "fear of John Doe" part of Jane Roe's narrative, even though this narrative was an after-the-fact creation that is completely contradicted by actual eyewitnesses and the documentary evidence in the record.

265.    The statements of these after-the-fact witnesses were extraordinarily prejudicial because some of these witnesses made statements about John Doe's actions that not even Jane Roe told to her cousin, her future roommate, her future boyfriend or the Columbia investigation team. Yet, the Columbia investigation team conveniently ignored the fact that the testimony of these after-the-fact "witnesses" went further than Jane Roe's testimony and characterized John Doe's actions in provocative and inflammatory terms that Jane Roe herself never said to the Columbia investigation team.

      **(v)**    **Gender-Biased Result-Oriented Shift Of Burden Of Proof On Jane Roe's Bruises: Columbia improperly shifted to John Doe the burden of proving that he did not cause Jane Roe's bruises.**

266.    According to the Columbia investigation report, John Doe was required to prove that he did not cause Jane Roe's bruises. Jane Roe did not know how she obtained her bruises and provided no evidence on this question.   Because Jane Roe was uncertain, the Columbia investigation team shifted to John Doe the burden of explaining the causes of Jane Roe's bruises. When John Doe indicated he had no idea how Jane Roe acquired her bruises, the Columbia investigation team held this failure against him, even though: (i) the bruises were not consistent with a coerced sexual assault, (ii) the location of the bruises were inconsistent with Jane Roe's testimony, and (iii) a number of the bruises, by coloration, predated John Doe's and Jane Roe's sexual activities earlier that same morning.  That the Columbia investigation team concluded that Jane Roe's bruises must have been caused by John Doe reflected its shifting of the burden of proof to John Doe.

(vi)    **Gender-Based Result-Oriented Evaluation Of Experts: the Columbia investigation team refused to consider the expert opinions on the two medically-related issues presented.**

267.    Upon receiving the draft Columbia investigation team report, John Doe realized that the incident raised two medically-related issues. One concerned the nature of, and cause for, Jane Roe's bruises and the second concerned the ramifications of Jane Roe's self-reported "blackout memory loss." John Doe promptly asked the Columbia investigation team for permission to solicit the views of expert witnesses to evaluate these issues. John Doe saw from the record that Jane Roe had intimate relations with her future boyfriend the evening before and sought the assistance of an expert to try to pinpoint the timing and cause for her bruises. John Doe needed Columbia's consent to seek expert advice because John Doe was constrained under Columbia procedures from disclosing documents to third parties without consent. Consent was given, but it took five weeks.

268.    Jane Roe responded with a very hastily put together expert report on the bruising. Jane Roe's report was provided by a registered nurse who did not appear to have the credentials to qualify as an expert. This expert report did not measure up to acceptable norms. But when John Doe sought to submit his expert's rebuttal views on Jane Roe's expert report, the Columbia investigation team refused to accept the rebuttal report because, it said, it did not want to slow down the investigation. (They said it would slow things down because Jane Roe would also want to submit a rebuttal, a questionable excuse since the investigation had already dragged on for seven months and any such rebuttal probably would have taken a week or less).

269.    John Doe received submitted expert reports on the from two well-regarded and distinguished medical experts. Each of John Doe's expert opinions were grounded in medically-based findings and medically-based expertise. John Doe's bruising expert confirmed that in terms

of their timing, size, shapes, locations, colors and causation, Jane Roe's bruises were not indicative of a sexual assault. John Doe's memory expert raised serious questions about the credibility of Jane Roe's reconstructed memory. According to the memory expert, a highly-qualified expert on memory who reviewed the record and provided an expert report in this matter, Jane Roe demonstrates a characteristic pattern described in the academic literature. Specifically, due to her professed blackout, Jane Roe felt compelled to fill in the gaps in her story and recreated her memories. Jane Roe admitted she did exactly this -- filled in the gaps in her story and recreated her memories -- with the help of at least three individuals over the following days and weeks. The three individuals were not with Jane Roe during the events and therefore could not say what actually happened. Thus, the memory expert concluded that Jane Roe's "memories" are tainted and distorted by the conjecture of her friends; therefore, Jane Roe's testimony was unreliable.

