# EXHIBIT A

**CONFIDENTIAL**                                        **March 13, 2018**

# RESPONDENT'S RESPONSE

# TO THE

# GENDER-BASED MISCONDUCT

# INVESTIGATIVE REPORT

## (dated December 2017)

March 13, 2018

# TABLE OF CONTENTS

INTRODUCTION: .................................................................................................................1

Part I:      My account of the evening's events has been consistent throughout this
             investigation and is detailed, candid and based on my recollection alone;
             Complainant's various accounts were "reconstructed" with the help of her friends
             because of Complainant's "blackout" memory loss, have been inconsistent, and
             are at odds with the statements and evidence provided by *her own witnesses* ....................4

Part II:     Complainant convinced me to go with her bar/party hopping during Friday night,
             August 25, 2017 ......................................................................................................8

Part III:    Despite Complainant's denials, disinterested witnesses observed Complainant
             and me engaged in consensual sexual behavior at the ███████████ including
             kissing, touching, hugging and sexually grinding on the dance floor ...................................10

Part IV:     Complainant's "reconstructed" allegations of strong feelings of "fear" are patently
             and knowingly false; Complainant "reconstructed" her "fear" narrative with
             Witness #1 on Monday night (almost 3 days after the morning in question) ........................16

Part V:      Complainant and I were two mature adults voluntarily agreeing to a consensual
             sexual encounter; Complainant and I agree that we engaged in multiple sexual
             activities in multiple rooms in multiple beds in my apartment .............................................23

Part VI:     Complainant's claimed recollection of the brief exchanges at my apartment is at
             odds with my recollection; Complainant and I each had the capacity to, and did,
             give mutual consent; I did not have actual knowledge of, or reason to know of,
             Complainant's "blackout" memory loss ............................................................................26

Part VII:    My expert witness provides context for Complainant's narrative in light of
             Complainant's "blackout" memory loss ............................................................................31

Part VIII:   No force, intimidating behavior or coercion was involved; Complainant's bruises
             were not the result of nonconsensual sexual activity ..........................................................34

Part IX:     Complainant's claim that my apartment had the appearance of a "violent scene"
             the next morning is belied by the objective facts ...............................................................40

Part X:      Complainant's course of conduct the next morning is not consistent with a violent
             sexual assault; Complainant's texts to Witness #1 tell a different story ...............................41

Part XI:     My course of conduct over the next few days is consistent with caring for a friend
             with whom I just had consensual sexual intercourse ..........................................................45

Part XII:    Great pressure on Complainant to report incident because of her allegations
             ("raped and beaten"); Complainant's witnesses and her documentary evidence
             vindicate me ............................................................................................................48

ULTIMATE FINDINGS .........................................................................................................50

# List of Exhibits

**Exhibit A:**   "Expert Report of Dr. Kim Fromme on the effect of Complainant's alcohol-induced blackouts on her cognition and memory processes."

**Exhibit B:**   "Expert Report of Dr. Jennifer L. Hammers on Complainant's bruising".

**Exhibit C:**   "Letter from [my girlfriend] dated January 15, 2018."

**Exhibit D:**   "Verbatim transcript of text messages between Complainant and me."

**Exhibit E:**   "Verbatim transcript of Investigative Report accounts of sexual behavior at the ███████████ and in the taxi."

**Exhibit F:**   "Verbatim transcript of Investigative Report accounts of Complainant statement of events as told to "after the fact" witnesses, Lenox Hill Hospital, Columbia Medical Center and the Incident Report."

**Exhibit G:**   "Verbatim transcript of text messages and log of phone calls between Complainant and Witness #1."

**Exhibit H:**   "Verbatim transcript ██████ to English translation) of text messages between Complainant and Witness #2."

**Exhibit I:**   "Verbatim transcript of text messages between Witness #2 and Witness #5."

**Exhibit J:**   "Verbatim transcript of text messages between Witness #2 and me."

**Exhibit K:**   "My unsent text to Complainant."

## RESPONDENT'S RESPONSE TO THE
## GENDER-BASED MISCONDUCT
## INVESTIGATIVE REPORT
(dated December 2017)

In this submission, I have analyzed and synthesized the evidence and documentation contained in the Gender-Based Misconduct Investigative Report dated December 2017 ("Investigative Report") together with certain additional information and documentation.  This collective material demonstrates that the sexual intercourse between Complainant and me on August 26, 2017 was the result of a knowing, voluntary and mutual decision by each of us to engage in sexual intercourse, that each of us had the capacity to make a reasonable, rational decision because each of us had the ability to understand his or her decision and that there was no force, intimidating behavior or coercion involved.

As the panel and I do not have the expertise to understand and assess bruises and differences in individual responses to alcohol this submission includes an expert report from a clinical psychologist who specializes in assessing differences in individual responses to alcohol and an expert report from an expert on bruising. The reports of the two experts, and their curricula vitae, are attached as **Exhibit A:**  *Expert Report of Dr. Kim Fromme on the effect of Complainant's alcohol-induced blackouts on her cognition and memory processes; and **Exhibit B:** Expert Report of Dr. Jennifer L. Hammers on Complainant's bruising.*

As you know, I am pretty much alone in this matter. Aside from my statements, the records that form the basis of the Investigative Report consist of the Complainant's multiple statements (in the Lenox Hill hospital records, the Columbia Incident Report and the Investigative Report);

statements of Complainant's ten eyewitnesses and outcry witnesses; Complainant's hospital and

medical records; and documents furnished by Complainant's witnesses. I know no one in the group

that Complainant and I were out with that night and I had no meaningful way to access any of those

witnesses. My sole witness was my sister to whom I reached out a few days after the event,

surprised and upset, to ask her views on why the Complainant might have cut me off as a social

media friend after our night out. Fortunately, many of the witnesses offered by Complainant are

truly independent and have no significant relationship with either party. It is this neutrality that

enhances the credibility of these witnesses who, in important ways, contradict the key cornerstones

of Complainant's narrative and demonstrate that I was falsely accused of nonconsensual coerced

sexual activity.

These false allegations of nonconsensual coerced sexual activity have been devastating

personally for me as well as my parents, my sister, and my girlfriend. Attached is a letter from my

girlfriend detailing her personal anguish. See **Exhibit C**: *"Letter from [my Girlfriend]."* My parents

raised me to respect all people and I have lived my life that way.  I was fortunate to have very strong

relationships with my mother and sister and this foundational trust and regard for women has

informed all of my relationships with female friends and colleagues.  I have been aware of the issue

of sexual violence ████████████████████████████████████████████████

███████████  To be falsely accused of perpetrating such violence has upset my world view.  It will

have a long-term effect on my well-being and belief in the trustworthiness of people.

These false allegations have also dramatically affected my educational experience at

Columbia this year. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████  That was one of the

main reasons I reached out to Complainant that evening – it would give me the opportunity to meet

incoming ███ students because Complainant was their ████████ ██████████

██████████████████████████████████████████████████████████

████████████████████████████

I was particularly devastated to read some of the inflammatory and false statements

Complainant made to fellow ████ students:

- **Witness #4:** *"He was violent towards her, like taking off her clothes".  Complainant showed her bruises.*

- **Witness #7:** *Complainant showed him the bruises and said it was Respondent; said he beat her up and raped her; really brutal.*

- **Witness #9:** *Complainant was "raped" by Respondent; she showed him the bruises.*

And those quotes are just the ones I know about.

While Complainant was apparently coached to refrain in both the Incident Report and her

interviews with the Investigative Team from explicitly repeating some of her more incendiary

remarks, Complainant made sure that the inferences were still there.  There are no supporting facts

to back her up.

I also found it very disturbing to read Complainant's tweet on ███████████

announcing to her more than 1,000 followers that her sexual misconduct case was under

investigation.

I very much look forward to seeing this matter resolved and my reputation restored.

# MY RESPONSIVE POINTS

**Part I:** **My account of the evening's events has been consistent throughout this investigation and is detailed, candid and based on my recollection alone; Complainant's various accounts were "reconstructed" with the help of her friends because of Complainant's "blackout" memory loss, have been inconsistent, and are at odds with the statements and evidence provided by *her own witnesses***

1.      I have always stated throughout these proceedings that the sexual intercourse engaged in by Complainant and me during the early morning hours of Saturday morning, August 26, 2017 was *voluntary, mutual and consensual, and did not involve coercion.*  In support, I have provided a detailed, consistent and coherent narrative providing significant detail about the evening and early morning events. Although I did not have any of my friends with me at any time, the observations of the *Complainant's* witnesses are entirely consistent with my version of events.

2.      Complainant, on the other hand, denies engaging in any sexual behavior with me at the ████████ alleges that she became "afraid" of me and what might happen starting about 1:15 am at the ████████ and further alleges that the sexual intercourse between us was not consensual. In making these allegations, Complainant provided an inconsistent account of the events of the night in her various statements to the Investigative Team, the initial Incident Report, and her Lenox Hill Hospital statement. In addition, Complainant's statements are inconsistent not only with my statements about what occurred that night, but also with statements made by her *own witnesses.*

3.      As I describe in detail below, the facts and objective evidence tell a very different story than Complainant's narrative. Multiple eye witnesses observed Complainant

kissing and engaging in other sexual behavior with me at the ████████ substantial

evidence proves Complainant was not "afraid" of me at any time throughout the night; and the

sexual intercourse between us (we were friends for a year) was mutually consensual. Thus, the

facts and objective evidence directly contradict Complainant's narrative.

