# EXHIBIT B

# GENDER-BASED MISCONDUCT INVESTIGATIVE REPORT

INV#20170503

## Table of Contents

Executive Summary ................................................................................................................. 4-5

Interviews Conducted ............................................................................................................. 5-6

Documents and Materials Examined ...................................................................................... 6-8

Policy Definitions .................................................................................................................. 8-9

Factual Summary .................................................................................................................. 10-56

    Complainant Statement ..................................................................................................... 10-21

    Respondent Statement ....................................................................................................... 21-31

    Witness Statements ........................................................................................................... 32-56

        Witness #1 ................................................................................................................... 32-34

        Witness #2 ................................................................................................................... 34-38

        Witness #3 ................................................................................................................... 38-42

        Witness #4 ................................................................................................................... 42-43

        Witness #5 ................................................................................................................... 43-46

        Witness #6 ................................................................................................................... 46-47

        Witness #7 ................................................................................................................... 47-49

        Witness #8 ................................................................................................................... 49-51

        Witness #9 ................................................................................................................... 51-52

        Witness #10 ................................................................................................................. 52-53

        Witness #11 ................................................................................................................. 53-54

        Witness #12 ................................................................................................................. 54-56

Findings and Analysis ........................................................................................................... 57-83

Conclusion ............................................................................................................................. 83

## Exhibits

(1)     Incident Report dated September 17, 2017

(2)     Instagram photographs from the Complainant's profile, provided by both the Complainant and Respondent

(3)     Photograph from inside of the Respondent's apartment on August 25, 2017, provided by the Complainant

(4)     Email receipt from Via ride on August 25, 2017, provided by the Complainant

(5)     Email receipt from Uber ride on August 25, 2017, provided by the Complainant

(6)     Email message sent by the Complainant to the Investigative Team on November 28, 2017

(7)     Photographs from inside of the ███████████ on August 25/26, 2017, provided by the Complainant

(8)     Screenshot of the call log between the Complainant and Witness #1 on August 26, 2017, provided by the Complainant

(9)     Partial text message history between the Complainant and Witness #1, provided by both the Complainant and Witness #1

(10)    Audio recording sent by the Complainant to Witness #1 on August 26, 2017, provided by both the Complainant and Witness #1

(11)    Photographs of the Complainant's shoes worn on the night of the alleged gender-based misconduct, provided by the Complainant

(12)    Complainant's Lenox Hill Hospital medical records from August 26, 2017, provided by the Complainant

(13)    Photographs of bruises on the Complainant's body taken by Witness #3 at Lenox Hill Hospital, provided by the Complainant

(14)    Complainant's Columbia Health Services records from August 26, 2017 – September 9, 2017, provided by the Complainant

(15)    Partial text message history between the Complainant and Respondent, provided by the Respondent

(16)    Printout of the Respondent's credit card transactions from August 18, 2017 – August 28, 2017, provided by the Respondent

(17)    Photographs of the ▇▇▇▇▇▇▇ provided by the Respondent

(18)    Photographs of the Respondent's apartment building, provided by the Respondent

(19)    Photographs of the Respondent's apartment and his ▇▇▇▇▇▇▇ provided by the Respondent

(20)    Email messages exchanged between the ▇▇▇▇▇▇▇ and the ▇▇▇▇▇▇▇ chairperson of the Respondent's residence on August 26, 2017, provided by the Respondent

(21)    Photograph of the floorplan of the Respondent's apartment, provided by the Respondent

(22)    Email message sent by the Respondent to the Investigative Team on October 17, 2017

(23)    Photographs of the gas valve and the Respondent's bedroom in his apartment, provided by the Respondent

(24)    Facebook Messenger history between the Respondent and Witness #2, provided by both the Respondent and Witness #2

(25)    Partial Facebook Messenger history between the Complainant and Respondent, provided by both the Complainant and Respondent

(26)    Partial text message history between the Complainant and Witness #2, provided by both the Complainant and Witness #2

(27)    Partial text message history between the Complainant and Witness #4, provided by Witness #4

(28)    Partial text message history between Witness #2 and Witness #5, provided by Witness #5

(29)    Partial text message history between the Complainant and Witness #7 provided by both the Complainant and Witness #7

(30)    Partial text message history between the Respondent and Witness #11, provided by the Respondent

(31)    Screenshot of the call log between the Respondent and Witness #11 on August 27, 2017, provided by the Respondent

(32)    Amy Smith Report regarding a review of Exhibit #12 and the physical injuries the Complainant sustained on the night of the alleged incident, provided by the Complainant

(33)   Jennifer Hammers Report regarding a review of the Factual Summary and several Exhibits with regard to the Complainant's stated memory loss, provided by the Respondent

(34)   Dr. Kim Fromme Report regarding a review of the Investigative Report and several Exhibits and the physical injuries the Complainant sustained on the night of the alleged incident, provided by the Respondent

(35)   Screenshot of a draft text message last modified on August 27, 2017 and saved in the Respondent's notes section on his phone, provided by the Respondent

## Executive Summary

Title IX Investigators Benjamin Marzolf and Jennifer Kelly ("the Investigative Team") conducted an investigation into allegations of gender-based misconduct made by the Complainant, a  graduate student, against the Respondent, a █████ in violation of the Gender-Based Misconduct Policy and Procedures for Students ("the Policy") of Columbia University ("Columbia"). The alleged gender-based misconduct occurred during the early morning hours on August 26, 2017 inside of the Respondent's off-campus residence.

The matter was initially reported to the Gender-Based Misconduct Office ("GBM") on September 17, 2017 after the Complainant submitted an Incident Report directly to GBM. In said Incident Report, the Complainant wrote that the Respondent allegedly "sexually assaulted" her after she had consumed alcohol and "black[ed] out." The Complainant further alleged that once inside the Respondent's residence – in a bedroom that was not the Respondent's – she "got on all fours and tr[ied] to crawl away but [the Respondent] flip[ped] up [her] dress and insert[ed] [her] from behind." The Complainant did not consent to the sex and was allegedly saying, "Why are you doing this? I thought we were friends. What about your girlfriend?" The Complainant also reported a second instance of intercourse, this time inside of the Respondent's bedroom, as the Respondent was "grunting" and the Complainant "tr[ied] to fight him off" before she "seem[ed] to have passed out." See Exhibit #1. Based on her allegations, the Investigative Team determined that the Complainant alleged two instances of Sexual Assault: Intercourse as those terms are defined in the Policy, with the bases for lack of affirmative consent being both incapacitation and the use of physical force.

The Respondent alleged that he and the Complainant engaged in consensual sexual activity at a downtown nightclub, followed by consensual sexual intercourse inside his apartment. The Respondent denied that the Complainant exhibited signs of incapacitation and similarly denied using physical force during sex.

To conduct its investigation, the Investigative Team was provided multiple electronic messages, photographs from the night of the alleged incident and the following day, and photographs of the Respondent's apartment. The Investigative Team was also provided Lenox Hill Hospital and Columbia Medical Services records, an audio recording, and contact information for all parties and

relevant witnesses. The Investigative Team interviewed the Complainant, the Respondent, and 11 witnesses from October 5, 2017 to March 27, 2018.[1]

## Interviews Conducted

Over the course of the investigation, the Investigative Team interviewed 14 individuals at the Gender-Based Misconduct Office. The Complainant and Respondent were both given the opportunity to provide a witness list to the Investigative Team during the investigative process, and at the conclusion of the investigation. Based on the parties' recommendations, coupled with information gathered by the Investigative Team throughout the investigation, 12 individuals in addition to the Complainant and Respondent were interviewed.[2] The background of the parties involved and the dates each individual was interviewed are detailed below.

**October 5, 2017**
- Complainant
  - The Complainant is a female second-year ▆▆▆ graduate student.

**October 11, 2017**
- Respondent
  - The Respondent is a male ▆▆▆▆▆▆▆▆▆ graduate student.

**October 12, 2017**
- Witness #1
  - Witness #1 is a male second-year ▆▆▆ graduate student, and the Complainant's boyfriend.
- Witness #2
  - Witness #2 is a female first-year graduate student in the ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆ and the Complainant's current roommate.
- Witness #3
  - Witness #3 is a female non-affiliate of the University and the Complainant's cousin.

**October 17, 2017**
- Witness #4
  - Witness #4 is a male second-year ▆▆▆ graduate student and the Complainant's friend.

**October 19, 2017**
- Witness #5
  - Witness #5 is a male first-year ▆▆▆ graduate student and friends with Witness #2.

---

[1] Delays in conducting all interviews are attributable to the parties' and their advisor's fall 2017 personal schedules, which resulted in certain interviews being delayed. Additionally, scheduling and logistical issues involving the witnesses slightly delayed the investigative process.

[2] The Investigative Team also sent outreach letters to three additional potential witnesses. The letters were sent on October 19, 2017, and October 25, 2017, respectively. While all three additional outreach letters were retrieved by the potential witnesses, none of them agreed to participate for the investigation and therefore these individuals were not interviewed.

**October 23, 2017**
- Witness #6
  - Witness #6 is a male first-year ███ graduate student and friends with Witness #2.

**October 24, 2017**
- Witness #7
  - Witness #7 is a female second-year ███ graduate student and the Complainant's friend.

**October 30, 2017**
- Witness #8
  - Witness #8 is a male first-year ███ graduate student and friends with Witness #2.
- Witness #9
  - Witness #9 is a female second-year ███ graduate student and the Complainant's friend.

**November 1, 2017**
- Witness #10
  - Witness #10 is a female first-year ███ graduate student and friends with Witness #2.

**November 14, 2017**
- Witness #11
  - Witness #11 is a female non-affiliate of the University and the Respondent's sister.

**November 16, 2017**
- Follow-up interview of the Complainant.

**November 21, 2017**
- Follow-up interview of the Respondent.

**March 27, 2018**
- Witness #12
  - Witness #12 is a female non-affiliate of the University and the Respondent's girlfriend.

## Documents and Materials Examined[3]

- Incident Report dated September 17, 2017

---

[3] Documents and/or materials not relevant to the investigation or beyond the scope of what can be considered by the Hearing Panel were not included in this report.

6

- Instagram photographs from the Complainant's profile, provided by both the Complainant and Respondent
- Photograph from inside of the Respondent's apartment on August 25, 2017, provided by the Complainant
- Email receipt from Via ride on August 25, 2017, provided by the Complainant
- Email receipt from Uber ride on August 25, 2017, provided by the Complainant
- Email message sent by the Complainant to the Investigative Team on November 28, 2017
- Photographs from inside of the ██████████ on August 25/26, 2017, provided by the Complainant
- Screenshot of the call log between the Complainant and Witness #1 on August 26, 2017, provided by the Complainant
- Partial text message history between the Complainant and Witness #1, provided by both the Complainant and Witness #1
- Audio recording sent by the Complainant to Witness #1 on August 26, 2017, provided by both the Complainant and Witness #1
- Photographs of the Complainant's shoes worn on the night of the alleged gender-based misconduct, provided by the Complainant
- Complainant's Lenox Hill Hospital medical records from August 26, 2017, provided by the Complainant
- Photographs of bruises on the Complainant's body taken by Witness #3 at Lenox Hill Hospital, provided by the Complainant
- Complainant's Columbia Health Services records from August 26, 2017 – September 9, 2017, provided by the Complainant
- Partial text message history between the Complainant and Respondent, provided by the Respondent
- Printout of the Respondent's credit card transactions from August 18, 2017 – August 28, 2017, provided by the Respondent
- Photographs of the ██████████ provided by the Respondent
- Photographs of the Respondent's apartment building, provided by the Respondent
- Photographs of the Respondent's apartment and ██████████ bedroom, provided by the Respondent
- Email messages exchanged between the ██████████████ and the ████████████ chairperson of the Respondent's residence on August 26, 2017, provided by the Respondent
- Photograph of the floorplan of the Respondent's apartment, provided by the Respondent
- Email message sent by the Respondent to the Investigative Team on October 17, 2017
- Photographs of the gas valve and the Respondent's bedroom in his apartment, provided by the Respondent
- Facebook Messenger history between the Respondent and Witness #2, provided by both the Respondent and Witness #2
- Partial Facebook Messenger history between the Complainant and Respondent, provided by both the Complainant and Respondent

- Partial text message history between the Complainant and Witness #2, provided by both the Complainant and Witness #2
- Partial text message history between the Complainant and Witness #4, provided by Witness #4
- Partial text message history between Witness #2 and Witness #5, provided by Witness #5
- Partial text message history between the Complainant and Witness #7 provided by both the Complainant and Witness #7
- Partial text message history between the Respondent and Witness #11, provided by the Respondent
- Screenshot of the call log between the Respondent and Witness #11 on August 27, 2017, provided by the Respondent
- Online article about dating and romantic culture in ██████ provided by the Respondent
- Partial text message history between the Respondent and an individual unrelated to the investigation, provided by the Respondent
- Partial text message history between the Complainant, Witness #7, and Witness #9, provided by both the Complainant and Witness #7
- Screenshots of Facebook profiles and pictures of Witness #2, Witness #5, and other individuals present on the night of the alleged gender-based misconduct, provided by the Respondent
- Amy Smith Report regarding a review of Exhibit #12 and the physical injuries the Complainant sustained on the night of the alleged incident, provided by the Complainant
- Jennifer Hammers Report regarding a review of the Factual Summary and several Exhibits with regard to the Complainant's stated memory loss, provided by the Respondent
- Dr. Kim Fromme Report regarding a review of the Investigative Report and several Exhibits and the physical injuries the Complainant sustained on the night of the alleged incident, provided by the Respondent
- Screenshot of a draft text message last modified on August 27, 2017 and saved in the Respondent's notes section on his phone, provided by the Respondent
- 4 articles from Respondent regarding alcohol and bruising, provided by the Respondent
- Written statement of Witness #12, provided by the Respondent
- Text messages between the Respondent and Witness #12, provided by Witness #12

## Policy Definitions[4]

**Sexual Assault: Intercourse**
Any form of vaginal, anal, or oral penetration, however slight, by a penis, object, tongue, or finger without a person's affirmative consent.

**Affirmative Consent**

---

[4] For the complete definitions of terms, please refer to pages 4-10 of the Policy, which is available at http://www.columbia.edu/cu/studentconduct/documents/GBMPolicyandProceduresforStudents.pdf.

Affirmative consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity.

- Consent can be given by words or actions, as long as those words or actions clearly communicate willingness to engage in the sexual activity. It is important not to make assumptions about consent. If there is confusion or ambiguity, participants need to stop sexual activity and talk about each person's willingness to continue.
- Consent cannot be procured by the use of physical force, compulsion, threats, intimidating behavior, or coercion.
- Consent cannot be obtained from, or given by, a person who is incapacitated.
- Silence or the lack of resistance, in and of itself, does not demonstrate consent.
- Consent can be withdrawn at any time, including after it is initially given. When consent is withdrawn or can no longer be given, sexual activity must stop.

**Force**

Force refers to the use or threat of physical violence to compel someone to engage in sexual activity. Examples of physical violence include hitting, punching, slapping, kicking, restraining, choking, strangulation and/or brandishing or using any weapon.

**Incapacitation**

Incapacitation occurs when an individual lacks the ability to knowingly choose to participate in sexual conduct. A person who is incapacitated cannot make a rational, reasonable decision because the person lacks the ability to understand his or her decision.

- Whether sexual conduct with an incapacitated person constitutes gender-based misconduct depends on whether the Respondent knew or should have known of the Complainant's incapacitation, based on objectively and reasonably apparent indications when viewed from the perspective of a sober, reasonable person in the Respondent's position.
- Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent. See the following for additional discussion on how drugs and alcohol can affect consent.

**How drugs and alcohol affect consent**

In evaluating whether a person is incapacitated due to the consumption of alcohol, drugs or intoxicants, the following factors will be considered:

- Whether the Complainant understood the "who, what, when, where, why or how" of the sexual conduct; and
- How the Complainant was physically affected by the consumption of alcohol or drugs, which may include, but is not limited to, warning signs such as having slurred or incomprehensible speech, vomiting, unsteady gait, imbalance, bloodshot eyes, combativeness, emotional volatility, or notable change in personality.

Another effect of alcohol consumption can be memory impairment, or forgetting entire or partial events (sometimes referred to as "blackout" or "brown-out"). A person may experience this symptom while appearing to be functioning "normally," including communicating through actions or words that seem to express an interest in engaging in sexual conduct. Whether sexual conduct with a person who is "blacked-out" constitutes gender-based misconduct depends on the presence or absence of the observable factors indicating that a person is also incapacitated, as described above. Total or partial loss of memory, without more, is insufficient to demonstrate incapacitation.

## Factual Summary

The Complainant and Respondent agree that they originally met one another during the Fall 2016 ███ Orientation, at a social event for new students. They similarly agree that after meeting one another, they developed a friendship and shared classes together. They met to discuss lectures in their shared classes, and also socialized with one another amongst other ███ students. Neither party stated that there were any flirtatious or sexual undertones to their relationship prior to the night of the alleged gender-based misconduct. While the parties agree that they had sex during the early morning hours of August 26, 2017, they disagree about whether the sex was consensual.

The Investigative Team interviewed the parties and witnesses with information relevant to this investigation. The following are factual summaries of those interviews, and represent the sum and substance of the interviews, rather than word for word transcriptions.

### Complainant Statement

I.   <u>Relationship History Between the Complainant and Respondent / Background Information</u>

The Complainant is a graduate student in ███ having enrolled in August 2016. ████████████████████████████████████████ Upon enrolling in ███ it was her "first time moving away from family for such a long time," which was "exciting, but also a little bit daunting."

During her first week at Columbia during ███ Orientation Week, she attended several "networking" and "social" events to meet her classmates. On the Tuesday of Orientation Week she met the Respondent at Arts & Crafts[5] at a social for students concentrating in ███ Upon meeting the Respondent, she stated that they "always chatted when [they] met in the hallway," and became "friends" on Facebook. When asked further about her history with the Respondent she stated they were initially "just like acquaintances that met on occasion at parties or hung out." However, she remembered having a "███ lab" with the Respondent during the Fall 2016 semester, and then during the Spring 2017 semester they had ████████████ together as well. After that class together they "sat together and became better friends." She explained that the Respondent is "very active on Facebook and [Facebook] Messenger, so he would send [the Complainant] a lot of videos he thought were interesting." Towards the end of the Spring 2017 semester they "had brunch together, and would study ██████ together." At times they would also "meet up for drinks with friends." The Complainant denied there ever being a romantic or sexual element to their relationship. She stated, "We were friends, but not really close . . . I met his girlfriend. He always had a girlfriend. I never had feelings like that for him, and even if I did I wouldn't act on it because he had that girlfriend. I met her once. She's very nice. ████████████

Following the Spring 2017 semester the Complainant returned home to ███ for the summer. She "stayed friends" with the Respondent, and the two "chat[ted] on and off" on Facebook Messenger. The Complainant returned ████████████ on August 21, 2017, shortly before the Fall 2017 semester began.

---

[5] Arts & Crafts is a bar located at 1135 Amsterdam Avenue between West 115th and West 116th Streets.

On August 25, 2017, the Complainant had plans with Witness #2, her soon-to-be roommate, to go to ███████████████████████████████ The Complainant explained that Witness #2 was also ███████ and "she had just moved to New York this year," so the Complainant "wanted to show her ██████████████ as a way to introduce her to the City. The Complainant had not heard from Witness #2 during the day, so she figured that she might instead "just take it easy." However, after getting Chipotle for lunch and re-heating leftovers for dinner, Witness #2 called and told the Complainant she was outside of ███████ The Complainant lived close by at the time, so she "got dressed and went to go meet [Witness #2] there."

Once at ███████ the Complainant and Witness #2 took a picture together, which the Complainant posted to her Instagram account. See Exhibit #2. Eventually she "received some messages from [the Respondent]." He was asking the Complainant if she had returned from ███████ and wanted to meet up.[6] Witness #2 had brought three of her classmates with her to ███████ and they were all discussing "whether [they] wanted to do something that night" together. The Complainant recalled having "one glass of sparkling wine" on ███████ at approximately 7:00 p.m. After receiving the messages from the Respondent, the Complainant "mentioned that [the Respondent] wanted to have [them] over for some drinks at his place," so the group "decided to go over there."

II.   Alleged Gender-Based Misconduct

Before going to the Respondent's apartment, "more people" joined the Complainant and Witness #2 at ███████ so "there were like seven people" all together, but the Complainant only knew Witness #2. Along the way to the Respondent's they "bought some seltzer water at a convenience store close by," and they were then admitted into the Respondent's building. The Complainant was "just chatting" primarily with the Respondent and Witness #2. She remembered pouring herself a drink while inside the Respondent's apartment. She used a "jar" and filled it with "vodka and seltzer water." After her interview the Complainant provided a picture of her and the Respondent with the other guests present in the Respondent's apartment. See Exhibit #3.

At one point the Respondent and Witness #2 went to the window to smoke, and the Complainant followed. At that point the Respondent told the Complainant that he had recently gotten engaged to his girlfriend, and the Complainant "was so happy to hear about it, and congratulat[ed] him." The Complainant also showed Witness #2 a "really nice" picture of the Respondent and his girlfriend and remarked, "Oh, see the way he's looking at her." As time progressed Witness #2 "was being anxious" because she had told her friends on the Upper West Side that she would go to their apartment for a housewarming party. Witness #2 is "very friendly," so she "invited everyone" to go with her to the other party. Before leaving, the Complainant, the Respondent, and Witness #2 took two of "the red plastic cups, like in college," and poured two more vodka sodas in those cups to share. The Complainant stated that she and Witness #2 primarily shared one cup, while the Respondent had most of the second cup himself. They took the plastic cups with them and then the three ordered a

---

[6] The Investigative Team requested that the Complainant provide her text history with the Respondent to be considered for the investigation. However, after the incident the Complainant "deleted the messages [be]cause [she] didn't like having to be reminded of [the Respondent's] existence every time [she] got a text message."

Via[7] to the apartment, located in the vicinity of ███████████████████████[8] However, upon arriving at the apartment they "found out that [the party] had actually been moved to another place." They therefore took an Uber to a different apartment, located in the vicinity of ███████████████████████[9] The Complainant stated that this second ride took place at approximately 10:30 p.m.

The parties and Witness #2 "only stayed . . . for a short while" at the housewarming party because it was "winding down." The Complainant thought she might have still been drinking from the red plastic cup made at the Respondent's apartment, but did not think she consumed any additional alcohol at the housewarming party primarily because "they offered [her] beer, but [she] doesn't drink it." The Complainant and Respondent were both "talking to people" while at the party, but then around approximately midnight the Complainant, the Respondent, and Witness #2 decided to leave and go to downtown to the ████████████[10] At first the Complainant said it was "definitely" just her, the Respondent, and Witness #2 who travelled downtown together, but after a brief pause, stated that she "could be confusing" the various car rides taken with one another.[11]

Once at the "club," the Complainant and Respondent were "more like together" than they were at the housewarming party. At her follow-up interview on November 16, 2017 she clarified, "Before we were talking to separate people, but in the ██████████ we were mostly talking to each other." She stated that she did not "experience anything that was weird," but she recalled "the three of [them] . . . all dancing." The Complainant provided several pictures taken of the group from inside of the club to illustrate this point. See Exhibit #7. Once at the bar the Complainant got "some ginger ale drink" that she thought was called a "Ginger Tower." At one point the Complainant, the Respondent, and Witness #2 went outside, and shortly after going outside Witness #2 decided to leave and go home "because she had [a] headache," therefore leaving the Complainant and Respondent together. According to the Complainant this was at approximately 1:15 a.m.

Upon reentering, the Complainant and Respondent approached the bar and the Respondent "opened a tab" and bought himself and the Complainant a drink. She ordered "sparkling wine," partially because she had been drinking "strong alcohol" before and wanted to switch back to wine. After purchasing the drinks the Respondent "started being inappropriate" with the Complainant. She explained, "[He was] like coming really close and touching me, like not in a friendly way." At her follow-up interview she clarified that the Respondent's "crotch [was] really tight up against [her] body." The Respondent's "presence was scaring" the Complainant somewhat, but "in the moment [she] didn't want to think that" he would try to do anything to her. The Complainant "didn't think much of it" and rationalized that it was "not the first time someone gets drunk and doesn't respect

---

[7] Via is an electronic rideshare application that permits users to have a car pick them up and drop them off based on an algorithmic system.

[8] The Complainant provided an email receipt from Via to corroborate that the ride took place and that she paid for it. See Exhibit #4.

[9] As with the Via ride from the Upper East Side to the Upper West Side (Exhibit #4), the Complainant provided her Uber receipt for the ride to the second apartment. See Exhibit #5.

[10] ██████████████████████████████████████████████████████████████████████

[11] After the Complainant's follow-up interview on November 16, 2017, she submitted an email to the Investigative Team that stated in relevant part, "I mixed up the [U]ber rides in my last interview. I believe in the [U]ber ride to the ████ ██████ we were actually joined by a couple of ████ guys that were there with us that night. You asked who paid for that ride and I think it was one of them. I confirmed with my roommate, she did not pay for the ride and neither did I." See Exhibit #6.

12

your personal space." The Respondent "tried to kiss" the Complainant, after which the Complainant reminded the Respondent of his girlfriend and the fact that they were just friends. During her follow-up interview the Complainant stated that in response to her reminder, the Respondent "was just like, 'Whatever, it doesn't matter.'" Both the Complainant and Respondent "just kind of laughed it off" at that point.

After this interaction with the Respondent at the bar her "memory becomes . . . blackout with like glimpses of memory." She recalled going on the "dance floor" with the Respondent at one point, and she could "feel him dancing behind" her. She "felt like a little bit uncomfortable," but she was "brushing it away" and once again figured it was due to the amount of alcohol he had consumed that night. The Complainant's next memory involved the parties "in a cab or Uber or something," and the Respondent told "someone" that the Complainant was the Respondent's "girlfriend." At this point the Complainant remembered feeling "really scared," although she also remembered feeling "stupid for being scared." When asked to clarify she stated, "I don't remember necessarily what I was scared of, I just remember being so scared. I was uncomfortable being around him, but I don't think I allowed myself to be scared of a friend of mine. That's why it's really weird." She thought that she would be "safer with him" than going home alone. She was "uncomfortable" with and "scared" of the situation, but "not necessarily scared of [the Respondent]."

The Complainant thought that prior to getting into a car with the Respondent she was "calling [her] friend" Witness #1. She "kept calling him . . . like before [she and the Respondent] went into the cab, and also in the cab." When asked during her follow-up interview what the Respondent's reaction was to the repeated calls, she stated that she did not remember. Witness #1 later told her that he was asleep, and that he therefore did not speak with the Complainant when she called him. The Complainant provided a screenshot of her call log, which reflected 16 calls and FaceTime calls placed to Witness #1's phone throughout the course of the night. See Exhibit #8. She also sent Witness #1 a text message while in the cab stating, "Can I come?" in ████ See Exhibit #9.[12] When asked if Witness #1 knew ████ she replied, "No, he doesn't. It was unusual, but I couldn't communicate it in English." She continued, "I just remember my brain being so slow. I couldn't make any rational decisions, and I just thought if I could just go to [Witness #1] I would know I'm safe. That's why I kept calling and wrote in ████ 'Can I come?'"[13]

She further described her physical condition at the time in the following manner: "Just like heavy kind of, and confused. My brain was really slow. I knew I was in a cab, but I didn't really know where I was. I just assumed we were going to the Upper East Side, [because] that's where I live and that's where he lives. But I didn't know where we were." The Complainant sent Witness #1 her "location update" from her phone before getting into the cab and up near the Respondent's apartment, and also left a "voice recording" in which you can allegedly hear the Respondent's voice. See Exhibit #9 and Exhibit #10, respectively. The Complainant did not fully recall sending these items to Witness #1, but was told that she sent the items when she spoke with Witness #1 after the night of the incident. She stated, "I have a vague memory of a voice recording and being like, thinking like, 'It's good to send this. It's good to have this.' I just remember making the decision instead of deleting

---

[12] The Investigative Team independently verified, via Google Translate, that the sum and substance of the Complainant's translation was accurate.

[13] During her follow-up interview she was asked to elaborate and she stated: "I don't think I meant that. Not like rational in the sense that I would do something irrational. I don't remember much from sitting in that car, I just remember everything so slow and when texting on my phone, it wasn't like normally on my text. I was struggling to text. . . . Not realizing what was happening or where I was."

it, to send it." When asked at her follow-up interview if she recalled exiting the car at any point during the ride uptown she replied, "No." Similarly, she did not recall any sexual activity with the Respondent in the car, as the Respondent stated in his narrative.

After this point, the Complainant's memory became less clear. She did not remember getting out of the car with the Respondent and going into his apartment. She said that she "just remember[ed] being in his apartment. Just thinking like, 'What is happening? What am I doing here?'" The Complainant's memory became "really weird" at this moment, in that she only had "like three really clear memories" from the rest of the night.