270.    The Columbia investigation team subsequently told John Doe that his expert reports were unreliable and would not be included in the record because John Doe had paid the experts. (Jane Roe's expert report was also not included). The Columbia investigation team reached this conclusion despite the impressive credentials of John Doe's experts and their carefully considered expert reports.

271.    Even though the Columbia investigative team explicitly said that the expert reports would not be considered, someone higher up must have thought better of that decision and how bad the record would look to preclude the expert reports on such flimsy grounds. This was especially true here where the expert reports undercut the conclusions the Columbia investigation team wanted to reach. The expert reports were therefore included in the record ostensibly for the Columbia hearing panel's consideration. This was just window-dressing. Since the Final Investigation Report attributed no significance to John Doe's expert reports, the Columbia hearing

panel was in no position in the short time frame it had the case to question this judgement. This silence had the same practical effect as not including the expert reports in the record.

272.     The expert reports submitted by John Doe address technical, scientific issues that the Columbia investigation team viewed as fundamental to the outcome of this investigation.  While the Columbia investigation team has considerable discretion to accept, or not, expert reports, it should be cautious about refusing to hear from experts on matters that fall outside the expertise of the Columbia investigation team. Even if the Columbia investigation team were unwilling to consider John Doe's expert reports, it should have retained its own experts or addressed in the Final Investigation Report the underlying issues raised by the expert reports. The Columbia investigation team inexplicably chose to do neither.

273.     The Columbia investigation team made this determination to preclude the export reports only after the Columbia investigation team  (x) initially  told John Doe after deliberating about it for five weeks that he could provide the expert reports; (y) reviewed  John Doe's expert reports and realized that  they supported John Doe; (z) read Jane Roe's expert report and determined that it would not stand up; and (aa) realized that it poked a huge hole in their gender-biased result-oriented investigation. It was an unconscionable abuse of process for the Columbia investigation team to react by simply turning a blind eye. But the Columbia investigation team also turned a blind eye to any evidence in this case that was inconsistent with the gender-biased result-oriented conclusion they were trying to justify.

**(vii)    Gender-Biased Result-Oriented Right To Cross-Examination: Jane Doe was never asked the many questions raised by John Doe.**

274.     Columbia did not permit John Doe to question Jane Roe, thereby depriving John Doe of the right to challenge his accuser. The Columbia investigation team eventually gave John Doe the opportunity to propose questions to be asked to Jane Roe; however, this occurred after the

Columbia investigation team had already issued its draft report.  John Doe proposed five questions (in addition to the dozens of questions raised by John Doe's March 13, 2018 written response), but Jane Roe refused to even listen to the questions much less answer them.

275.    As noted, the Columbia investigation team believed that Jane Roe's failure to even listen to the questions was a *positive* in assessing her credibility because it reflected her frustration about the length of the process.

276.    John Doe initially proposed only five questions because John Doe believed that, as the Columbia investigation team was charged with conducting a full and fair investigation, the investigation team would not need prompting to ask the many unanswered questions raised by the inconsistencies between Jane Roe's narrative, the statements of other witnesses and the documentary evidence.  Numerous obvious unanswered questions were highlighted in John Doe's submissions to the Columbia investigation team.  It turned out, however, that John Doe's assumption was mistaken; the Columbia investigation team was content to rest on its incomplete record, and the burden was entirely on John Doe to pose written questions to fill these investigation gaps.

277.    Before the hearing, John Doe sought to have the Columbia hearing panel ask some of the many questions that the Columbia investigation team failed to ask.  Again, John Doe's request was refused.  Instead, the Columbia hearing panel just asked Jane Roe the five written questions that had been previously propounded by John Doe. Jane Roe grudgingly responded to the Columbia hearing panel on these five questions. But there was no follow up from the Columbia hearing panel and no other questions asked of Jane Roe.