4.      Complainant claims that she was in a "blackout" state of memory loss during

much of the morning in question and remembers very little detail. She claims that her

"blackout" state began at about 1:15 am and continued until she woke up later that morning in

my apartment.

5.      This "blackout" state was not an unusual event for Complainant.  Complainant

confessed to a history of "blackouts". She *admits* that "I have blacked out in my past." Also,

"she recalled having blacked out previously," although when she blacks out, "she does not

normally experience losing her memory". (Investigative Report p. 17). According to

Complainant, the difference between her blackout during the morning in question and her

other blackouts, is that this blackout allegedly lasted longer than usual and that when she

blacked out in the past, "I've always been very aware that I drank too much. I didn't feel that

way this time."

6.      As a result of her "blackout", Complainant admits that she only has isolated,

fleeting "memories" of what took place and that, therefore, she "reconstructed" the early

morning's events with the assistance of Witness #1, her current boyfriend; Witness #2, her

current roommate; and Witness #3, her cousin ████████

7.      Complainant and Witness #3 *admit* that Witness #3 "filled out all the paperwork

at the hospital on behalf of the Complainant" and that Complainant asked Witness #3 to do

the talking for Complainant at the hospital. Thus, it is unclear who said what at the hospital. In any event, the details communicated to the hospital nurses were sparse.

8.     Complainant, Witness #2 and Witness #3 also *admit* that they spent Sunday afternoon August 27, 2017 at Complainant's apartment reconstructing the events that form the basis of Complainant's narrative. And Complainant and Witness #1 admit they spent Monday evening together similarly reconstructing Complainant's narrative. Moreover, Complainant and her current roommate, her cousin and her current boyfriend probably continued reconstructing Complainant's narrative until September 17, 2017 when Complainant submitted her written Incident Report and further until November 16, 2017 when Complainant gave her final follow-up interview.

9.     Witness #1 and Witness #3, however, were not physically present, or otherwise communicating with Complainant during the Saturday, August 26, 2017 early morning hours. Witness #2 left the ███████ at 1:15 am, prior to the time Complainant and I became more publicly intimate. Thus, all Witness #1, Witness #2 and Witness #3 could offer Complainant were speculative theories of what may have happened.  Such theories (e.g., that no sexual behavior occurred and Complainant was "fearful") conflict with the objective evidence.

10.    The "reconstructed" narrative developed by Complainant, Witness #1, Witness #2 and Witness #3 is built on two fundamental (and clearly false) allegations:

- First, Complainant alleges, contrary to the objective facts, that Complainant and I did not engage in mutual sexual behavior at the ███████ and

- Second, Complainant alleges, contrary to the objective facts, that she experienced strong feelings of "fear" of me and what I might do.

11.    As I describe in the next sections, this "reconstructed" narrative is entirely *inconsistent* with the facts and the objective evidence. Indeed, the undisputed testimony given by *Complainant's* eye witnesses and Complainant's entire course of conduct throughout the evening and morning support my account.

## Part II: Complainant convinced me to go with her bar/party hopping during Friday night, August 25, 2017

12.     Complainant and I first met and became friends during our first week in Columbia University's ▮▮▮ program in the Fall, 2016 semester. Initially, we "met on occasion or hung out". But, by the end of the school year, we "sat together [in class] and became better friends" and "had brunch together and studied ▮▮▮ together." We also socialized together after school where we'd "meet up for drinks with friends." Throughout our first year as friends, there was no romantic or sexual element to our relationship. Complainant stated "We were friends, but.......He always had a girlfriend....and even if I did [have feelings for him] I wouldn't act on it because he had *that* girlfriend." (Investigative Report p. 10). ▮▮▮

▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮

13.     Complainant and I stayed in touch via social media over the summer and on Friday, August 25, 2017 we got back in touch for the first time for the Fall, 2017 semester. I reached out to Complainant at 8:01 p.m. and she then invited me to join her at ▮▮▮▮ ▮▮▮[2]

> *Complainant: I'm at ▮▮▮▮▮ Where you at?*
> *Me: At home! What are you doing this weekend??"*
> *Complainant: Come to ▮▮▮▮*

The text log makes it clear that I refused Complainant's first and subsequent invitations to go out. Instead I invited Complainant, Witness #2 and three of Witness #2's ▮▮▮ friends over to my apartment. At first, Complainant simply thanked me but then she asked me to join her at a housewarming party. I refused Complainant's second invitation to go out and said that I wanted to just "*chill at home*".

_____

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See **Exhibit D:** "Verbatim transcript of text messages between Complainant and me."*

14.    Complainant then texted me *"Do u wanna have us over?"*. I said ok again and Complainant, Witness #2, Witness #2's three friends, as well as four additional individuals, all came over to my apartment for approximately one hour.

15.    At my apartment, Complainant, Witness #2 and I discussed whether I would get married to my girlfriend. At that point, Complainant made a comment to me (which she now denies) that really stood out. Complainant said: "Imagine if *we* were married." I told the Investigative Team in October, 2017 that it was an awkward situation at the time and "looking back on it" the comment struck me as "odd", but at the moment I did not "take it as an indicator of anything."  Now, however, I believe this comment was Complainant's first "flirt" of the evening.

16.    The group of ten enjoyed themselves at my apartment until they decided to go to the housewarming party. Witness #2 confirmed that I still "wanted to stay" home in my apartment and not go out, rebuffing Complainant's third invitation.

17.    Thus, the text log and testimony are clear that Complainant wanted me to spend the evening with her bar/party hopping, but that I preferred to stay alone in my apartment and not out. However, I eventually relented and joined Complainant, Witness #2 and the others first at the housewarming party and then at the ███████████.

18.    The group went by car to the housewarming party, stayed about 30 minutes and then left for the ███████████  I rode in the front seat of the taxi from the housewarming party to the ███████████ and chatted with the driver.  We arrived at the ███████████ at about 11:40 pm.  It was not until after about 1:15 am that Complainant and I began partying together exclusively at the ███████████.

**Part III:**     **Despite Complainant's denials, disinterested witnesses observed Complainant and me engaged in consensual sexual behavior at the** ▮▮▮▮▮▮ **including kissing, touching, hugging and sexually grinding on the dance floor**

19.     I have stated that Complainant and I engaged in kissing, touching, hugging and sexual grinding on the ▮▮▮▮▮▮ dance floor, and that this sexual behavior was voluntary and mutually consensual and continued for a protracted period of time. [3]

20.     Complainant's narrative is very different – she denies that we engaged in any voluntary, consensual kissing or other sexual behavior at the ▮▮▮▮▮▮

21.     As described in great detail below, three of *Complainant's* eye witnesses (i.e., Witness #5, Witness #6 and Witness #8) confirm my account as they observed Complainant and me voluntarily and mutually kissing and engaging in other sexual behavior (including touching, hugging and sexual grinding).

22.     The keen observations by Witness #5, Witness #6 and Witness #8 of Complainant and me in the ▮▮▮▮▮▮ are even more remarkable because they had just met both of us that evening and we were undoubtedly not the only couple in the crowded ▮▮▮▮▮▮ engaging in amorous activity.

23.     When we first arrived at the ▮▮▮▮▮▮ I did not spend all my time with Complainant. I had a lengthy sports conversation (boxing) with the bartender.  I also danced in a circle with others, conversed with others and separated from Complainant outside the ▮▮▮▮▮▮ during smoking breaks. Still Complainant and I were having a fun time together. As I told the Investigative Team, Complainant "always laughs at my jokes, but it

---

[3] *For a description of Complainant, my and eyewitness accounts, see* **Exhibit E***: "Verbatim transcript of Investigative Report accounts of sexual behavior at the* ▮▮▮▮▮▮ *and in the taxi").*

seemed more so than usual." (Investigative Report p. 23, reproduced in Exhibit E p.1). Others witnessed this as well. Witness #5 testified that "they spent the whole night together. They were laughing together…" (Investigative Report p. 43, reproduced in Exhibit E p.3). Witness #5 also testified that Complainant was "laughing a lot".

24.     As I also told the Investigative Team, as Complainant and I talked face to face and joked with one another, "Our hands started to brush. Maybe it [was] accidental at first but then you start to realize, 'Ok, sexual energy started developing between us". (Investigative Report p. 23, reproduced in Exhibit E p. 1). The eye contact and hand touching were subtle. Thus, it is not surprising that Witness #2 said she did not see any flirtatious behavior or kissing between us prior to her 1:15 am departure from the ██████ ████[4]. Evidently, as described below, Witness #2 left the ████████ too early; other witnesses saw kissing and unmistakable consensual sexual behavior take place after Witness #2 left.

25.     Although I testified that sexual tension with Complainant began to build at the ████████ it would appear that we may not have engaged in publicly-observed sexual behavior prior to reentering the ██████ at around 1:15 am Saturday morning (i.e., after going outside for our last smoking break). We both agree that we did not kiss before 1:15 am.