The Complainant first remembered "being in a bedroom that [she] had never been into before." The room had a bed and "these wooden like really tall bedposts," and the Complainant recalled having on a dress but no underwear. When asked, she stated she did not know or remember how or when her underwear came off. She "just remember[ed] being like, on all fours" on top of the bed. While she qualified her statement somewhat to say that she did not "want to say anything that [she was] not sure of," she thought the Respondent "pushed [her] on the bed, and [she] got up on all fours . . . [and the Respondent] flipp[ed her] dress up." The Complainant "did not want this to be happening," and she remembered thinking, "What is this? How did I get here?" According to the Complainant the Respondent "was in charge of everything and doing everything." The Complainant wanted to fight off the Respondent but he "was so strong that [she] was afraid that if [she] would fight too much or piss him off or something that he would try to like have anal sex with [her]." Therefore, rather than try to fight the Respondent off, she said, "No, no. We're friends. What about your girlfriend?" The Complainant "tried to say her name," in the hopes that it "might like make [the Respondent] snap out of whatever was going on in his head." However, the Complainant was unable to describe the Respondent's response, if any. During her follow-up interview she said, "No. I don't remember him having any response."

The Complainant recalled the Respondent then inserted his penis into her vagina from behind on top of the bed as she was "face down." During her follow-up interview she became visibly upset and added, "I remember this so clearly and I remember thinking in that moment, 'Oh my God, I'm being raped.' I remember facing down and I remember being in this room I'd never been in before, but I don't remember exactly how my body was." The Complainant was asked for additional details surrounding the encounter, such as how and when the Respondent removed his clothing. She remembered the Respondent's "pink shirt" being off at some point, but she did not recall the surrounding details or when his clothing was removed. She stated, "I don't remember if it was in that particular moment, but I kept repeating 'No, we're friends.' It's never crossed my mind that we would ever do anything."

The next memory the Complainant had involved her asking the Respondent, "Why are you doing this? I don't understand what's happening, why are you doing this?" The Respondent replied something along the lines of, "I've always wanted this." This was "such a shocking thing" to the Complainant, but she could not recall additional specific details. She thought it was during a "different moment" than when they were in the bedroom with the "really tall bedposts." Upon further questioning she thought that this exchange took place in the living room of the Respondent's apartment, after leaving the other bedroom.

14

The third memory of the Complainant took place in the Respondent's bedroom,[14] as she was "on [her] back and [he was] on top of [her]." According to the Complainant this third interaction was "such a clear memory." As the Respondent was on top of her and "humping" her he repeatedly said, "Yeah, yeah." She still had her dress on, and she was thinking to herself, "What the fuck is happening?" She also clearly remembered looking up at the Respondent's "white chest and his hands" as he was inserting his penis into her vagina. At one point the Complainant "put up [her] hands to push [the Respondent] away," but the Respondent "took [her] hands and put them like this," after which the Complainant demonstrated the Respondent pinning down her arms and hands above and to the side of her head. The Complainant noted that while the Respondent was having sex with her she kept thinking of the photograph of the Respondent and his new fiancée that she had shown to Witness #2 earlier that night. She stated, "During what happened, I had that picture seared into my brain and I kept thinking of her during that moment."

The Complainant eventually "gave up the whole thing," and she thought she "passed out" at that point as the Respondent continued to have sex with her. Upon further questioning she stated, "I must have fallen asleep but it didn't feel like sleep. When I woke up, I don't know how to explain this, but when I woke up it was like the moment had just ended from when I passed out." During her follow-up interview she clarified, "I don't remember passing out, falling asleep. It was like I was in the moment and then I woke up. It was like it was happening and suddenly I woke up." When asked if the Respondent used a condom either time they had sex she replied, "I don't know." Additionally, when asked if any other sexual activity took place that evening she stated, "I don't remember." She similarly did not have any memory of how the sex ended the second time in the Respondent's bedroom or whether the Respondent ejaculated. She "passed out," and her "next memory" was the following morning.

The Complainant woke and was "in the same bed and [the Respondent] was next to [her]" with his "back facing [her]." The Complainant "was still like so disoriented and confused," and her body was "like kind of numb." She kept thinking to herself, "I have to go, I have to go." She still had her dress on from the night before, but did not have her underwear and did not know where they were. She "tried to look for [her] underwear," but eventually she was "just trying to get out of there." The Complainant also realized that her cell phone and apartment keys were missing, so she snuck out of the Respondent's bedroom[15] to look for them, retrieve her shoes, and leave without waking the Respondent.

Once outside of the Respondent's bedroom the Complainant saw "like stuff everywhere." During her follow-up interview she elaborated, "My stuff was everywhere. It didn't look like there had been a break-in or a fight or anything, it was just messy. There was stuff everywhere. I don't know how to describe it. It was just not neat." She went into the living room and spotted one of her shoes near the front door. She then went over to the "other bedroom," and found her other shoe there. She also found her leather backpack in that bedroom, which housed her apartment keys and wallet. She

---

[14] At her follow-up interview she explained that she knew the second room was the Respondent's because she "saw into his room" when she was at his apartment for the Respondent's birthday party ███████████████████

[15] During her Pre-Determination Conference the Complainant added, "It's up in the air where we woke up the next morning. I remember very clearly where we fell asleep and where we woke up. We woke up in the bed with the striped sheet. Which I thought is his bedroom because when I went to his ████████████ he said, 'This is my bedroom' and ██ ███████████ is the tall bedposts. I just want to be really clear that we woke up in that bedroom and that's where the second assault took place and that's where this gas valve is . . . I don't remember why we were switching bedrooms, but for me I think it was because I was trying to not sleep in his bed."

additionally had two books inside of her backpack the previous night, but she could not locate them at that time. The Complainant was focused on finding her phone so she could leave, and she "ultimately" found it after going back out to the living room. She saw it "peeking up" from couch cushions in the living room. When asked during her follow-up interview if she knew how her things became scattered across the apartment she replied:

> No. I've been really careful about not speculating with you guys. I don't add anything I don't remember. But I have had this memory that keeps coming back to me of him taking my phone and throwing it. Like him taking it from me and throwing it. Because I was calling. But other than that, I don't know. I don't even know if that's a real memory anymore.

The Complainant asserted that the memory came to her "immediately," and has "always been a lingering thought after this." She said she did not tell the Investigative Team this during her initial interview because she "didn't want to mention things [she] wasn't 100% certain about." She said she thought the Respondent threw her phone "in the middle of the living room," but she could not provide additional details.

After she retrieved her phone, she put on her shoes and took her other available belongings and left the apartment. The Complainant thought that it was approximately 10:00 a.m. on August 26th by the time she left the apartment. During her follow-up interview the Complainant was asked if she bumped into anything on the way out of the Respondent's apartment, but she denied hitting anything. She "[did not] recall" if she hit her body on anything the previous night, but asserted that she did not bump into anything before leaving the Respondent's apartment or throughout that day. Similarly, she denied interacting with the Respondent's super or any other building official, and did not remember seeing any gas valve or smelling gas at any point during the night, as the Respondent recounted in his narrative. She was also asked additional questions about the type of shoes she wore that night. She stated that she wore newly purchased "brown sandals" throughout the night. They were flats, and she remembered getting "crazy blisters on [her] toes" as a result of wearing them. After her follow-up interview she provided the Investigative Team photographs of the shoes worn that night. See Exhibit #11.

As she started walking back to her own apartment, the Complainant noticed that she had received a response from Witness #1 to her messages sent the previous night. At 8:08 a.m. on the 26th he texted her, "Hahahaha[.] Thanks for these location updates[.]" At 10:33 a.m., as she was walking back to her apartment, she replied, "In ▮▮▮▮▮ it says: can I come over? Sorry[.] I am so sorry[.] You wanna hang out today? I really want to see you[.]" See Exhibit #9. However, at that time she did not elaborate to Witness #1 any further. She explained that she was still "feeling like completely numb and still disoriented." Once she arrived at her apartment the Complainant encountered Witness #3 when she entered. The Complainant had previously decided to "just go into [her] bed and not talk about" what occurred the previous night. However, when she opened the apartment door, Witness #3 was making a smoothie in the kitchen and looked directly at the Complainant.

Upon seeing the Complainant, Witness #3 first exclaimed, "Hey!" She then looked at the Complainant and immediately asked, "Are you ok?" Rather than respond, the Complainant "just started crying." Witness #3 "kept asking, 'What happened?' [but the Complainant] couldn't say anything." She reportedly "just kept saying like, 'Everything was fine, and then all of the sudden it wasn't.'" Witness #3 asked the Complainant about bruising on her arms, and the Complainant

responded, "I think I was sexually assaulted." The Complainant said she was unsure how exactly she sustained the bruising, but told the Investigative Team that she does not "bruise easily" and has "never" been bruised after consensual sex before. The Complainant "hadn't realized [she] was so battered" by what had transpired with the Respondent until Witness #3 called her attention to it. Witness #3 put the Complainant to bed and instructed her to not take a shower for the time being.

The Complainant cried in bed thinking about what had occurred, and Witness #3 eventually asked her if she would be "willing to go to the emergency room" to address the situation. The idea of going to the hospital "wasn't something that had crossed [the Complainant's] mind," but at approximately 12:00 p.m. she decided to go with Witness #3 to Lenox Hill Hospital a few blocks away. Upon arriving at the hospital Witness #3 "filled out all the paperwork" on behalf of the Complainant, largely because the Complainant was still upset and struggling to understand what had happened with the Respondent. The Complainant was seen by medical professionals over the course of the next several hours, and received medical care including a sexual assault forensic examination by a nurse at the hospital. See generally, Exhibit #12.

When she finished at the hospital, the Complainant returned home with Witness #3. She had been given medications to prevent sexually transmitted infections ("STIs"), and therefore "just went home and watched *Modern Family* and threw up and had diarrhea." During the previous night, while at the ▓▓▓▓▓▓▓ the Complainant posted a photograph of her and the Respondent and the other people she was with to her Instagram account. The photograph had the caption ▓▓▓▓▓▓▓ See Exhibit #2. Once she was back in her apartment after the hospital, the Complainant "deleted everything" that reminded her of the Respondent, including the Instagram photo. When asked about her reasons for doing so during her follow-up interview she stated: "I deleted my Instagram story that had anything to do with [the Respondent], and all of those photos from my phone, and that photo from my Instagram page, because I thought it was disgusting. I didn't want to have that on my Instagram." [16]

Upon asking the Complainant how much alcohol she consumed throughout the night, she recalled first having "one glass of sparkling wine on ▓▓▓▓▓▓▓ which was at approximately 7:00 or 7:30 p.m. on the night of August 25th. Once at the Respondent's apartment, she had a vodka soda mixed drink. [17] She stated, "[W]e had [a] mason jar of vodka and seltzer with strawberries. I mixed it myself, so it would just have like not too much [alcohol in it]. If I'm mixing it myself, [I] just pour a little bit in." When asked how much vodka she put into her drink, she stated "about a shot glass," and she held her hand up to reflect approximately a half inch height. She, Witness #2, and the Respondent then shared two "plastic cups" filled with vodka and seltzer water. In the Complainant's estimation those drinks had "maybe a little bit more" vodka than the mason jar drink the Complainant made. They took the plastic cups with them across town to the two apartments, and the Complainant did not think she consumed any additional alcohol while at those places. Once at the ▓▓▓▓▓▓▓ downtown, she remembered getting a "Ginger Tower" that "wasn't particularly strong." After that

---

[16] According to the Complainant, Witness #2 "had taken a screenshot" of the photograph before the Complainant deleted it on August 26, 2017 because she is a "great memory collector." The Complainant "did not know she had screenshotted it until [she] asked if [Witness #2] had any photos from that night," after the Complainant started considering reporting the allegations.

[17] In the Complainant's Lenox Hill Hospital records provided for this investigation (Exhibit #12) it specifies that they were drinking "Absolut Vodka." See Exhibit #12 at p. 14 of 114. During her interviews the Complainant affirmed that "that's the vodka [she] was referring to that [she] had in [the Respondent's] apartment."

drink she remembered having "one" sparkling wine that the Respondent purchased for her, although she acknowledged that she "could have had more" and simply stopped remembering.

She stated that the amount of alcohol she had that night was "normal" for her, other than the fact that she "normally [does not] drink strong alcohol." Although she recalled having blacked out previously, she stated that she does not normally experience losing her memory. She explained, "I have blacked out in my past, but I've always been very aware that I drank too much. I didn't feel that way this time." The fact that she started to feel "heavy" towards the end of the night was "weird" to the Complainant. Additionally, she remembered feeling "slow and confused" into the following day, until approximately 12:00 p.m. on the 26th while at the hospital. The Complainant "didn't think about any drugs in [her] system until the nurse asked if she could do a toxicology screen." [18] The Complainant remembered the Respondent handing her the first sparkling wine at ▮▮▮▮▮▮ after he paid for it, but when asked if she saw him do anything that resembled placing something in her drink, she denied observing that behavior.

The Complainant said that the Respondent "was drunk" throughout the night. She remembered in the Uber ride downtown to the ▮▮▮▮▮▮ she thought the Respondent was "a little drunk," and he became more drunk as the night wore on. She stated that the Respondent "changes a bit" when drinking, in that he "becomes loud" and "just a little bit different kind of." However, she did not recall the Respondent falling over or slurring his words or observing other obvious signs of intoxication.

As documented in the Lenox Hill medical records, when the Complainant was seen by medical professionals they took pictures of bruising and redness to her arms, neck and face, and thigh. See generally Exhibit #12. [19] However, when asked about the depicted physical injuries the Complainant did not specifically recall physical force being used by the Respondent other than recalling he threw her onto the bed in the guest [20] bedroom and pinned down her arms and hands in the Respondent's bedroom. When asked if she remembered any further physical struggle she stated:

> I just remember it being a struggle and me being scared, but I don't remember how [I sustained the bruising depicted in the pictures]. I still have a huge bruise here on my thigh. It's still visible. It was huge. I don't remember how that came along, or any of that. He's not really big, he's not like that big of a guy. But he felt so much stronger than me, also because I was so drunk and intoxicated. I think I would be able to fight him off in a normal moment, but I was just like so weak and confused and disoriented. I don't know this, but it seems to me like I may have not been conscious. I remember him being on top of me, and I feel like I had kind of [given] up and I don't know if I went to sleep or if I like made myself go to sleep. But I passed out while he was on top of me.

---

[18] At the time of this report the results of the Complainant's toxicology screen were unknown given that the Complainant opted to not report the allegations to law enforcement.

[19] Witness #3, the Complainant's cousin, also independently took photographs of the Complainant's physical injuries using the Complainant's cellular phone. The Complainant initially provided the photographs to GBM without a timestamp, but subsequently also provided the photos with the timestamps displayed. See Exhibit #13.

[20] Throughout her interviews with the Investigative Team the Complainant frequently referred to the room she described having "tall bedposts" as the "guest" bedroom. She clarified that she did not believe that bedroom belonged to the Respondent, and therefore assumed that it was a guest room.

Upon further questioning she added, "My head was, like I hit something. For a week afterwards, I was really tender here [indicating the side of her head]. I must have received a really hard blow to the head. I'm not sure how I got that though."[21]

III.   Lenox Hill Medical Records

The 114 pages of Lenox Hill Hospital records summarized and documented many things reported by the Complainant. Generally speaking, the medical records contained documentation of routine testing and paperwork, such as discharge instructions for the Complainant. However, among the many things noted, the paperwork indicated that the Complainant "remember[ed] having a few drinks but felt more intoxicated than expected" and "recall[ed] [the Respondent] pinning her down and forcibly having vaginal sexual intercourse with her despite her saying no." See Exhibit #12 at p. 6 of 114. During the Complainant's follow-up interview, when asked if she remembered telling the hospital officials this, she replied, "They're summarizing what I said, but I was there for five hours. Yeah, we discussed this. She had a questionnaire, and we discussed this." The Complainant added that the "pinning down and forcing" was specifically in reference to being "in [the Respondent's] bedroom and [her] hands on his chest and him pinning [her] arms or shoulders down." The records also reflected that the Complainant said, "I didn't even know I had these bruises." See Exhibit #12 at p. 14 of 114. When asked about this reported statement during her follow-up interview the Complainant said, "I think what that's about is I went to the bathroom at the hospital to put on a gown, and then I noticed the bruise I had on my thigh. And that was kind of a shock because that was a huge one. . . . I also didn't know I had the bruises until I saw [Witness #3]." The Complainant said she does not "have a memory" of how she sustained the injury to her thigh.

The records also noted that the Complainant reported "tenderness to [her] vaginal area upon palpation during forensic exam and tenderness to areas with markings. Blood also noted to vaginal and cervical swabs." See Exhibit #12 at p. 21 of 114. The forensic nurse also made a notation that she observed "redness" and "small amounts of blood" around the Complainant's vaginal area. See Exhibit #12 at pp. 105 and 108 of 114. When asked about the "tenderness" during her follow-up interview the Complainant said that she remembered telling the nurse this and added, "It was just sore and I connected it to him forcing himself on me." When asked about the blood on the swabs taken, the Complainant remembered talking with the forensic nurse about whether she was on her period at the time of the incident. She stated that she "wasn't at the time," but it was "around the time of [her] period." She denied observing any blood before the night of the incident, but recalled some "light bleeding" on August 27th. Upon checking an app on her phone, she stated that she had her period "on the 28th and 29th" of August. She stated that her period "usually just starts," and it was atypical for her to have light bleeding the day before.

As described above, the Complainant underwent a forensic examination with a sexual assault forensic examiner ("SAFE") nurse, which also included completing a "Drug Facilitated Sexual Assault Laboratory Information Form." In that form the Complainant reported "drowsiness" and "loss of consciousness," as well as "confusion" and "memory loss." The Complainant also reported having "5-6" alcoholic drinks during the night, which were classified as "sparkling wine" and "vodka." While the Complainant provided "30 ml" of blood for the drug-facilitated testing, she was told by the nurse

---

[21] The Complainant's Columbia Health records from her visit on September 1, 2017 indicated under the heading "Additional Notes" that the Complainant had a "probable mild-moderate TBI / Concussion given history and current symptoms." See Exhibit #14 at p. 9 of 14.

that it would not be tested for the existence of foreign drugs in her system unless she reported the allegations to law enforcement. See Exhibit #12 at p. 81 of 114.

IV.     Reporting the Alleged Gender-Based Misconduct

The Complainant said that the Respondent "texted [her] the day after," during the day on August 26th, saying "something like, 'Dude haha lol.'" The Complainant did not respond to the message. He wrote her again later that same day something to the effect of, "I'm so tired from last night. How are you doing?" The Complainant "couldn't bear to have these texts in [her] phone," so she deleted them upon receipt. The Respondent also sent the Complainant a message on Facebook Messenger the following day, August 27, 2017. The Respondent apparently wrote "like, 'How are you?'" but the Complainant did not respond, "totally deleted him . . . and blocked him on Messenger and deleted him on Facebook." The Complainant stated she did not hear from the Respondent again after she blocked him on the social media application.

Following the incident with the Respondent, the Complainant did not immediately report the allegations to the University. That Sunday (August 27, 2017), Witness #2 came over to the Complainant's apartment and the Complainant "told her everything that happened." She also eventually disclosed the incident to Witness #1, who at the time of the incident was "just like [a] really good friend" and not her "exclusive" boyfriend. Despite telling her friends and family, the Complainant did not disclose the allegations to any University officials at that time primarily because she had been participating in training sessions to become a ████████ for ███ students. She "made a decision to continue with that and just do the best [she] could" while trying to not think about the incident. She went through the following week and "put on a really smiley face," and she "tried to act like [her] normal self." She acknowledged that it was "good to have a distraction," and she generally "felt safe at ███.

The Complainant also disclosed the allegations to her mother, who subsequently flew to New York from ████ to provide support. While the Complainant's mother stayed with her the Complainant "tried to pretend like this hadn't happened," and she was able to behave relatively normally given the "distraction" of her ████████ training. During the week following the alleged assault she met with someone in Sexual Violence Response ("SVR") at the behest of her mother, and discussed the incident. The Complainant also met with an official in Counseling and Psychological Services ("CPS"), which led to the Complainant becoming upset while trying to explain how she felt about the incident. She "was feeling so guilty, because [she] felt like [she] was like being happy and doing [her] continuing normal life, [and] felt like [she] was betraying the person inside [her] who had been violated." The Complainant discussed reporting the allegations to a non-confidential resource on campus such as GBM, and discussed "how it would affect [her] life." Her CPS counselor and mother refrained from "pressuring" her to report, but did tell her that they thought it should be reported at some point. The Complainant "agreed" and therefore decided to report. However, when she "got down to report, [she] couldn't" because she was "just so scared." She continued, "Everything was ok, I was managing everything. I had normal conversations with my friends sometimes, and [was] following along in school." She was afraid that reporting would "mess the little stability [she] had up," and she was also concerned that the Respondent would retaliate against her in some way for reporting.

The Complainant's mother left to return to ████ on September 11th. The same day that she left, the Complainant was at the ████████████ "to meet up with friends outside ████ ████████████ She was discussing with her friends the possibility of reporting the incident to

20

University officials, when the Complainant "saw [the Respondent] out of the corner of [her] eye, walking up to a grassy space." The Complainant saw the Respondent approach a mutual friend and she had "this pain in [her] stomach," and she tried to "hide" to avoid encountering the Respondent. The Complainant saw the Respondent enter the ████████████████ and she thought to herself, "What do you do in this situation?" She started to feel "totally numb," and eventually felt "so angry" and "insignificant." She explained, "I was so angry that he would just come there with his backpack and act like nothing had happened and it didn't matter, and I didn't matter, and nothing that I had experienced had any significance whatsoever." Once this occurred the Complainant "knew [she] had to report this so that [she] could feel safe in [her] building again." According to her, "at that moment he kind of made the decision for me," largely because she "couldn't feel safe anywhere" on Columbia's campus. That following weekend, she "decided to have no plans on Saturday and Sunday" so that she could write down as many details as she remembered about the incident to put into an Incident Report. She did so over that weekend, and on Sunday, September 17, 2017, she filed an Incident Report with the Office. See Exhibit #1.

## Respondent Statement

I.       Background Information / Relationship History Between the Complainant and Respondent



The Respondent is a graduate student enrolled in a ████████████████ having enrolled in August 2016. He was born in ████████████ and currently lives in New York City ████████ When enrolled at ████████████████ for his undergraduate degree, ████████████████████████████████████████████████████

The Respondent enrolled at ████ in August 2016, to pursue a ████████████ He recalled meeting the Complainant "one year ago at a ████████████ orientation gathering." The two "hit it off quickly," and soon became "good friends." He and the Complainant "were in a few classes together," and they would frequently talk about the classes and also "would send each other funny articles, [and] pictures, [because they] had an amicable relationship but it had to do with [their] sense of humor." The two "went out to drinks or happy hours or mixers sponsored by ████ quite often," and at one point the Complainant confided in the Respondent that she was "missing ████ and ████████████████████████ The Respondent described himself as a "support person" for the Complainant. The Respondent affirmed that throughout the Spring 2017 semester he and the Complainant became "even closer." To illustrate this point, he described his birthday party ████ for which he "only invited a small group of people," including the Complainant. He stated, ████████ And she was one of them." Despite this, the Respondent averred that their relationship was "always platonic," and the two "never" exchanged any messages or had interactions that were flirtatious prior to the night of the alleged incident.

Following the Spring 2017 semester the Respondent went ████████████ for a summer internship. He and the Complainant "were talking over Facebook Messenger, exchanging articles [and] memes," and were in "constant communication." The Respondent returned to New York on August 1st, and he thought the Complainant returned around "mid-August."

On August 25, 2017 at approximately 5:00 p.m., the Respondent finished his classes and went to the ██████ ██ He went for a "happy hour," and consumed "two beers" and some "bar food" while there. Afterward the Respondent went to his apartment, located on the Upper East Side. He was planning to "spend the night at home," after having "a really intense week." He "got [his] hookah pipe ready," and was "sitting in front of the TV watching sports."

At 8:01 p.m. the Respondent texted the Complainant, "Hellllooooooo. [sic]" The Respondent explained that he was "checking in, seeing what [the Complainant] was going to do that weekend." The Respondent knew that the Complainant was a ██████████ and he wanted to see if she was meeting her orientation group, because as a ██████ student the previous year he knew it was "important to meet different types of people." The Complainant responded "not long after," informing the Respondent that she, Witness #2, and some friends were at ██████████ The Complainant also eventually informed him that they were planning to attend a housewarming party later, and she invited the Respondent to join. The Respondent replied, "I may just chill at home t[onight]," but he had previously invited the Complainant, Witness #2, and the others over to his apartment if they were interested. The Complainant initially declined, but "followed up" later and asked, "Do you wanna have us over?" The Respondent replied, "Yeah come," telling the Complainant to "bring some beer" and informing her that he already had "some beer and liquor." See Exhibit #15. Before the Complainant arrived at his apartment, she texted the Respondent again asking "if she could bring more people" over to his apartment. The Respondent believed it was "a total of, including [the Complainant], nine people" who came to his apartment. The Respondent "greeted them," and started hosting what he described as "a stopover" before the housewarming, rather than a "party." He stated, "It was part of the flow of their night, and became the flow of my night."

II.     Alleged Gender-Based Misconduct

The Respondent recalled socializing with the Complainant, Witness #2, and the other guests in his apartment for "about an hour." At one point, he was in the kitchen with the Complainant and Witness #2 smoking a cigarette. During their conversation the Complainant asked the Respondent about his girlfriend, Witness #12. She "asked how things were going," to which the Respondent replied, "They're great. It's getting kind of serious." The Complainant then asked if the Respondent thought they would get married soon, and the Respondent replied, "Maybe." The Complainant then said, "Imagine if we were married." The Respondent "didn't comment," nor did Witness #2. The Respondent just "left it at that." At his follow-up interview on November 21, 2017, the Investigative Team asked whether the Respondent replied at all to the Complainant's comment. He stated, "I reacted like anyone to an awkward situation and didn't say anything. I don't remember specifically if I said anything, I think I just laughed awkwardly." He acknowledged that "looking back at it" the comment struck him as "odd," but at the moment he did not "take it as an indicator of anything." Similarly, he was "not sure" whether Witness #2 had a reaction to the Complainant's comment.

Soon after this conversation the Complainant and Witness #2 "convinced [the Respondent] to go to this housewarming party."[23] The Complainant, Witness #2, and the Respondent "took an Uber or Via, or its equivalent" over towards the Upper West Side of Manhattan. The Respondent recalled that before leaving, the Complainant "had one drink at [his] apartment, then she took one

---

[22] ████████████████████████████████████████

[23] At his Pre-Determination Conference the Respondent added, "I really didn't want to go to the club, but I didn't want to seem like a 'wet blanket,' so I went along. From the very first interaction with the Complainant, I indicated that I did not want to leave my apartment."

with her" to the housewarming party. Upon follow up questioning the Respondent elaborated, "She had a drink, like a soda and vodka with ice, or maybe orange juice. It was like a red cup. She had one of those in the apartment. Then she brought another one with her [in the car on the way to the housewarming party]." When asked whether the Respondent also brought an alcoholic drink with him he responded, "No, I wouldn't bring one with [me], it's illegal. [The Complainant] and [Witness #2] had that together in the taxi." However, the Respondent acknowledged taking a "sip" of the Complainant's drink on the way to the apartment because "[the Complainant] stopped drinking it . . . because she didn't like the way it tasted." The Respondent recalled that the drink was approximately "four-fifths full" when he took a sip, but he then "poured it out" because "it was just soda and liquor, it had nothing else . . . [and] was bland."

Upon arriving at the first apartment they realized they had "gone to the wrong location." They confirmed the correct location with Witness #2's friends and then decided to walk to the second apartment where the party had moved to by this point. The Respondent stated that they decided to walk to the second apartment because it would "only take like two minutes." He stated that while walking to the apartment he, the Complainant, and Witness #2 were "all walking just fine to this guy [Witness #5]'s house."

When he entered Witness #5's apartment, Witness #5 "handed [the Respondent] a Heineken right away. The Respondent "believe[d]" that Witness #5 handed "everyone" a beer, and the Respondent started "hitting it off" with two ████████ guests at the party. The Respondent explained that he was "speaking to them ████████████████████ The Respondent remembered being in the party for approximately "30 to 35 minutes" based on a review of "time stamps on [his] phone." At one point the Respondent observed that a male guest at the party was "very clearly too drunk" and was "drooling and like, 'Ehhhhhh' and . . . [the Respondent] could tell he wasn't . . . everyone was like, 'What's going on with this guy?'" The Respondent went outside with the guest and his friends and told them to take him home. The drunk individual's friends "wanted to go to a club," but the Respondent was also "ready to go home." The group "said [he] should go with them" to a club downtown, and the Respondent eventually agreed.

The Respondent, the Complainant, Witness #2, Witness #6, and approximately two other individuals "got an UberXL" to take them to the ████████ in Chelsea. When asked why the group chose to go to the ████████ the Respondent replied, "I don't know. I was kind of being shepherded around. I was going with the flow." On the way downtown the Respondent sat in the front seat of the car, while the Complainant and other passengers sat behind. The Respondent recalled arriving to the club at approximately "11:30 or 11:45." The Respondent noted that in order to enter the club he and the group had to walk down a long ramp to gain entry. He stated, "We got out of the taxi and we walk[ed] down this ramp. [The Complainant was] wearing heels and she was fine walking down this ramp." When asked clarification questions he added, "She was wearing heels. She was walking upright and not stumbling. Walking like a normal person walks, down a ramp on these lines that kind of stick out." At his follow-up interview the Investigative Team asked for additional details the Respondent remembered about the Complainant's shoes. He mentioned that he's "not a shoe guy" and could not provide a specific brand, but he remembered that the heel on the shoes "had some height."