**(viii)   Gender-Biased Result-Oriented Investigation Report: the form and layout of the Columbia investigation team report obscure the inconsistencies and discrepancies between Jane Roe's testimony and the rest of the evidence.**

278.    The form and content of the Columbia investigation team report buried the investigation deficiencies of the Columbia investigation and obscures the fact that the Columbia investigation team simply accepted Jane Roe's narrative uncritically without asking proper follow-up questions either about Jane Roe's credibility issues or the overt fundamental inconsistencies and discrepancies raised by the eyewitness statements and documentary evidence. These procedural and investigation flaws made it impossible, given the speed with which the Columbia hearing panel reached its conclusions, for the Columbia hearing panel to identify the inconsistencies and properly evaluate the Columbia investigation team's findings.

279.    The form and content of the Columbia investigation team's draft report presents a distorted picture of the witness testimonies and evidence for a number of reasons, including:

    a.    the draft report strung together party-by-party and witness-by-witness interview summaries and credibility assessments with few citations to the record;

    b.    there was no summary analysis providing a clear understanding of each party's narrative, no synthesis of each party's multiple interviews, and no reconciliation of the testimony of all the witnesses and evidence;

    c.    there was no critical analysis of the numerous overt fundamental inconsistencies and discrepancies between Jane Roe's testimony and the testimony of the eyewitnesses and the documentary evidence;

    d.    10 of the 44 pages are devoted to Jane Roe's after-the-fact witnesses (fifteen pages including her cousin's account) who heard Jane Roe's statements after they were reconstructed;

e.      The hearsay statements of all of Jane Roe's after-the-fact "witnesses" are granted the same weight as the weight given to the testimony of the actual eyewitnesses in judging the credibility of Jane Roe's and John Doe's narratives;

f.      the hearsay statements of Jane Roe's after-the-fact "witnesses" were highly prejudicial because these witnesses made statements about John Doe's actions that were conjecture and did not reflect what Jane Roe told to her cousin, her future roommate, her future boyfriend or to the Columbia investigation team; and

g.      the Columbia investigation team ignored the fact that the hearsay statements of Jane Roe's after-the-fact "witnesses" went far beyond all of the other evidence when assessing the facts.

**(ix)    Gender-Biased Result-Oriented Decision-Making Process: the Columbia investigation team refused to consider John Doe's written response.**

280.    The Columbia investigation team never considered, much less addressed, the many matters raised in John Doe's March 13, 2018 report, and never questioned Jane Roe about them.

281.    After John Doe received the Columbia investigation team's draft report, John Doe submitted a written response on March 13, 2018 that highlighted many of the inconsistencies and discrepancies in Jane Roe's narrative. While John Doe's March 13, 2018 submission provided the Columbia investigators with a roadmap for further investigation and inquiry, the Columbia investigation team ignored relevant questions and information designed to shed light on its inquiry and showed no interest in questioning Jane Roe about the highlighted issues.

282.    Instead, the Columbia investigation team castigated John Doe for submitting his response, indicating to John Doe that he was limited to making corrections and adding information to the draft report and that it was not appropriate for John Doe to comment on, and raise questions about, Jane Roe's narrative and evidence at that time or to point out the inconsistencies between

Jane Roe's narrative and other witness statements and the documentary evidence. The Columbia investigation team further indicated that any submission of the type offered by John Doe was premature and, when appropriate, would be limited to only ten single spaced pages addressed to the Columbia hearing panel once the Columbia investigation team had finalized its findings.