26.     According to Complainant, the sexual behavior started immediately after Witness #2 left the ██████ around 1:15 am. Perhaps Witness #2's absence somehow freed the sexual activity to begin. I, however, had not met Witness #2 before the evening in question and did not really know when Witness #2 left.  (Investigative Report p. 24,

---

[4] *Witness #2's claimed failure to observe any sexual behavior prior to 1:15 am undoubtedly colored the views she expressed while helping Complainant reconstruct the evening's events on Sunday afternoon August 27, 2017. Witness #2 told the Investigative Team in no uncertain terms that Complainant had no romantic interest in me.  (Investigative Report p. 34, reproduced in Exhibit E p.2). However, Witness #2 admitted she had not previously discussed this with Complainant.*

reproduced in Exhibit E p. 2).  I had no reason to believe that Witness #2 or anyone else at the

████████████ would object if Complainant and I started to kiss and, from my perspective, the

presence or absence of Witness #2 had no significance in terms of the timing for initiating a

kiss.

27.    Once back inside the ████████████ after our smoking break, we became

exclusive with our time together. We were "standing face to face" and our consensual

touching "turned into mutual kissing". (Investigative Report p. 23, reproduced in Exhibit E p.

1). I told the Investigative Team that, "Our heads [were] leaning toward each other. First it

start[ed] out as lips, then French kissing." As we were mutually kissing one another,

Complainant "lean[ed] back and ask[ed], 'What about [redacted]," referring to my girlfriend. I

replied, "Don't worry about it, she's not here right now." Complainant also confirms this

dance floor discussion[5].  (Investigative Report p. 23-24, reproduced in Exhibit E p.1).  We

then started mutually "kissing again."

28.    I told the Investigative Team that I "assume[d]" that other members of the group

observed the kiss, but I was not sure. As I stated, "It's a pretty small club so I assume some of

them would have seen us kissing. It would be quite odd if they didn't see us since the club

was so small." I believed that group members "were within a radius of us that wasn't very

large" and that we were kissing "for a while." (Investigative Report p. 24, reproduced in

Exhibit E, p 1).

29.    Shortly after we returned to the ████████████ at 1:15 a.m., *Complainant*

suggested a toast.  Complainant went to the bar and brought back two glasses of champagne,

---

[5] During her memory reconstruction process and/or due to her fragmented memory recall, Complainant
mistakenly recalled this conversation as having occurred at my apartment when it actually occurred earlier in
the evening at the ████████████

which she had ordered on my tab, and we joined in a celebratory champagne toast.[6]
(Investigative Report p. 24, reproduced in Exhibit E. p. 1-2).

30.    It is noteworthy that Complainant implied that I drugged her, thereby causing
her blackout. Although Complainant denied seeing me slip drugs into any drinks,
Complainant inexplicably left this implication standing.  I never gave Complainant any drinks
that evening and emphatically deny Complainant's innuendo. Complainant made her own
drinks at my apartment and she handed the glass of champagne to me at the ████████
and not the other way around.

31.    After our champagne toast, Complainant and I soon "started dancing."  As I told
the Investigative Team, "We formed one of those circles. She and I are dancing together. That
turns into grinding." "She was grinding on me. She ha[d] her behind area, her butt, on my this
area [indicating towards [my] pelvis with [my] hands], my waist area. [She was] grinding. It's
not like [we were] dancing and [she was] not doing anything. [She was] grinding on me. [She
was] in full control of her body. Full control." (Investigative Report p. 24, reproduced in
Exhibit E, p 2).

32.    Complainant claims to have a different "memory" of the events at the ████████
████ Complainant said that, shortly after Witness #2 left the ████████ I "started being
inappropriate" with Complainant; my "presence was scaring" Complainant; and I "tried to
kiss" Complainant. (Investigative Report p. 12, reproduced at Exhibit E, p. 1; see also
Incident Report). Complainant also asserts that my "crotch [was] really tight against [her]
body" (Investigative Report p. 12, reproduced at Exhibit E, p. 1) and asserts that I "stroked

---

[6] I knew that the ████████ charged hefty prices but I was taken aback by the size of the bar tab at the end
of the evening. I attributed the size of the bar tab to the high prices charged for champagne, which is not a
drink of choice for me in part because of its cost, or the fact that others put charges on my tab or some
combination of both.

[my] crotch against [her] thigh (Incident Report). According to Complainant, she stated her objections to me, and she and I then "just kind of laughed it off". (Investigative Report p. 12 reproduced at Exhibit E, p. 1; see also, Incident Report (where Complainant said that [she] " laughed it off")). It is difficult to reconcile Complainant's claim of "fear" with her statement to Witness #5 later that she wanted to stay alone with me at the ██████████ and then her agreement to go back to the my apartment over one and one-half hours later at almost 3:00 am. Complainant's actions are highly inconsistent with someone who is uncomfortable or "scared" of me and the situation.

33.    Witness #5, Witness #6 and Witness #8 observed the sexual interactions between Complainant and me and each of their eye witness statements is entirely consistent with my memory and entirely inconsistent with Complainant's testimony. The three eye witness observations of Complainant's course of conduct also directly conflict with Complainant's later allegations of experiencing a "strong feeling of fear" beginning shortly after Witness #2 left the ██████████ Each of the three eye witnesses and a fourth unidentified witness testified seeing us mutually and consensually kissing, touching, hugging and sexually grinding on the dance floor.:[7]

34.    To summarize:

- Witness #5, Witness #6 and Witness #8 were the only eye witnesses at the ██████ ████ after Witness #2 left at around 1:15 am;

- Witness #5, Witness #6 and Witness #8 observed Complainant and me mutually and consensually kissing, hugging, touching, or sexually grinding on the dance floor, notwithstanding Complainant's denials, and a fourth eye witness believed Complainant was at the ██████████ "with her boyfriend";

---

[7] See **Exhibit E**: "Verbatim transcript of Investigative Report accounts of sexual behavior at the ██████ ████ and in the taxi."

14

- Witness #8 confirmed that he observed Complainant and me kissing, didn't see Complainant disagreeing with what was happening, didn't see Complainant "trying to reject" me and didn't see Complainant "moving her head when he was trying to kiss her";

- Witness #6 denied observing either party looking uncomfortable with the dancing that he witnessed; and

- Witness #5 and Witness #6 observed Complainant and me towards the end of the night and thought we looked to be "romantically involved" and "romantically or sexually interested," and having "sexual tension" between us.

Thus, there is no factual dispute among *Complainant's* eye witness statements about what happened at the ███████ after approximately 1:15 am. My account is completely consistent with their account.

* * * * * * * *

35.   Standing alone, it might be possible to excuse Complainant on this point of not remembering our mutual sexual behavior at ███████ on the grounds of her "blackout" memory loss. But this clearly suspect aspect of Complainant's narrative also indicates that Complainant's narrative may not be credible. The next section casts even more doubt on the reliability of Complainant's narrative.

15

**Part IV:    Complainant's "reconstructed" allegations of strong feelings
of "fear" are patently and knowingly false; Complainant
"reconstructed" her "fear" narrative with Witness #1 on
Monday night (almost 3 days after the morning in question)[8]**

36.    The other cornerstone of Complainant's narrative concerns her "fear" of the
situation with me. Complainant maintains that her "blackout" intensified and her "fear" began
shortly after Witness #2 left the ▮▮▮▮▮ at 1:15 am. Complainant claims that my
"presence was scaring Complainant" and that "I just remember being so scared. I was
uncomfortable being around him." (Investigative Report p.12, reproduced in Exhibit E p. 1).

37.    Complainant's allegations of "fear" are inconsistent with Complainant's sexual
behavior witnessed by others at the ▮▮▮▮▮ and her confession to Witness #1 that she
had voluntarily agreed to go home with me.  According to Witness #1, Complainant told him
that she didn't think there were any problems "in going back to Respondent's place because
they live so close and are friends . .." (Investigative Report p. 32, reproduced in Exhibit F p.
7).

38.    Complainant's allegations of "fear" are also inconsistent with her entire course
of conduct throughout the night.  Complainant and I had been friends for over a year and
Complainant convinced me to join her Friday for a night of partying even though I rejected
Complainant's invitations to go out three separate times. Then, at some point at the ▮▮▮▮

---

[8] *The following exhibits are relevant to this discussion:* **Exhibit F***: "Verbatim transcript of
Investigative Report accounts of Complainant statement of events as told to "after the fact"
witnesses, Lenox Hill Hospital, Columbia Medical Center and the Incident Report,"* **Exhibit G***:
"Verbatim transcript of text messages and log of phone calls between Complainant and Witness
#1",* **Exhibit H***: "Verbatim transcript (*▮▮▮▮*  to English translation) of text messages between
Complainant and Witness #2",* **Exhibit I***: "Verbatim transcript of text messages between Witness
#5 and Witness #2."*

██ Complainant and I stayed together for the rest of the night, laughing, dancing, kissing, hugging and sexually grinding against each other.

39.   Throughout our entire time together, Complainant failed to mention her "fear" to anyone. Indeed, Complainant's allegations of "fear" does not stand up to scrutiny for each of the following reasons which individually and collectively leave no doubt:

- Complainant initiated a champagne toast with me shortly after we returned to the ██████ at about 1:15 am and then "danced the night away" with me at the ██████ way past the 1:15 am time the "fear" of me allegedly started;

- Complainant engaged in publicly-observed sexual activity with me (kissing, touching, hugging, and grinding on the dance floor) way past the 1:15 am time her "fear" of me allegedly started.