The group entered the club which was "not very crowded" given the relatively early hour. The Respondent "immediately went to the bar to get a drink," and he recalled purchasing a "Red Bull vodka" for approximately $20.00. The Respondent opened a tab, and provided a copy of his card transaction total from that night which reflected that he spent $143.00 at the bar. See Exhibit #16.

23

The Respondent and others sat on couches "near the bar," and the Respondent proceeded to socialize with the group and bartender at the club. The Respondent provided pictures of the club to help illustrate the layout of the venue. See Exhibit #17. The Respondent recalled "hanging out" with the group and "going out fairly frequently" to smoke cigarettes.

At approximately 12:30 a.m. on August 26th, after the Respondent purchased another drink which he believed was "a cranberry vodka," the Respondent and Complainant were "standing by the couches." The Respondent stated, "She always laughs at my jokes, but it seemed more so than usual. She was laughing and finding me really funny." As the two talked and joked with one another their "hands were kind of touching each other." He elaborated, "Our hands started to brush. Maybe it [was] accidental at first but then you start to realize, 'Ok, sexual energy started developing between us.'" At his follow-up interview the Investigative Team asked whether Witness #2 was present to observe this and the Respondent replied, "I can't say definitively [whether she was present]. It was a group of people together, it's not a very big club."

As this occurred the two "went out for a cigarette together," as the Complainant continued "laughing at [the Respondent's] jokes." The two walked out of the club together up the ramp they had walked down previously. Again, the Respondent noted that the Complainant walked the "same as before, walking fine," adding that she walked "upright, no stumbling, she was good." Once at street level they started smoking a cigarette and they entered into a conversation with two strangers. The Respondent told the people that the Complainant was ▮▮▮▮▮▮ and "they and [the Respondent and Complainant] laughed" about it before walking back down the ramp to reenter the club. At his follow-up interview the Investigative Team asked the Respondent if Witness #2 was present for the cigarette break. He replied, "I had gone out a couple different times. I had gone out with [the Complainant] once, maybe twice. I remember saying to some guy, 'Oh, she's ▮▮▮▮▮▮ and she started laughing. I don't think [Witness #2] came out with us, but I'm not 100% sure one way or the other."

Once back inside of the club the Respondent and Complainant were "standing face to face" and the mutual "connection and touching" then "turned into mutual kissing." He stated, "Our heads [were] leaning toward each other. First it start[ed] out as lips, then French kissing." As they were mutually kissing one another the Complainant "lean[ed] back and ask[ed], 'What about [Witness #12],'" referring to the Respondent's girlfriend. The Respondent replied, "Don't worry about it, she's not here right now." The two then started mutually "kissing again." The Respondent "assume[d]" that other members of their group observed the kiss, but he was not sure. He stated, "It's a pretty small club so I assume some of them would have seen us kissing. It would be quite odd if they didn't see us since the club was so small." When asked where the kissing occurred he stated, "I can't be 100% but the way I recall is that we were next to this couch-ish thing near the bar. . . . They were either on the dance floor or whatever. . . . They were within a radius of us that wasn't very large." The Respondent and Complainant were kissing "for a while," as the club began to fill up with more patrons and the club started "becoming a festive environment."

The Complainant then asked the Respondent what he wanted to drink and he replied, "Give me what you're having." The Complainant went to the bar and at 1:12 a.m. she texted the Respondent, "Wherr???" which the Respondent characterized as the Complainant asking where he was in the club. See Exhibit #15. The Complainant eventually returned with two glasses of champagne. He and the Complainant then made a toast with their drinks. Soon after this, the Respondent and Complainant "started dancing." He stated, "We formed one of those circles. She and I are dancing together. That turns into grinding." He elaborated, "She was grinding on me. She ha[d] her behind area, her butt, on my this area [indicating towards his pelvis with his hands], my waist area. [She was] grinding. It's not

24

like [we were] dancing and [she was] not doing anything. [She was] grinding on me. [She was] in full control of her body. Full control."

The Respondent recalled "dancing in a circle" with the group and at times "grinding" with the Complainant until approximately 2:20 a.m., when he "ask[ed] if she want[ed] to go back to [his] apartment" and the Complainant replied, "Yes." As with the kissing, the Respondent "assume[d]" that others at the bar observed the parties grinding together, but he was not positive. When asked about Witness #2 the Respondent stated, "[Witness #2] might have been there, she might not have. She might have left. . . . Maybe she had seen us kissing." The Respondent and Complainant then once again left the club together and walked back up the ramp. As before, the Complainant was "good, [she was] walking normally, [she was] wearing her heels." The Respondent and Complainant "hail[ed] a taxi" and started to travel back up towards the Respondent's apartment. At his follow-up interview the Respondent provided his credit card receipt that reflected a $22.38 charge for the car ride. See Exhibit #16. He added that he "tried to look into talking with the driver" of the car for the instant investigation, but "when [he] reached out to the company attached to the name they said that they don't have drivers operating in Manhattan because it's based in Long Island." The Respondent surmised that the company was "trying to cover themselves so they didn't get caught driving in Manhattan" without being licensed to do so.

On the way back uptown the Respondent and Complainant once again were "kissing." The Complainant also was "putting her hand over [the Respondent's] pants on [his] penis, rubbing it" while they sat in the car. The Respondent was also "digitally penetrating" the Complainant in the car. At his follow-up interview he clarified that the Complainant was "wearing some lacy underwear so it [was] easy to just slide it over" as he inserted his fingers into her vagina. He stated, "It felt very mutual, like we were both very involved in it." At his follow-up interview he added, "She was responding with heavy breathing and kissing, so there was a mutual exchange." When asked if the car driver had any reaction to the sexual activity the Respondent replied, "No we weren't really paying attention to the driver. . . . If you've ever talked to a taxi driver, this is something they deal with all the time."

At one point the car approached a red light and stopped and the Complainant suddenly "got out" of the car. The Respondent was "not sure" where the car stopped, partially due to the fact that he was "not sure what route" the driver took. When she exited the Respondent asked the Complainant, "What are you doing? Are you ok?" The Complainant replied, "Nothing," and proceeded to reenter the car. The Investigative Team asked additional questions about this at the Respondent's follow-up interview. He stated, "Yeah, she got out and I'm like, 'What's up?' and she's like, 'Nothing' and she got back in." The Complainant was "like standing there and then . . . got back in." The Respondent "[did not] think" the driver of the car had "any explicit reaction" to this behavior. When the Complainant got back in the car she and the Respondent "continued kissing" and "doing everything" that they had been doing before, with it still being "very mutual" between the parties. When asked, the Respondent did not think the Complainant was making any calls or texting, but acknowledged that "she could have been" and he simply did not notice it.

The Respondent thought he and the Complainant arrived at his apartment "around 2:40, around 2:45 and 2:50" in the morning on the 26th. The two "walked up the stairs" to the Respondent's second floor apartment. He explained, "It's eight steps, a landing, and then eight more" to reach his floor. The Respondent provided pictures of the common stairwell and hallway of his building to illustrate this. See Exhibit #18. The Respondent asserted that while walking up the stairs to his apartment the Complainant was "walking fine, [she was] wearing heels, [she was] walking upright like a runway model, like she [knew] what [she was] doing. She [knew] how to walk."

Once inside the Respondent's apartment he "kick[ed] off [his] shoes," and the Complainant "kick[ed] off her heels, standing up." The two both walked over towards the couch in the living room of the apartment, with the Respondent leading the way and the Complainant following and then sitting down on the couch. The Respondent explained that in order to walk over to the couch, the Complainant had to "walk through the maze with the coffee table," which required some level of coordination. As with the stairwell and hallway, the Respondent provided photographs of his apartment to illustrate this point. See Exhibit #19. The Respondent and Complainant "start[ed] kissing again" once on the couch, which he described again as "mutually kissing, French kissing." The Complainant started to "grab [the Respondent's] red Hawaiian shirt" while also "putting her hands in [his] hair." The Respondent "grabb[ed] her waist," and the two engaged in what the Respondent described as a "dance" of sexual activity. During this sexual activity the Respondent remembered thinking to himself, ▇▇▇▇▇▇▇▇▇▇▇▇▇ If anything happens to this couch . . . we can't stay here." So the Respondent stated to the Complainant, "Let's go into my room," which was next to the living room and the couch they were seated on. See Exhibit #19.

The two walked into the Respondent's bedroom and "laid down on [his] bed" together before they "started kissing again." The Respondent "started doing digital penetration again" as the Complainant once again "had her hand on [the Respondent's] penis." The Complainant then "undid [the Respondent's] belt," and placed her hand to the Respondent's penis. At his follow-up interview the Investigative Team asked how the Complainant "undid" the Respondent's belt. He responded, "We were side by side and she reached her hand and undid this belt," as he indicated to the belt he was wearing during the interview. As they "were doing that" sexual activity while lying "perpendicular" to the head of the Respondent's bed, he realized that his bed is "so tiny" that "it's not big enough for two people."[24] The Respondent then "came up with the idea" to suggest moving into ▇▇▇▇▇▇▇▇▇ bedroom across the living room from his bedroom, and the Complainant agreed. At his follow-up interview the Investigative Team asked for additional details surrounding this conversation. The Respondent stated, "I said, 'The bed is small,' and she said, 'Yeah.' And I said, 'We can go into the other room, the bed is bigger,' and she said, 'Yeah.'"

The Respondent and Complainant then got up from the Respondent's bed and "navigate[d] the furniture obstacle course" through the living room to enter ▇▇▇▇▇▇▇▇▇ bedroom. See Exhibit #19. The Respondent once again noted that the Complainant did not have difficulty walking through the living room, and did not stumble or trip.

Once in ▇▇▇▇▇▇▇ bedroom the Respondent "hopped up first" onto the "tall" bed, and the Complainant "hopped up second." At his follow-up interview the Respondent described how the bed is "31 inches high," and added that the Complainant had "no difficulty" getting up onto the bed. The Respondent and Complainant "continue[d] what [they] were doing before," including "kissing, digital penetration, [and] her hand on [his] penis inside [his] pants." After some time the Complainant was "about to take off her dress," but the Respondent "told her to leave it on." He said to the Complainant, "Leave it on. I like that."

When asked during his follow-up interview, the Respondent was not "100% sure," but he thought his clothing came off "as [he and the Complainant] were going to the other room [from his

---

[24] At his Pre-Determination Conference the Respondent added, "The bed in my room is a single bed and very small." He also requested that reference be made to the pictures he provided of his bedroom during the investigation, to illustrate this point. See Exhibit #23.

bedroom]." The Complainant then removed her underwear [25] and "open[ed] her legs," and the Respondent recalled that the Complainant was "very, very wet" by this point. He explained that once in ███████ bedroom "it [did not] take a lot of foreplay, [we had] been doing foreplay" leading up to that moment. The Respondent then got on top of the Complainant and inserted his penis into the Complainant's vagina. When asked, he denied using a condom before initiating sex. He acknowledged that there was "no discussion about it," and that it was "probably not the safest behavior," but he rationalized that it is "pretty normal with [his] generation." At his follow-up interview the Respondent said the Complainant did not ask about birth control before sex started, and stated that "it wasn't until [they] got towards the end when [the Respondent] said, 'Are you on birth control?'" that the subject came up.

The Respondent and the Complainant engaged in "missionary position" for "some time," after which the Complainant "[got] on top, and [she was] riding [the Respondent]." While engaged in this position the Complainant was allegedly "enjoying" the sex. The Respondent explained, "She was looking at me, [and] she was saying, 'You're so sexy.'" The Respondent was "saying it too" during intercourse. They engaged in this position for "a few minutes," after which they "move[d] to from behind." When asked during his follow-up interview for additional details about how the two "moved to from behind" the Respondent stated, "It's kind of like a dance. She was moving on her own. She went on her own to from behind." He said the Complainant never fell off the bed or had any apparent difficulty maneuvering while switching positions.

While engaged in this position the Respondent's penis "accidentally slipped by her butt," and the Complainant said, "Ouch." When asked for further clarification at his follow-up interview the Respondent stated, "I mean it slipped by so . . . so I can't be sure if it technically fit the insertion definition, but I can tell you that it might have been an 'ouch' just to say, 'Your penis is by my ass.'" The Respondent then said he was "sorry" and "put [his] penis inside [the Complainant's] vagina" while he was positioned behind her. As they engaged in sexual intercourse in this position, the Respondent "started having erectile difficulties," meaning that he started to lose his erection. He explained, "It was a new person, so there was that anxiety. And the effects of alcohol" caused the Respondent to partially lose his erection. The two then "switch[ed] to 69" to "get back into it." The Complainant performed oral sex on the Respondent as he performed oral sex on the Complainant on the bed. During oral sex the Complainant was "moaning" and "making noises."

The Respondent's penis became erect again, and the two then resumed sexual intercourse in the "missionary" position. The Respondent "[got] close" to ejaculating, and as he and the Complainant looked at each other he asked her if she was on birth control. The Complainant replied, "Yes." The Respondent then asked if he could "finish inside of her," and the Complainant once again replied, "Yes." The Respondent then ejaculated inside of the Complainant and withdrew his penis from her vagina. The two kissed once again, and the Respondent then "went to the bathroom to get toilet paper" so that the Complainant could "clean herself up." The Respondent then fell asleep on ███████ bed with the Complainant next to him. When asked if they slept together in ███████ bed and whether they touched he replied, "I don't remember how specifically we were sleeping. I just fell asleep."

---

[25] During his follow-up interview the Respondent mentioned that he "found [the Complainant's] underwear in ███ bedroom the following morning." He "threw it out" because he did not "envision this sort of situation." He thought he had thrown them out on "Saturday [August 26th] or Sunday [August 27th]."

The Respondent recalled waking up at approximately 10:00 a.m. on August 26th, and he noticed that the Complainant "wasn't there" by the time he woke. The Respondent recalled waking up to the porter of his building "banging on the door" while yelling that there had been a gas leak in the Respondent's apartment.[26] The Respondent denied smelling any gas, but got dressed and eventually met with his porter, Fire Department officials, and representatives from Con Edison to address the situation. According to the Respondent, his neighbors first "started smelling the gas around 9:30" that morning, and notified the Respondent's porter and the chairperson of the █████. They then "came into the apartment" and were "knocking on doors" to alert anybody inside of the leak. The Respondent asserted that the individuals did not come into ████████ bedroom, where he was sleeping, so they "didn't find [the Respondent]" during that initial search. At his follow-up interview the Respondent clarified:

> Finally [the porter] came back. I believe I had some missed calls from █████ [The porter] was like, 'Oh sorry man, I missed you. There's a gas leak.' I was really frazzled. I woke up to a guy in my room. I got myself together, and then FDNY came and they looked around. Not long after that ConEd came. That's the guy who ameliorated the situation. He plugged the leak. We had turned the valve already, but he plugged it with a nut.

When asked if anyone ever told the Respondent why they did not knock on ████████ bedroom door he replied, "No, just that he missed it. He apologized for it. He was new also. He was saying how it was his first day on the job." The Respondent also provided a floorplan of his apartment to help show the location of ████████ bedroom in relation to the rest of the bedrooms and apartment, and to illustrate how it was easy for the porter to have "missed it" during his initial search. See Exhibit #21.[27]

The Respondent surmised that the Complainant might have "woke[n] up to people yelling and saying, 'Hello, is anyone in here?' which created some panic" for the Complainant, prompting her to leave the apartment without saying goodbye to the Respondent. The Respondent "handled the situation" regarding the gas leak, and eventually notified ████████ who was "flipping out." The Respondent explained the possible gas leak further in the following manner:

> There's a little spigot in my bedroom. If you knock it even slightly, normally you're fine because we don't have gas coming in. But somehow gas seeped into there and it came out. So I believe at some point while [the Complainant] and I were in my bedroom someone's butt hit it, or someone's shoulder hit it.[28]

During his initial interview the Respondent was asked about both his and the Complainant's alcohol consumption throughout the night. The Respondent recalled drinking "two beers at happy

---

[26] At his follow-up interview the Respondent provided a series of emails exchanged between ████████ and the chairperson of the ████████████████ to corroborate that the gas leak did in fact occur. See Exhibit #20. He also attempted to provide records from Con Edison to further corroborate his claim, but the electric company informed the Respondent that they would "need a subpoena" to obtain the records.

[27] At his Pre-Determination Conference the Respondent added, "It is important to note that there are two doors that need to be opened in order to get into ████████ One door is located next to the foyer, then there is a hallway, and then another door. This helps clarify why the substitute porter would have not realized that someone was in this area of the apartment."

[28] At his Pre-Determination Conference the Respondent added, "My bedroom used to be a kitchen, hence why there is a gas valve located in there."

hour" in addition to eating "some bar food." [29] He denied having anything else to drink before the Complainant and her friends came to his apartment. Once there he had "an orange juice, vodka, and soda. And a PBR [beer] at [his] place." Then, once at Witness #5's housewarming party, he had a "Heineken bottle" of beer. At the ██████████ he had "one Red Bull vodka, one cranberry vodka, [and] one champagne." He denied drinking anything more once back at his apartment with the Complainant. He acknowledged that by the end of the night he "wasn't like dead sober," but he maintained that he was "in full ability and capacity to move and to walk and to stand." He added, "It was normal for me." The Respondent acknowledged that there were "things that are not at the top of [his] memory bank" given the length of time that passed between the incident and his interviews, but he maintained that he never had any "memory loss" attributable to his alcohol consumption that night. He similarly denied ever slurring his words, stumbling, or vomiting as a result of drinking alcohol on the night of the alleged incident.

As for the Complainant, the Respondent asserted that he has "been out drinking with [the Complainant] at least 15 times," and he has seen her "at all stages of drinking" alcohol. He referenced a prior occasion in April 2017, during which the Complainant was "totally different" in that her "personality completely changed" and she was "introverted, reserved, and super serious." In contrast, the Complainant's "personality in August was normal [Complainant]," meaning that she was "extroverted, friendly, she was walking fine, speaking fine. Everything about her was fine." He added:

> We walked up this slope [at the ██████████], her wearing heels. . . . Also all the moments in my apartment building, walking up the steps, landing, eight more steps. Then also getting into the apartment, taking off heels standing up. . . . No falling over the entire night. No vomiting or other obvious signs.

The Respondent was also asked about affirmative consent for the sexual activity that he and the Complainant engaged in on the night of the alleged incident. The Respondent pointed to "all the moments during sex that are moments that indicate[d] consent." He stated:

> There's her putting her hand through my hair, her grabbing my shirt, her undoing my belt, putting her hand in [my pants], her saying, 'You're so sexy' [during sex], her getting on top riding me, her also being on top for oral sex 69, and then also me asking about birth control and asking if I can finish inside of her and she said, 'Yes.'

The Respondent was specifically asked about the Complainant's allegation that physical force was used during sex. He asserted, "There was none." After the Investigative Team showed the Respondent the pictures depicted in Exhibit #13 and informed him that the Complainant alleged that she tried pushing the Respondent off of her while saying, "No" during sex and tried to remind him of his girlfriend, he stated the following:

> Earlier in the night, she did say, 'What about [Witness #12]?' but not during sex at all. She was indicating in her actions that she was consenting. Additionally, the bruising -- it's worth looking into whether she bruises easily. We moved maybe five different times during intercourse. My girlfriend [Witness #12] also bruises after having sex. There's no physical force though, it's consensual. It could potentially be my grip. But there was no restraining or

---

[29] The credit card transaction history the Respondent provided reflected a $13.00 charge at the Lion's Head Tavern on August 25, 2017. See Exhibit #16.

anything like that. But when moving from behind to 69 and moving around, there's some movement back and forth. She was on top of me too.

Following his initial interview on October 11, 2017, the Respondent emailed the Investigative Team with additional information regarding the allegations of force. Specifically, on October 17, 2017 he wrote in relevant part:

> I want to follow up on the photos of [the Complainant's] bruises. I have no idea what caused those bruises or where they came from. They did not come from our time having sex. While I mentioned that I have a firm grip when I have sex with my girlfriend [Witness #12], the only marks she gets are some light ones from hickies, *not from my grip*. . . . [Witness #12] never develops marks that look anything like the ones [the Complainant] displayed in the photos. Those look more like she bumped into something as they do not reflect any finger/hand marks. . . . One of us had to have bumped into the gas valve and caused it to open slightly. . . . [The Complainant's] bruises could have come from bumping into the gas valve, which also caused the subsequent gas leak. The gas valve is right next to where [the Complainant] was on the bed. She easily could have bumped into it and the valve could have opened slightly. The valve is large enough to cause bruising if knocked into. See Exhibit #22.

To illustrate his point, the Respondent also attached to his email several photographs of the gas valve and his bed that he mentioned during his interview and referenced in his message on October 17th. See Exhibit #23.

At his follow-up interview he was once again asked about the Complainant's bruising and whether he recalled her bumping into anything throughout their time together. When specifically asked if she "crashed" into anything he replied, "Crashing, no. No, I can't say specifically, 'Oh it happened at X point.' But she was on that side of the bed [that had the gas valve], and the gas valve was knocked." The Investigative Team confirmed that, according to the Respondent, he and the Complainant did not have sex in his bedroom where the gas valve was located. After confirming that "just digital penetration and kissing" occurred in his room, the Respondent was asked how he thought the Complainant could have bumped the gas valve if she was not moving around during sex. He replied that it must have occurred "when [they] were kissing in [his] room." The Respondent stated that he "had no marks" or bruising on his own body the next day.

III.    Events Following the Alleged Gender-Based Misconduct

After resolving the "immediate emergency" of the gas leak, the Respondent contacted the Complainant. He texted her, "Duuude Omg lol." See Exhibit #15. The Respondent explained, "She's a good friend of mine, I wanted to make sure it wouldn't be awkward between us and that we could still be friends" despite the fact that the Respondent had a girlfriend and they had sex the night before. The Complainant "didn't respond," but the Respondent initially "didn't think that much of it." He figured she was perhaps "doing something else or sleeping" when he sent the message.

Witness #2 sent a Facebook Messenger message to the Respondent that afternoon. At 3:44 p.m. on the 26th she wrote, "Hi [Respondent]! Have you heard from [Complainant] today? I've been

trying to reach her all day to know she got home safe . . . but her phone is off and she's not replying on messenger[.]" See Exhibit #24.[30] The Respondent "didn't read" Witness #2's message immediately, explaining to the Investigative Team that the message "went into the spam filter." At 3:56 p.m. Witness #2 wrote him once again and stated, "No worries she's at home[.]" The Respondent replied to Witness #2, "Heyy lol fun night I think I accidentally spent too much money at the bar." [sic] See Exhibit #24. After showing the messages to the Investigative Team the Respondent added, "This doesn't look like someone worried sick about her friend."

Later that evening the Respondent once again contacted the Complainant. At 7:47 p.m. he texted, "How u feeling today?? I have been tired all day lol[.]" [sic] See Exhibit #15. Once again the Respondent got "no response" from the Complainant. The Respondent thought "maybe she's feeling guilty for having been a part of . . . I have a girlfriend. I can understand it from that sense." The next morning (August 27, 2017) the Respondent once again attempted to contact the Complainant, this time via Facebook Messenger. The Respondent sent the following messages: "Hey . . . Whatsup . . . How r u [sic]" See Exhibit #25. However, upon trying to send the messages the Respondent learned that the Complainant had "blocked" him. He was "shocked that such a good friend would block [him], even though [they] slept together." After this, the Respondent "called [his] sister" and asked, '[Witness #11,] I slept with a really good friend of mine and she blocked me on Messenger, why would she do that?" The Respondent's sister told the Respondent that the Complainant "probably feels ashamed and guilty" about what occurred between the parties, which prompted her to block him on social media.

Eventually the Respondent "read between the lines" and resolved to not try contacting the Complainant further unless and until she "[came] around" and decided to talk to him again. At his Pre-Determination Conference the Respondent added that he drafted a text message he initially intended on sending to the Complainant, but ultimately decided against it. The message stated in relevant part:

> Hey, I saw that you unfiended me on Facebook. That's fine if you don't want to talk for some reason, but I just wanted to make sure that you aren't feeling guilty because we spent the night together. It happened and it probably shouldn't have we have been good friends for a while and I'm also in a serious relationship, So I understand why you may be feeling upset. I don't feel great about it either. See Exhibit #35.

The Respondent concluded that "[the Complainant] blocking [him] on Facebook meant she did not want to talk for now." The Respondent subsequently provided a screenshot of the unsent text message for the Investigative Team's review. See Exhibit #35.

The Respondent also recalled that on one day after his night with the Complainant he saw her again outside of ▆▆▆▆ He went over to "meet a friend," and as he was "hanging out with her talking to her on the steps," he saw a "▆▆▆▆ girl with a friend and she was crying." He started to walk back towards ▆ and thought it was "weird," and thought the person looked like the Complainant. As he was walking he "looked back, and it was [the Complainant]." The Respondent "didn't go up to her or anything," and asserted he never had any "face to face" interactions with the Complainant on that occasion or at all after the August incident.

---

[30] The Respondent also provided a screenshot of the Facebook messages, which were identical to the messages depicted in Exhibit #24.

# Witness Statements

## Witness #1

The Investigative Team interviewed Witness #1 on October 12, 2017. He is a male second year student in ███ He is the Complainant's current boyfriend, although they were not in an official relationship at the time of the alleged gender-based misconduct in August. He and the Complainant first met during the "first week of Orientation," at a social event located at Arts & Crafts. The two "hit it off in terms of personalities," and he started to develop an "on and off romantic interest" with the Complainant over several months last year. They kept in touch over the summer months when away from New York, and upon returning they "picked up where [they] left off." However, they were not "formally dating" at the time of the alleged incident, and only made their relationship official in the weeks following that night. When asked about his background with the Respondent Witness #1 said, "I understand my indirect conflict of interest as [the Complainant's] boyfriend., [but] I met [the Respondent] the first week too. He is an outgoing, gregarious individual." He added that they were on the "same fantasy football league" last semester, and that he "had no qualms or problems with him at all" before the allegations arose. He stated that he and the Respondent "never became close friends," but they were "friendly acquaintances" and had "no awkward beef" at any point.

Witness #1 was not present with the Complainant and Respondent on the night of the alleged gender-based misconduct. Witness #1 "had just come back from a summer internship" and was "finishing one of [his] deliverables" to "finish up [his] internship." While he was texting with the Complainant that night, he told her that he was "staying in working on the PowerPoint" presentation that he needed to complete. The two "texted for a little" throughout the night, before Witness #1 fell asleep. The two exchanged messages back and forth until approximately 12:30 a.m. on August 26, 2017. Upon reviewing his text history with the Complainant that night, at 12:20 a.m. he wrote in relevant part, "ALSO hope youre having a way more fun night than me hahaha[.]" [sic] The next text was the Complainant writing, "That's good to hear," sent at 12:53 a.m. See Exhibit #9. Witness #1 did not respond to the Complainant, explaining to the Investigative Team that he must have fallen asleep between his messages at 12:20 a.m. and the Complainant's response at 12:53 a.m.

That morning, Witness #1 "woke up to a series of text messages" from the Complainant, some of which were in ███ The messages also included "texts of her location," with one such location drop pin in Chelsea near the ███████ and another sent from the Upper East Side near the Respondent's apartment. See Exhibit #9. Witness #1 also noticed that he had "a bunch of missed calls [from the Complainant] as well," and he provided a screenshot of his call logs from the night. See Exhibit #8. Witness #1 did not immediately think that something was wrong with the Complainant. He explained that previously after a night out, the Complainant "gave [him] a lot of phone calls then too, [and Witness #1] was asleep as well." The Complainant was "embarrassed the next day" about calling Witness #1 so many times, and so when he saw all of the texts and missed calls he "thought it was another one of those episodes." He therefore responded, "Hahahaha[.] Thanks for those location updates[.]" See Exhibit #9. The Complainant asked to see Witness #1, telling him "I really want to see you." Witness #1 reminded the Complainant that he "had plans to be in Central Park and have a picnic" for a friend's birthday party. He felt uncomfortable inviting the Complainant along for the event, given that it "wasn't [his] event and [he] wasn't at the place yet where [he] could just bring" the Complainant with him.

The Complainant later called Witness #1 and was "hysterically crying" to the point that "it was really hard for her to get words out." Witness #1 asked if she was alright and "started to freak out a bit" by how upset the Complainant sounded on the phone. The Complainant told Witness #1 that she was with her cousin Witness #3 and was going to the hospital with her. Witness #1 "tried to say it wasn't a problem that [the Complainant] drunk called" him the night before, but he started to "assume she had been sexually violated" based on the way she was behaving on the phone. He explained, "The way she was crying and saying being with her cousin, I assumed that. I don't know what other reason you could go to the hospital for. I assumed that if she had injured herself or something at 4:00 a.m., she would already be at the hospital." The Complainant did not explicitly tell Witness #1 that she was sexually assaulted or more details about the allegations, but Witness #1 nevertheless assumed that something along those lines had happened given everything that he was able to glean from their brief conversation. The two continued texting sporadically throughout the day on the 26th, but did not explicitly discuss the allegations further at that time. They "didn't mention it again Saturday into Sunday."

On Monday, August 28, 2017, Witness #1 saw the Complainant at ███ given that they were both ██████████ for the incoming class. When he saw the Complainant she was "her normal outgoing gregarious self." He added, "Nobody would have even imagined that anything would have happened at all." However, Witness #1 observed the Complainant wearing shorts and remembered seeing "some sort of bruises around her leg." He and the Complainant were in separate Orientation groups, so they did not interact during the day. That evening however, they met up at the Hungarian Café [31] to discuss what had occurred the previous weekend. Witness #1 "didn't want to ask" and "didn't want to make [the Complainant] share anything she didn't want to share," but admitted that he was "curious" to know why she was so upset on the phone over the weekend.