**(x)  Gender-Biased Result-Oriented Decision-Making Process: John Doe was not provided with a meaningful opportunity to respond to the Columbia investigation team final report and the Columbia hearing panel rushed to judgment.**

283.  John Doe received the Columbia investigation team's final report on Thursday evening, April 12, 2018, and was given until only Tuesday April 17, 2018 to provide his written response. John Doe was given a mere three working days to respond to a ninety-plus page single-spaced report plus several hundred pages of exhibits. Further, John Doe's response was limited to only ten single-spaced pages. This five-day time period and page limitation gave John Doe insufficient time and space to draft a comprehensive response. Still, John Doe met the deadline and on Tuesday, April 17, 2018, John Doe submitted a written response to the final Columbia investigation team report stating he had been wrongly and falsely accused and giving his reasons for this conclusion. The page limitation, however, made it impossible for John Doe to point out the many errors in the final report.

284.  The Columbia hearing panel (i) received the ninety-plus-page Columbia investigation team report and attachments thereto, together with the responses of John Doe and Jane Roe, on April 18, 2018, (ii) held a "hearing" the next day on April 19, 2018 and (iii) rendered a decision based on the Columbia investigation report the following day on April 20, 2018. The Columbia hearing panel did not have the time to undertake a fair and thoughtful review of the entire record, but rather completely relied on the flawed report of the Columbia investigation team.

[100]

**(xi)**     **Gender Biased Result-Oriented Decision-Making Process: gender bias at the hearing and in the decision-making.**

285.     The failure of the Columbia investigation team to address the fundamental inconsistencies and discrepancies between the key tenets of Jane Roe's narrative and the eyewitness statements and documentary evidence carried over and effectively prevented the Columbia hearing panel from making an informed decision.

286.     The Columbia hearing panel did not ask Jane Roe about the overt fundamental discrepancies and inconsistencies between Jane Roe's narrative and the statements of her witnesses and documentary evidence, despite the fact that John Doe highlighted them to the Columbia hearing panel and explicitly sought to have the Columbia hearing panel question Jane Roe on these points.

287.     Jane Roe made inflammatory allegations in her written response submitted to the Columbia hearing panel and in her oral statement to the Columbia hearing panel that Jane Roe had not previously made to the Columbia investigation team during the entire seven-month "investigation." These allegations were not questioned by and were simply presumed to be true by the Columbia hearing panel and were severely prejudicial to John Doe, who had no meaningful opportunity to respond to them.  As noted, Columbia also rebuffed John Doe's efforts to have his questions of Jane Roe answered, even though evaluation of the evidence hinged on Jane Roe's credibility.

288.     The Columbia hearing panel, without a critical write-up from the Columbia investigation team, without asking its own questions, and without adequate time to go through the record, had by necessity placed reliance on the Columbia investigation team's findings and rubber-stamped the Columbia investigation team findings.  By letter dated April 20, 2018, the Columbia hearing panel announced its finding that John Doe was responsible for sexual assault involving

two instances of non-consensual sexual intercourse.   As noted, the Columbia hearing panel decision came only two days after the Columbia hearing panel received the voluminous written record and only one day after the hearing.   The sanction of expulsion was issued four days after the Columbia hearing panel responsibility decision.   This represents a gender-biased rush to judgment that was unfairly prejudicial to John Doe.

**(xii)    Columbia has a gender-biased victim-oriented process.**

289.    Columbia has a victim-centered and gender-biased process in which an accused male student is prosecuted under a presumption of guilt, improperly placing the burden of proof on the male student, and evaluates evidence according to gender-biased assumptions to reach results finding males "responsible" to achieve "justice" according to "gender-identity politics." The Columbia investigation report stated this explicitly, saying: "*It is hard to fathom why the Complainant would subject herself to a long and invasive process…if she merely engaged in consensual sex but regretted it afterwards*" [emphasis supplied]. Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Columbia on the basis of his sex.