- None of Witness #5, Witness #6 or Witness #8, who were watching, believed that Complainant was afraid of me; indeed, their statements indicate that Complainant and I were growing closer as the night wore on;

- Complainant made no mention of this "fear" to Witness #2 at any time throughout the morning, including at 1:15 am when Witness #2 left the ██████

- Complainant made no mention of this "fear" to Witness #2 when Complainant sent a text message to Witness #2 at 1:24 am;

- Complainant made no mention of this "fear" to Witness #5 at any time throughout the morning, including after 2:00 am when Complainant expressly indicated to Witness #5 that she wanted to stay at the ██████ with me;

- Complainant made no attempt to reach out to Witness #3 (her ██████ cousin) or anyone else throughout the night because of her "fear" after it became clear Witness #1 was not responding to her calls;

- Complainant made no mention of this "fear" to me at any time throughout the morning, and even says that she laughed off my crotch being rubbed against her body;

- Complainant made no mention of her "fear" at all to Witness #1 at 2:13 a.m. when she texted Witness #1 "Can I come over?";

- Complainant accepted my invitation to go to my apartment, voluntarily got into the taxi with me and knowingly and willingly accompanied me to my apartment at approximately 2:45 am after a night of partying and growing sexual activity;

- Complainant did not at any time ask the taxi driver or me to drop her off at her apartment even though we lived relatively close to each other;

- Complainant did not claim "fear" Saturday or Sunday afternoon when Complainant, Witness #2 and Witness #3 attempted to recreate the evening's events; and

- Complainant never left a single Facetime audio message for Witness #1 (or anyone else) expressing her "fear", despite calling Witness #1 numerous times throughout the night.

The last point is worth repeating:  Complainant states that her "fear" started at about 1:15 am and that she was entirely *conscious* of this fear, but despite calling Witness #1 numerous times throughout the night, Complainant never left a Facetime audio message expressing her "fear" to Witness #1 (or anyone else).

40.    A number of Complainant's other attempts to support her "fear" allegation do not stand up, including:

- ██████ **text**:  Complainant claims that at 2:13 am (before Complainant agreed to go home with me), she texted Witness #1 in ██████ (inviting herself over) allegedly because

  *"I couldn't communicate it in English.  I just remembered my brain being so slow.  I couldn't make any rational decisions, and I just thought if I could just go to [Witness #1] I would know I'm safe.  That's why I kept calling and write in* ██████ *"Can I come ...".  [See Investigative Report p. 13].*

  Complainant's explanation is a stretch.  This text was sent just a little while after Complainant sent her text in ██████ to Witness #2 at 1:24 am. The more likely explanation is that Complainant had simply failed to reset her i-Phone to English from the ██████ she used in her text to Witness #2.[9]

---

[9] *See* **Exhibit H:**  *"Verbatim transcript (*██████ *to English translation) of text messages between Complainant and Witness #2."*

- **Pin location drops and "butt" call voice mail**: *Complainant* claims to have had retained enough wits about herself to consciously send Witness #1 her "location updates" and a recording of my voice while in the taxi. She explains the pin location drops and the short voice recording she left for Witness #1 at 2:44 am this way*:*

> *"I knew I was in a cab, but I didn't really know where I was. I just assumed we were going to the Upper East Side, [because] that's where I live and that's where he lives. But I didn't know where we were." The Complainant sent Witness #1 her "location update" from her phone before getting into the cab and up near the Respondent's apartment, and also left a "voice recording" in which you can allegedly hear the Respondent's voice."*

> *The Complainant did not fully recall sending these items to Witness #1, but was told that she sent the items when she spoke with Witness #1 after the night of the alleged incident. She stated, "I have a vague memory of a voice recording and being like, thinking like, 'It's good to send this. It's good to have this.' I just remember making the decision instead of deleting it, to send it." (Investigative Report p. 13)*

It is disturbing how willing Complainant is to distort important facts. In this instance, Complainant asserts that she actually made a conscious decision in the taxi to record me and to send my voice to Witness #1. She claims this recording has her "attacker's voice" and it "is not something I would do unless I felt less than safe." Despite this dramatic explanation, Witness #1 described his discussion with Complainant on this precise point in a fundamentally different way; they "guessed" the call was "essentially a 'butt dial'". (Investigative Report p. 32, reproduced at Exhibit F p. 7).

- **Serial call history**: Complainant claims that the 17 calls she made to Witness #1 throughout the night evidence her "fear". (Investigative Report p. 12-13; Investigative Report p. 33; Incident Report)

Again, Complainant is distorting important facts. Witness #1 *admitted* that Complainant had previously made numerous late night calls to Witness #1 after a different night out where she was not fearful or in trouble, and that Complainant had

apologized to him the next morning for the numerous "drunk-dials". (Investigative Report p. 31).

* * * * * * *

41.    Complainant's "fear" narrative is extraordinarily relevant for two reasons. First, it reveals the ease by which Complainant is willing to mold her narrative on important points. Simply put, she was untruthful to the Investigative Team when recounting the relevance of the ████████ text, the audio recording and the serial calls and transformed it into corroborative evidence of her "fear." Second, the "butt dial" corroborates the fact that we were making out in the back of the taxi as Complainant's phone was obviously set on Witness #1's contact information due to Complainant's repeated attempts to reach him and because Complainant and I were actively moving around in the back seat of a taxi.

42.    It is noteworthy that Complainant's "fear" narrative, which has become one of the cornerstones of Complainant's story, was not part of her original story:

- Neither Complainant nor Witness #3 mentions her "fear" when recalling their conversation ████████████ on Saturday morning;

- Neither Complainant nor Witness #3 mentioned her "fear" to the nurse at the hospital; and

- Neither Complainant, Witness #2 nor Witness #3 mentioned her "fear" when recalling their discussions on Sunday afternoon while admittedly reconstructing the events of Friday night/Saturday morning.

43.    Complainant's "fear" did not surface until she was alone with Witness #1 on Monday night when Witness #1 looked at all of Complainant's texts, pin location drops and

phone calls to Witness #1 and decided they had significance. (Investigative Report p. 32-33). It was only after this "realization" that Complainant's "fear" narrative became one of the cornerstones of Complainant's allegations. Thereafter, Complainant added "fear" to her reconstructed narrative notwithstanding the overwhelming facts to the contrary.

44.    Complainant's "fear" narrative and supporting "evidence" became central to her story by the time Complainant formally reported the incident to Columbia University over three weeks later on September 17, 2017.  Complainant's Incident Report supports her "fear" claim with three detailed and carefully-considered sentences. Complainant specifically claims:

> *"What I remember most clearly is a strong feeling of fear and powerlessness. It can also be seen by the fact that I called a friend I trust completely around 17 times that night, sent him updates of my location and a voice mail from my phone where my attacker's voice can be heard. That is not something I would do unless I felt less than safe."*

45.    It is particularly noteworthy that Complainant claims to have made 17 calls, sent updates of her locations and to have left a Facetime message out of "fear" but failed to ask the taxi driver to take her home.

46.    Far from demonstrating that Complainant was afraid of me, a careful reading of the string of texts sent by Complainant to Witness #1 from Friday to Monday tells a very different story, a story that also explains the serial phone calls.  (*See* ***Exhibit G***:  *"Verbatim transcript of text messages and log of phone calls between Complainant and Witness #1"*) .

47.    It seems clear from the texts that Complainant had a sexually intimate interaction with Witness #1 the immediately previous night and was upset that Witness #1 did not reach out to her at all on Friday. Complainant tried desperately all Friday evening into the

wee hours to get Witness #1 to invite her over, presumably for another sexually intimate interaction.  As Complainant said in her texts to Witness #1 on Friday night August 25 at 11:43 pm and Saturday morning August 26 at 12:08 am, "I am just paranoid and insecure … when it comes to intimate connections…"

\*    \*    \*    \*    \*    \*    \*    \*

48.    As indicated above, based on the facts and the objective evidence, the "fear" narrative that Complainant made a cornerstone of her Incident Report and recounted to the Investigative Team is inconsistent with the evidence. Complainant's story that she did not knowingly and willingly go to my apartment and that the texts, location pin drops and phone calls show that "Complainant was afraid" was constructed way after the fact and does not stand up to scrutiny.  Complainant's willingness to misrepresent this evidence to support her obviously untruthful "fear" narrative cannot find excuse in her "blackout" memory loss. This has to raise further doubts about the reliability of Complainant's entire narrative.

**Part V:**     **Complainant and I were two mature adults voluntarily agreeing to a consensual sexual encounter; Complainant and I agree that we engaged in multiple sexual activities in multiple rooms in multiple beds in my apartment**

49.   After partying exclusively with me at the ██████████ for over an hour between 1:15 am and approximately 2:30 am, Complainant (██ years old) and I (██ years old), who were friends for over a year, voluntarily and mutually agreed to leave the Electric Room together, grab a taxi and go to my apartment for a sexual encounter.

50.   I described in great detail to the Investigative Team the kissing and other sexual activities that occurred after we settled into the *private* confines of the back seat of the taxi on the way to my apartment.  Complainant does not deny that kissing or other sexual activity occurred in the taxi; instead, she only states that she does not "recall" kissing or other sexual activities occurring in the taxi.  It seems highly implausible that Complainant and I would engage in the kind of sexual activities observed by Witness #5, Witness #6, Witness #8 and others in the *public* confines of the ██████████ bar area and dance floor, but then have a completely platonic long ride at almost 3:00 am from ████ ██████ ███ ███ ██████ all of the way to my apartment on ██ █████████ Avenue in the *private* confines of the backseat of a taxi.