The Complainant proceeded to tearfully tell Witness #1 that she was with the Respondent after Witness #2 left the ██████████ and she "started to black out." She and the Respondent got into a cab together and she told Witness #1 that the Respondent had been "talking to [her] about his fiancée that night" and she "never thought he was attracted to [her] in that sense," so initially she did not foresee anything being wrong. The Complainant told Witness #1 that what happened next was "all a blur," although she remembered "struggling" with the Respondent before he had sexual intercourse with her. When the Investigative Team asked if the Complainant elaborated on the "struggle" he replied:

> She had such a tough time remembering the things. Just crying a lot. When she was able to give an audible explanation about what's going on, I barely did any follow up questions. I didn't want to dig too much deeper. But I remember her saying that she didn't think there was any problem in going back to his place because they live so close and are friends and didn't think of it. She was at his place, then the next memory was her struggling. I don't remember if it was sexually struggling, or wrestling or what. Then she was crying, then she said she remembered asking him, 'Why are you doing this?' and him being like, 'I always wanted to.' Then she told me she kind of came to, and all her belongings were dispersed. I can't remember if she said she woke up on the floor, you can probably verify that with her account, but that's a memory I think I have. I think her saying she remembered waking up on the floor, but I'm not 100% sure on that one.

---

[31] The Hungarian Pastry Shop is located at 1030 Amsterdam Avenue between West 110th and West 111th Streets.

Witness #1 also mentioned that he will "never forget [the Complainant] showing [him] the bruises" at the restaurant while describing the alleged incident. He and the Complainant were wearing short-sleeved Polo shirts for their Orientation groups that day, but the Complainant "had a sort of black shawl thing that covered up the arms" that she took off to show Witness #1 the marks on her body. He described them as "really shocking," and opined that based on what the Complainant told him about the encounter, coupled with the bruising pattern he observed, he did not think the bruises could have been caused by "consensual rough sex." He acknowledged that he could not "definitively say yes or no" to whether the Complainant bruised easily, noting that she has fair skin. When asked if the Complainant had ever bruised after sex with him he replied, "Not that I know of," and he stated he did not ever see any bruising on the Complainant similar to the marks he saw on her that day.

After describing the incident to him, Witness #1 "tried to tell [the Complainant] she was doing really well" in order to be "supportive" of her. As they were discussing the alleged incident it suddenly "came to [Witness #1]," and he re-read the Complainant's messages she sent during the early morning hours of August 26th. See generally Exhibit #9. He told the Complainant, "You sent me texts that night and you sent me locations." The two then "both kinda looked at [the] locations" and messages, and the Complainant informed Witness #1 that the first pin drop was "near Chelsea Market" and the second pin drop was near the Respondent's residence. See Exhibit #9. Additionally, Witness #1 described what they surmised was "essentially a butt dial" in which you can overhear the Respondent's voice. See Exhibit #10.

In the days and weeks following the alleged incident Witness #1 explained that the Complainant "wanted to forget it and never see [the Respondent] again," but then she "saw him on campus" which prompted her to "submit the report" to GBM and initiate the instant investigation.

### Witness #2

The Investigative Team interviewed Witness #2 on October 12, 2017. She is a first-year ███ student, and the Complainant's current roommate. She knows the Complainant "from ██████ given that the two "went to the same university" there. Witness #2 contacted the Complainant prior to coming to New York this past summer, and the two decided to become roommates in the fall. She and the Complainant were "just acquaintances" before moving in together, but she acknowledged that they are "very close" now that they both live together. Witness #2 had "never met" the Respondent prior to August 25, 2017, but the Complainant told her that night that he was "her friend from school."

On August 25, 2017 at "at like 5:00 p.m. or something" Witness #2 was out at a "mixer" at the Boat Basin [32] with friends she had recently made in her department at ███ She "messaged [the Complainant]," telling her that she and her ███ friends were going to be on ██████████ and inviting her to join. The Complainant came to meet her "like a half hour later," and the group was on ██████ "for an hour or something." The Complainant notified Witness #2 that her friend, the Respondent, messaged her and invited them to go over to his apartment, which was close to the museum. Witness #2 "wanted to go to a housewarming party where [her] friend was," but the Complainant convinced her to "drop by" the Respondent's place before making their way to the other party.

---

[32] The Boat Basin Café is located at West 79th Street along the Hudson River.

Witness #2 thought they stayed at the Respondent's apartment "for maybe one or two hours," after which Witness #2 "really wanted to go to the housewarming party because [she] knew they were leaving" to go out that night. According to Witness #2 the Respondent "wanted to stay" at his apartment. While at his apartment Witness #2 recalled "having a conversation" during which the Respondent told Witness #2 and the Complainant that he "just got engaged" and he "seemed very happy about it." She also remembered the Complainant "showing [her] a picture [of the Respondent and his fiancée], and being like, 'Look how cute they are!'" When asked additional follow-up questions, she stated that she thought the Respondent "wanted to share the news" and brought it up with her and the Complainant for that reason. Witness #2 thought that she "asked how [the Respondent and his fiancée] knew each other," and the Respondent then "told [them] the story of how they met." The Respondent then "was telling [Witness #2 and the Complainant] how he proposed, ██████████████ ████████████████████████████████████ She told the Investigative Team that the Respondent "said they were engaged" already, and not that the Respondent was considering proposing.

After being at the Respondent's apartment they "took an Uber" to Witness #5's apartment, who is Witness #2's friend in ███ On the way across town they initially went to "another place," but when Witness #2 "rang the bell than called [her] friend," she realized that the party had moved to Witness #5's apartment closer to Central Park. Upon arriving the group was "about to leave," so Witness #2, the Complainant, and the Respondent were only at the party for "a half hour or so" before they all went to the ████████ downtown. Witness #2 recalled taking an "Uber or taxi" with the Respondent, the Complainant, and "probably I guess, maybe [Witness #8 and [Male #1]]."[33]

Upon arriving Witness #2 recalled that there were "couches in the middle of the room." She and the group "put [their] stuff there" and "danced a bit." However, Witness #2 was "feeling really bad" and had a migraine that was bothering her. Therefore, she eventually left the Complainant with the Respondent and her other friends at the club. She stated, "I was leaving [the Complainant] with one of her good friends [the Respondent] and also my friends. When I think back, I'm like, 'Shit, I should have taken her with me, but we were not living together at the time.'" Upon follow-up questioning Witness #2 added that while at the club she was primarily dancing with the Complainant and the Respondent "was dancing as well." Witness #2 stated that there was "just a big group of us dancing," and she "didn't notice [the Complainant and Respondent] dancing together or anything, not in like any weird way." When asked what she meant by dancing in a "weird" way she elaborated, "I just remember us dancing together and not like they . . . I just remember all of us in a group." When specifically asked if she saw the Complainant and Respondent dancing together in a flirtatious or sexual manner she stated, "No, not when I was there at least. I didn't see anything." When asked if she saw the Complainant and Respondent kiss on the dance floor she stated, "No. I would have stopped that. I knew [the Complainant] wasn't interested at all." She said her basis for believing that the Complainant was not interested in the Respondent romantically was "just a feeling," and she denied the Complainant ever discussing her feelings towards the Respondent with her.

Before leaving, Witness #2 approached the Complainant and told her she was "going to have a cigarette." The Complainant and Respondent went outside with her. When asked, Witness #2 denied that the Complainant had any difficulty walking out of the club and up the ramp with her. Upon leaving the dance area and going outside, Witness #2 "decided [she] didn't want to go back in [and]

---

[33] The Investigative Team sent an outreach letter to Male #1 on October 19, 2017, which was retrieved by Male #1 on October 20, 2017. However, Male #1 did not respond to the outreach or agree to participate for the investigation, and therefore was not interviewed.

wanted to go home," largely because her migraine was bothering her. The Complainant "doesn't always smoke" with Witness #2 and "sometimes she just comes to hang out," and Witness #2 could not recall if the Complainant smoked outside of the club with her. The Respondent "wasn't so much with" Witness #2 and the Complainant because he started talking with other people outside of the club. After finishing her cigarette Witness #2 left the Complainant and Respondent to return home.

At the subway station to return uptown, at 1:24 a.m. on August 26, 2017, the Complainant sent Witness #2 a series of text messages in ███████ "asking [her] where [she] was and what [she] was doing." See generally Exhibit #26. [34] Witness #2 told the Investigative Team that she "thought [the Complainant] was worried" about her getting home so late at night. Witness #2 continued, "Because she was just like very happy when we left, and not drunk at all or anything like that. I didn't think anything was wrong with her," so she surmised the Complainant was simply checking in on her to make sure she got home safely. Witness #2 told the Complainant to have fun the rest of the night and to "continue to dance" as she had been doing earlier. See Exhibit #26.

Witness #2 "got home," and the next day she messaged the Complainant "asking her how the night was." However, she "didn't hear" from the Complainant, and after some time she "got worried." Witness #2 eventually was able to find the Respondent on Facebook, so she decided to "message" him and ask if he had heard from the Complainant. At 3:44 p.m. on August 26, 2017, Witness #2 wrote the following to the Respondent:

> Witness #2: Hi [Respondent] ! Have you heard from [Complainant] today?
> Witness #2: I've been trying to reach her all day to know she got home safe . . . but her phone is off and she's not replying on messenger[.] See Exhibit #24.

At 3:56 p.m. Witness #2 sent the following additional message: "No worries she's at home[.]" See Exhibit #24.

The Respondent initially did not respond to Witness #2's outreach. However, after accepting her request to send messages they messaged the following to each other:

> Respondent: Heyy
> Respondent: Lol
> Respondent: Fun night
> Respondent: I think I accidentally spent too much money at the bar
> Witness #2: Haha yeah it was a very fun night[.]
> Respondent: [emoji] [emoji] See Exhibit #24.

The Investigative Team asked Witness #2 if she ever spoke with the Complainant about what allegedly occurred with the Respondent, and she explained that the Complainant "sent [her] a message a bit later in the day" on the 26th and disclosed that she was at the hospital. The two met in person on Sunday, August 27, 2017, and the Complainant "told [her] what happened." When asked what the Complainant told her she said the following:

---

[34] Witness #2 translated the messages into English upon providing them to the Investigative Team. The Investigative Team also independently verified, via Google Translate, that the sum and substance of Witness #2's translation was accurate.

She welcomed me, we sat on the couch. I thought maybe she just had fell or something. I was hoping, like, because according to the message, when you go to the hospital worst case scenario it is rape but maybe she just fell or it was just a stitch. I could tell she was not feeling well and then she burst into tears and she said, 'I thought he was my friend.' I have goosebumps thinking about it. And then I realized it was probably [the Respondent]. She had really [sic] difficulty talking about it. She show[ed] me the bruises she ha[d] all over her arms. I was just in shock, I had no idea how to respond. She [told] me she was attacked. She [told] me what she remember[ed] from the night.

Upon asking her for additional details about what specifically she remembered the Complainant telling her, she added:

She said they were there after I left. She remember[ed] going to the taxi with him and she remember[ed] being in his apartment thinking about exiting like 'How can I get out?' but she knew she was drunk or drugged or whatever, that she didn't have the confidence to just walk out because what would happen to [the Complainant] if she just walked out onto the street? She told me her stuff was all over the place. And that it seemed like they had had, like there was some violence, and all she remember[ed] and she hear[d] in her head, him saying, 'I've always wanted to do this.' She [said] she was thinking the whole time about -- because earlier in the night at this party [he was] telling us he just got engaged – [she was] thinking about when he showed her the pictures of them so happy. She [told] me that her bag was in the other room and she remember[ed], I think she said something probably that she wanted to sleep in the other room and that explain[ed] why her bag was there. I think because she said her bag was in the room, which would indicate that she was trying to sleep in the other room. She [woke] up and just grab[bed] her stuff. [She tried] to find everything herself and [she was] in the – how do you say, when you're like a zombie state when she [went] home to her cousin. Her cousin took her to the hospital.

During follow-up questioning the Investigative Team specifically asked Witness #2 questions about her, the Complainant's, and the Respondent's alcohol consumption throughout the night. When describing her own alcohol consumption, she estimated that she had "maybe two glasses of [white] wine" at the Boat Basin earlier in the night before meeting the Complainant. Then she had a "small can" of beer on ███████ which she described as "some summer beer." While at the Respondent's apartment the Complainant made her a drink in a "fancy glass," and Witness #2 thought it was "a mix of probably vodka or something and maybe some cranberry juice or something." Witness #2 said she only had the one drink at the Respondent's apartment and she did not "remember it tasting strong." She also recalled having "like a drink on the go" upon leaving the Respondent's apartment, and she asserted that she and the Complainant "shared a glass" in a "plastic cup" that was "probably the same to what [they] had" in the Respondent's apartment. Once at the housewarming party Witness #2 "had one beer" that she thought was in "like a glass bottle, green." Then, downtown at the ███████████ Witness #2 "didn't go for a drink" initially due to the fact that her head hurt. She and the others present started dancing and she eventually had "like a mojito, or something in that area, actually probably a gin and tonic," before she left the club and went home. Witness #2 said the amount of alcohol she drank was "what [she] drink[s] regularly" or "maybe a lower standard" than what she normally drinks, given that it was spread out over several hours. She described feeling "light" and she could "feel that [she] had some alcohol, but it was not anything like too much."

When asked if she knew how much alcohol the Complainant drank that night Witness #2 replied, "Not really, but I think we were drinking pretty much similar." She added, "I think she had one glass of sparkling wine at ████ and then at [the Respondent's] we had the drink over there and the drink on the way to the housewarming." Witness #2 said that the Complainant "probably" had a beer at the housewarming party, and she remembered the Complainant getting a drink "at the bar when [they] got there" but she could not recall additional details. When asked to describe the Complainant's demeanor and behavior throughout the night she said, "While I was with them, she was in a fun mood. It was not like . . . like I would never have left her if she wasn't standing straight. Everyone was standing when I left, [the Complainant] didn't seem intoxicated then." She specifically referenced the conversation she and the Complainant had outside of the ████████ immediately before Witness #2 left at approximately 1:20 a.m. During that time the Complainant and Witness #2 were having a "debate" about "something political" with another patron of the club. She stated, "When I thought about it the day after, I thought that we weren't that drunk and we were having a fun conversation outside. A conversation when you had to think." She denied any noticeable changes in the Complainant's demeanor throughout the night, saying, "I think [the Complainant] is always very happy. She's always like that. I didn't notice that much change." The Investigative Team specifically discussed incapacitation as that term is defined in the Policy, and asked Witness #2 whether the Complainant exhibited any objective outward signs of possible incapacitation. Witness #2 denied observing anything concerning or odd about the Complainant's outward behavior. When asked if she has ever seen the Complainant visibly intoxicated and exhibiting any of the common signs of incapacitation in the past she answered, "No. I've partied with her, but I've never seen her too drunk." She added:

> My first thought was that she had been drugged or something. I don't know, I just couldn't understand. Also, she sent me a message right after I left, like asking where I was and what I was doing. I thought she was just checking up on me, but now maybe she wanted to go home as well. I just couldn't understand. She didn't really seem drunk at all when I left. Maybe she drank more when she got inside.

When asked to describe the Respondent's level of intoxication that night, Witness #2 referenced that the night was the first and only time she has interacted with him and therefore she had little basis or past experience to compare his intoxication level to. She did not know how many drinks he consumed, but noted that "he was always chatting with the taxi or Uber driver" as they went downtown. She qualified her statement by saying that she thought his conversational tone "is more of his character" than evidence of him being intoxicated. She mentioned that "you could see that he had been drinking," but added she would "rather not say anything" more than that.

### Witness #3

The Investigative Team interviewed Witness #3 on October 12, 2017. She is a non-affiliate of the University and the Complainant's cousin ███████████████████████████████████████████████████████████████████████████████████████████████████████ and "before that [they] were pretty close" and would "always [meet] when [Witness #3] was going to visit ████████ Witness #3 "just heard about" the Respondent from the Complainant. The Complainant described the Respondent as "one of her friends," and Witness #3 also recalled the Complainant

telling her that the Respondent "lived on the Upper East Side, in our neighborhood." Witness #3 denied ever meeting or interacting with the Respondent.

Witness #3 was not with the Complainant and Respondent on the night of the alleged gender-based misconduct. On the night of August 25th, she was "in the office" and after work went to a "gathering with friends" at a local bar. She was texting with the Complainant during the night, and the Complainant told Witness #3 that "she was on ██████████████ with her friend [Witness #2]." According to Witness #3, the Complainant "seemed happy." Witness #3 estimated that her last communication with the Complainant was at approximately "9:30 or 10:00'ish" on the 25th, and Witness #3 did not see the Complainant that night.

The next day "around 10:30" in the morning, after Witness #3 returned home from her "gym class in Chelsea," she encountered the Complainant. Witness #3 explained her initial encounter with the Complainant in the following manner:

> We have a very long hall from the door, and then the kitchen. I was preparing my post-workout smoothie and I could see the door opening. From the first look at her I saw something was wrong. Something in her face, her look. I got scared for a moment there. She was in a state of like shock or panic kind of, or a mix of both in a way. She looked at me with a bit of blank eyes. She didn't have her shoes on, she was just carrying them. Her hair was kind of messed up. Her hair basically wasn't brushed, a bit all over the place. She walked down that corridor and came into the living room. We have an open space kind of living room. I asked her, 'Are you ok?' She didn't really answer me initially. Since it was summer she wasn't wearing a lot. I saw big bruises on her arms. I remember taking pictures of it at the hospital. Big bruises on her arms. I started to ask her, I started thinking. I didn't even ask her where she was but started crying at that time.

When asked follow-up questions about the Complainant's appearance at that time and specifically whether the Complainant appeared intoxicated to her Witness #3 added, "I think it was, like I've seen her come home the day after being out before . . . The [Complainant] I know, she's smiley, even if a bit hungover. She would joke about it. That wasn't what I saw. Maybe she would come in a bit tired. That wasn't tiredness, that was shock." When asked how her speech was she replied, "She was speaking through tears," but she denied any slurring. Witness #3 denied that the Complainant was stumbling when entering the apartment, but did recall that she was "holding [her shoes] and she was barefoot." When asked what shoes she remembered the Complainant holding she answered, "Sandals, I think these brown sandals. They were flats I think." She qualified that she was "maybe" guessing about the appearance of the shoes, but affirmed that she remembered them being "new shoes" the Complainant had recently purchased.

Witness #3 then hugged the Complainant as she cried. The Complainant "ended up going to her room and laying down" and Witness #3 initially did not follow her. She then came into the Complainant's bedroom, sat down next to the Complainant on the bed, and observed that the Complainant "was crying still" and "wasn't in her normal state, [and] unlike herself." Witness #3 "started to ask [the Complainant] about her bruises" but "no name [was] discussed or where she was or anything" initially. Witness #3 eventually "realized what had happened" and thought she then asked the Complainant, "You were with someone and you didn't want it?" and the Complainant nodded in agreement. It "all kind of came together" for Witness #3 then, and she "realized what had happened."

Witness #3 "felt like a big sister" after learning what had happened and explained to the Complainant that they would "take care of this." Witness #3 told the Complainant to "rest a bit" while she looked up "options" for what to do next, and she told the Complainant that they should "probably go to the hospital." While the Complainant rested, Witness #3 "went to the Columbia website to see what resources were available," but she also knew that "New York City hospitals had a process that's existing" to respond to sexual assault. She and the Complainant "talked a bit more" about what had happened and Witness #3 "got the name" of the Respondent. The Complainant was still "very upset," and according to Witness #3 she "didn't want to do anything really" at first and kept saying, "I don't know what to do." Witness #3 stated she "pushed [the Complainant] a little bit to do the whole hospital thing." She further explained that she did not "pressure" the Complainant to go to the hospital; rather, she told her that she thought it would be a good idea to do so for her own health and safety. The Complainant ultimately "was the one kind of saying, 'Well what else can we do?'" and agreed to go to the hospital with Witness #3. Witness #3 estimated that they left for the hospital "probably an hour after [the Complainant] got home."

The Complainant and Witness #3 then "took a taxi down to Lenox Hill Hospital," largely due to the fact that Witness #3 had been to that hospital previously and "knew exactly where this hospital was" and was generally familiar with the layout. Witness #3 recalled "doing the paperwork" for the Complainant upon entering the hospital. Prior to walking in Witness #3 asked the Complainant, "Do you want me to talk for you?" and the Complainant replied, "That would be great." The two waited "maybe 10-15 minutes" after which the Complainant became "impatient" and "was being like, 'Ah, it's taking so long. Why are we here?'" The Complainant eventually "got called" and Witness #3 accompanied her to meet with the "triage nurse." The triage nurse asked the Complainant what happened and why she was there, but the Complainant "couldn't answer" largely because she was "still crying and very upset." Witness #3 added that she thought the Complainant seemed "frozen in a way" based on the way she behaved. The nurse became "a bit like rough" with the Complainant and told her something along the lines of, "I can't help you if you don't tell me what's going on." The Complainant asked the nurse if Witness #3 could speak on her behalf and the nurse agreed. Witness #3 then told the nurse that the Complainant had been "the victim of sexual violence." The nurse asked Witness #3 what she meant by that but Witness #3 was only able to tell her "what [she] knew" from her earlier conversation with the Complainant and could not answer the nurse's questions about "when . . . it happen[ed], where, and that kind of thing."

After some time "another nurse" came and led Witness #3 and the Complainant into another room. Witness #3 stated, "We stayed there the entire day basically. For several hours." The nurse they met with in this second room at the hospital "had been trained" in conducting sexual assault forensic examinations and "knew what she was supposed to do." Witness #3 stated that she did not remember the exact "sequencing of the day," but she remembered the nurse explaining "everything" to the Complainant, including "how it would go, all the tests she could take, [and] samples."

When asked if the Complainant submitted to a forensic examination Witness #3 stated, "Yes, she went through all that. Urine samples, swabs, [and] pictures of the bruises were taken." When asked about the bruising that was documented during the hospital visit Witness #3 explained, "Initially I just saw the arms, big bruises on her arms" as she indicated to the Investigative Team by pointing to her upper arm and shoulder area with her hands. She continued, "But afterwards there was a bit on the face, and she complained for many days after that she was hurting in the head. It wasn't as visible as these ones [indicating her arms and shoulders]. But you could see it a bit on her face. When she

40

took her bottoms off, there was a bruise down in that area too." She clarified that she recalled "down in that area" meaning "on [the Complainant's] left leg." She also remembered the Complainant getting "all kinds of pills for sexually transmitted diseases and that." When the Investigative Team asked if the nurse ever discussed the possibility that the Complainant was drugged the night before Witness #3 replied:

> Yeah. The nurse was asking all these questions just to kind of get the background. Like how many drinks and all those things. She asked about how she normally would be drinking, and for her it was unusual that she would black out for that long of a period. So I think they did the urine test quite early, because these things go out quite fast. So yeah, that was talked about.

The Investigative Team also asked Witness #3 if she remembered what the Complainant told the forensic examiner about what had occurred with the Respondent. Witness #3 replied:

> She had been on this rooftop, then they went home to [the Respondent], his place. Then they ended up going to a club downtown. So [Witness #2] was there, [the Complainant], and [the Respondent] and a lot of [Witness #2's] friends . . . It was [the Complainant] and [Witness #2] having this very political conversation with this random guy on the street. She was reflecting back and she was like, 'I couldn't have been very drunk at that time. You have to have a certain level of clarity to have those conversations.' I think she was saying that her friend [Witness #2] left around 1:00 and [the Complainant] and [the Respondent] were at the bar. Soon after [Witness #2] had left [the Respondent] was trying to get a bit closer to her or tried to kiss her and she was like, 'Hey no, we're friends. You have a fiancée.' They had just kind of cheered for him and his fiancée. She knew that he had a girlfriend but she didn't know they were engaged. Everyone was like, 'Happy times, good for you.' After that, I'm not sure if it's then or a bit later, she starts forgetting. Her blackout kind of starts . . . I don't think she remembers any kind of trip that was taken between the club and his apartment, but I remember her saying that she remembers the moment . . . she remembers that she was saying, 'No' and he said something like, 'I've been waiting so long to do this.' Something like that. . . . I think she said she tried to push, but she felt a bit like, not like frozen, but like incapacitated in a way, that kind of feeling she had.

After being at the hospital for several hours with the Complainant and the completion of the forensic examination, Witness #3 remembered that the Complainant seemed to Witness #3 like she had "a little bit of a load . . . off her chest." She explained that they were both impressed with the "strong support network" that was evident during their time with the forensic nurse. Witness #3 estimated that they left the hospital around "4:00 or 5:00 p.m., something like that." She recalled that upon leaving the hospital they "got a smoothie" and walked ███████████████ together.

Once back, Witness #3 could not remember if the Complainant "took a shower and laid down, or laid down right away." Witness #3 remembered leaving the apartment for "maybe two hours" before returning that evening, but she thought the Complainant stayed home. When asked how the Complainant acted around her in the days following the alleged assault, Witness #3 mentioned that on the day after the hospital visit (August 27, 2017), Witness #2 came over to the apartment and they

41

all "talked about [the alleged assault], all three of [them]." She said that the Complainant and Witness #2 were "trying to retrace [the Complainant's] steps and understand the evening when her and [Witness #2] were there, and put the pieces together." They talked about Witness #2's friends present with the Complainant and Respondent that night. According to Witness #3, Witness #2 had asked one of her friends if they remembered seeing or interacting with the Complainant and Respondent at the ███████████ that night, and the friend replied something along the lines of, "I saw her there with her boyfriend." Witness #2 replied that the Respondent is "not [the Complainant's] boyfriend." Witness #3 did not know who this friend was, and added that there "was a big group of guys" at the bar with the Complainant and Respondent. The Complainant told Witness #3 and Witness #2 that she "didn't remember what she was doing" for large portions of the night and was "thinking about all kinds of scenarios" about what happened. They also discussed the morning after the alleged assault, and that the Complainant "had to go around the apartment to look for her stuff" and "had left some books there," and "had left her underwear as well."

The Investigative Team asked Witness #3 what she remembered about the appearance of the Complainant's bruises and she replied, "They were kind of distinctive. I think they changed color and got darker during the day." She added, "The one of the face, I didn't see it until later. The other ones were, not like dark dark, but you could see them." Witness #3 confirmed that she was the individual who took the pictures of the Complainant depicted in Exhibit #13 while the two were at the hospital together. The Complainant pointed out her injuries to her face and head to Witness #3, and Witness #3 noted that "it was a bit of discoloring I guess, it wasn't swollen or anything." When asked if the Complainant explained or knew what caused the bruising Witness #3 replied, "She was trying to put it together, but the exact moment, I don't think so."

## Witness #4

The Investigative Team interviewed Witness #4 on October 17, 2017. He is a ██████ student in the same concentration as the Complainant, and the two have had classes together. He described he and the Complainant as "good friends," and added that she is "one of [his] best friends at ████ whom he "shares . . . most conversations with." He thought they first met "around campus" at one of the many social functions hosted by the school. When asked about his background with the Respondent he replied that he "didn't really know him." He elaborated, "I've talked to him two or three times, at a ████ happy hour for the first time. . . . [but] I've never really gone in depth with him as a person." He acknowledged to the Investigative Team that he has a "more robust relationship with [the Complainant] than [the Respondent]."

Witness #4 was not with the Complainant and Respondent on the night of the alleged gender-based misconduct. He remembered seeing the Complainant on the "first day of Orientation" given that he and the Complainant were both ████████████ for the incoming class. Upon seeing the Complainant she appeared "a bit off" to Witness #4, so he asked her how she was doing and if everything was alright. Witness #4 clarified that the Complainant seemed "a bit like nervous." He continued, "You're supposed to be engaged with the new kids coming into ████ and she was just like not really engaging. So I was like, 'Hey, what's up?' And from that, like someone had already noticed her bruise. So once I asked about it, it came down basically." The Complainant "took [Witness #4] aside" near Miller Theater on campus and said, "You're the first person I'm going to tell. I wasn't going to discuss this today, but since you asked." The Complainant then "start[ed] to get very emotional and tear[ed] up." The Complainant was wearing shorts on this particular day, and she told Witness #4 that "someone had noticed a bruise on her leg" that morning. She explained to Witness

#4 that she was "self-conscious" about the observation made, told the person that she must have fallen, and seemingly wanted to confide in Witness #4. The Complainant then told Witness #4 that over the weekend she went out with the Respondent and others, that "there were drinks involved," and eventually the Respondent "was trying to force himself on [the Complainant] and being very aggressive." When asked what he specifically remembered the Complainant telling him he stated:

> While drinking [the Respondent] was being very aggressive towards [the Complainant]. And the scenario in which going from the public place to whose apartment, I can't really remember, but I think it was [the Respondent's] apartment. He was violent towards her, like taking off her clothes while she was like, 'Why are you doing this I don't understand.' . . . She also told me the morning after she woke up, I don't know if there was sleep involved or something but she told me that he threw her stuff around the apartment. It was a mess basically. She left his apartment, and the day after he was contacting her as if nothing had happened.

During the course of their conversation the Complainant also "started to show [Witness #4] the bruises on her body" by taking off a shawl she had on. Upon seeing the bruises Witness #4 concluded that what had happened was "serious." When asked to describe what he remembered about the appearance of the bruising, he said that they were "large brown-green marks on [the Complainant's] skin." He recalled the marks being "near [the Complainant's] thighs, and like in the shoulders." He declined observing any additional bruising on her, and also denied observing the coloration of the bruises throughout his interactions with her during Orientation Week.