290.    To say the process is "victim-centered, but not gender biased" is: (i) trumping reality with a theoretical but non-existent possibility of females being both victims and accused and males being both victims and accused; and (ii) ignoring what these university sexual misconduct tribunals have been about.   If the system is victim-centered, it is not neutral and impartial; and the reality at Columbia and elsewhere is that males are the "accused" respondents and females are the "victim" complainants. Furthermore, the conception of these campus sexual misconduct tribunals has been to protect women. The April 2011 Dear Colleague Letter premised the need for colleges to discipline sexual misconduct, using a preponderance of the evidence

standard, with the false statistic that 1 in 5 *women* on campus were victims of sexual assault, https://www2.ed._gov/about/offices/list/ocr/letters/colleague-201104.html; the real number of college women assault victims is .03 in 5. *Rape and Sexual Assault Victimization among College Age Females, 1995-2013* (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf. To deny the female protectionist nature of campus sex tribunals is not law, but a misconceived political effort to obscure the gender-identity politics at work, and openly promoted outside the courtroom, and undercut farness for respondents. Universities such as Columbia can deny all they want about being "pressured" (never mind the federal funding involved), but universities have acted aggressively in implementing measures to specifically protect female "survivors" and "victims."

291.    Paragraphs 52 through 80 above in this Amended Complaint document the Columbia statements in the media and social media giving rise to the anti-male gender biased, victim-oriented, trauma-informed process reflecting the mantras of believe all woman and rape culture.

292.    The decked was stacked against John Doe. The Columbia investigation team presumed from day one that John Doe was guilty of the sexual misconduct charges, as everyone is guilty when someone complains, and it was just a matter of putting the evidence together to prove the case. There is no other way to explain the Columbia investigation team's failure to address the evidence that contradicted the narrative they were seeking to develop.

293.    The totality of circumstances establishes that Columbia has demonstrated a pattern of inherent and systematic gender bias and discrimination against accused male students.  Upon information and belief, all students that have been suspended or expelled from Columbia for sexual misconduct have been male.

294.    Male respondents in sexual misconduct cases at Columbia are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the sufficiency of the evidence.

**C.    John Doe Received An Excessive Sanction Based In Part on Gender Bias.**

295.    An "unduly severe penalty" was imposed in this case because John Doe, who had no prior disciplinary history and who believed he had consent for the sexual conduct that occurred, was expelled from Columbia. This "unduly severe penalty" was affected by John Doe's male gender.  This decision has career-ending consequences for John Doe.

296.    Columbia University imposed an excessive sanction which deprived John Doe of a Columbia graduate school degree even though he had essentially completed the program. The Columbia sanction letter stated that the Dean had reviewed the entire file and had concluded that in light of the serious nature of the violations, John Doe should be expelled from the Columbia graduate school program.  The Dean's review, consultations and decision had to have occurred in the four days over the Easter weekend between Friday, April 20, 2018 and Tuesday, April 24, 2018.

297.    The totality of the circumstances establish that Columbia's decision to order an unduly severe expulsion was affected by John Doe's male gender.  Columbia's decision to order sanctions that were unduly severe did not take into sufficient account that John Doe had a previously unblemished disciplinary record at Columbia and presumed that Columbia would have an unsafe environment by the presence of a male student who was in fact on campus for two school years without incident.

**D.    Monetary and Injunctive Relief.**

298.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

299.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the expulsion, enjoining Columbia from preventing John Doe doing what is necessary to receive a graduate degree from Columbia and granting clearing of John Doe's transcript of the disciplinary record.

**SECOND CAUSE OF ACTION:**
**(State Law Breach of Contract)**

300.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

301.    Columbia created an express and/or implied contract under New York law when John Doe accepted an offer of admission to Columbia University and paid the tuition and fees.

302.    Columbia Policy provides that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed.  Columbia breached its contract with John Doe when it failed to conduct a fair and impartial process that treated John Does and Jane Roes equally and when it failed to adhere to the presumption of innocence of the respondent, including by not using the proper burden of proof standard by effectively shifting the burden of proof to John Doe, by precluding John Doe's expert witnesses, and by failing to question Jane Roe about the obvious

material fundamental inconsistencies and discrepancies between her narrative and the statements of her witnesses and the documentary evidence she provided.