51.   It is worth noting here Complainant's responses to some pointed questions during an interview by a nurse at the hospital. During this examination, the nurse questions Complainant about a number of medical and psychological conditions. In particular, under the "Psychophysiological" section, the nurse records that Complainant said that she takes Prozac and admitted that she experienced a "loss of inhibitions".   (Lenox Hill Medical Records, p. 107). Complainant's own concession on this point supports what the independent witnesses

report unfolding inside the ███████ as well as what I detailed took place in the ███████ ███ the taxi, and finally, my apartment.

52.    At approximately 2:45 or 2:50 am, Complainant and I arrived at my apartment after an evening of dancing, partying and sexual activity at the ███████ and even more sexual activity during the taxi ride to my apartment.

53.    I provided a very graphic, detailed and consistent account of the sexual activities that took place in my apartment. I was also very candid in admitting that I experienced temporary erectile dysfunction during our sexual activities.

54.    Our interactions in the apartment demonstrate that the Complainant was an active and willing participant throughout the encounter. To begin, after kicking off our shoes, we each independently moved to the couch to begin kissing. Then we moved to my bedroom to continue sexual foreplay where she undid my belt, then placed her hand on my penis. When I asked if she wanted to move to ███████ room where the bed was larger, she said "Yeah." After the Complainant and I switched to ███████ bedroom, we engaged in vaginal intercourse on the bed, first with me on top and then with Complainant on top. We switched positions again and had sexual intercourse from behind with Complainant on all-fours.  We then engaged in mutual oral sex, and eventually resumed intercourse in the missionary position.  Then, we talked about birth control before I ejaculated. These are very specific and detailed accounts that underscore that any reasonable sober person would have believed Complainant was an engaged sexual partner

55.    Complainant alleges that due to her "blackout" memory loss, she only had "like three really clear memories" from the rest of the night.  Complainant remembers an exchange with me as we walked across the living room going from my bedroom to ███████ bedroom

24

about the "whether's" and "why's" of what was about to occur ("Memory #1). I discuss memory #1 in Part VI. Complainant also remembers being with me in two separate beds in two separate rooms in the apartment, and having sexual intercourse with me in two different positions (Memory #2 and Memory #3)

56. There is remarkable consistency between my detailed narrative and Complainant's claimed three or four flashes of memory in terms of our mutual sexual activity. I described a mutually engaged encounter in which there was sexual activity in three different locations and sexual intercourse in at least four separate positions during the evening. Complainant similarly acknowledges moving freely between both bedrooms and agrees with me that we engaged in vaginal intercourse in the missionary position and from behind while she was on all-fours.

57. On the other hand, contrary to what Complainant claims to "possibly" remember, I did not force Complainant up from the floor onto ▮▮▮▮▮▮ bed into an all-fours position. Complainant and I had intercourse only in ▮▮▮▮▮▮ bedroom and, when we first got onto the bed, we started in a missionary position before eventually switching to an all-fours position. In addition, it seems very unrealistic that Complainant could be pushed up from the floor onto a particularly high bed and forced into an all-fours position, much less *forced* to perform sexual intercourse in an all-fours position. Complainant's claim to this "possible" memory is not reliable.

\* \* \* \* \* \* \* \*

58. It is difficult to reconcile Complainant's claims of coerced sexual conduct with her "memories" of walking freely from bedroom to bedroom discussing in conversational tones what we were doing and of engaging in robust sexual activity in multiple locations.

**Part VI:** **Complainant's claimed recollection of the brief exchanges at my apartment is at odds with my recollection; Complainant and I each had the capacity to, and did, give mutual consent; I did not have actual knowledge of, or reason to know of, Complainant's "blackout" memory loss**

59.    As noted in the preceding section, Complainant claims to have limited memory of what went on in my apartment but does recall brief exchanges with me, including as we walked across the living room moving from my bedroom to ▮▮▮▮▮▮ bedroom.

60.    Complainant does not allege that our words were shouted or spoken with anger or otherwise in a raised voice or a confrontational tone, and she does not remember crying.

61.    According to the Incident Report, submitted on September 17, 2017, Complainant claims to remember only:

- saying *"why are you doing this. I thought we were friends. What about your girlfriend?"* and me answering *"I have always wanted this"*; and

- Me saying *"yeah yeah"* during sexual intercourse (she claims to remember this in both the Incident Report and the Investigative Report).

62.    The Investigative Report similarly contains limited examples of what Complainant claims to remember being said while in the apartment. The Investigative Report indicates that on October 5, 2017 and on November 16, 2017 (during Complainant's follow-up interview), Complainant claims to remember:

- Saying *"No, no. We're friends. What about your girlfriend? [and then she] tried to say her name"*.  However, the Investigative Report indicates that Complainant was unable to describe my response, if any. During her follow-up interview, Complainant said: *"No I don't remember him having any response"*.

26

- Repeating *"No, we're friends."* However, again, the Investigative Report indicates that Complainant does not remember me responding to any one of her statements.

- Having a brief exchange with me as we walked through the living room from one bedroom to the other bedroom. The Investigative Report indicates that Complainant claims she remembers saying *"Why are you doing this? I don't understand what's happening, why are you doing this?"* She also claims she recalls me saying something along the lines of: *"I've always wanted this."*

63.     Much of Complainant's story of what took place in my apartment is an account of what she claims to have been *thinking* at the time rather than what she remembers saying. It is difficult to square Complainant's claimed vivid memories of what she was *thinking* with Complainant's diametrically opposite claim that she does not remember very much of what she was *doing*.  It is also difficult to square Complainant's claimed vivid memories of what she said to me (as distinguished from what she thought about) with her inability to provide any memory of what I said to her in response immediately thereafter.

64.     In any event, I do not agree with Complainant's account -- no such conversations took place between us.

65.     I asked Dr. Kim Fromme, a noted expert on alcohol-induced "blackout" memory loss, to explain why Complainant and I may have a different recollection of the exchanges that occurred between us as well as other topics and to explain whether Complainant's "reconstructed" memory is reliable.  Dr. Fromme's opinion on this matter is discussed in detail in Part VII, below.

66.     The fact is that Complainant provided affirmative consent by affirmatively accepting my invitation at 2:30 am in the morning to go back to my apartment; by climbing

27

two flights of stairs up to my apartment independently and without assistance; by her actions as a willing and enthusiastic participant in our sexual activities at the ████████ in the taxi and in my apartment in two different beds in at least three different locations and in multiple different positions; by participating on top in both sexual intercourse and oral sex 69; and by responding affirmatively to my question whether I could "finish inside her."  I also cited a number of other factors to the Investigative Team indicative of affirmative consent. (Investigative Report p. 28).

67.    Importantly, as noted earlier, much of the Complainant's story of what took place in my apartment is an account of what she claims to have been thinking at the time and not what she actually articulated.  Consistent with Dr. Fromme's evaluation described in the next section, based on Complainant's "blackout" memory loss and her need to reconstruct the evening's events, Complainant is not in a position to reliably distinguish between what she was thinking and what she actually said.  A good example is Complainant's claim that she anticipated that I would be angered by her refusal to have sex with me so she referenced my girlfriend to make me feel guilty and stop.  As discussed earlier, this conversation took place much earlier on the dance floor of the ████████ not in my apartment.  Complainant's inability to identify my response to her in the apartment on this point supports my statement that this discussion did not take place in the apartment.  But if you accept Complainant's allegation that she was still referencing my relationship with my girlfriend in my apartment, it demonstrates: (1) that Complainant had the capacity to consent (since she was capable of rationalizing that my relationship status might present a barrier to *my* consent to engage in sexual activity); and (2) that Complainant wanted to assure herself about *my* willingness and capacity to consent in light of my relationship status.

68.    After Complainant and I both gave affirmative indication of consent to engage in sexual intercourse, Complainant never said "no"; not one single time. If Complainant had said "no", I would have immediately acceded to Complainant's wishes and stopped what we were doing.

69.    Neither Complainant nor I considered ourselves incapacitated as that term is used in the Columbia Policy to give consent.  Complainant asserts that she was not intoxicated, as do I. Further, it is clear from Witness #2's testimony to the Investigative Team that Complainant was not incapacitated at 1:15 am. Similarly, it is clear from Witness #5's testimony that Complainant was not incapacitated after 2:00 am when he spoke directly to her and she explicitly indicated that she wanted to stay at the ███████ alone with me.

70.    Even though Complainant says that she suffered a "blackout" memory loss for much of the evening, there were no observable factors indicating that Complainant was in a "blackout" state or was incapacitated.  I did not have actual knowledge, or even reason to know, that Complainant was in a "blackout" memory state.  Witness #5 spoke privately to Complainant after 2:10 am (when Witness #5 believed he was "sober") and did not believe Complainant was in a "blackout" state. Furthermore, none of Complainant's other eye witnesses who interacted with Complainant throughout the night observed or believed Complainant was in a "blackout" state or incapacitated.

71.    There was no report of slurred speech, unsteady gait, imbalance, emotional volatility, or a notable change of personality.  Similarly, there was no report that Complainant was unable to keep her balance, unable to walk without assistance, or otherwise showed any physical signs of incapacity. In fact, Witness #2 denied that the Complainant had any difficulty walking out of the ███████ and up the ramp with her. (Investigative Report p.