Once the Complainant finished telling Witness #4 about the allegations, Witness #4 asked her what she wanted to do moving forward, and assured the Complainant that he "would be involved if she wanted [him] to be." Witness #4 told the Complainant that he thought she should report the allegations "to make sure this doesn't happen to someone else." However, he also acknowledged during his interview that he did not know the Respondent or what had occurred well enough to make a "judgment call on the situation." The Complainant told Witness #4 she was planning to report the allegations, and he reiterated that no matter what the Complainant decided to do, he would be a "support person for her." He stated that "nothing really came up about it" until "a couple weeks" before his interview with the Investigative Team. He explained that the Complainant texted him and told him that she had provided Witness #4's name to the Investigative Team for a possible interview. Specifically, on October 6, 2017 she texted Witness #4 in relevant part: "I don't know if I told you but Columbia is investigating what happened to me in August . . . They asked about the first people I talked to about this after the incident . . . I gave them your name." Witness #4 replied in relevant part, "No worries! Happy to help however I can." See Exhibit #27. Witness #4 understood that "there was a framework" for the University process and that it "might take time before [he] talked with anybody."

## Witness #5

The Investigative Team interviewed Witness #5 on October 19, 2017. He is a ███ student in the same program as Witness #2, having met her "like a week or two before [the alleged gender-based misconduct] at one of the Orientation events." Witness #2 was "one of the first people" Witness #5 spoke with once he became a student at Columbia, and they remain friendly. Witness #5 stated that on August 25, 2017, "the plan was everyone coming to [his] apartment first" before they went downtown. However, Witness #2, the Complainant, and the Respondent "didn't turn up . . . until like five minutes before [they] left" and went to the ███████ Witness #5 told the

Investigative Team that his first time meeting and interacting with both the Complainant and Respondent was that night when they "walked through the door" to his apartment. He denied seeing or interacting with the Complainant after that night, and thought he might have walked past the Respondent on campus since then, but did not interact with the Respondent. He did not think the Respondent saw him.

As mentioned above, Witness #5 and others "planned to meet at [Witness #5's] house at 8:00 p.m." so they could "start drinking before going to the club" to avoid buying too many expensive drinks. When the Complainant, Respondent, and Witness #2 arrived at his apartment, they came with several others including approximately "four ███ guys." After being introduced, Witness #5 recalled the Complainant told him that the Respondent was her "best friend." One of the ███ was "incredibly drunk" when he entered Witness #5's apartment. When asked for further clarification Witness #5 added, "He couldn't stand and he was knocking things over. He got into the toilet and knocked the bottles over. He couldn't stand." Witness #5 told the group to take the intoxicated individual home, but the Respondent "got annoyed and told [Witness #5], 'Let it be. I'll handle it.'" According to Witness #5, the Respondent "was drunk too" when he entered Witness #5's apartment. He elaborated, "I thought he was behaving a bit odd, but people were like, 'How can we judge him when we've never met him.'"

The group left for the club shortly after the parties and Witness #2 arrived, but Witness #5 was not in the car with them. Witness #5 and his group "got in five minutes too late and had to get a deal or something" in order to gain access to the club. When he entered the club "everyone [was] at the bar, and [they] got the drinks that came with the entry." Witness #5 and the group "danced the whole night," and from his recollection the Complainant and Respondent seemed like they were "just friends" during that time. When pressed for more information Witness #5 elaborated that "towards the end," Witness #5 "didn't see them kissing, but [he] saw them and they looked romantically involved." He continued, "They spent the whole night together. They were laughing together, dancing. They were not touching each other, but together." He thought that throughout their time at the club they became "closer and closer," but he reiterated that he did not see them kissing or otherwise engaging in sexual activity while he was present at the club.

As the night continued into the "early hours" of August 26th, some of the group started to leave the club. Witness #5 did not see his friend Witness #2 leave, nor did he get a chance to say goodbye to her. At 1:24 a.m. on the 26th he wrote Witness #2, "Where [a]r[e] you[?]" She replied in relevant part, "Went home, waiting for the subway now." Later at 2:05 a.m., Witness #5 wrote again asking, "Whyyyy," and she replied that she had "[t]oo much to drink. To[o] tired. Headache. Now in [her] new bed[.]" At 2:07 a.m., Witness #5 told Witness #2 that he was also leaving the club when he texted in relevant part that he was "heading back now." See Exhibit #28. He thought that as he was leaving, the Complainant and Respondent were the only members of the original group left at the club. He explained, "There were other people that we kind of met while there, but everyone from my house was gone." Witness #5 stated that he "pulled [the Complainant] aside and told her [he] was leaving." He "[did not] remember if [he] asked [the Complainant] to leave [with him]," but thought regardless she "said she wanted to stay with her friend." Given that Witness #5 was previously told that the Respondent was "best friends" with the Complainant, he decided to leave the club with some of his friends from the night.

Witness #5 eventually "heard . . . what happened" to the Complainant from Witness #2. Witness #5 had paid for some of the Complainant's drinks during the night, and she had "said she would pay [Witness #5] back." When she did not send him the money she owed he found it "bizarre,"

particularly because the Complainant had been "adamant about paying [him] back" during the night. Witness #5 eventually spoke with his friend Witness #2, who told him that the Complainant "was in the hospital." Witness #5 asked Witness #2 if "something happened with the guy," referring to the Respondent, and Witness #2 told him, "Yes." Witness #5 never spoke again with the Complainant or Respondent, and denied knowing the specific allegations of gender-based misconduct other than hearing from Witness #2 that the Complainant became "incredibly drunk and wanted to go home, but somehow [she] ended up in a taxi to [the Respondent's] house," that she "blanked" while at the Respondent's apartment, and that he "forced himself on [the Complainant]."

Witness #5 was asked about the amount of alcohol consumed by him and other witnesses, as well as the parties, throughout the night of the alleged incident. He stated that Witness #2 arrived to his apartment "sober pretty much," and described the Complainant similarly as being "happy drunk" but not "too drunk." He stated that the Respondent seemed "super drunk" when he arrived, but "other people said he was fine" and told him that he should not "judge him" because that was his first time meeting the Respondent. Witness #5 estimated that he had "like a beer or two, and maybe a cocktail" at his apartment before heading downtown. He thought he had "two or three drinks" at ████████████████ and he thought those drinks were "single shot mixers or a beer." When asked, he said he had "no idea" how many drinks the Complainant, the Respondent, or Witness #2 consumed at the bar.

Witness #5 said he was "pretty alert" for the majority of the night. He explained, "Once we were at the club, towards the end of the night, by the end of the night I had sobered up. We had the three drinks early on, and I sobered up before going home. I think if I had been really drunk I would have forgotten to say goodbye [to the Complainant]." He recalled that while he was with her Complainant "could stand up straight," and was a "sort of giggly and laughing kind of drunk. She didn't seem falling over drunk." He reiterated throughout his interview that the Complainant generally seemed "very silly drunk, laughing a lot, but she could stand." He added that "towards the end" the Complainant "seemed more drunk," but she appeared to be "having a really fun time and dancing" with the Respondent. He stated that "towards the end of the night" the Complainant and Respondent became "closer and closer," and Witness #5 saw them "hugging but not kissing" one another. To Witness #5, what he saw "seemed like what best friends would do if they're out clubbing together." He denied that the dancing was "particularly sexual," adding that "for most of the night it was them two, then we would join and it'd be a circle but they'd be next to each other." Witness #5 described the Respondent as "drunk, like slurring his words drunk" when he first met the Respondent. He added that the Respondent "seemed a bit odd to [him]," which he described as "either a bit drunk or just a bit weird." According to Witness #5 the Respondent was "more wobbly than most" while at the club, and he thought he saw the Respondent do "a lot of side by side hugging and leaning for support" while next to the Complainant. He stated that his "picture of [the Respondent] at the club was him quite drunk," to the point where he was "slurring words and not holding himself up completely upright."

During follow-up questioning the Investigative Team again delved into what Witness #5 remembered occurring between the parties while at the club. When asked, Witness #5 again denied ever seeing the Complainant or Respondent kissing. When asked about the type of dancing he witnessed occurring between them, he acknowledged that he "wouldn't rule . . . out" the possibility that they were "grinding" with one another, because he "wasn't like watching them the whole night." He also qualified his earlier answers by explaining that once Witness #2 left the club Witness #5 "didn't see [the Complainant and Respondent] as much." He continued, "Sometimes they would join

45

the group, but because they didn't know the rest of the group as well they didn't spend as much time around us. They were in the corner near the bar or in the middle of the dance floor for the most part." Witness #5 denied ever observing any sexual touching between the Complainant or Respondent that night, but acknowledged that, to him, "it looked like some sexual tension" existed between them.

## Witness #6

The Investigative Team interviewed Witness #6 on October 23, 2017. He is studying ▇▇▇▇▇▇▇▇▇▇ He met Witness #2 on "the first day of Orientation" this past August, and "sat next to her and talked to her" during Orientation and eventually they "formed a little group and all happened to be friends." Before August 25, 2017, he had not met either the Complainant or the Respondent. In fact, he "only knew [the Complainant] as [Witness #2's] roommate," and "didn't know the other individual's name" at all. He denied having any interactions with either party since the night of the alleged gender-based misconduct, and he was unaware of the specific allegations being investigated.

Witness #6 was at Witness #5's apartment "earlier in the day" on August 25th, "probably until like 9:30 p.m." when he left to go change before returning to the apartment to head downtown. He explained that he did not interact with either the Complainant or Respondent inside of Witness #5's apartment because "the portion they were there was the portion [he] wasn't there." Witness #6 thought he returned to Witness #5's apartment "around 11:00 or 11:30 p.m.," and that the group left for the ▇▇▇▇▇▇▇ shortly after he returned. Witness #6 was in a car with Witness #5, Witness #10, and "other friends," and did not ride or interact with the Complainant, Respondent, or Witness #2 on the way downtown.

Upon arriving at the club, Witness #6 and his friends were "sitting on the couches and stuff" at first, before the club got crowded. He and the others "ordered some drinks," and as they continued to consume alcohol they started "dancing." He stated, "As it progressed, everyone was drinking a lot and dancing." While he remembered seeing the Complainant and Respondent while at the club, he denied any significant interactions with either individual. He said, "It just seemed like a guy and girl close to each other and dancing with each other." Upon asking follow-up questions about what he remembered seeing he added, "I definitely would say that they seemed like they were romantically or sexually interested," but he "[did not] remember seeing" the two kiss or otherwise engage in sexual activity together. He "just remember[ed] them being close" while at the club and he thought they were "grinding" at one point. He elaborated, "They were face to face, grinding up on each other from what I remember." Witness #6 denied observing either party look uncomfortable with the dancing that he witnessed. He remembered Witness #2 approaching at one point during the night and telling him, "This is my roommate," as she pointed out the Complainant. However, other than he and the Complainant saying "Hey" to each other, he did not recall any additional interaction and denied speaking with the Respondent.

When asked about the amount of alcohol consumed by him and others at the club Witness #6 stated, "Everyone was very intoxicated." He continued, "The amount of drinks that everyone was drinking -- we had drinks at [Witness #5's] place, and then got there and drank more. It piles on." He could not remember if he saw the Complainant or Respondent drinking at the club, but recalled that there was "a tab going" and he thought they "probably joined in" and got drinks. When asked if he remembered any behavior by either party that suggested he or she was intoxicated he replied, "I can't really say objectively whether I noticed that. I was also really intoxicated, so it's hard for me to judge it. I would guess they were also drinking a good amount. I don't remember seeing anything like that

though." While he stated that he "remember[ed] everything" from the night, he acknowledged that his level of intoxication was "higher than normal." He denied saying goodbye to either the Complainant or Respondent before he left with Witness #5, and said they "might have been" in the club when he left but he was unsure.

## Witness #7

The Investigative Team interviewed Witness #7 on October 24, 2017. At the time of her interview she was in her "third semester" at ▮▮▮▮ Witness #7 and the Complainant were in the same Orientation group when they started at ▮▮▮▮ and she remembered the two were "paired together for the ice breaker" and have become "really good friends since then." In fact, Witness #7 described the Complainant as "one of [her] best friends at ▮▮▮▮ and noted that they "spend a lot of time" together "regularly." She originally met the Respondent through the Complainant, and she thought "the three of [them] went out for dinner in fall 2016" at Arts & Crafts. She stated that she does not know the Respondent "super well," adding that they "don't have each other's cell numbers, [are] not social media friends, [and] never hung out one-on-one." The dinner that she attended with the Complainant and Respondent "seemed normal," and she recalled getting along fine with the Respondent when she was with him. She added that the Complainant "didn't really talk about [the Respondent] that much" whenever she and the Complainant were together.

Witness #7 was not present with the Complainant and Respondent on the night of the alleged gender-based misconduct. She explained that the Complainant was "with her cousin and some of their friends, it wasn't a ▮▮▮▮ group." She added, "I had to be on campus all day, I had TA Training. She didn't need to be there on campus." Both Witness #7 and the Complainant were ▮▮▮▮▮▮▮▮▮▮ for the incoming class of ▮▮▮▮ students this past summer. However, Witness #7 missed the first day of Orientation on Monday, August 28th, 2017 because she "hurt [her] back." The Sunday before Orientation started (August 27), Witness #7 texted the Complainant, "I sprained my back and now idk[35] if I can do orientation tomorrow[.]" The Complainant replied in relevant part, "Ohh no that doesn't sound too good . . . Something happened this weekend for me too that I need to tell you about[.]" Witness #7 asked, "What happened??" The Complainant replied in relevant part that she "would rather talk about it in person." See Exhibit #29. The two initially agreed to call one another later on Sunday night, but they were both too tired to talk then. They continued to communicate with one another throughout Monday, and ultimately agreed to meet for coffee on Tuesday morning before they went to their Orientation ▮▮▮▮▮▮ session for the day.

On Tuesday morning (August 29, 2017) they met at the "Law School Café" for breakfast, and the Complainant "told [Witness #7] what happened with [the Respondent]" over the previous weekend. The Complainant "walked [Witness #7] through the story," and as the Complainant described the allegations Witness #7 observed "really giant bruises all over [the Complainant's] arms and neck" that she described as "really brutal." When asked what she specifically recalled the Complainant told her that morning, she stated in relevant part:

> She said something was going on with her. I was expecting something big from her. I thought she was going to tell me she was sick. She pulled her sleeves up and showed me her bruises. I didn't realize what that was. I thought it was part of the disease. Then she said it was [the Respondent], and then I realized it was a person doing something

---

[35] The phrase "idk" is an abbreviation for "I don't know."

to her. So I was really shocked. . . . She said that he sort of invited himself to ▇▇▇▇ or something with her cousin. . . . Then they took a cab and she was calling [Witness #1], and she left him a voicemail. . . . Some sort of voicemail or voice recording she left for [Witness #1]. Then she said they went back to [the Respondent's] apartment . . . She didn't really go into detail about what happened in the apartment, but she said he beat her up and raped her. I remember her saying 'He did all of this,' meaning the bruises, and that she used the word 'rape.' Then on Sunday, when she woke up, all her stuff was thrown all over the apartment. Her stuff was everywhere, and his things were everywhere. It just looked disturbed.

The Investigative Team asked how the Complainant appeared during the conversation, and Witness #7 said that she "seemed fine until [they] started talking about" the specific allegations of gender-based misconduct. At that point the Complainant "seemed a little bit shaken" and "was in tears" and seemingly "overwhelmed" by what had occurred. The Complainant also told Witness #7 that she was unable "to think clearly in the morning when she woke up," and she said she was "confused as to how this person she knew could treat her like that." The Complainant then described how she and her cousin, Witness #3, went to the hospital together the next day and "had the rape kit done [with] pictures of all the bruises and all that entails."

After describing the allegations to Witness #7, the Complainant was "debating whether to drop out of the ▇▇▇▇▇ thing," but she decided to stay with the program in part because the Complainant's mother came to stay with the Complainant, as a "source of support." For the "first couple weeks" after the incident the Complainant was "doing really well," and Witness #7 tried to remain an additional source of support for the Complainant. She recalled that she "went with [the Complainant] to the SVR appointment. The first one, not all of them." Upon reviewing her phone, Witness #7 confirmed that the first appointment was on Thursday, August 31, 2017 at 2:00 p.m. Witness #7 "knew that SVR was one of the five [36] non-disclosing offices or whatever," so they "decided to go to SVR together" to learn more about the disciplinary process and the options available to the Complainant. After their appointment the Complainant seemed "kind of drained," and Witness #7 remembered telling the Complainant that "since everything had already been documented" at the hospital, the Complainant "had done everything she has to and everything else will be voluntary at that point." According to Witness #7 the Complainant was still unsure about whether she wanted to report the allegations to GBM.

Witness #7 stated that there was a distinct incident with the Respondent that prompted her to report the allegations for an investigation. On September 11, 2017, the day the Complainant's mother left to return to ▇▇▇ the Complainant and Witness #7 "were sitting outside ▇▇▇ and [the Respondent] came there." The Complainant "got really awkward," said something along the lines of "I gotta go," and got up and left Witness #7 and the rest of the group with whom they were sitting. Witness #7 turned around and observed the Respondent "like 20'ish feet" from where she and the Complainant had been. Soon thereafter at 5:43 p.m. the Complainant texted Witness #7, "Shitshitshit He was right there[.] Fuuck ohhh ohhh[.] [sic]" Witness #7 said she "didn't even see him" at first and offered to go to class with the Complainant or meet her somewhere else to discuss. The Complainant told Witness #7 she was "sitting next to the thinker" near Philosophy Hall and asked Witness #7 to

---

[36] There are actually six offices across campus that are deemed "confidential resources" for students regarding allegations of gender-based misconduct. Confidential resources on campus include: Sexual Violence Response; Clergy; Counseling and Psychological Services; the Office of Disability Services; the Ombuds Office; and Healthcare Providers.

come over "for a sec at least[.]" See Exhibit #29. When Witness #7 arrived, the Complainant was "angry, crying, [and] upset" and "kind of collapsed on the grass." Witness #7 was "hugging" the Complainant, and offered to miss her upcoming class at 6:00 p.m. in order to stay with the Complainant. However, Witness #2 "happened to be free or between classes," so she came and Witness #7 "left a couple minutes after that." At 6:42 p.m. Witness #7 texted the Complainant, "Hey how are you doing?" The Complainant replied, "I feel like I'm falling to pieces[.] On my way home." See Exhibit #29. The Complainant filed her incident report six days later on September 17, 2017.

## Witness #8

The Investigative Team interviewed Witness #8 on October 30, 2017. He is also a first year student in ███ in the same program as Witness #2, having met her during their initial Orientation. On the night of the alleged incident, Witness #8 and Witness #2 went to a "welcome drinks" event hosted by their department at the Boat Basin. Witness #2 "had plans with a friend," the Complainant, and invited Witness #8 to come along with her. Witness #8 affirmed that he had never met the Complainant or Respondent prior to that night, and has not interacted with either individual since then.

Witness #8 recalled meeting the Complainant "on ████████ at "approximately 7:30 . . . plus or minus one hour." The group stayed "until it was night and ████ closed around 8:30 or 9:00." They "started going out at ████ and [they] decided [they would] go to this party where [the Complainant] was invited." The Complainant had told the group that the Respondent texted her and invited her "to a party . . . and that [Witness #8 and his friends] could all come if [they] wanted." They "walked there" for "maybe 20 minutes," before entering the Respondent's apartment building. Upon arriving Witness #8 mentioned that he thought they "were the only people invited," because nobody but their group and the Respondent were present.[37] He recalled that it was "just a little apartment party, nothing fancy [or] overly prepared." The Respondent had placed "some alcohol on the coffee table" in the living room, and Witness #8 engaged in "random conversations" with the people in attendance. He explained that everyone there were "all new friends," so the majority of his conversations with people were "like, 'What are you doing here? What do you expect of Columbia?'" He denied having any extensive conversation with the Complainant while at the Respondent's apartment, but remembered talking with the Respondent about "his studies." Witness #8 stated that he and the Respondent had "a very normal and decent conversation," and during that conversation the Respondent did not seem like he "was drunk or drinking too much."

The group left the Respondent's apartment at approximately 10:20 p.m., when they "all decided to go to another party" at Witness #5's apartment on the Upper West Side. When they arrived to Witness #5's apartment on Central Park West, they "didn't stay very long" due to the fact that when they came people had already been "talking about going to a nightclub." He estimated that he and the group "stayed maybe less than 10 minutes," then "went down and ordered another Uber to go to the ████ in Chelsea." The group had to take two Ubers given the number of people with them. Witness #8 recalled "being with [the Complainant]" for the Uber ride downtown, but he did not recall if the Respondent was with them. He also remembered that on the car ride downtown they were all "singing in the car," which signaled to Witness #8 that the group might not have been

---

[37] Witness #8 added that after the night he "thought it was kind of weird" that the Respondent was hosting a party but only invited the Complainant.

"as sober as [they] could have been." The group arrived at the ▮▮▮▮▮ at approximately 11:30 p.m., and they "entered the nightclub without any difficulties." The second car ride arrived approximately "15-20" minutes after Witness #8 and the Complainant however, and they "discussed what to do" given the "entrance fee" they had to pay. Ultimately, the second group also came into the club.

Witness #8 "stayed at the nightclub for a few hours," but he said he did not "remember anything meaningful." He and the others were "basically dancing and going to the bar buying drinks." Witness #8 said that he left the club "at maybe 2:30 a.m.," but acknowledged that was just a "guess."

Towards the end of the night Witness #8 remembered seeing the Complainant and Respondent kiss as they were dancing on the dance floor. When asked for further details about their dancing he stated, "I just remember them dancing in a way that made no doubt to me that at least he was going to try to kiss her. It was kind of obvious to me." And when asked about the kiss he stated, "Before leaving the party [at the ▮▮▮▮▮] I remember seeing [the Respondent] and [the Complainant] kissing. First dancing together, but then kissing." Witness #8 "didn't pay attention to that," rationalizing that "it happens in nightclubs all the time." Witness #8 "stayed with the rest of the group" until he left to return home. He thought that after the night he spoke with Male #1[38] about the kiss, but Male #1 reportedly "hadn't even noticed something happening between [the Complainant and Respondent]." When asked to elaborate with as much detail he could remember he stated: "We were in the middle of the nightclub, with everybody around. I remember them dancing . . . I remember [the Respondent] being very like, his hands were on [the Complainant's] body . . . I don't know if she agreed with that or not. I was not close enough to hear what they were saying." When asked how far away from the parties he was when he saw this behavior Witness #8 stated, "Maybe 10-15 feet." Witness #8 said that "it seemed to [him] like [the Respondent] was the one trying to kiss [the Complainant] more than the contrary." When asked what led him to say that he responded, "The way he started dancing with her then kissed her. He was trying something." However, he also added that he "didn't see any behavior of [the Complainant] making [Witness #8] think she disagreed with this happening." He did not see the Complainant "trying to reject" the Respondent nor did he see her "moving her head when he was trying to kiss her." He thought it was "just the one time" that he saw the two kissing, towards the end of the night shortly before he left the club.

Witness #8 acknowledged that he drank "quite a few drinks" from his time at the Boat Basin until he went home after the ▮▮▮▮▮ However, because his drinks were "spread on such a long time," by the end of the night he "was really not drunk at all." He acknowledged that "some people were though." He referenced an individual at Witness #5's apartment who was "really drunk" and the group all agreed that he "couldn't come with" them to the ▮▮▮▮▮ He thought "most people had two or three drinks" at the ▮▮▮▮▮ but he "only had one" because "it was very expensive to drink there." He stated that he did not "remember seeing anything particular about [the Complainant's] drinking," and he "assum[ed] she drank the same amount of alcohol [as] the others." He stated, "It seemed to me like she was able to be a very normal person, her way of walking, talking, and behaving." At the same time he recognized that he "didn't talk to [the Complainant] in the club," so it was "difficult to say if she was drunk or not." Similarly, while he spoke with the Respondent in his apartment and that conversation did not make Witness #8 "think maybe he was drunk or drinking

---

[38] The Investigative Team sent an outreach letter to Male #1 on October 19, 2017, which was retrieved by Male #1 on October 20, 2017. However, Male #1 did not respond to the outreach or agree to participate for the investigation, and therefore was not interviewed.

too much," he did not have any further conversation with the Respondent at the club and therefore had "no clue" if he became more intoxicated as the night wore on.

## Witness #9

The Investigative Team interviewed Witness #9 on October 30, 2017. She is a second-year ██████ student, and met the Complainant "last year during Orientation Week at ██████ They were placed in the "same group," and since have become "friends." In fact, Witness #9 classified the Complainant as "one of [her] closest friends at ██████ and stated that the two "hang out pretty much every day at school." Witness #9 stated she "[does not] know [the Respondent], [she] just know[s] of him." She "recognize[s] his face," but they "never got introduced." Given that ██████ is a small school" and her close relationship with the Complainant, Witness #9 knows who the Respondent is but denied ever having any social interactions with him.

Witness #9 was not present with the Complainant and Respondent on the night of the alleged gender-based misconduct, but the Complainant told her about the incident "a few days after Orientation started." Witness #9 returned to New York City on August 29, 2017, and "met [the Complainant] Wednesday [August 30th]." After lunch as the Complainant, Witness #9, and Witness #7 were "exchanging stories" and "happy . . . because [they] hadn't seen each other in so long," the Complainant was "really abrupt" and "suddenly said, 'I have something very serious to tell you.'" The Complainant told Witness #9 that she was "raped" by the Respondent, and went into "a big blur of things" about the incident. The Complainant "didn't talk about it in much detail" at that time, and Witness #9 "could see that [the Complainant] was still trying to process things herself." When asked what the Complainant specifically reported to her, Witness #9 stated:

> I distinctly remember her using the word 'raped.' I remember very clearly that she said, 'I was,' and then said, 'raped,' the word, in a very under her breath sort of way. It was significantly lower toned than the rest of her sentence. She said that she didn't remember much. She has like glimpses you know, some random glimpses throughout the night. But most of it she doesn't remember. And once she said that again, there was no reason for me to kind of ask more. It was a rather short conversation but a lot of it was more about how is she doing and how is she dealing with it more than the incident itself. To be honest, I would not know what to say. I'm actually ok with not knowing the details.

Witness #9 added that the Complainant said "it happened over the weekend" and remembered the Complainant showing her bruises that were "horrible." Witness #9 stated that the bruises were located on the Complainant's "upper arms, [her] left arm . . . It was like right under her shoulder on the upper part." When asked how the Complainant was able to show her the bruises Witness #9 stated, "She was wearing like a cardigan, a throw-on sort of thing. Inside she was wearing the ██████ shirt. She pulled up her sleeves of the ██████ shirt." The Complainant also told Witness #9 that she "had bruising on her upper thigh as well but because [they] were on the fourth floor of ██ [Witness #9] didn't see it." Witness #9 stated that the Complainant did not describe any additional physical injuries to her at that time, but she did remember the Complainant telling her that she "went to the nurse or the doctor the day after the incident." The two "hugged it out" after the Complainant finished speaking.

Witness #9 also told the Investigative Team that after their initial discussion, the Complainant "was still trying to figure out what she want[ed] to do about [the allegations]," meaning "how far she wanted to take this matter." Witness #9 stated that "over the course of the months" following their initial discussion in August, the Complainant and Witness #9 "did speak about it now and then," but "mostly" they just talked about "how this is affecting [the Complainant's] school, her academics." Witness #9 noted that the Complainant at times had to "skip some assignments" and "skip some classes" as a result of what occurred. Witness #9 denied ever making attempts to "influence [the Complainant's] decision" about whether to report the allegations to GBM or not. She "definitely made sure" the Complainant knew that she needed to "prioritize herself" regardless of "whether she decide[d] on reporting it or decid[ed] to deal with it" via other means.

### Witness #10

The Investigative Team interviewed Witness #10 on November 1, 2017.[39] She is a ███████ student currently seeking a master's degree, but in a different department than Witness #2. She stated that she does not know the Complainant or the Respondent, having only met them "this night with [Witness #2]." She stated that the night of the alleged gender-based misconduct was the only time she interacted with either party.

Witness #10 was at Witness #5's apartment before the Complainant, Respondent, and Witness #2 arrived. She did not go to █████████ or the Respondent's apartment before. Once the parties and Witness #2 arrived at Witness #5's apartment, Witness #10 recalled "talking in ███████ with the Respondent for "maybe five minutes." When asked what they talked about she replied, "I don't remember exactly. He was just happy to be speaking with somebody in █████ When asked if she spoke with the Complainant at Witness #5's apartment she replied, "I don't remember, but I don't think so. From my memory, I don't remember talking to her. Maybe just introducing myself to her, but I don't remember having a conversation with her."

After her conversation with the Respondent and "maybe 10 minutes" after the parties and Witness #2 arrived, they "all left [Witness #5's] house together to go to the club." Before leaving "there was a ███████ guy who was really drunk" and the group was "sending him home." The group was then "waiting down for the Uber and deciding who was going to go with who." Witness #10 recalled taking "two Ubers" downtown, but "[Witness #2] and [the Complainant] and [the Respondent] left before" Witness #10. She remembered that when she arrived at the ███████ "they wanted to make us pay and they didn't make them pay at the entrance."