303.    As noted above, in August 2017, Columbia issued revised Gender Based Misconduct Policies which were in effect in John Doe's case.  Those revised Gender Based Misconduct Policies included, among others: (i) the requirement that investigators be impartial and unbiased; (ii) investigators interviewing all witnesses with relevant information; (iii) during the investigation, complainants and respondents may ask questions of each other through the investigators; (iv) credibility is to be determined by the consistency of accounts over time, demeanor, corroborating evidence, motive to lie and reasonableness of detail; (v) the burden of proof is the preponderance of the evidence, which means that it is more likely than not the respondent engaged in the conduct for which the respondent was charged as Gender Based Misconduct under Columbia's Gender Based Misconduct Policies; (vi) a pre-determination conference as to which it was the last opportunity for the parties to offer evidence and ask questions of each other through the investigators; (vii) a hearing panel that is tasked to evaluate and analyze the relevant information; and (viii) at the hearing, no cross-examination and questions asked by the parties of each other.

304.    Columbia did not adhere to its contractual promises by: (i) not adhering to the requirement that investigators be impartial and unbiased; (ii) by not adhering to the requirement that during the investigation, complainants and respondents may ask questions of each other through the investigators; (iv) by not adhering in fact to the requirement that credibility is to be determined by the consistency of accounts over time, demeanor, corroborating evidence, motive to lie and reasonableness of detail; (v) by not adhering in fact to the requirement that the burden of proof is the preponderance of the evidence, which means that it is more likely than not the

respondent engaged in the conduct for which John Doe was charged as Gender Based Misconduct under Columbia's Gender Based Misconduct Policies; (vi) by not adhering in fact to the requirement that a pre-determination conference be held at which John Doe could offer evidence and ask questions of Jane Doe through the investigators; and (vii) by not adhering in fact to the requirement that a hearing panel that is tasked to evaluate and analyze the relevant information;

305.   Based on the aforementioned facts and circumstances, Columbia breached its express and/or implied contract with John Doe because Columbia breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe.  Columbia failed its duty of good faith and fair dealing when it committed the procedural and substantive errors complained of above, meted out a disproportionate sanction notwithstanding the flawed process and found John Doe responsible despite the lack of evidence in support of Jane Roe's allegations of sexual misconduct.

306.   John Doe is entitled to recover damages for Columbia's breach of the express and/or implied contractual obligations described above.  As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

307.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION:
### (State Law Promissory Estoppel)

308.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

309.    Columbia's Policies constitute unambiguous representations and promises that Columbia should have reasonably expected to induce action or forbearance on the part of John Doe.

310.    Columbia expected or should have expected John Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Policies be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly.

311.    John Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Columbia, by choosing to attend Columbia rather than other schools of equal caliber.

312.    These express and implied promises and representations made by Columbia must be enforced to prevent substantial injustice to John Doe.

313.    Based on the foregoing, Columbia is liable to John Doe based on promissory estoppel.

314.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

315.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Columbia as follows:

(i)  on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Columbia awarding John Doe:

   (a)  damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

   (b)  an injunction vacating John Doe's disciplinary findings and decision, enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the expulsion, enjoining Columbia from preventing John Doe doing what is necessary to receive a graduate degree from Columbia and granting clearing of John Doe's transcript of the disciplinary record;

(ii)  on the second cause of action for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)  on the third cause of action for state law promissory estoppel, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities,

[109]

and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff John Doe demands a trial by jury of all issues presented herein that are triable by a jury.

**Dated: New York, New York**
            **July 30, 2021**

**NESENOFF & MILTENBERG, LLP**

By: /s/ *Philip A. Byler*
**Philip A. Byler, Esq.**
**Andrew T. Miltenberg, Esq.**
**Stuart Bernstein, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
pbyler@nmllplaw.com
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com

*Attorneys for Plaintiff John Doe*