33). In addition, Complainant was able to walk up two flights of stairs to my apartment without any assistance. She was also able to navigate from room to room, multiple times, through the array of furniture in my apartment.

72.     Based on Complainant's physical state, neither I, nor any reasonable person, could have believed that she was incapacitated. There is simply no evidence in the record that either Complainant or I was incapacitated within the meaning of the University Policy, so as to be unable to make a rational, reasonable decision to knowingly, voluntarily and mutually participate in consensual sexual intercourse.

*   *   *   *   *   *   *   *

73.     Given the obvious flaws in much of Complainant's "reconstructed" narrative and her course of conduct, it is difficult to take at face value Complainant's claim that she did not consent to sexual intercourse in my apartment.

**Part VII:    My expert witness provides context for Complainant's narrative in light of Complainant's "blackout" memory loss**

74.    As is readily apparent, Complainant's "reconstructed" narrative of the events of August 27, 2017 is very different than mine.  I asked Dr. Kim Fromme, Professor of Clinical Psychology at University of Texas, to review the record and provide her expert opinion on the reason for this difference, focusing particularly on Complainant's "blackout" memory loss, and to explain whether Complainant's "reconstructed" memory is reliable.  Dr. Kim Fromme, is a well-regarded expert on the effects of alcohol intoxication on cognitive processes, especially alcohol-induced blackouts.  *See **Exhibit A**: Expert Report of Dr. Kim Fromme on the effect of Complainant's alcohol-induced blackouts on her cognition and memory processes.*

75.    Complainant claims that she was in a "blackout" memory loss state on the night of the incident. However, being "blacked-out" does not equate to the type of incapacitation that would render an individual incapable of providing consent. In fact, Columbia's Gender-Based Misconduct Policy (the "Policy") states: "*Total or partial loss of memory, without more, is insufficient to demonstrate incapacitation.*" (Policy p.10). In addition, the Policy states, "*Whether sexual conduct with a person who is "blacked-out" constitutes gender-based misconduct depends on the presence or absence of the observable factors indicating that a person is also incapacitated.*" (Policy p. 10).

76.    As indicated above, Complainant did not exhibit observable factors indicating that she was incapacitated to me or any of the other witnesses who observed Complainant that night (all of whom are Complaint's own friends and witnesses). As such, Complainant's claim that she was in a "blackout" memory loss state does not change the fact that she was not incapacitated as defined by the Policy, and thus that the sexual encounter was consensual.

77.    As Dr. Fromme explains, "Although the terms "blackout" and "passed out" are often used interchangeably, "blackouts" differ significantly from passing out. When someone passes out from alcohol, the person loses consciousness and capacity. Conversely, while in an alcohol-induced blackout, a person is *fully conscious, aware of his or her surroundings at the moment, and is able to voluntarily engage in a variety of complex behaviors* (i.e., carrying on conversations, driving, engaging in sexual activity)." It follows that even if Complainant was "blacked-out", she was aware of her surroundings at the moment and was able to voluntarily engage in and consent to sexual activity with me.

78.    Dr. Fromme also explains how Complainant's "blackout" memory loss and her need to "reconstruct" the evening's events with the assistance of others has an overarching impact on her the reliability of her narrative.

79.    As I described in detail in Part I, the first person who took on this role, unsolicited, was Witness #3 who, based on little information from Complainant, quickly drew conclusions about what must have happened and took it upon herself to persuade Complainant to go to the hospital, explain to hospital personnel at least Witness #3's version of what happened, and fill in the hospital paperwork.  In subsequent days, others helped Complainant try to piece together the events of the evening, although they had no first-hand knowledge and could only speculate.  The result is that Complainant's "reconstructed" memory was tainted by the conjecture of others and was therefore distorted.

80.    Dr. Fromme stated her opinion, after reviewing the record, that there is a scientific basis for concluding that Complainant's recollection of events may not be accurate due to the process of memory reconstruction following the experience of alcohol-induced blackouts.  This is not to say that Complainant has necessarily intentionally misrepresented

the events in question, but rather that her inability to recall all events due to alcohol-induced blackouts, and her efforts to fill in memory gaps in order to create a personal narrative, are likely to result in distortions of her recollections.

81.    Complainant even concedes that her reconstructed memory may be faulty when she stated during her second set of interviews with the Investigative Team: "…I have had this memory that keeps coming back to me of him taking my phone and throwing it. Like him taking it from me and throwing it. Because I was calling. But other than that, I don't know. I don't even know if that's a real memory anymore."

82.    This underscores precisely the point Dr. Fromme is making of how the mind seeks to fill in memory gaps.

83.    Dr. Fromme's analysis provides scientific support for the fact that Complainant's narrative of the night lacks reliability and credibility because the mind tries to fill in memory gaps during memory reconstruction after a "blackout," and because the memory is susceptible to being tainted by the conjectures of others. As such, Complainant's "reconstructed" recollection of the communications and actions that transpired between the Complainant and me prior to initiation of and during sexual activities are not reliable.

*   *   *   *   *   *   *   *

84.    The foregoing analysis and opinion explains why Complainant's story differs from my account of the evening in key respects, demonstrates why Complainant's narrative is unreliable and supports my position that the sexual intercourse and other sexual activity between Complainant and myself was knowing, voluntary and mutually consensual and was not the result of force or coercion, and that each of us had the requisite capacity pursuant to Columbia's Policy.

**Part VIII:   No force, intimidating behavior or coercion was involved; Complainant's bruises were not the result of nonconsensual sexual activity**

85.    As discussed, Complainant and I engaged in sexual activity in three different locations in my apartment and Complainant claims recalling engaging in conversations with, as we freely moved between rooms.  While I deny that these conversations took place, I agree that we moved freely between the various locations in my apartment.

86.    While much of what Complainant has said has been shown to be inaccurate and unreliable, her narrative to the Investigative Team is noteworthy because of the absence of allegations that there was a struggle or that this was a forced sexual encounter.  Complainant originally said in the Incident Report that "I remember trying to fight him off but not being able to".  However, in the later discussions with the Investigative Team, Complainant admitted that her "strategy" was to not physically resist me.  Complainant said that "rather than try to fight the Respondent off", she tried to remind me that we were friends and I had a girlfriend. (Investigative Report, p. 13)  This is a perfect illustration of Dr. Fromme's expert conclusion that Complainant's account of her "reconstructed" narrative is not reliable.  As I told the Investigative Team and described in #32 above, Complainant and I had this conversation about my girlfriend but it occurred at the ███████████ not my apartment.  Complainant also asserted: "I think I would be able to fight him off in a normal moment, but I was just so weak and confused and disoriented." (Investigative Report p. 18).  Again this is inconsistent with the notion that this was a forced sexual encounter.

87.    Complainant claims that at one point she put up her hands to push me away and that I pinned down her arms and hands above and to the side of her head.  While I deny that this interaction occurred, Complainant's description of our body positioning is completely

consistent with consensual sex. Complainant also claims that she "possibly" remembers being

pushed up onto ███████ bed into an all-four's position. We have already established that

this claim was not a real memory.  See #57 above.  Other than these two instances, which I

deny, Complainant is making no allegations of physical force being used by me at any time

throughout the entire night she was alone with me.

88.   Complainant also stated to the Investigative Team that she wore her dress

throughout all of the sexual encounter. Yet there is no testimony from Complainant or

Witness #3 that the dress was torn, stretched or compromised in any fashion that would

suggest she tried to fight off an assault or that the sexual intercourse was anything other than

consensual.

89.   I have no first-hand knowledge of how Complainant received her bruising and

neither does Complainant.  Complainant does not allege that I caused the bruising.   In fact,

Complainant admitted that she was surprised when Witness #3 pointed out the bruises and

asserts that she does not know how the bruises were acquired.

90.   I asked Jennifer L. Hammers, D.O., an experienced pathologist, to review the

record and provide her expert opinion on Complainants' bruising.  Dr. Hammers said the

following about bruising:

- **Bruising is caused by leaking blood under the skin:**  Contusions, or bruises, on
  the skin surface are focal areas of skin discoloration caused by bleeding under the
  surface of the skin at the location where the body impacts a hard object or where a
  hard object impacts the body.  During the impact, small blood vessels beneath the
  surface of the skin are compressed and torn, allowing blood to leak into the
  surrounding soft tissues.  The leaked blood causes the discoloration of the skin

that results in the visible bruise.  Depending on how deep the bleeding occurs beneath the surface of the skin, a bruise may or may not be visible on the surface of the skin.

- **No necessary correlation between size and force:**  The size of the resulting bruise does not specifically correlate to the amount of force from the impact.  In general, a bruise resulting from less force tends to be smaller and a bruise from a larger force will be larger, but many factors determine the size of the resulting bruise including the size, weight, and features of the object causing the injury, the location of the injury of the body, the amount of blood and the length of time that bleeding occurs under the skin, and personal bruising variation.  The size and shape of some bruises may be patterned and can suggest the type of object that caused the bruises.

- **Color change shows aging:**  Aging of bruises can only generally be made due to individual variation in perception of the color of a bruise, skin tone, lighting during examination, and individual variation in rate of resolution of a bruise.  In general, pink/purple/blue colored bruises are recent and over the course of days they change color to a green/yellow/brown color as the hemoglobin in the bruise is broken down and removed by the body.