When asked about her own level of intoxication that night Witness #10 said she "was drunk" and had "maybe three glasses of vodka [at Witness #5's apartment] and then there at the club, two or three glasses of vodka." She thought she mixed the vodka with "maybe Red Bull." Despite being "drunk" she asserted that she never lost her memory of the night due to her alcohol consumption. Witness #10 said that at the club they "were all drunk." She elaborated, "I remember [the Complainant] was really drunk. She was hugging me and all that." When asked for additional details she stated, "She was holding a champagne glass the whole time, she was hugging me, and she's older

---

[39] Investigator Kelly unexpectedly had to leave the office on November 1, 2017 before Witness #10's scheduled interview. Consequently, Investigator Marzolf asked Witness #10 if she wanted to postpone the interview until Investigator Kelly returned, or preferred to conduct the interview as scheduled. Witness #10 told Investigator Marzolf that she wanted to conduct the interview that day, and therefore Investigator Marzolf was the sole investigator present for the interview.

than me and calling me like her little sister. And we were dancing a bit together." Witness #10 noted that "everyone was dancing," but remembered the Complainant approaching and hugging her "on the dance floor" at one point during the night. Witness #10 added that "it wasn't like an awkward hug or anything," but the Complainant "was drunk like everyone, like a happy drunk." She denied observing any additional signs of intoxication from the Complainant and "didn't notice" the Complainant stumbling or slurring her speech at any point.

Witness #10 said that she "[did not] remember [the Respondent] at the ███████████ She "didn't notice him" while there, and attributed this oversight to the number of people that were together in their group. When asked if she remembered seeing the Complainant and Respondent in the club together that night she said, "No. My best friend came. She's not at Columbia, and so I wasn't really paying attention to what everyone else was doing." She "didn't really analyze" whether the Respondent was intoxicated during her ███████ conversation with him inside of Witness #5's apartment. When asked if anything stood out to her about the Respondent's intoxication level she replied, "Not really." Finally, she "guess[ed]" that she left the ███████████ "with [her] roommate" at approximately 3:00 a.m. that night.

## Witness #11

The Investigative Team interviewed Witness #11 on November 14, 2017.[40] She is the Respondent's older sister and a non-affiliate of the University. Witness #11 stated that she "know[s] [the Complainant's] name," and she was told by the Respondent that the Complainant came to the Respondent's birthday party in ███████ However, Witness #11 stated that she did not "remember meeting her" then, and added that she did not "even remember . . . seeing her at the party." According to Witness #11, she has "never spoken" with the Complainant to the best of her recollection.

Witness #11 was not present with the parties on the night of the alleged gender-based misconduct. She was "away that weekend" with ███████████████ On Sunday, August 27th at 11:55 a.m. the Respondent texted Witness #11, "Hey where r u guys[?]" Witness #11 told the Respondent that she and ████████ but she did not know what city. At 12:21 p.m. the Respondent texted again, "I will be home soon. R u free to chat on phone in a bit? Need some advice." Witness #11 responded, "Sure, let me know before and I will walk down stairs." See Exhibit #30.

Later that day as Witness #11 was "leaving to come back" ███████ she was driving separately from her mother and pulled over to "walk [her] dog." As she was walking the dog she called the Respondent, as requested.[41] The Respondent told Witness #11 that "one of his good friends had de-friended him on Facebook," and he "couldn't figure out why she de-friended him." The Respondent "wanted a girl's point of view slash his sister's point of view" about why the Complainant might de-friend him. The Respondent explained to Witness #11 that he and the Complainant "had hooked up that weekend," which was the "only anomaly" from before the weekend. Witness #11 added that the Respondent also "didn't know if [the Complainant] woke up and was upset that she hooked up with a guy who had a girlfriend."

---

[40] The Investigative Team sent outreach to Witness #11 on October 31, 2017. However, given her work schedule, the interview needed to be postponed until November 14, 2017.

[41] The Respondent provided a copy of his call logs, which reflected that at 5:44 p.m. on August 27, 2017 the Respondent received an incoming call from Witness #11 that lasted 13 minutes. See Exhibit #31.

Witness #11 "just talked with" the Respondent, and asked "how the night had been." The Respondent told Witness #11 that he and the Complainant "had been hooking up at the bar," and "continued to hook up and had sex together" once back at the Respondent's apartment. The Respondent also told Witness #11 that while they were kissing in the club, the Complainant asked him about his girlfriend, but they then resumed kissing. Witness #11 told the Respondent how once she "had gone on a date with someone and then unfriended them," and she told the Respondent that she thought the Complainant might be "embarrassed or upset" about "hooking up" with the Respondent when she knew that he had a long-term girlfriend. She added that "neither of you guys are saints" for having sex with one another under those circumstances, and she hypothesized that this might be the reason why the Complainant unfriended the Respondent on social media.

When asked about the Respondent's tone during the phone conversation Witness #11 said that the Respondent "was confused in the situation" because he "felt like everything was copasetic" when he and the Complainant engaged in sexual activity. Otherwise the Respondent seemed "normal for the most part on the phone." The Respondent told Witness #11 that he "felt everything was mutual consent-wise,"[42] and that both apparently "engaged in and enjoyed the sex." Witness #11 spoke with the Respondent "later in the weekend," after she and ████████ had spoken with the Respondent about the "whole mess of a situation" surrounding the gas leak in the apartment. She was not positive, but she told the Investigative Team that the Respondent "deal[t] with the fire trucks and everything and then message[d] [Witness #11] and then in that realm is when he realized [the Complainant] de-friended him." Witness #11 also remembered the Respondent mentioned that he and the Complainant consumed alcohol throughout the night, but she "[did not] think he ever specifically said [he or the Complainant] were intoxicated." Witness #11 "assume[d] that he was" drunk to a certain degree, because she did not think he would cheat on his girlfriend otherwise.

### Witness #12

The Investigative Team interviewed Witness #12 on March 27, 2018.[43] She stated that she has known the Respondent "since ████████████ 2016," when they met at an ████████████ ████████████ She told the Investigative Team that they have been "dating" for approximately "three years" since they met, but qualified her answer. She said, ██████████████



She recalled going to "a place next to the school," and she briefly interacted with the Complainant and Respondent together there. She stated that the encounter was "friendly" when she met the Complainant, and that she "qualified [the Complainant as] one of the best friends

---

[42] The Investigative Team asked whether the Respondent specifically told Witness #11 this during the phone call. She replied, "That's more of a paraphrase. I remember him saying, like obviously he has a girlfriend and he knew he shouldn't hook up with someone else when he's in a monogamous relationship . . . But he said they seemed to both enjoy the sex and were both engaging in the sex."

[43] At his Pre-Determination Conference the Respondent requested that the Investigative Team interview Witness #12, which he is permitted to do under the Policy. Witness #12's interview therefore took place via video conference several months after the conclusion of other interviews.

or classmates of [the Respondent] at the time." She added, "They looked fine, nothing wrong with them. Just two friends hanging out making jokes, nothing special."

Witness #12 was not present with the parties on the night of the alleged gender-based misconduct, ███████████████████████ However, she recalled communicating with the Respondent on August 25, 2017, at approximately 9:00 p.m. local time,[44] in the hours leading up to the alleged incident. She told the Investigative Team, "All I know is that night, I talked to [the Respondent], we were messaging." She remembered the Respondent telling her that he was "tired" and planning to "stay home," but he later told Witness #12 that the Complainant was "going to his place and was around in the neighborhood, going to his place with some friends." Witness #12 told the Respondent, "That's fine, have fun," and remembered telling the Respondent that it was better to have guests over to his apartment than "staying home" alone. Witness #12 thought she then "went to bed" and did not speak to the Respondent again until the following morning.

On August 26, 2017 Witness #12 messaged the Respondent again. She "texted like usual," and told the Respondent about her sick cat. When asked if the Respondent mentioned anything about the night Witness #12 responded, "No. I didn't ask and he didn't say anything." She confirmed that she and the Respondent continued to communicate on a regular basis and she did not know about the allegations at that time.

Witness #12 told the Investigative Team that she first learned about the allegations of gender-based misconduct "in December," ████████████████████████████████████████ and while together the Respondent told Witness #12, "I have something to tell you." The Respondent "started by saying [he] slept with someone else," and Witness #12 at first "thought he was joking." She explained, "I never thought [the Respondent] would do something like that." The Respondent then told her, "No, I'm sorry I'm serious about everything," and he then "explained" to Witness #12 what occurred. She continued, "After I started talking to him, he said, 'It's not all, I have something else to say.' And he told me about the case." When asked what she specifically remembered the Respondent said she replied, "He said like, 'I slept with this girl and it was a mistake and now she reported that to the school policy for non-consensual sex.'" She acknowledged that the Respondent "named" the Complainant when describing the situation to her. Witness #12 "didn't want to listen" to the Respondent, and ████████████████████████████████ ████████████████████ because she "didn't want to see him again." She was "super furious" and "didn't want to talk" to the Respondent. ███████████████████████ and instead stayed with the Respondent.

Once she "calmed down" she eventually "forgave" the Respondent. She explained, ████████ ████████████████████████████ . . . I realized maybe I will lose so much the person I love and the future we will have together for a one night mistake. I realized maybe he deserves a second chance." She added, "Up until now for three years that I know, he didn't do anything wrong, nothing." Although she started talking to the Respondent again she added, "But like, not like a couple. Just talking to him. He was spending the five days trying to make me forgive him, and begging me to talk to him." As of the date of her interview, Witness #12 stated that she and the Respondent were still "trying to forget about what happened and move on," and confirmed they are still planning to get married one day and live together.

---

[44] ███████████████████████████████████████████████████████████████

The Investigative Team asked Witness #12 whether she knew the specific allegations the Complainant made against the Respondent. She stated, "I'm aware what she said, but I don't know what she said exactly. I know only his version of facts and I believe him." When asked if she was aware of the specific reasons why the Complainant alleged the sex was non-consensual she stated, "I don't know . . . I know [the Respondent], how he acts with girls. He would never do that. He's too sweet he can't even be violent with a fly." When asked if she has ever experienced anything akin to the Complainant's allegations of physical force during sex with the Respondent she stated, "No." When asked if she has ever sustained bruising or physical injuries during consensual sex with the Respondent she laughed and stated, "No. The only thing I had was some kisses on my neck, like teenagers." She then confirmed that she was referring to hickies on her neck as a result of being with the Respondent.

DO NOT COPY

# Findings & Analysis

The Investigative Team evaluated whether the Respondent engaged in the following activity in violation of the Gender-Based Misconduct Policy and Procedures for Students:

- **Sexual Assault: Intercourse**
  - Specifically, it has been alleged that on August 26, 2017, at one point between approximately 3:00 a.m. and 10:00 a.m., inside of the Respondent's apartment inside of a bedroom that was not his, the Respondent engaged in sexual intercourse with the Complainant by placing his penis inside her vagina without her affirmative consent, in that the Complainant was incapacitated and therefore unable to provide consent, and also that the Respondent used physical force to engage in sex.
- **Sexual Assault: Intercourse**
  - Specifically, it has been alleged that on August 26, 2017, at one point between approximately 3:00 a.m. and 10:00 a.m., inside of the Respondent's apartment inside of his bedroom, the Respondent engaged in sexual intercourse with the Complainant by placing his penis inside her vagina without her affirmative consent, in that the Complainant was incapacitated and therefore unable to provide consent, and also that the Respondent used physical force to engage in sex.

At issue is whether the alleged acts occurred and, if so, whether the behaviors constitute violations of Policy. In this matter, the parties recount contrasting versions of events. While both generally agree that sex occurred, their narratives surrounding affirmative consent and the Complainant's ability to provide it differ significantly. Thus, the issues are not merely what conduct occurred and whether affirmative consent was provided, but also which party's version of events is more credible, as the details are irreconcilable.

When assessing the credibility of the parties and witnesses during the course of this investigation, the following factors were used to evaluate their credibility: (1) the consistency or inconsistency of their accounts of events over time; (2) their demeanor during interviews; (3) their motive to lie; (4) the presence or absence of any corroborating evidence; and (5) whether their statements included specific details that were reasonable and logical.

Additionally, both parties retained outside individuals to review the Factual Summary and Exhibits and provide an opinion about what was contained in the investigative materials. The Investigative Team considered these reports in conjunction with the information gathered during the investigation, and addressed each report below.

## Summary and Analysis of Reports Submitted by Parties

The Complainant submitted a report authored by Amy Smith, a Registered Nurse ("RN") and the Coordinator of SAFE/Emergency Nursing at Northwell Lenox Health Greenwich Village. Ms. Smith reviewed the Complainant's Lenox Hill Hospital medical records (Exhibit #12), including the photographs of physical injuries on the Complainant's body, prior to issuing her report. In said report, Ms. Smith noted ecchymosis to the Complainant's "arms, legs, face and neck as well as vaginal area."

She also noted that the Complainant reported "spotty memory," which she classified as "consistent with a substance being added to her drinks." Ms. Smith also opined that the "vulvar pain, redness and bleeding" to the Complainant's vaginal area was "consistent with forced penetration of a penis to a vagina," and that the ecchymosis on her arms and left leg was "consistent with being pinned down from above while lying supine and trying to struggle against the pinning force." Ultimately, she wrote that the Complainant's "account of the events and the subsequent injuries are consistent with forcible sexual assault." See Exhibit #32.

The Respondent submitted two reports, one authored by Jennifer Hammers, a Doctor of Osteopathic Medicine ("DO"), and a second report authored by Dr. Kim Fromme, a Professor of Clinical Psychology. In Ms. Hammers report, she detailed the different types of bruises that an individual can sustain, and how they are typically inflicted on the body. She also opined that the Complainant's bruising could have been sustained while "striking against multiple pieces of furniture . . . that could cause injuries to . . . surfaces of the Complainant's arms and left leg." She also stated that the bruising noted on the Complainant's back and shoulder was "consistent with injuries expected from the body striking against/along the gas valve" in the Respondent's apartment, and that the injuries to the Complainant's vaginal area "may be the result of menstrual bleeding or from injuries to the internal genital structures during both recent consensual and non-consensual sexual intercourse." Ultimately, she wrote that the Complainant's physical injuries were "not consistent with forced sexual activity." See Exhibit #33.

In the Respondent's second report by Dr. Kim Fromme, she concluded that the Complainant experienced "alcohol-induced blackouts," which "prevent[ed] [the Complainant] from forming complete long-term memories" but "[did] not impair [the Complainant's] ability to appraise the nature of [her] actions at the time." She also wrote that "the Complainant's recollection of events may not be accurate due to the process of memory reconstruction following the experience of alcohol-induced blackouts." Ultimately, she concluded that that the Complainant "was not overtly intoxicated nor incapacitated, and the Respondent would not have been able to know if she was in an alcohol-induced blackout." See Exhibit #34. The Investigative Team noted that Dr. Fromme came to this conclusion about the Complainant's memory, mental state, and lack of incapacitation without speaking to the Complainant or seeing any toxicology analysis, and instead relied solely on the Factual Summary and several Exhibits.

The Investigative Team noted that the Complainant's expert was only provided the medical records and accompanying pictures of her physical injuries before issuing an opinion consistent with the Complainant's version of events. Conversely, the Respondent's experts reviewed the Factual Summary of the Investigative Report and several Exhibits before providing an opinion consistent with the Respondent's narrative.

The Investigative Team recognized that the Complainant's report served to bolster the Complainant's account, just as the Respondent's reports did. It is telling that each individual consulted by the parties, and paid to issue an opinion, provided a report that confirmed that party's account. The parties would presumably not have offered their reports for consideration by the Investigative

Team and Hearing Panel if the conclusions drawn by their individuals differed from their account of events. Given the inherent incentive of these individuals to provide conclusions consistent with their party's position and against the opposing party's narrative, the Investigative Team questions the overall probative value of the reports. Nevertheless, they are included for consideration by the Hearing Panel, in conjunction with all other information gathered during the disciplinary process.

## Credibility Assessments [45]

I.   <u>Complainant's Credibility</u>

When analyzing the Complainant's credibility, the Investigative Team examined whether her statements to the Investigative Team were consistent with her statements to others and throughout her investigative interviews. The Complainant was consistent in her statements, including her stated inability to recall several parts from later in the night, particularly after leaving the bar and when with the Respondent in his apartment.

The Complainant consistently reported that she drank alcohol throughout the night of the alleged incident, and that she had only "glimpses of memory" for the time period just prior to leaving the ███████ and thereafter. She stated that despite this loss of memory, the amount she drank that night was not outside the bounds of what she normally drinks. She further explained that historically, the amount of alcohol she consumed that night would not normally lead to her not remembering portions of the night.

The Investigative Team took note of the Complainant's admission of not remembering large portions of the night, as it reflected a desire to avoid embellishing her account of the evening. She explicitly told the Investigative Team during her follow-up interview that she consciously avoided "speculating" about what she remembered from the night, and only gave details of things that she actually remembered occurred. Given her status as the Complainant in this case, and therefore the individual coming forward with specific allegations of gender-based misconduct against the Respondent, it would seem to benefit her account to provide as much detail about the incident as possible. If, for example, she provided specific details about how the various bruises and other physical injuries on her body were inflicted, the Investigative Team would likely be able to verify or discredit those specific allegations based on other available information gathered during the investigation. The fact that she candidly admitted and consistently maintained her inability to provide several details from the night rendered her account genuine to the Investigative Team. Importantly, she was still able to consistently report that she remembered the Respondent using physical force to engage in sexual intercourse, and that she repeatedly tried to get him to stop engaging in the activity in both her words and actions.

One inconsistency arose during the course of the investigation, but the Investigative Team deemed it minor in the greater context of all other known information. The Complainant initially stated that she took a car downtown to the ███████ with just the Respondent and Witness #2. However, after her follow-up interview she stated that she actually rode downtown with the

---

[45] Every witness was only interviewed once given the limited information they could provide regarding the incident and allegations. The Investigative Team was therefore unable to assess whether those witnesses were consistent over time at follow-up interviews, but nevertheless examined whether their statements were consistent with other information collected.

Respondent, Witness #2, and "a couple of ▇▇▇ guys," one of whom paid for the ride. This inconsistency did not directly relate to the allegations of gender-based misconduct or even her direct interactions with the Respondent that night. Given the number of places the Complainant went that night, the varying composition of the groups at each destination, and the different modes of transportation that she took to get to the various destinations, the inconsistency carried little weight in the Investigative Team's overall assessment of the Complainant's credibility.

The Investigative Team also noted the Complainant's demeanor during her investigative interviews. She answered questions asked by the Investigative Team and remained poised throughout her interviews, despite specific questioning about highly sensitive topics. She provided definitive statements in response to general questions about what occurred, but as noted above, when asked specific follow-up questions about the allegations of gender-based misconduct she was often unable to provide many details. She did not present as nonresponsive or evasive for answering in this fashion; rather, her demeanor reflected that she truly could not clearly remember everything that occurred inside of the Respondent's apartment on the night of the incident. Her memory was fragmented, with certain memories standing out clearly to her while other details escaped her. She never became frustrated or evasive with the Investigative Team, and conveyed a seemingly genuine sense of fear, anxiety, and anger over what transpired with the Respondent on that night.

It is important to address the fact that the Complainant declined to hear the Respondent's questions that he submitted at the conclusion of the investigation, prior to his Pre-Determination Conference. The questions, and the Complainant's reluctance to hear them, are documented in the Addendum to the Factual Summary. These questions went towards the source of the Complainant's bruising and possible chemical interactions between medications the Complainant had and alcohol. The Complainant's reluctance to hear the questions and therefore not provide a response was noted by the Investigative Team in her overall credibility assessment. However, declining to hear the questions is different than hearing what the questions were, and subsequently deciding not to answer them. Prior to declining to hear the questions, the Complainant frequently expressed her exasperation with the length of the disciplinary process. The fact that she reached her limit after multiple interviews and after reading expert reports written by individuals the Respondent engaged, who were able to review deeply personal medical records and accounts that she had provided, was unsurprising to the Investigative Team. The Investigative Team concluded that the Complainant was not being evasive. If she was truly being evasive, it makes more sense that she would learn what the questions were and then choose not to answer. Rather, the Investigative Team concluded she was merely unhappy with how long the process took and that her reluctance to hear the questions was a symptom of that frustration.

The Investigative Team examined whether the Complainant had a motive to lie about the allegations, but no identified possible motives were substantiated. The Investigative Team cannot speculate on possible reasons why the Complainant would want to fabricate allegations against the Respondent, and there was nothing discovered through the investigation, nor suggested by the Respondent or witnesses, to suggest that the Complainant had a reason to lie or held a grudge against the Respondent. In fact, the information deduced from the investigation, and acknowledged both parties, suggested that the Complainant and Respondent were good friends prior to this incident, and did not have any prior negative interactions that would lead the Complainant to make false allegations. When the Investigative Team specifically asked the Respondent if he was friends with the Complainant before the alleged gender-based misconduct he replied, "Yes." Furthermore, when asked if he thought she had any negative feelings towards him prior to this incident he replied, "No."

60

The Respondent suggested that the Complainant was motivated to fabricate the allegations because she was ashamed and embarrassed that she had consensual sex with the Respondent when she knew that he was in a long-term relationship with someone else and when she was beginning a relationship with Witness #1. However, there was nothing to support this conclusion, and the Investigative Team cannot speculate on possible motivations. The Complainant's messages to Witness #1 the night of the incident and in the days following could possibly be interpreted as some acknowledgement by the Complainant that she regretted having sex with the Respondent. However, they are at least equally likely – if not more likely – to have been the result of the Complainant coming to terms with a violent sexual assault committed by the Respondent. In her messages to Witness #1 in the time immediately preceding the sexual encounter, the Complainant appeared to be genuinely afraid of the Respondent and this supported her narrative to the Investigative Team that she did not want to have sex with him. Finally, it is hard to fathom why the Complainant would subject herself to a long and invasive forensic examination, report the allegations to the University, and participate in a months-long disciplinary process as a result of that report if she merely engaged in consensual sex but regretted it afterwards.

Similarly, the Respondent suggested that the Complainant may have initially told her friends and classmates that she was sexually assaulted out of shame and embarrassment, and was subsequently afraid to "come clean" and admit that the allegations were false. In light of the timing of the allegations, this contention did not ring true to the Investigative Team. From the moment the Complainant entered her apartment after the alleged incident, she was upset and disclosed that she had been assaulted by the Respondent. The notion that she fabricated the allegations because her friends heard that she was assaulted and was afraid to acknowledge that she merely regretted consensual sex does not make sense because when she first disclosed the allegations to Witness #3 none of her friends knew about the incident.

This motivation, while technically possible at a later point after she told her friends, is not the most likely explanation for why the Complainant came forward to the University with allegations, and does not align with other evidence deduced from the investigation. Rather than report the allegations to the University and endure a disciplinary process that took the better part of an entire academic year, the Complainant could have just as easily "saved face" and told her friends that the incident occurred but she was unwilling to report it. It is well established that sexual assaults are an underreported offense, and there was nothing to suggest that the Complainant was somehow eager to file a report and engage the disciplinary process. In fact, the Investigative Team noted that the Complainant was reluctant throughout the process, expressed what appeared to be genuine emotional difficulty answering questions during interviews, and contemplated withdrawing entirely at various stages. Ultimately, the Investigative Team concluded that a motive to fabricate allegations was not the most likely explanation for why the Complainant brought forth her complaint.

The Investigative Team reviewed whether there was corroboration for the Complainant's narrative, and examined numerous electronic messages, medical records, photographs, and various other materials that corroborated aspects of the Complainant's statements. Certain pieces of evidence corroborated peripheral details or supported her assertions regarding the timeline of events, such as the Complainant's Via and Uber receipts from the night. See generally Exhibits #4 and #5. However, other evidence provided substantial corroboration for core elements of the Complainant's allegations. For example, the Complainant provided a picture of herself on ▬▬▬▬ with Witness #2 during the early evening hours on August 25, 2017, prior to meeting the Respondent. See Exhibit #2. It is apparent in these photographs that, at the time they were taken, the Complainant did not have any

bruising or other visible physical injuries to her arms, neck, or face. Additionally, one of the photographs appears to have been taken in the ██████████ and the Complainant did not have any visible injuries in the photograph. This corroborated the Complainant's assertion that she sustained her injuries that night after the ██████████ while at the Respondent's apartment.

It is worth noting that the Respondent did not directly dispute that the Complainant sustained the injuries that night; instead, he denied that he directly inflicted the injuries and suggested that the Complainant could have bumped into various pieces of furniture in the ██████████ or his apartment, and/or the gas valve in his bedroom. The Respondent's suggestion regarding the timing of the Complainant's injuries did not directly contradict the Complainant's allegation that she sustained the injuries during her time with the Respondent. Nevertheless, the Investigative Team found it significant that the evidence tended to support her contention that she sustained her injuries while alone with the Respondent, in conjunction with her allegation of a violent sexual assault. The Investigative Team had difficulty crediting the Respondent's suggestion that the injuries were sustained by bumping into furniture or the gas valve, most especially because the Respondent simultaneously contended that the Complainant was not displaying signs of intoxication and was walking without difficulty in high heels while with the Respondent at his apartment. The Investigative Team found no basis to believe that the Complainant's injuries were sustained accidentally, or at any other time, and found that it is more likely that they were the result of an impact or being held tightly by another person.

The call logs, text messages, and audio recording between the Complainant and Witness #1 also provided important corroboration to the Complainant's narrative. See Exhibits #8, #9, and #10, respectively. These communications with Witness #1 provided corroboration for the Complainant's general assertion that she was fearful of being with the Respondent, as opposed to feeling comfortable and wanting to be with the Respondent, while riding in a car uptown alone with him towards the end of the night. The fact that the Complainant placed no less than 14 calls to Witness #1 between approximately 1:55 a.m. and 3:11 a.m., the timeframe that corresponds to when the Complainant and Respondent were likely with each other after the ██████████ provides revealing information about the Complainant's mental state at that time. See Exhibit #8. As noted above, the Complainant consistently reported feeling afraid of the Respondent during the cab ride and while inside his apartment, even though she could not clearly remember everything that transpired. The fact that she called Witness #1 repeatedly aligns with her stated fear of the Respondent towards the end of the night, and suggested to the Investigative Team that she may have been trying to find ways out of his apartment. The fact that she reached out to a friend that she trusted, in the middle of the night when she would otherwise not have been reaching out, and ██████████████████████ led the Investigative Team to credit the notion that these calls were for help and not some other purpose. The Complainant could have placed the calls for some reason other than being afraid of the Respondent; however, on balance, these alternative reasons for calling Witness #1 repeatedly seem less likely given all the known information. Indeed, the Respondent alleged in his narrative that the Complainant was not only unafraid of him that night, but that she was actively engaged in and enjoying the sexual activity with the Respondent. It does not follow that the Complainant would repeatedly call someone in whom she was romantically interested (Witness #1) while engaging in and enjoying sexual activity with the Respondent.

Similarly, the messages between the Complainant and Witness #1 that night corroborated the Complainant's assertion that she did not want to go home alone with the Respondent. The Complainant first sent Witness #1 a "pin drop" of her current location at approximately 1:55 a.m. on

August 26, 2017, when she was down in Chelsea near the ███████████ See Exhibit #9. She then sent a series of texts in ████████ which roughly translated to "Can I come?" followed by the audio message in which you can hear a man's voice, presumably the Respondent's. See Exhibits #9 and #10, respectively. After this, the Complainant once again sent Witness #1 a "pin drop" of her location, this time while on the Upper East Side near the Respondent's apartment. This was done at approximately 2:44 a.m. on August 26, 2017. See Exhibit #9. The series of text and audio messages the Complainant sent Witness #1 supported her assertion that she was afraid of the Respondent by that point of the night. She specifically recalled thinking, "It's good to send this. It's good to have this," at the time she sent the pin drops and made the recording, even though she told the Investigative Team during her interviews that she was not entirely sure why she thought that. As with the call logs, there are alternate possible explanations for the repeated messages; however, given all of the other information deduced from the investigation these alternate explanations are unlikely considering what the the Complainant asserted and remembered, even though her memories were limited. Importantly, the Respondent also asserted in his narrative that the Complainant jumped out of the car without any explanation. This detail, provided by the Respondent in his own narrative, provided further evidence to support the Complainant's contention that she was afraid of being alone with the Respondent at that time.

The Complainant's text messages with Witness #2 that night also provided important corroboration for her timeline and version of events. The ████████ messages between the two friends corroborated the Complainant's assertions that Witness #2 left the ████████████ at approximately 1:15 a.m. Indeed, the first message provided was sent at 1:24 a.m. and the conversation ended with Witness #2 telling the Complainant to continue enjoying herself at the club and keep dancing. See Exhibit #26. This conformed with the Complainant's broader narrative that she did not start to feel unsafe around the Respondent or lose her memory until after Witness #2 left the club. In fact, she reported to the Investigative Team that she did not "experience anything that was weird" and was "dancing" with the Respondent and Witness #2 while she was still at the club.