- **Blanching shows prominent area of impact and type of impact:**  Blanching of the coloration of the bruise occurs when the injuring object has an aspect(s) that is more prominent.  The prominence can be rounded like a softball, can be pointed like the edge of a table, or can be irregular like a nozzle.  Blanching is not seen

when a bruise is caused by a uniform or smooth object, such as the length of a

countertop or from finger-top or hand.

91.     Dr. Hammers' lengthy report takes into account the entire record as well as her

careful review of each bruise for size, location, coloration, and blanching.  After this careful

review, Dr. Hammers states her opinion, expressed with a reasonable degree of medical

certainty, that the bruises documented on the Complainant are not consistent with forced

sexual activity and, additionally, that the size and location of the bruises are not consistent

with bruises from the hands and fingers.  Dr. Hammers further concluded that the bruises on

Complainant's arms are consistent with the body striking against a hard object as opposed to

someone forcefully holding the Complainant down.  *See* **Exhibit B:**  *"Expert Report of Dr.*

*Jennifer L. Hammers on Complainant's bruising"*.

92.     In concluding that Complainant's bruising is not consistent with forced sexual

activity or injuries from the hands and fingers, but instead with a body striking against a hard

object, Dr. Hammers offered the following:

- The size, shape and distribution of the bruises is not consistent with the
  Complainant's accounts [her two memories of physical interaction] outlined in the
  Investigative Report.

- The bruising on Complainant's right upper am/shoulder is consistent with striking
  against the gas valve in my bedroom.

- The bruises identified on the arms and leg are on prominent surfaces of the body,
  meaning areas that during the normal course of movement can be injured by
  striking against an object.  Respondent's apartment as well as the ███████████

37

night club has multiple pieces of furniture, some with prominent edges, that could cause injuries to these prominent surfaces of the Complainant's arms and left leg. The region of the ████████ where couches are located is noted to have many pieces of furniture in small space with narrow walkways between the pieces of furniture. Additionally, the report of sexual activity in the bed that has large posts could account for the injuries to the upper arms if the Complainant's body weight was pressed against the posts during sexual intercourse.

- Formation of the bruises would not require unwilling forceful pressing of the Complainant's body against an object to cause these injuries. It is clear from the accounts of both parties that there were sexual interactions throughout the apartment and that these bruises could have been caused from these interactions.

93. Dr. Hammers also makes clear that a number of the bruises could have been caused at the same time and don't reflect completely distinct "strikes" or "pressings". For instance, Dr. Hammers indicates that the three bruises on Complainant's arm, even if discrete injuries, could be "from the same object with the body pressing against the object in a slightly different position." She also opines that "given the close proximity of these three bruises, it is possible that one impact against a large object with a complex or irregular surface could cause all of these injuries." This is important when assessing Complainant's bruising. Despite the multiple marks on her right arm, Dr. Hammers' forensic analysis reveals the bruises are inconsistent with an individual restraining someone and were likely all caused either at the same time or proximate in time to one another.

94. Dr. Hammers also said that, because of their coloration, certain bruises (e.g., bruises on the thigh) did not occur during the time period in question.

*     *     *     *     *     *

95.    Based on the foregoing, there is nothing in the bruising to suggest that the sexual

encounter between Complainant and me was other than consensual or that force or coercion

was involved.

**Part IX:    Complainant's claim that my apartment had the appearance of a "violent scene" the next morning is belied by the objective facts**

96.    Complainant has told witnesses and implied to the Investigative Team that a "violent scene" awaited her the next morning when she woke up in bed after falling asleep next to me.  She attempts to create a picture of violence in her statements to witnesses and to the Investigative Team by stating that her belongings were scattered around my apartment. Complainant characterized it as a "violent scene" to at least one witness.  She toned down this headline in the Incident Report and in her interviews with the Investigative Team but she left the innuendo intact.

97.    The objective facts tell a very different story.  Any disarray in my apartment was directly attributable to the mess created by the large group of people that Complainant brought to my apartment the prior evening.

98.    In addition, each of Complainant's belongings was exactly where she left it earlier that morning.  Complainant she would have easily found them if she followed the path she took after entering my apartment -- one shoe where she kicked it off near my apartment front door, one shoe a few feet away by my bedroom, her phone on the couch where we started making out once inside the apartment and her backpack in my bedroom where she left it. If anything, the disarray in the apartment speaks to Dr. Hammers' opinion as to the bruising. It is not in dispute that Complainant and I moved throughout the apartment, undressed in stages, and engaged in sexual interactions in multiple parts of the apartment including couches and multiple beds.

99.    This is still another example of Complainant's unreliable and untrustworthy claims about what happened that night.

**Part X:**     **Complainant's course of conduct the next morning is not consistent with a violent sexual assault; Complainant's texts to Witness #1 tell a different story**

100.   Complainant's course of conduct and texts[10] later the same morning are questionable for someone who alleges she was the victim of a bruising sexual assault just a few hours before.  Instead, her course of conduct and texts are more in line with someone who regretted the previous night's sexual encounter and hoped it did not jeopardize her budding romantic relationship with someone else.  This is consistent with Complainant's initial plan, as explained to the Investigative Team, to first "just go into [her] bed and not talk about what occurred the previous night," (Investigative Report p. 16) and then to hopefully see Witness #1 later that *same* day.

101.   Complainant's text record shows that at 10:33 am, Complainant stopped walking home to review her messages and then translated her prior night's ▮▮▮▮ text to Witness #1 ("In ▮▮▮▮▮ it says: can I come over?").  She then texted Witness #1 "Sorry. I'm so sorry", which may have been an embarrassed apology for the serial calls she left for Witness #1 the preceding night or her way of beginning to apologize for having a consensual sexual encounter with me earlier that morning.

102.   Complainant told the Investigative Team that she decided as she was walking home "to just go into [her] bed and not talk about what occurred the previous night." (Investigative Report p. 16).

103.   After entering her apartment with her shoes in her hands (because of the terrible blisters on her feet), disheveled hair, and probably with a pained look on her face from

---

[10] See **Exhibit G**:  *Verbatim transcript of text messages and log of phone calls between Complainant and Witness #1.*

walking multiple Manhattan blocks home with blistered feet, Complainant sat with Witness #3 for a few moments, said nothing initially according to Witness #3, and then went alone into her bedroom. (Investigative Report p. 38). At this point in time, Complainant was exactly where she planned to be – alone in her bedroom having said nothing to Witness #3.

104.  It is not difficult to see why Complainant would feel upset and regret about the previous night's consensual sex with me.  Complainant probably preferred being with Witness #1, and was likely distressed that Witness #1 had both distanced himself after their romantic encounter the preceding Thursday night and rebuffed Complainant's desperate entreaties all evening long to get invited over.  Complainant may have also felt regret that she slept with me if for no other reason than that I had a girlfriend.  Complainant may have focused on the two one-night sexual encounters with two non-exclusive friends on two consecutive nights and may have been dismayed by the possibility of having no future romantic prospects with either one and having ruined two good friendships.

105.  At 10:53 am, Complainant's efforts to spend time with Witness #1 continued. While finally alone in her bedroom *before* Witness #3 convinced Complainant to go to the hospital, Complainant asked Witness #1: "You wanna hang out today?" Complainant didn't elaborate further other than to say she really wanted to see him, but her casual slang, breezy request *at this precise moment in time* to "hang out" with Witness #1 later the *same* day is difficult to reconcile with her subsequent allegations that she was the victim of a sexual assault.

106.  Complainant's course of conduct and texts are entirely consistent with her fairly basic plan to take a nap and continue pursuing Witness #1 (so far, without success since they were intimate the immediately previous day). Further, since Complainant also testified that

the idea of going to the hospital "wasn't something that had crossed her mind" (Investigative Report p. 16), Complainant's soft, slangy, breezy text to "hang out" makes sense only if she wanted to do just that – take a nap, shower and then "hang out" with Witness #1 later that *same* day. Complainant's casual tone and clear intent is not what one would expect from someone who was the victim of a sexual assault just a few hours before.

107.   In the meantime, according to the Investigative Report, after Complainant went alone into her bedroom, Witness #3 came into her room and sat down next to Complainant on the bed. Witness #3 asked about the bruises, but no names were discussed. (Investigative Report p. 38). According to the Investigative Report, Witness #3 "eventually realized what had happened". Witness #3 said that she thought she then asked Complainant "you were with someone and you didn't want it?" and the Complainant "nodded" in agreement. Witness #3 told the Investigative Team that it then "all kind of came together" and "she realized what had happened." (Investigative Report p. 38). Witness #3 did some research and then went back into Complainant's room and pressed Complainant to go to the hospital for Complainant's "own health and safety," to which she ultimately agreed. (Investigative Report p. 38).

108.   At the same time Complainant's insecurity about her hoped for blossoming relationship with Witness #1 -- ". . . paranoid and insecure when it comes to intimate connections . . ." -- was seemingly confirmed when Witness #1 turned down Complainant's 10:53 a.m. "you wanna hang out" text by texting at 11:02 a.m. that he was going to a Central Park birthday celebration for another woman. Complainant immediately called Witness #1 at 11:03 a.m. (the phone log shows two calls so she must have been very desperate to reach him). Witness #1 said that Complainant was "hysterically crying" to the point that "it was really hard for her to get her words out". The conversation was brief and about the only thing Witness #1 actually learned was that Complainant's cousin (i.e., Witness #3) was taking her

43

to the hospital.  Witness #3 acknowledges that Complainant did not tell him at the time that she had been the victim of a sexual assault or why she was going to the hospital.  Witness #1 says now that he speculated at the time that Complainant may have been the victim of a sexual assault – "what other reason would you go to the hospital" – but that memory could easily be a retrospective conclusion.