Perhaps the most significant piece of corroborative evidence are the Complainant's Lenox Hill Hospital and Columbia Health medical records. The injuries documented and photographed in these records corroborated the Complainant's narrative to the Investigative Team about the existence of these injuries. Additionally, the narrative statements contained in the records, specifically concerning her allegations of unwanted sexual intercourse with the Respondent, aligned with what she reported to GBM in her Incident Report, and what she described to the Investigative Team during her interviews. In all of these documents and while with the Investigative Team for her interviews, the Complainant reported that the Respondent used physical force to restrain and engage in sex with her without her consent. The medical records corroborated the Complainant's assertion to the Investigative Team that the Respondent "pinn[ed] her down and forcibly ha[d] vaginal sexual intercourse with her despite her saying no" as the Complainant placed her hands on the Respondent's chest in an effort to get him off of her. See Exhibit #12 at p. 6 of 114.  The records also indicated "tenderness to [the Complainant's] vaginal area upon palpation during forensic exam and tenderness to areas with markings," and there was also "[b]lood . . . noted to vaginal and cervical swabs." See Exhibit #12 at p. 21 of 114. The Investigative Team noted these documented injuries when considering whether a forcible sexual assault caused the Complainant's injuries, as she alleged. Also, the records corroborated the Complainant's statements to the Investigative Team that she felt like she was more intoxicated than expected, given the amount of alcohol she consumed throughout the night.

The Complainant's Columbia Health Services records also corroborated aspects of the Complainant's narrative. Importantly, the Columbia Health records documented the physical injuries

first noted in the Lenox Hill medical records; however, in the Columbia records from approximately five days after her visit to Lenox Hill, the Complainant's bruising is described differently than it was described at Lenox Hill Hospital immediately after the alleged assault. In the Lenox Hill Hospital records, the bruising is primarily described as "dark pink" or "light purple" or "dark red" or "pink with green." See Exhibit #12 at p. 108 of 114. Additionally, the color photographs Witness #3 took while the Complainant was at the hospital (Exhibit #13) also depict primarily red or purple marks on the Complainant's body. However, the bruising in the Columbia Health records is mostly described as "green," or "brown," or "purple," or a combination of these colors. See Exhibit #14 at p. 9 of 14. This change in coloring to the bruising suggested that the bruises were aging and beginning to heal. Similarly, the "probable mild-moderate" concussion noted in the Columbia records corroborated the Complainant's contention to the Investigative Team during her interviews that she suspected that she hit her head at some point while in the Respondent's apartment, and that her head was sore for approximately a week after that night. See Exhibit #14 at p. 9 of 14.

In addition to evidence gathered during the investigation, the Investigative Team also looked to the various witness statements to determine whether their accounts corroborated or contradicted the Complainant's narrative. Several witnesses corroborated key aspects of the Complainant's narrative, which further strengthened the credibility of the Complainant's account. Witness #1 corroborated that the Complainant sent him several messages on the night of the alleged incident, as described by the Complainant and as proven with the provided messages. Additionally, Witness #1 corroborated the Complainant's statements that she disclosed the full details of the alleged assault within days after it occurred, and that the Complainant was upset, emotional, and unable to recall all of the specific details. Importantly, Witness #1 specifically corroborated the Complainant's assertions both in her Incident Report and to the Investigative Team that she asked the Respondent during sex why he was doing this and he replied in sum and substance, "I always wanted to." The mention of this specific and corroborated phrase, coupled with Witness #1 saying that the Complainant reportedly talked with the Respondent about his fiancée throughout the night, was considered by the Investigative Team when assessing the Complainant's overall credibility.

Witness #2 also provided corroboration for the Complainant's narrative. She corroborated that the two met up at ███████ and were together throughout the night until Witness #2 went home from the ███████ with a headache. Witness #2 corroborated that she, the Complainant, and the Respondent had a conversation about the Respondent's new fiancée while in the Respondent's apartment. Unlike the Respondent's version of that conversation, Witness #2 corroborated the Complainant in that she said the Respondent "seemed very happy" about the recent engagement, and that he "wanted to share the news" with the Complainant and Witness #2. Witness #2 also corroborated the Complainant's account of this conversation, in that she denied hearing the Complainant comment to the Respondent, "Imagine if we were married," as alleged by the Respondent. She further corroborated that the Complainant disclosed the alleged incident to her shortly after it occurred, while she was still contemplating whether to report the allegations to law enforcement or the University.

Witness #2 told the Investigative Team that the Complainant did not appear to be overly intoxicated when they were together throughout the night. Indeed, according to Witness #2, the Complainant "was in a fun mood" while with Witness #2, and she was "standing straight" and did not have difficulty navigating the ███████ or ramp upstairs to join her for a cigarette break. Also, she said that she did not see the Complainant and Respondent dancing in a flirtatious or sexual manner in the club, and said that she "would have stopped" it if she saw the Complainant and

Respondent kissing, because she knew the Complainant was not interested in him. Upon initial examination, Witness #2's statements seem to contradict the Complainant's narrative. At the very least, they seem to cast doubt upon the theory that the Complainant may have been incapacitated and therefore unable to provide her affirmative consent for sex. However, the Complainant always stated that it was not until after Witness #2 left the club that the Respondent "started being inappropriate" with her, and she did not start to lose her memory of the night until after Witness #2 left.

It is noteworthy that Witness #2, one of the Complainant's close friends and presumably "on her side" in this investigation, was so forthright about what she did and did not observe that night with regard to the Complainant's stated discomfort with the Respondent's behavior and her level of intoxication. As noted below in Witness #2's credibility assessment, her frank acknowledgements to the Investigative Team despite her potential bias in the Complainant's favor rendered her a particularly credible witness in the overall assessment. Indirectly, Witness #2's credibility also served to lend a degree of credibility to the Complainant's account. With respect to Witness #2's narrative, the Investigative Team concluded that had the Complainant enlisted Witness #2 to support her allegations despite them being false, it would have made more sense for her to tell the Investigative Team that the Respondent was aggressive with the Complainant, and that the Complainant was obviously and visibly intoxicated while in the club. The Investigative Team found it significant that Witness #2 reported essentially the opposite and found that in essence, this corroborated the Complainant's account.

Witness #3 corroborated the Complainant's initial disclosures of the alleged gender-based misconduct. While Witness #3 was not present with the Complainant and Respondent on the night of the incident, she supported the Complainant's contention that what occurred with the Respondent caused great distress to her. Witness #3 also specifically corroborated seeing the Complainant ▮▮▮▮ ▮▮▮▮▮▮▮ the morning after the incident, appearing as if she was "in a state of like shock or panic kind of, or a mix of both in a way." This aligned with the Complainant's account that she was "completely numb and still disoriented" from what had transpired with the Respondent the previous night. Additionally, Witness #3 corroborated the Complainant's assertion that she wore "brown sandals" while going out, and remembered the Complainant entered the apartment holding her shoes in her hand. See Exhibit #11. Witness #3 also corroborated seeing bruising on the Complainant's arms, shoulders, neck, and face, and confirmed taking pictures of those injuries while in the hospital. See Exhibit #13. Significantly, Witness #3 also corroborated the large bruise on the Complainant's inner left thigh that was photographed by the SAFE nurse at Lenox Hill Hospital but left undocumented by Witness #3.

Witnesses #1, #4, #7, and #9 corroborated the Complainant's subsequent additional disclosures of the alleged gender-based misconduct. As with Witness #3, none of these individuals were present with the Complainant and Respondent on the night of the incident, but they all had conversations with the Complainant afterwards regarding what happened and her feelings towards the Respondent as a result of his alleged behavior.

Witnesses #7 also corroborated the Complainant's reported fear of seeing the Respondent on campus after the alleged assault. More specifically, Witness #7 was present with the Complainant when she saw the Respondent walking towards the ▮▮▮▮▮▮▮▮▮▮▮▮▮ following the alleged assault, and she said the Complainant became upset and afraid to interact with the Respondent, as the Complainant alleged to the Investigative Team. Witness #7 described the Complainant getting "really awkward" upon seeing the Respondent, texting her "Shitshitshit [the Respondent] was right there[.] Fuuck ohhh ohhh[.] [sic]," and then becoming "angry, crying, [and] upset," and "kind of collaps[ing]

65

on the grass" when Witness #7 joined her. See Exhibit #29. While this corroborative evidence does not speak directly to whether the Respondent committed a Policy violation, the fact that the Complainant's friend corroborated her feelings about what occurred afterwards is significant. The Investigative Team found that the Complainant's obvious fear and distress indicated that it was unlikely to be blackout sex she was later embarrassed by; rather, it seemed to be genuine fear and distress. If the Complainant was lying and truly had consensual sex with the Respondent, it does not make sense to the Investigative Team why she would repeatedly reiterate her fear of the Respondent to different people at different times. It would require a level of conniving and scheming behavior to frame the Respondent in this way that was not reflected during her interviews. Moreover, by the time the Complainant reported the allegations to the University she could have easily avoided the Respondent, as he was no longer affiliated with and taking classes at ████  This corroborative evidence lends support to the Complainant's overall narrative that what occurred with the Respondent was nonconsensual and that she had negative feelings towards him after the fact. This information is in accord with other evidence gathered throughout the investigation regarding the Complainant's apparent fear of the Respondent both during and after the alleged gender-based misconduct.

The last credibility factor the Investigative Team considered was whether the details the Complainant provided were reasonable and logical when examined in the context of all other available information. The Complainant was able to provide details for the events before, during, and after the alleged gender-based misconduct. However, as noted in the Factual Summary above, the Complainant's memory became fragmented as the night wore on, and she was unable to provide several details about what actually transpired between her and the Respondent in his apartment. Nevertheless, the details she was able to provide were generally reasonable and logical, and were often corroborated by other documentary evidence and witness statements. The Complainant's account made more sense than the Respondent's when examining all of the statements and evidence gathered. The Investigative Team concluded that Complainant's fragmented memory did not render her entire account unreliable or incredible; rather, it was merely a reflection that she had consumed alcohol and experienced a traumatic event, which prevented her from preserving all of the details of the night in her long-term memory. On balance, after a review of all the statements given, coupled with the evidence provided by the parties and witnesses, the Complainant's version of events provided a comprehensive understanding of what occurred.

II.     Respondent's Credibility

The Respondent's statements to the Investigative Team regarding what occurred between him and the Complainant were largely consistent throughout his investigative interviews. There were no major contradictions across his statements uncovered during the investigation, and he largely told the same version of events at each meeting with the Investigative Team.

The Respondent consistently reported that he drank alcohol throughout the night, but that he was not overly intoxicated. Similarly, he consistently reported that the Complainant did not appear overly intoxicated to him throughout the evening at the club and afterwards, and that the two both mutually engaged in sexual activity. The Respondent repeatedly insisted that the Complainant appeared fully aware, was not slurring or falling over, and was not otherwise exhibiting outward signs that she was incapacitated. The Respondent provided alternative explanations for how the Complainant sustained her physical injuries that night – first suggesting she could have bumped into the gas valve in his bedroom, but then adding that she could have also bumped various parts of her body along furniture in the ████████ or his apartment. However, these alternative explanations

are not necessarily inconsistent statements; rather, they are merely different possible causes of the bruising raised by the Respondent throughout the disciplinary process. Moreover, the Respondent consistently denied that he directly caused the physical injuries to the Complainant.

The Investigative Team also evaluated the Respondent's demeanor during his investigative interviews. The Respondent's demeanor alone did not suggest to the Investigative Team that he was being untruthful. Generally, he was respectful during his interviews and answered the Investigative Team's questions. When asked specific follow-up questions or confronted with information that conflicted with his narrative, he maintained this same level of decorum and answered questions with relative certainty.

The Respondent may be motivated by the outcome and possible consequences of the investigation to fabricate his version of what happened that night. Indeed, a person responsible for gender-based misconduct may have an innate motivation to fabricate their narrative of events in an effort to avoid being found responsible. However, there was nothing discovered during the investigation that substantiated this possible motive, and the Investigative Team cannot speculate. Other than this obvious possible motivation to lie to avoid sanctioning that might result from a finding that he engaged in non-consensual intercourse while a graduate student at the University, there were no additional motivations identified by the Investigative Team or suggested by the Complainant.

There were various pieces of evidence that corroborated aspects of the Respondent's narrative. As with the Complainant, certain evidence corroborated less consequential aspects of his narrative, such as his credit card transaction history that night, which served to corroborate how much money he spent for drinks at the ███████████ and for the cab uptown after leaving the bar with the Complainant. See generally Exhibit #16. The photographs of the Respondent's apartment and the gas valve in his bedroom provided corroboration for the Respondent's contention that various obstacles existed in his apartment and bedroom that could have caused bruises to the Complainant's body had she bumped into them. See Exhibits #19 and #23. Importantly however, the Respondent did not affirmatively allege that he observed the Complainant bumping into these items. In fact, he pointed out how the Complainant had no difficulty walking, dancing, or "navigat[ing]" the "obstacle course" of furniture in his apartment.

Additionally, the email exchange between ████████████████████████ corroborated the Respondent's assertion that there was a gas leak in his apartment that needed emergency repair the morning after the alleged incident. See Exhibit #20. Based on this corroborative evidence, the Investigative Team determined that there was indeed a gas leak in the Respondent's apartment the morning after the alleged incident, and that the most likely cause of that gas leak was due to one or both of the parties bumping the protruding valve in the Respondent's bedroom. Despite this, it is still unclear from either party exactly how or when the gas valve was opened or whether it was opened by the Respondent after the Complainant left. The Complainant stated that she had no recollection of bumping into the valve, and the Respondent similarly stated that he did not specifically recall this occurring. Interestingly, the Complainant also alleged that she did not remember many portions of the night inside of the Respondent's apartment, but the Respondent maintained that he remembered the entire evening. Presumably, had the Complainant or Respondent accidentally bumped into the gas valve while the two engaged in sexual activity, the Respondent – who by his own affirmative statements never had any "memory loss" due to his alcohol consumption that night – would have noticed this, especially if he had been the individual to strike the valve. If the Complainant had been an active participant as the Respondent described, striking the gas valve repeatedly during sexual activity with enough force to cause the

documented bruising, it would have likely been painful to her. It follows that she would likely stop striking it that way during consensual sex. Additionally, given the location of the bruise she sustained to her inner thigh, it is unlikely that that injury was a result of striking the gas valve. Finally, it was suspect to the Investigative Team that the Respondent simultaneously averred that he remembered the night, but did not remember or know how the gas valve was bumped or how the Complainant sustained her injuries.

The text messages and call logs between the Respondent and his sister (Witness #11) also provided corroboration for portions of his narrative. More specifically, the Respondent told the Investigative Team that he contacted his sister after the night of the alleged incident because he wanted her perspective on why the Complainant blocked him on social media and would not respond to his messages. The text message exchange the Respondent provided corroborated that he contacted Witness #11 because he "need[ed] some advice." However, the messages did not explicitly specify the reason he contacted Witness #11 or what exactly he needed "advice" for. See Exhibit #30. Similarly, the call log provided by the Respondent reflected that he called his sister at 5:44 p.m. on August 27, 2017, but the substance of that conversation was not captured in the call log of their 13 minute conversation. See Exhibit #31. Witness #11's statements to the Investigative Team corroborated the Respondent's stated reasons for calling his sister. She confirmed that the Respondent was "confused" on the phone because he "felt like everything was copasetic" when he and the Complainant engaged in sexual activity, and he did not understand why she would block him on social media. The unsent text message provided by the Respondent at his Pre-Determination Conference also corroborated his contention that he acknowledged that the Complainant blocked him on social media and was going to refrain from contacting her until she "came around" and was ready to talk to him again. See Exhibit #35.

Several witnesses corroborated significant aspects of the Respondent's narrative. As described above, Witness #2 did not describe the Complainant as being particularly intoxicated while she was present with the parties that night. Additionally, Witness #5 told the Investigative Team that while he was at the club the Complainant appeared to be a "happy drunk" but she was not "too drunk," and she could "stand up straight" while he was there. This corroborated the Respondent's assertion that the Complainant appeared "extroverted [and] friendly," and that she was "walking fine [and] speaking fine" throughout the evening. Witness #5 further acknowledged that he thought there was some "sexual tension" building between the Complainant and Respondent while at the ▊▊▊▊▊▊▊▊ and he thought the parties might be "romantically involved," partially due to the fact that the Complainant chose to stay at the club with the Respondent when Witness #5 asked her if she wanted to leave. This supported the Respondent's contention that he and the Complainant were mutually engaging in flirtatious and sexual behavior while at the club. However, Witness #5 waffled on these characterizations and also characterized the Respondent in a manner that contradicted the Respondent's description of his own intoxication level. Witness #5 described the Respondent as "super drunk" and "odd," and added that he thought the Respondent was "like slurring his words drunk" and "side by side hugging and leaning" on the Complainant for support while in the club. He also "didn't see [the Complainant and Respondent] kissing" while at the ▊▊▊▊▊▊▊ and despite thinking they might be "romantically involved," he also stated that he thought the two were "just friends" while dancing together.

Witness #6 also corroborated aspects of the Respondent's narrative. He stated that it "seemed like [the Complainant and Respondent] were romantically or sexually interested" in one another at the club, and recalled the two "grinding" on the dance floor. This corroborated the Respondent's

contention that "sexual energy started developing" between him and the Complainant that night. Yet, Witness #6 "didn't remember seeing" the two kiss, and he also acknowledged that "everyone was very intoxicated" that night.

Witness #8 was the sole witness to definitively state that he observed the Complainant and Respondent kissing on the dance floor. Unlike other witnesses who were more tentative when asked about this, Witness #8 told the Investigative Team, "I remember seeing [the Complainant and Respondent] kissing." However, the Investigative Team found it significant that he also added that there was "no doubt" in Witness #8's mind that the Respondent "was going to try to kiss [the Complainant," and "his hands were on [the Complainant's] body." He added that it "seemed like [the Respondent] was the one trying" to kiss the Complainant, rather than a mutual leaning in to kiss one another, as the Respondent articulated during his interviews. Witness #8 added that he "didn't see any behavior" that led him to believe that the Complainant "disagreed with this happening," but he stated that the Respondent was the one who initiated the kiss. Importantly, the Complainant did not deny that this occurred. She told the Investigative Team that at one point the Respondent "tried to kiss" her, which prompted her to remind the Respondent that he had a girlfriend. Nevertheless, Witness #8 provided corroboration for the Respondent's contention that he and the Complainant kissed, and he also added that the Complainant "seemed like she was able to be a very normal person" throughout the night. This provided support for the Respondent's position that the Complainant was not overly intoxicated.

Similarly, Witness #10 told the Investigative Team that she "didn't notice" the Complainant stumbling or slurring her speech while at the ███████████ and thought she seemed like a "happy drunk," which corroborated the Respondent's statements that the Complainant appeared to be "fine." However, Witness #10 also stated that, to her recollection, everyone was "drunk." She also described the Complainant as "really drunk" and "hugging" her while holding a glass of champagne on the dance floor, as the Complainant referred to Witness #10 as her "little sister." This somewhat odd behavior lent support for the conclusion that the Complainant was intoxicated, if not incapacitated as that term is defined in the Policy.

The last credibility factor considered by the Investigative Team is whether the details provided by the Respondent were reasonable and logical in the context of all information gathered during the investigation. In contrast to the Complainant, the Investigative Team concluded that some of the details the Respondent provided did not make sense. For example, during his initial investigative interview the Respondent repeatedly and emphatically stressed that the Complainant was wearing high-heeled shoes that "had some height" throughout the evening. He stated multiple times that while at the ███████████ when walking down or up a ramp to enter or exit the club, the Complainant was "walking like a normal person walks" despite her choice in footwear. He also added that once at his apartment after leaving the club, the Complainant walked up his hallway stairs "like a runway model, like she [knew] what [she was] doing."

Presumably, the Respondent provided this detail to stress that the Complainant was not stumbling or falling over while with the Respondent, which is one of the many factors considered when determining if someone is incapacitated and therefore unable to provide affirmative consent for sexual activity. However, the Respondent is the only individual who claimed that the Complainant was wearing high-heeled shoes. When the Investigative Team asked the Complainant at her follow-up interview about the shoes she wore that night, she stated she wore flats and subsequently provided photographs of the flat brown sandals that she recalled wearing that evening. See Exhibit #11.

Furthermore, Witness #3 told the Investigative Team that when she saw the Complainant █████ ████████ the morning after the alleged sexual assault, the Complainant was barefoot and holding "brown sandals" that she thought "were flats." Finally, when confronted with the Complainant's assertion that she wore flat sandals as opposed to high-heeled shoes the Respondent replied, "Like I said, I'm not a shoe guy. I don't recall anything. And yeah." <u>See</u> Addendum to Factual Summary.

All of this information collectively led the Investigative Team to question the Respondent's assertion that the Complainant was wearing high-heeled shoes. Normally, this minor detail would not factor significantly into the Respondent's overall credibility. Indeed, whether the Complainant wore heels or flats that night is immaterial when considering whether the Complainant provided affirmative consent for sex. However, given the Respondent's insistent and repeated assertions on a detail directly related to a central issue to be resolved in this case – the Complainant's possible incapacitation – the Investigative Team deemed this to be a more substantial detail that detracted from the Investigative Team's assessment of the Respondent's overall credibility. If the Complainant was in fact wearing high heeled shoes and still able to walk without difficulty or stumble, this would be evidence that she was not incapacitated that night. The Respondent's insistence on the high heels and the Complainant's ability to walk without difficulty, despite evidence contradicting this contention, suggested to the Investigative Team that he was deliberately untruthful about this point. This reflected an intention to deceive regarding a topic as important as the Complainant's ability to provide affirmative consent. His misstatement appeared deliberate to the Investigative Team largely because he was so insistent on repeating that she had heels on, but then admitted that he could not recall what she wore that night when he challenged on this topic.

Additionally, the Investigative Team questioned the Respondent's insistence that he was not intoxicated on the night of the alleged gender-based misconduct. He stated that he "wasn't like dead sober" at the end of the night, suggesting that he was at least somewhat inebriated or "tipsy," but maintained that he was "in full ability and capacity to move and to walk and to stand." He added that there were "things that [were] not at the top of [his] memory bank" given the length of time that passed between the incident and his interviews, but he stressed that he never had any "memory loss" from drinking alcohol. Despite this characterization, the other evidence deduced from the investigation suggested that the Respondent was in fact intoxicated, as most everyone else was that night. As described above, Witness #5 described the Respondent as "super drunk" and "like slurring his words drunk" while "side by side hugging and leaning" on the Complainant for support. Additionally, Witness #6 thought that everyone at the club was "drinking a good amount" and possibly intoxicated.

Upon a review of the pictures taken throughout the night at the █████████ the Investigative Team questioned the Respondent's level of intoxication. In Exhibit #2, the third photograph depicts the Respondent leaning in for a group picture with the Complainant and various witnesses, some of whom are holding alcoholic drinks. A similar group photograph in Exhibit #7 depicts the Respondent embracing Witness #5 – an individual the Respondent met for the first time that night and who described the Respondent as "super drunk" – for a group photograph while people are holding various cocktails. Moreover, the Respondent's voice is apparently audible in Exhibit #10, and the Investigative Team concluded that the Respondent sounded as if he was slurring his words or mumbling during the recording. The characterizations of witnesses, coupled with the evidence provided throughout the investigation, led the Investigative Team to question whether the Respondent was in fact far more intoxicated than he claimed to be. The seeming contradiction between the Respondent's stated level of intoxication to the Investigative Team, and the way he was

70

portrayed through witness accounts, photographs from the night, and the audio recording, detracted from the Investigative Team's assessment of his credibility.

Finally, the Investigative Team finds it curious that the Respondent asserted throughout his interviews that he had "no idea" what caused the physical injuries to the Complainant's body, despite asserting that he never had any memory loss from alcohol. The Investigative Team concluded that the Respondent was either: (a) telling the truth when stating he had "no idea" how the injuries occurred, because he was in fact intoxicated and unable to recall portions of the night but lied about this to the Investigative Team; or (b) was untruthful when stating he did not know the source of the bruising, because he caused the physical injuries to the Complainant during the course of the sexual activity. Given that key aspects of the Respondent's narrative were contradicted by other information collected, the Investigative Team ultimately found the Respondent's account to be less credible than the Complainant's narrative.

III.   Witness #1's Credibility

Witness #1's statements were consistent throughout his interview and consistent with the documentary evidence he provided afterwards. The Complainant requested the Investigative Team to interview Witness #1, her friend at the time of the alleged gender-based misconduct who later became her boyfriend. When interviewed, he corroborated the Complainant's disclosure of the incident to him, as well as her assertions that at a certain point in the night she "started to black out" but remembered "struggling" with the Respondent during sex. He also provided a copy of his communications with the Complainant before, during, and after the alleged gender-based misconduct, which provided valuable information and corroboration for the Complainant's narrative. See generally Exhibit #9. Witness #1's demeanor during his interview was unremarkable, and neither detracted from nor enhanced his credibility. He answered the questions posed by the Investigative Team and was seemingly forthright in his responses.

Given that Witness #1 was the Complainant's boyfriend at the time of his interview, coupled with the fact that he acknowledged that he "understand[s] [his] indirect conflict of interest" due to this fact, the Investigative Team considered whether Witness #1 was biased towards the Complainant and whether that potential bias motivated him to lie during his interview. However, he simultaneously asserted that he met the Respondent at approximately the same time he met the Complainant, that the Respondent is generally an "outgoing, gregarious individual," and that Witness #1 was "friendly acquaintances" with the Respondent prior to learning about the allegations.

There was nothing discovered during the investigation to substantiate this potential bias or motive to lie. Witness #1 did not say anything that led the Investigative Team to conclude that he was somehow colluding with the Complainant or lying when describing his observations of her after the alleged assault. In fact, he candidly told the Investigative Team that when he woke up on August 27th to all of the Complainant's missed calls and messages, he assumed that she got too drunk and was simply "embarrassed the next day" because of it. There is no discernible benefit to acknowledge this if he were in fact lying on the Complainant's behalf. Surely, had he been colluding with the Complainant to fabricate the allegations against the Respondent, it would make more sense and be more straightforward to simply assert outright that he thought something had happened to the Complainant. Similarly, he explained to the Investigative Team that when he first saw the Complainant in person on Monday, August 28, 2017, she was her "normal, outgoing, gregarious self." As with his initial reaction to the missed calls and messages, had he been lying to the Investigative Team on the

Complainant's behalf it would have been simpler and perhaps more expected to describe the Complainant as crying or visibly upset about what transpired with the Respondent from the moment he saw her.

As discussed above and in the Complainant's credibility assessment, Witness #1 provided corroboration for several aspects of the Complainant's narrative. Additionally, the Investigative Team found that the information provided by Witness #1 was reasonable and logical when considered in light of everything else uncovered throughout the investigation.

IV.    Witness #2's Credibility

 Witness #2's statements were largely consistent during her interview, and were also consistent with other statements and evidence collected. The Complainant requested that the Investigative Team interview Witness #2, her ▮▮▮▮▮ friend and future roommate at the time of the alleged incident. Witness #2 corroborated portions of the Complainant's narrative regarding the amount of alcohol they both drank that night, and the Complainant's disclosure of what transpired with the Respondent after she left the ▮▮▮▮▮▮▮▮ However, she also corroborated the Respondent's contention that the Complainant never appeared to be exhibiting outward signs of intoxication such as falling over, slurring her words, or becoming unresponsive, as noted above in the Respondent's credibility assessment.

Witness #2's demeanor was respectful at all times, and she agreed to answer all of the Investigative Team's questions. She never became upset or combative with the Investigative Team, which factored favorably into her overall credibility. Moreover, the Investigative Team concluded that Witness #2 was not motivated to lie on the Complainant's behalf due to a bias in her favor. Despite both the Complainant and Witness #2 describing one another as very close friends and roommates, it was clear in Witness #2's interviews that she was being forthright and candid with the Investigative Team regarding her observations and recollection of events. To be sure, had she been coloring her statements to favor the Complainant over the Respondent, it does not make sense for her to assert that the Complainant "didn't seem intoxicated" when she was with her and the Respondent that night. The fact that Witness #2 was this frank and open, and did not appear to be exaggerating her observations of the Complainant, rendered her statements particularly credible. Witness #2's observations of the Complainant did not necessarily render the Complainant's account less reliable or incredible, given that the Complainant consistently reported that her condition did not change until after Witness #2 left the ▮▮▮▮▮▮▮▮

The details that Witness #2 provided were reasonable and logical and made sense when examined in conjunction with other information collected throughout the investigation.

V.    Witness #3's Credibility

Witness #3's statements were consistent throughout her interview. The Complainant provided Witness #3's contact information for an interview. Witness #3 is the Complainant's cousin, and the first person to encounter the Complainant after the night of the alleged incident. Witness #3's stated observations of the Complainant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ supported the Complainant's statements regarding how she felt and what occurred that morning. Witness #3 described the Complainant as "in a state of like shock or panic," while holding her shoes in her hands with her hair "a bit all over the place." She further described observing "big bruises on [the Complainant's] arms"

72

when she entered the apartment, and when Witness #3 started to ask what happened to her, the Complainant was "speaking through tears." Similarly, the Complainant stated to the Investigative Team that when she entered her apartment and Witness #3 asked what happened, the Complainant "just started crying" and eventually tearfully told Witness #3, "I think I was sexually assaulted."

Witness #3 also provided corroboration for the Complainant's account of what occurred at Lenox Hill Hospital that morning. She confirmed that she was "doing the paperwork" for the Complainant when they first arrived at the hospital given the Complainant's condition at that time. She went on to corroborate the Complainant's assertion that during sex, when the Complainant asked the Respondent why he was having sex with her, she remembered the Complainant telling her that the Respondent said in sum and substance, "I've been waiting so long to do this." The Investigative Team found the level of corroboration provided by Witness #3 remarkable, and it factored positively into the assessment of both the Complainant's and Witness #3's overall credibility.