109.   Complainant's and Witness #3's description of the hospital visit creates additional doubt as to whether or not the "sexual assault victim" narrative was, at least, initially, Complainant's story or simply Witness #3's story that Complainant ultimately embraced. As already indicated, Complainant and Witness #3 *admit* that Witness #3 "filled out all the paperwork at the hospital on behalf of the Complainant" and that Complainant asked Witness #3 to do the talking for Complainant at the hospital. Thus, it is unclear who said what at the hospital. In any event, the details about the alleged sexual assault communicated to the hospital nurses were sparse.

110.   Finally, many of the text exchanges between Witness #1 and Complainant beginning from Saturday August 26 at 4:58 p.m. while Complainant was still at the hospital and thereafter, seem odd for someone who has just been the victim of a violent sexual assault. I will not recount these texts here but they are worth reading in their entirety (See **Exhibit G**, *Verbatim transcript of texts between Complainant and Witness #1*)  The tone and content of these texts is not what one would expect from the victim of a sexual assault.  Instead the tone and content is consistent with what one would expect from someone who regrets having had a sexual encounter the previous evening and is looking to solidify her relationship with a different romantic partner.

### Part XI:   My course of conduct over the next few days is consistent with caring for a friend with whom I just had consensual sexual intercourse

111.   My course of conduct during Saturday and Sunday is also instructive. I reached out to Complainant to see how she was.[11]  I communicated with Witness #2 with the same objectives.  I called my older sister on Sunday night to get her insight on why Complainant might have "defriended" me. At all times, my course of conduct is consistent with caring about a friend with whom I just had sexual intercourse.

112.   Shortly after Complainant left the apartment, I dealt with the "immediate emergency" of the gas leak and then I contacted Complainant. I texted her, "Duuude Omg lol."  Complainant did not respond to the message. As I told the Investigative Team, "She's a good friend of mine, I wanted to make sure it wouldn't be awkward between us and that we could still be friends". Complainant "didn't respond," but I initially "didn't think that much of it." I figured she was perhaps "doing something else or sleeping" when I sent the message.

113.   Witness #2 sent a Facebook Messenger message to me that afternoon. At 3:44 p.m. on August 26 she wrote, "Hi [Respondent]! Have you heard from [Complainant] today? I've been trying to reach her all day to know she got home safe . . . but her phone is off and she's not replying on messenger[.]" I "didn't read" Witness #2's message immediately, explaining to the Investigative Team that the message "went into the spam filter." At 3:56 pm, Witness #2 wrote me once again and stated, "No worries she's at home[.]" I replied to Witness #2, "Heyy lol fun night I think I accidentally spent too much money at the bar." [sic]

---

[11] *See* **Exhibit D**: *Verbatim transcript of text messages between Complainant and me and* **Exhibit J**: *Verbatim transcript of text messages between Witness #2 and me.*

45

114.   Later that Saturday evening, I once again contacted Complainant. At 7:47 p.m. I texted, "How u feeling today?? I have been tired all day lol[.]" [sic].  Once again, I got "no response" from Complainant.  As I told the Investigative Team, I thought "maybe she's feeling guilty for having been a part of . . . I have a girlfriend. I can understand it from that sense." (Investigative Report p. 29-30). Complainant alleges that she "couldn't bear to have these texts in [her] phone," so she deleted them upon receipt. (Investigative Report p. 19).

115.   The next morning (Sunday August 27, 2017), I once again attempted to contact Complainant, this time via Facebook Messenger. I sent the following messages: "Hey . . . Whatsup . . . How r u [sic]" Again, Complainant did not respond, "totally deleted him . . . and blocked him on Messenger and deleted him on Facebook." However, upon trying to send the messages, I learned that Complainant had "blocked" me. I was "shocked that such a good friend would block [me], even though [we] slept together." (Investigative Report p. 30).

116.   After I learned that Complainant had defriended me, I drafted the following "note" that I intended to text to Complainant:[12]

> *"Hey, I saw that you unfriended me on Facebook.  That's fine if you don't want to talk for some reason, but I just wanted to make sure that you aren't feeling guilty because we spent the night together.  It happened and it probably shouldn't have since we have been good friends for a while and I'm also in a serious relationship, so I understand why you may be feeling upset. I don't feel great about it either.*
>
> *Anyway, if you don't want to talk, that is okay.  Just let me know.  Enjoy the rest of your Sunday."*

Last modified:  Aug 27, 2017

---

[12] *Ultimately, I never transferred the "note" to text. Only recently did I discover the "note" in my saved notes, See **Exhibit K**:  "My unsent text to Complainant."*

Eventually I "read between the lines" and resolved to not contact Complainant further unless and until she "[came] around" and decided to talk to me again. I have not initiated any further contact with her.

117.   I was distressed by this turn of events and reached out to my sister (Witness #11) on Sunday evening August 27, 2017.[13] I told my sister that "one of [my] good friends had de-friended me on Facebook," and I "couldn't figure out why she de-friended me." I "wanted a girl's point of view slash his sister's point of view" about why Complainant might de-friend me. I told my sister that  Complainant and I "had been hooking up at the bar," and "continued to hook up and had sex together" once back at my apartment. I also told my sister that while we were kissing in the ▇▇▇▇▇▇▇▇ Complainant asked me about my girlfriend, but we then resumed kissing. My sister told me how once she "had gone on a date with someone and then unfriended them," and she told me that she thought Complainant might be "embarrassed or upset" about "hooking up" with me when she knew that I had a long-term girlfriend. My sister added that "neither of you guys are saints" for having sex with one another under those circumstances, and she hypothesized that this might be the reason why Complainant unfriended me on social media.

---

[13] *See Investigative Report p. 52-53.*

**Part XII:    Great pressure on Complainant to report incident because of her allegations ("raped and beaten"); Complainant's witnesses and her documentary evidence vindicate me**

118.  The question arises in every case involving an allegation of sexual assault of why a complainant would put themselves through the ordeal of reporting the incident unless the allegations were true.

119.  In this case once Witness #3 took charge and convinced Complainant to go to the hospital for Complainant's "own health and safety," Complainant was started down a path that inexorably would lead to her ultimately filing an Incident Report.  This happened even though there is no support in the underlying facts for the Incident Report.

120.  The pressure on Complainant to report the incident only increased once Witness #3 spoke for Complainant at the hospital; once Complainant, Witness #2 and Witness #3 reconstructed the events on Sunday; and once Complainant and Witness #1 reconstructed the events on Monday night.

121.  This pressure then must have become acutely intense after Complainant told other individuals that I raped and beat her, and maybe even drugged her:

- ***Witness #4:***  *"He was violent towards her, like taking off her clothes".  Complainant showed her bruises.*

- ***Witness #7:***  *Complainant showed him the bruises and said it was Respondent; said he beat her up and raped her; really brutal.*

- ***Witness #9:***  *Complainant "raped" by Respondent; she showed him the bruises.*

As those are the ones we just know about.

122.   Under these circumstances, Complainant undoubtedly felt great pressure to file an Incident Report even if no one was overtly putting on pressure. That is, if Complainant's "reconstructed" allegations were true (which they are not), then everyone she told would expect that an Incident Report would be filed.  At this point, there was no going back. Complainant needed to file the Incident Report to vindicate the claims she had been making.

*     *     *     *     *     *

123.   As it turns out, Complainant's witnesses and documentary evidence calls into question the reliability of Complainant's narrative and establish that Complainant's narrative lacks support in the underlying facts.

## ULTIMATE FINDINGS

Based on the record in this case, I submit the following findings for your consideration:

- Complainant and I engaged in one or more acts of vaginal sexual intercourse on August 26, 2017, which is agreed by both.

- Complainant and I had the capacity to knowingly, voluntarily and mutually participate in consensual sexual activity.  Neither of us was incapacitated by alcohol or drugs within the meaning of the University Policy so as to be unable to make a rational, reasonable decision because of such incapacity.

- Complainant and I each knowingly and willingly consented to engage in sexual intercourse.

- The sexual intercourse between Complainant and me was not the result of force or coercion.

- Even though Complainant alleges a "blackout" loss of memory, I had no knowledge or reason to know of Complainant's "blackout" state. Complainant appeared to be functioning normally, including through actions or words that express an interest in engaging in sexual conduct.  There were no observable factors indicating that Complainant was in a "blackout" state or was incapacitated and I did not have actual knowledge or reason to believe Complainant may have been incapacitated. As defined under the University Policy, a reasonable person in my position would not know or have reason to know of Complainant's blackout state or any alleged incapacitation.

- Complainant's reconstructed narrative is built on a limited number of "memories" that are not supported by the objective facts, and tainted by witnesses who attempted to "fill in the gaps" post-incident without any supporting evidence and without any first-hand observations of our sexual interactions at issue.

Based on the foregoing, Complainant's version of the events clearly does not satisfy the "preponderance of the evidence" standard needed to find in her favor.

Respectfully submitted,