Witness #3 was responsive to the Investigative Team's questioning and generally conveyed a respectful and upfront demeanor. Being the Complainant's cousin and having no prior interactions with the Respondent, the Investigative Team considered whether Witness #3's close relationship with the Complainant generated a motive for Witness #3 to lie. However, there was nothing uncovered during the investigation to substantiate this possible motive. She did not appear to exaggerate her statements or observations, and acknowledged that she, the Complainant, and Witness #2 met after returning from the hospital to "put the pieces together" from the night. The Investigative Team contemplated whether this behavior, coupled with Witness #3 taking the initiative to bring the Complainant to the hospital for a sexual assault forensic examination, was evidence of Witness #3 influencing the Complainant and her characterization of what occurred with the Respondent. Indeed, it is conceivable that Witness #3's behavior influenced the Complainant to characterize what occurred with the Respondent as a sexual assault rather than consensual sex that the Complainant later regretted. Despite this possibility, there was nothing uncovered to confirm it. The Complainant was clear that she did not remember portions of the night, and Witness #3 was deemed to be merely helping to retrace the Complainant's steps and remember as much as possible about what occurred. The Investigative Team concluded that Witness #3 was providing needed support for the Complainant after experiencing a traumatic event, rather than trying to exert any undue influence over the Complainant. Witness #3 was not present with the parties on the night of the alleged gender-based misconduct, and therefore the probative value of her statements was limited to information following the alleged assault. That being said, the details that she provided made sense in the greater context of the investigation.

VI.   <u>Witness #4's Credibility</u>

No major inconsistencies were discovered throughout Witness #4's investigative interview. The Complainant requested the Investigative Team interview Witness #4, who was one of the first people to whom she disclosed the incident. He corroborated that when he saw the Complainant on Monday, August 28, 2017, she had "serious" bruises on her "thighs, and like in the shoulders." He further corroborated that the Complainant told him that the Respondent was "aggressive" and "violent" during the sexual encounter, which the Complainant later shared with the Investigative Team. He was not present on the night of the alleged gender-based misconduct, and therefore he could only provide corroboration for the Complainant's injuries after the fact and her disclosures about what she remembered occurring. Witness #4's demeanor did not significantly detract from or

enhance his credibility. He answered questions posed by the Investigative Team, and never became combative or nonresponsive.

Witness #4 described the Complainant as "one of [his] best friends at ██████ and acknowledged that he "didn't really know" the Respondent. For this reason, the Investigative Team considered whether he had any bias in support of the Complainant's narrative of events. However, as with other witnesses, nothing objective was uncovered to substantiate this theory, and his statements alone did not suggest that he was being untruthful. Furthermore, the text messages between Witness #4 and the Complainant provided evidence that Witness #4's statements were not unduly influenced by the Complainant. Indeed, on October 6, 2017 she wrote to Witness #4 in relevant part, "Columbia is investigating what happened to me in August . . . They asked about the first people I talked to about this . . . and since you were the first ██████ person I told I gave them your name. They might reach out to you just about that moment when I told you." Witness #4 replied in relevant part, "No worries! Happy to help however I can." See Exhibit #27. This exchange provided objective evidence that the Complainant did not try to influence Witness #4's statements to the Investigative Team, and provided additional credibility to his statements. The details he provided were reasonable and logical, albeit the relevance of his statements was limited to information regarding events after the incident.

## VII.   Witness #5's Credibility

Witness #5 was consistent during his investigative interview, and his statements also aligned with the text messages he provided between him and Witness #2. See generally Exhibit #28. The Investigative Team obtained Witness #5's contact information through the course of the investigation. Neither party specifically requested that he be interviewed. He hosted the apartment party which the Complainant and Respondent attended briefly, and was also present with them at the ██████ He, like all of the other witnesses in ██████ did not have a personal relationship with either party before that night. Instead, he was friends and classmates with Witness #2. Witness #5's demeanor reflected this apparent objectivity. While he answered all questions from the Investigative Team, he conveyed a sense of not having any allegiance to either party, and was therefore deemed a much more neutral witness than those who described themselves as close friends or relatives of either party. This neutrality also led the Investigative Team to accord more weight to his statements. As described above in the Complainant and Respondent's credibility assessments, Witness #5 provided corroboration for each of their statements in different ways.

Given the objective and unbiased characterization of Witness #5's statements, the Investigative Team had no reason to suspect that he had a particular motive to lie about what he reported to the Investigative Team. He was upfront about things he did not remember, and given his lack of affiliation with either party there was no discernable benefit for him to lie. The statements he provided were reasonable and logical, and made sense to the Investigative Team given the other information available throughout the investigation.

## VIII.   Witness #6's Credibility

No major inconsistencies arose during Witness #6's interview. The Investigative Team also chose to interview Witness #6 without any specific request from either the Complainant or Respondent. He stated that he did not interact with either party at Witness #5's apartment, but observed them at the ██████ As with Witness #5, Witness #6 met the Complainant and Respondent that night, and has not had interactions with either party since. Therefore, he was deemed

74

a particularly neutral and objective witness, and his statements were examined in that light. His demeanor during his interviews also reflected this objectivity, and he seemed to answer the questions posed to him to the best of his ability.

Witness #6 corroborated that the parties were "grinding" with one another, which both the Complainant and Respondent asserted in their statements. He also corroborated the Respondent's contention that the Complainant did not appear uncomfortable with the dancing. He thought that everyone at the ▮▮▮▮▮▮ including the Complainant, was "intoxicated," but qualified his statements by adding that he was very intoxicated himself that night and therefore the veracity of his statements was somewhat called into question. The Investigative Team credited his assertion that everyone was intoxicated that night, and his other statements made sense when examined in conjunction with other known information from the investigation.

IX.   Witness #7's Credibility

Witness #7 was consistent in her statements to the Investigative Team, and with the text message history she provided as an exhibit. See generally Exhibit #29. The Complainant requested that the Investigative Team interview Witness #7, who was one of several people to whom the Complainant disclosed the incident after the fact. She was not present with the parties on the night of the alleged assault, but was present on September 11ᵗʰ when the Complainant saw the Respondent walking towards the ▮▮▮▮▮▮▮▮ She generally corroborated the Complainant's account of that incident, and provided her text history with the Complainant, which further bolstered the Complainant's statements. The Complainant's obvious discomfort around the Respondent became apparent upon a review of the messages, and supported her overall assertion that she was afraid of the Respondent after the night of the alleged assault. Indeed, by texting "Shitshitshit He was right there[.] Fuuck ohhh ohhh[.] [sic]," the Investigative Team concluded that the Complainant's stated feelings toward the Respondent were genuine. See Exhibit #29.

Witness #7 was responsive to the Investigative Team's questions, and did not appear evasive at any point during her interview. She acknowledged to the Investigative Team that she is "really good friends" with the Complainant but does not know the Respondent well. For this reason, the Investigative Team suspects that Witness #7 was biased toward the Complainant. Nevertheless, there was nothing in her statements that led the Investigative Team to conclude she lied to benefit the Complainant. The information that she provided was valuable, reasonable, and logical when evaluating the Complainant's behavior after the alleged gender-based misconduct. Given her absence on the night of the alleged assault, she was unable to provide probative material for the overall analysis of whether there was a Policy violation.

X.   Witness #8's Credibility

Witness #8 consistently reported what he remembered from the night of the incident. The Investigative Team obtained his contact information through the course of the investigation, and neither party specifically requested that he be interviewed. As described above in the Respondent's credibility assessment, he corroborated the Respondent's position that he and the Complainant kissed on the dance floor in the ▮▮▮▮▮▮ and the Complainant did not appear to "disagree" with the conduct. He also corroborated the Complainant's position that the Respondent seemed to be the one initiating the conduct.

Given his lack of prior affiliation with either party, the Investigative Team has no reason to suspect that he was biased towards either party when recounting what he observed that night. He was upfront about what he did and did not remember, and never refused to answer any particular question posed by the Investigative Team. Witness #8's statements to the Investigative Team were generally reasonable when considered in the context of all other information obtained. Witness #8 stated that he did not think the Respondent was "drunk or drinking too much" when they spoke in Witness #5's apartment, but he also qualified that he stopped talking with the Respondent at the club and thought the Respondent could have become more drunk by the end of the night. Therefore, Witness #8's statements were deemed generally reliable, taking into account that he was most likely not paying particular attention to either the Complainant or Respondent throughout the night. As with most of the ███ witnesses who seemed to have no allegiance to either party, their lack of association with the Complainant and Respondent factored into the Investigative Team's overall assessment of those witnesses' statements.

XI.    Witness #9's Credibility

Witness #9 was consistent in her statements about what the Complainant disclosed to her after the night of the incident. She was offered by the Complainant as a witness, and corroborated the Complainant's assertion that she was reluctant to report the allegations to the University. She told the Investigative Team that for weeks after the alleged assault the Complainant "was still trying to figure out what she want[ed] to do about [the allegations]," and she was unsure "how far she wanted to take this matter." This was noteworthy to the Investigative Team. One may think the Complainant would have wanted to report immediately to initiate the disciplinary process and compel the Respondent to take accountability for his actions. However, the fact that the Complainant was so reluctant to report, and that this was corroborated by Witness #9 and others, made sense to the Investigative Team when considering her attitude toward the disciplinary process. Indeed, the Complainant repeatedly discussed the possibility of withdrawing from participation in the disciplinary process. Rather than interpret this to mean the Complainant is incredible, it reflects her genuine fear and anxiety surrounding this process and the Respondent. Her reluctance to endure a months-long and invasive disciplinary process and confront the Respondent for his alleged behavior is illustrative of her fear and discomfort.

Witness #9 admitted that the Complainant is "one of [her] closest friends at ███ which suggested that she is partial to the Complainant. While her statements were clearly favorable to the Complainant's narrative, there was nothing objectively discovered that led the Investigative Team to conclude she was untruthful. She was open and responsive to the questions asked by the Investigative Team, and the details she provided were logical and fit in with other information provided during the investigation.

XII.    Witness #10's Credibility

Witness #10 was consistent in her statements, and like the other ███ witnesses (absent Witness #2) she was present with the parties on the night of the incident but did not have any prior or subsequent interactions with them. The Investigative Team obtained her information throughout the investigation, and neither party specifically requested that she be interviewed. Given her lack of affiliation with both the Complainant and Respondent, the Investigative Team judged her to be a neutral witness without any apparent motive to lie about what she observed.

Witness #10 corroborated that the Complainant, "like everyone" that night, was "drunk." Furthermore, and as described above, she provided support for the Complainant's allegation that she was very intoxicated when she said that the Complainant appeared "really drunk" and behaving in a manner that Witness #10 characterized as "like a happy drunk," calling Witness #10 her "little sister." She did not appear to have any bias for either party's narrative, and the Investigative Team concluded that she was being forthright and truthful in her statements. Her demeanor exemplified this lack of prejudice, and she was responsive to the Investigative Team's questions. When examining whether Witness #10's statements made sense in the greater context of known information, it became apparent that she was incorrect when she said that she did not think the Respondent was at the ▓▓▓▓▓▓▓▓ with the rest of the group. Given everything else gathered during the investigation, including the Respondent's own statements, this was obviously inaccurate. Nevertheless, this does not necessarily render Witness #10 incredible. She acknowledged that once her own friend came to the club, she "wasn't really paying attention to what everyone else was doing." Consequently, the Investigative Team concluded that she was merely mistaken about the Respondent's presence at the club, rather than being misleading or dishonest.

XIII.   <u>Witness #11</u>

The Respondent's sister, Witness #11, consistently reported during her interview what she remembered from her conversation with the Respondent. As described above in the Respondent's credibility assessment, Witness #11 corroborated his contention that he contacted her to talk about the possible reason(s) why the Complainant would not return his messages and block him on social media. The Respondent specifically requested that Witness #11 be interviewed during the investigative process.

Of course, being the Respondent's sister led the Investigative Team to question whether she had an implicit bias in favor of her brother. She initially told the Investigative Team that consent for the sex between the Respondent and Complainant was "mutual," but upon follow-up questioning acknowledged that she was merely "paraphrase[ing]" what the Respondent told her on the phone. The Investigative Team wondered whether Witness #11 was merely advancing the narrative that her brother requested, but did not uncover anything objective to substantiate that she was lying to benefit the Respondent. Witness #11's demeanor was unremarkable and did not significantly detract from nor enhance her credibility. She answered the questions posed by the Investigative Team and remained respectful. Finally, when looking at whether the details she provided were reasonable and logical, they did seem to coincide with other known information. Witness #11 "assumed" that the Respondent was intoxicated on the night of the incident, stating that she did not think the Respondent would have cheated on his long-term girlfriend if he was sober. While just an assumption according to Witness #11, it coincided with the Investigative Team's conclusion that the Respondent was indeed more intoxicated than he conveyed during his interviews and was in sync with all of the other evidence and information collected.

XIV.   <u>Witness #12</u>

Witness #12, the Respondent's girlfriend in ▓▓▓▓▓ spoke with the Investigative Team at the Respondent's request after his Pre-Determination Conference. Nothing was uncovered during her interview which led the Investigative Team to conclude that she was inconsistent. She corroborated that she and the Respondent have been together for several years. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

This differed slightly from the Respondent's initial account. He told the Investigative Team that when he saw the Complainant in his apartment he told her that things with Witness #12 were "getting kind of serious" and replied "maybe" when the Complainant asked him if he was getting married soon. After this initial characterization, the Respondent later acknowledged to the Investigative Team that he had spoken to Witness #12's parents about getting married at some point in the future. The Investigative Team noted the Respondent's shifting characterization of the relationship. However, it did not significantly change the overall credibility assessment of the parties, given that it was not directly related to the allegations of gender-based misconduct. Moreover, the Respondent's statements are not directly contradictory to one another, or with Witness #12's statements.

Witness #12 corroborated the Respondent's statements regarding bruising and physical injuries during sex. More specifically, the Respondent told the Investigative Team that "the only marks [Witness #12] gets [from their consensual sexual encounters] are some light ones from hickies, *not from [his] grip*." See Exhibit #22. Similarly, when asked if she ever sustained any physical injuries during consensual sex with the Respondent Witness #12 replied in relevant part, "The only thing I had was some kisses on my neck, like teenagers," and she then confirmed that she was referring to hickies on her neck.

Witness #12's close relationship with the Respondent led the Investigative Team to consider if she had any bias toward him that led her to lie during her interview. To be sure, she frequently referred to how well she knew the Respondent and concluded that, based on that knowledge, she did not think he was capable of engaging in the alleged gender-based misconduct. Despite favoring the Respondent's narrative over the Complainant's, nothing substantiated that Witness #12 was actually lying to the Investigative Team. In fact, during her interview she came across as candid, open, and willing to answer all questions. She frankly described how and when the Respondent disclosed to her that he had sex with the Complainant, and her initial reaction to learning this information. The details she provided throughout her interview, when examined in the context of other information gathered, made sense and were reasonable and logical.

## Recommended Finding

In order to issue a recommendation regarding responsibility, the Investigative Team must first ascertain whether there is a preponderance of evidence that the alleged behavior occurred. If so, the Investigative Team must then also assess whether the Complainant provided affirmative consent for the sexual activity. There are two bases for the Complainant's alleged lack of consent: (i) that she was incapable of providing affirmative consent by virtue of being incapacitated; and (ii) the Respondent used physical force to engage in sex with the Complainant despite her lack of consent.

I.    Assessing Whether the Alleged Behavior Occurred

A.    *Sexual Intercourse Inside a Bedroom Other than the Respondent's*

In consideration of all of the information available, it is undisputed by both parties that the Complainant and Respondent engaged in vaginal intercourse (penis to vagina) on August 26, 2017, at one point between approximately 3:00 a.m. and 10:00 a.m. inside of the ████████████ bedroom. Given that both parties agreed on these facts coupled with all other available information, the Investigative Team finds a preponderance of evidence that they did in fact engage in vaginal sexual intercourse (penis to vagina) at that time.

B.    *Sexual Intercourse Inside the Respondent's Bedroom*

The Complainant alleged that, in addition to sex inside of the ████████████ bedroom, she and the Respondent also had sex inside of the Respondent's bedroom on August 26, 2017, at one point between approximately 3:00 a.m. and 10:00 a.m. Conversely, the Respondent denied that sex occurred inside of his bedroom. While he acknowledged that other sexual activity occurred in his bedroom, he denied sex occurring largely because his bed was "not big enough for two people." As articulated above in the credibility assessments, the Investigative Team found the Complainant to be more credible than the Respondent. For this reason alone, the Investigative Team doubts the Respondent's assertion that sex did not occur in his bedroom.

Additionally, the Respondent stated that he and the Complainant "laid down on [his] bed together" while positioned "perpendicular" to the head of the bed and engaged in "kissing," "digital penetration," and the Complainant "undid" the Respondent's belt and placed her hand to the Respondent's penis. By his own statements, the bed was apparently large enough for the Respondent and Complainant to engage in several different types of sexual activity. Furthermore, upon a review of the pictures of his bed, it appeared to the Investigative Team to be a twin or full-sized bed. See Exhibit #23. While perhaps not the most comfortable setting to engage in sex, it certainly was possible to do so and the size of the bed did not somehow change this fact. The Complainant remembered the sex in the Respondent's bed occurred with her "on [her] back and [the Respondent] on top of [her]," as if they were in a missionary position lying lengthwise on the bed. This positioning would undoubtedly be possible on a smaller mattress.

Based on the all of the foregoing, the Investigative Team concluded that there was a preponderance of evidence that sexual intercourse (penis to vagina) did in fact occur inside the Respondent's bedroom.

II.    Assessing Whether There Was Affirmative Consent for Sex

A.    *Incapacitation*

The Investigative Team first analyzed whether there was sufficient information to conclude that the Complainant was incapacitated during the sex in the Respondent's apartment, thereby rendering her incapable of providing affirmative consent. Incapacitation is defined in the Policy as a state when the Complainant "lacks the ability to knowingly choose to participate in sexual conduct." The Investigative Team looks to whether there is evidence of objective factors to support this conclusion. The factors examined when making this determination include: (i) whether the Complainant understood the "who, what, when, where, why or how" of the sexual conduct; and (ii) warning signs including but not necessarily limited to "slurred or incomprehensible speech, vomiting, unsteady gait, imbalance, bloodshot eyes, combativeness, emotional volatility, or notable change in personality." See Policy at p. 9.

The Complainant provided many details of events and her interactions with the Respondent and others that transpired prior to and after the alleged gender-based misconduct. However, she was unable to recall several details from her time in the Respondent's apartment, when sex occurred. Importantly, losing memory alone is insufficient for the Investigative Team to conclude that a party was incapacitated at the time of sexual activity. As articulated above, there still needs to be evidence of the listed objective factors, given the fact that a person may be incapacitated but appear to be functioning "normally," including communicating through actions or words that seem to express an interest in engaging in sexual conduct. See Policy at p. 10. Moreover, "whether sexual conduct with an incapacitated person constitutes gender-based misconduct depends on whether the Respondent knew or should have known of the Complainant's incapacitation, based on objectively and reasonably apparent indications when viewed from the perspective of a sober, reasonable person in the Respondent's position." See Policy at p. 9.

The information gathered reflected that the Complainant engaged the Respondent and others in conversation throughout the night, and that while at the ███████████ the Complainant did not exhibit any of the objective factors mentioned above. Both parties generally acknowledge that the Complainant talked normally when around people in the club, and the witnesses interviewed confirmed the same. For example, Witness #2 told the Investigative Team that at one point shortly before Witness #2 left the ███████████ the Complainant engaged in a political "debate" without any difficulty, during which she "had to think" in order to continue the conversation. This illustrated that, at least at that time, the Complainant was capable of engaging in an intellectual conversation. The fact that she was capable of doing this led the Investigative Team to conclude that the Complainant was capable of making an informed and voluntary decision regarding sexual activity at that point in the evening. In other words, there is a preponderance of evidence that while at the ███████████ the Complainant was able to provide her affirmative consent for sex, despite her probable intoxication. Moreover, the majority of people interviewed – including the Complainant's close friend Witness #2 – told the Investigative Team that the Complainant seemed physically fine throughout the night at the ███████████ They all denied observing her stumble or fall over, vomit, or otherwise exhibit outward signs that she was overly intoxicated.

It goes without saying that in many investigations involving allegations of sexual assault, there are no witnesses present to describe a complainant's condition at the moment of sex. Similarly, in this case, while the Complainant was described generally as being a "silly" or "happy" drunk while at the ███████████ only the Complainant and Respondent were together when sex occurred. While the parties and witnesses described the Complainant in a manner that suggests she was not incapacitated at the ███████████ the available information suggested to the Investigative Team that as the night progressed the Complainant's condition deteriorated.

After Witness #2 left the club, the Complainant only remembered "glimpses of memory," and her reaction time and perception was reportedly "slow." She said that while texting and calling Witness #1 in the car with the Respondent she was "struggling" to send the messages, without fully realizing "what was happening or where [she] was." This goes to some of the factors considered by the Investigative Team when evaluating whether a person is incapacitated. More specifically, it provides support for the notion that the Complainant did not comprehend the "what" and "where" of her surroundings. The Complainant also sent Witness #1 messages in ███████ despite knowing that he does not speak the language, which provided additional evidence of the Complainant's inability to fully comprehend who she was talking to when sending the messages. Moreover, by the Respondent's own admission during his interviews, the Complainant unexpectedly got out of the car on the ride

back up to his apartment. He told the Investigative Team the following about this behavior: "Yeah, she got out and I'm like, 'What's up?' and she's like, 'Nothing' and she got back in." The Complainant was "like standing there and then . . . got back in." This bizarre and seemingly irregular behavior reflected a level of emotional volatility and notable personality change by the Complainant, two of the many factors considered by the Investigative Team when evaluating whether she was incapacitated.

The crucial consideration for the Investigative Team is to determine what condition the Complainant was in at the time of sexual activity. The Investigative Team is only permitted to render decisions based on the available evidence, and cannot speculate as to what may have occurred inside the mind of any particular individual at the moment of sexual activity. The evidence provided throughout the investigation reflected that the Respondent observed the Complainant engaging him in conversation while at the ██████████ and not falling over or slurring her words in the club. The Respondent told the Investigative Team that while in his apartment, the Complainant was completely "fine" and did not exhibit any of the outward signs of incapacitation. Given his credibility issues discussed above, the Investigative Team questioned the veracity of these statements. Nevertheless, the Complainant also described certain behaviors that suggested to the Investigative Team that she did not "lack the ability to knowingly choose to participate in sexual conduct." She remembered that at some point throughout the sexual encounter she asked the Respondent, "What about your girlfriend?" She also told the Respondent, "No, we're friends," and asked him, "Why are you doing this?" These statements and questions from the Complainant led the Investigative Team to conclude that she was in fact aware of what was happening in the Respondent's apartment, had the ability to decide whether or not she wished to engage in sex, and communicated that she did not, and then asked that the behavior stop. This awareness suggested that while she did not consent to sex, she was sufficiently capacitated to decide whether or not to consent, and to then convey that lack of affirmative consent to the Respondent.

The various behaviors in the car ride uptown described by the Complainant and Respondent suggested that the Complainant was becoming increasingly intoxicated as the night wore on, and the Investigative Team is aware that after drinking stops, alcohol content can still continue to rise in the bloodstream, creating signs and symptoms of intoxication to increase. Despite this, the Investigative Team finds that there was insufficient information to conclude that the Complainant was incapacitated at the moment of sex. The text messages and strange behavior when exiting the car, while noted by the Investigative Team, were contradicted by the Respondent's narrative of how the Complainant acted in his apartment. Moreover, the Complainant told the Investigative Team that she remembered engaging the Respondent in limited conversation during sex, which suggested she was aware of her surroundings, the "who, what, [and] where" of the encounter, and generally what was happening. For these reasons, the Investigative Team concludes that the Complainant was not incapacitated.

B.      *Physical Force*

The Investigative Team also considered whether there was sufficient evidence to conclude that the Complainant did not provide her affirmative consent and that the Respondent used physical force to engage in sex. The Complainant described becoming physically fearful of the Respondent as the night progressed, and articulated a memory of the Respondent pinning her down during sex as she tried to push him off by placing her hands upon his chest. The Respondent denied that this occurred. The Investigative Team found the Complainant to be more credible than the Respondent as noted above, and therefore concluded that the Complainant's version of what occurred in the Respondent's apartment was the most accurate. Additionally, it is clear to the Investigative Team that

the Complainant sustained significant physical injury while with the Respondent. While the Complainant was unable to specifically remember how and when she sustained those injuries, the circumstantial evidence of the documented bruising and injuries were deemed not only significant by the Investigative Team, but were clearly sustained while with the Respondent, a conclusion that seems inevitable given all other gathered information. The photographs from before and after her time with the Respondent that night particularly supported this conclusion, that the Complainant sustained the injuries while the two were together.

The Complainant sent Witness #1 multiple text messages, pin drops of her location, an audio message, and tried to call and FaceTime him numerous times during the car ride uptown with the Respondent. The Investigative Team found that the most likely reason for sending these communications was due to what the Complainant alleged; namely, that as the night progressed she became increasingly afraid of the Respondent and concerned about what might happen if she were to stay with him. To be sure, there is no other reasonable explanation for why she would send those communications if not because she did not want to be with the Respondent. It does not make sense that she would send these communications and invite herself over to be with her soon-to-be-boyfriend if she actually wanted to be with the Respondent that night. Additionally, the Respondent added that the Complainant unexpectedly got out of the car on the ride uptown. This provided further evidence to support the Complainant's contention that she was fearful of -- and wanted to get away from -- the Respondent.

The Investigative Team also considered the physical injuries the Complainant sustained that night, which provided additional critical and probative information. The Investigative Team deemed the large bruise on the Complainant's thigh as particularly significant. Certainly, this is not a location where one would normally bump into objects in a nightclub or the Respondent's apartment, as he suggested throughout his interviews. The Complainant also credibly asserted that she did not have any bruising before the night of the alleged assault. Similarly, the redness and marks on the Complainant's face, neck, upper arms, and shoulders seem unlikely to have been caused by the Complainant bumping into various objects throughout the night. The Investigative Team found that the bruising was more likely than not caused by the Respondent's actions during sex.

Additionally, the Investigative Team finds no basis to conclude that the injuries were the result of rough but consensual sex. The severity of the bruising is readily apparent upon a review of Exhibit #13. The Investigative Team concluded that the size and extent of the injuries, coupled with their location on the Complainant's body, is most likely the result of a nonconsensual forcible sexual assault.

The Respondent claimed that he remembered the entire night, and that he was not too intoxicated to have forgotten how the Complainant's bruises were inflicted. Yet, he also insisted that he "ha[d] no idea" how the Complainant got her bruises, but suggested that she might have bumped into the gas valve in his bedroom, furniture in his apartment, or furniture in the ▮▮▮▮▮▮▮▮▮ At his follow-up interview he was once again asked about the Complainant's bruising and whether he recalled her bumping into anything throughout their time together. When specifically asked if she "crashed" into anything he replied, "Crashing, no. No, I can't say specifically, 'Oh it happened at X point.' But she was on that side of the bed [that had the gas valve], and the gas valve was knocked." The Investigative Team confirmed that, according to the Respondent, he and the Complainant did not have sex in his bedroom where the gas valve was located. After confirming that "just digital penetration and kissing" occurred in his room, the Respondent was asked how he thought the Complainant could have bumped the gas valve if she was not moving around during sex. He replied

that it must have occurred "when [they] were kissing in [his] room." The Investigative Team doubted this statement, finding it unreasonable that aggressive kissing would lead to the injuries the Complainant developed.

The Respondent stated that he "had no marks" or bruising on his own body the next day. If the Complainant sustained such extensive bruising from consensual sexual activity in the apartment, it would seem to follow that the Respondent also had marks or injuries similar in shape and location. It does not make sense that, if this was consensual moving around between the two of them, the Complainant would be the only one with such severe marks and bruising, and the Respondent had no injuries whatsoever. To be sure, it does not follow that she would be the only party who had injuries if both were engaging in sexual activity rigorous enough to result in the extensive bruising sustained by the Complainant. Had the Complainant bumped into the gas valve, it makes the most sense that the Respondent would have remembered seeing the Complainant bump into it. Especially given his insistence that he did not forget any portions of the night, the Investigative Team found his explanation to be dubious at best. Similarly, the Respondent insisted that the Complainant was able to navigate the "obstacle course" of furniture in his apartment, and therefore it seems unlikely that she injured herself by bumping into any other furniture. The Investigative Team noted that the Respondent on the one hand seemingly tried to provide evidence that showed he and the Complainant were not overly drunk or incapacitated during sex, while on the other hand denied having knowledge about how the Complainant sustained her injuries and contended that the Complainant must have bumped into several objects. Based on this, the Investigative Team concluded that the most likely explanation for the Complainant's injuries is that the Respondent inflicted the bruising, and is now attempting to hide this fact from the Investigative Team.

For all of the foregoing reasons, the Investigative Team concluded that the Complainant did not provide her affirmative consent for sex and the Respondent used physical force to engage in it.

## Conclusion

In conclusion, it is the Investigative Team's recommendation that the Respondent be found **_responsible_** for two violations of the Policy definition of Sexual Assault: Intercourse, in that the Respondent engaged in sexual intercourse with the Complainant by placing his penis inside her vagina without her affirmative consent while he used physical force to engage in sex.