# EXHIBIT C

# RESPONSE

I have been falsely accused. The Findings provide that the question for you is "which party's version of events is more credible, as the details are irreconcilable." See Findings p.57 ("F57").

Many of the details that the Parties provided to the Investigative Team (the "IT") are not "irreconcilable" as Complainant simply does not offer a full and complete narrative as to what actually happened in my apartment. In fact, Complainant concedes that towards the end of the night her "memory becomes…blackout with like glimpses of memory" and that her memory became "weird." She has no recollection of important details and, with respect to another "memory" she concedes, "I don't even know if that's a real memory anymore".

All of her "memories" and other evidence call into question the reliability of Complainant's narrative because (1) her "blackout" state of memory loss renders her unable to provide reliable testimony, (2) her memories were constructed after the fact with the help of 3 friends, none of whom witnessed the relevant events, (3) all eye witness testimony contradicts her assertion that no sexual activities occurred at the Club, (4) her "clearest memory" fear narrative didn't surface until days after the morning in question, (5) her course of conduct is entirely inconsistent with her allegations and (6) qualified experts refute her allegations. Once this is fully explained, it becomes clear that a decision should be rendered in my favor.

****************************

I reached out by text to Complainant for the first time after the summer on Friday, August 25, 2017 at 8:01pm. We had been classmates and good friends the previous school year. As the text log shows, from that point on, Complainant invited me out multiple times, which I declined. Eventually, Complainant and 9 others came to my apartment for about 1 hour. She flirted with me there ("Imagine if we were married). It's clear Complainant guided much of the social flow of the night. Our group ended up at the Club. There, Complainant ensured we were "more like together" and told W5 that we were "best friends." She was laughing at my jokes and dancing close to me in a circle with others. We started making eye contact and subtly brushing our hands together. After Complainant's roommate (W2) left the Club, Complainant actively searched me out with her text at 1:12am asking where I was. I reentered the lounge, we reconnected and soon started touching and kissing. She then suggested a toast, approached the bar, ordered champagne, handed my glass to me and made the toast. Thereafter, we went to the dance floor where W5, W6 and W8 testified to seeing us kissing and sexually grinding against each other in full public view. We remained exclusively together kissing, hugging, touching and sexually grinding for over one hour. According to W5's testimony, towards the end of the night, W5 pulled her aside and told her that everyone either already left or was now leaving. Complainant explicitly told W5 around 2:15am that she wanted to stay alone with me.

At around 2:30am, I asked Complainant "Do you want to go back to my place?" and she accepted my invitation. At no point did she ask to be dropped off at her apartment where her cousin was physically present (only a short distance away █████████████████).
We continued engaging in sexual activities in the privacy of the taxi until we reached my apartment. As I later learned, however, she was also texting W1 trying to get invited to his place presumably to continue their sexual relations from the preceding night, but he didn't respond.

Upon entering my apartment, we engaged in consensual sexual activities in multiple rooms and then had sexual intercourse in ████████ bedroom. As we moved from my room with its small single size day bed to the larger bed in ██████ bedroom, Complainant claims that we discussed

what we were doing in conversational tones. Complainant explicitly consented verbally and by her conduct in multiple ways, multiple times; she never said "no." Had she said "no", we would have stopped immediately.

After waking up in bed next to me, Complainant found her things where she left them the night before and went home. Complainant testified she didn't consider going to the hospital and didn't intend to tell ▇▇▇▇▇▇▇ what she did the night before. Instead, Complainant stated she intended to go into her bed to take a nap and then "hang out" with W1 later that same day, a normal routine for someone needing sleep after two active nights in a row. The texts to W1 soon after leaving my apartment, asking to "hang out" later that same day were filled with happy emojis and a lighthearted tone, which is difficult to reconcile with her claim that she was emotionally distraught at this precise moment from a sexual assault.

Complainant has bruises, but I'm certain I didn't cause them. At no time did I exert force, restrain or in any manner physically pressure her. There was a continuous back and forth interaction, and a mutual initiation and response to each other's sexual stimulation. In fact, she never accuses me of conduct that would cause her bruises. She admits that she doesn't even remember how or when her bruises were acquired. There is not a single bruise that corresponds to her allegations. Dr. Hammers, a highly-qualified expert on bruising, concluded that her bruises are inconsistent with her allegations due to their size, shapes, locations and colors.

Complainant's testimony has limited usefulness since her memory is affected by her "blackout" memory loss. She doesn't describe what happened, concisely or otherwise. Instead, she essentially says "I said no but cannot remember much else because I was in a state of blackout memory loss". According to Dr. Fromme, a highly-qualified expert on memory, Complainant demonstrates a characteristic pattern described in the academic literature. Specifically, due to her blackout, she needed to fill in the gaps in her story and recreate her memories. Complainant admits she did exactly this with the help of at least 3 friends over the following days/weeks - 3 friends who were not with Complainant during the events and therefore could not say what happened. Thus, Dr. Fromme concluded that Complainant's "memories" are tainted and distorted by the conjecture of her friends and, therefore, Complainant's testimony is unreliable. This is not to say that she intentionally misrepresented her account, but rather she was influenced by others.

Complainant's reconstructed narrative is built on two flawed tenets: (1) she alleges that we did not engage in consensual sexual activities at the Club and (2) she alleges that she became afraid of me and what might happen after 1:15am. The objective evidence refutes both.

**Part I: My memories are my recollections alone; Complainant's account was created with the help of her friends who were not with her at any relevant time**. Complainant claims to remember few details about what happened because she was in a "blackout" state of memory loss beginning at 1:15am. She admits to a history of "blackouts." She also admits to recreating the events that form the basis of her narrative. Complainant and W3 (her cousin ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇) admit that W3 first suggested to Complainant that she was "with someone and you didn't want it" and Complainant nodded yes. W3 then took charge and eventually persuaded Complainant to go to the hospital. W3 spoke for Complainant at the hospital and filled out all the paperwork. Thus, it's unclear who said what at the hospital. W2 (her current roommate) and W3 also admit they spent Sunday, August 27, with Complainant creating her narrative. And Complainant and W1 (her then non-exclusive boyfriend) admit they spent Monday evening creating her narrative again. Complainant, W1, W2 and W3 likely continued creating Complainant's narrative until September 17 when she submitted her Incident Report. W1 and

W3, however, were not with us at all during the relevant time and W2 left the Club at 1:15am, moments before Complainant and I became publicly sexually intimate. Thus, all W1, W2 and W3 could offer Complainant are speculative theories of what may have happened.

Complainant's six main witnesses, W1, W2 and W3, who helped her create her narrative, and W4, W7, and W9, who each claim to be her "best" or "closest" friend, heard Complainant's side of the story for two months before they testified. This had to color their testimony. I knew no one with us that evening and do not benefit from outcry witnesses. This creates a real imbalance in the record. The Report devotes most of the 68 substantive pages (not including recommendations) to Complainant and her witnesses and only a few pages to me and my two witnesses (my sister and girlfriend). This huge imbalance makes it hard for my story to come out.

**Part II**: *The eye witnesses confirm that after 1:15am we kissed/touched/hugged/sexually grinded on the dance floor*. After Complainant searched for and found me, we reconnected and our subtle eye contacts and touching transformed into publicly-observable, mutually-consensual kissing. She identifies the timing as 1:15am, immediately after W2 left. However, from my perspective, the presence of W2 had no significance in terms of the timing for initiating a kiss. The only person that might have been constrained by W2's presence is Complainant.

The Findings fully acknowledge that the eye witnesses remaining after 1:15am (W5, W6 and W8) refute Complainant's narrative and fully corroborate my narrative. But the same evidence, which contradicts her narrative, is not considered when assessing her credibility. Instead, the Findings subtly but clearly attempt to downplay the significance of W5's, W6's and W8's testimony in many ways (including by citing comments not relevant to their observations). However, the evidence is clear that (1) W5, W6 and W8 (all friends of W2) were the only eye witnesses at the Club after 1:15am; (2) W5, W6 and W8 observed us mutually and consensually kissing, hugging and touching, and Complainant voluntarily grinding sexually against me on the dance floor; (3) W8 confirmed that he observed us kissing, didn't see her disagreeing with what was happening, didn't see her trying to reject me and didn't see her moving her head when I was trying to kiss her; (4) W6 denied observing either party looking uncomfortable with the dancing that he witnessed; (5) W5 believed that towards the end of the night Complainant looked like she was having "a really fun time" with me and (6) W5 and W6 observed us towards the end of the night and thought we looked "romantically involved" and "romantically or sexually interested," and as having "sexual tension" between us. An unidentified fourth eye witness believed Complainant was at the Club "with her boyfriend". It is noteworthy that each of W5, W6 and W8, whom I had never met before, already knew about Complainant's allegations, and yet each supported my narrative in testifying to seeing us engage in numerous sexual activities.

These sexual activities were the precursor to going back to my apartment and having sex. In light of the testimony above, Complainant's denial of any consensual sexual behavior at the Club raises serious questions about the credibility of her narrative. Nevertheless, no follow-up questioning regarding these discrepancies and contradictions was ever done. Thus, the first foundational pillar of her narrative is untrue. It's clear we engaged in consensual sexual activities at the Club. It's also worth noting here that the hospital nurse recorded that Complainant takes Prozac and she admitted she experiences a "loss of inhibitions".

**Part III**: *Complainant's allegations of feelings of fear were constructed days later and are proven false by the objective evidence*. The second tenet of Complainant's narrative is her fear of me and the situation. She claims my "presence was scaring" her since shortly after W2 left the Club and she was "really scared" while alone together in the taxi. This "fear narrative" was a key

3

part of her Incident Report ("What I remember most clearly is a strong feeling of fear") and played a central role in the Findings. However, the Findings fail to address the objective evidence demonstrating that her "fear narrative" is untrue. As described below, Complainant's "fear narrative" was not created until she was alone with W1 on Monday night. The eye witness accounts at the Club, the fact she elected to leave the Club and get into a cab with me, and the fact she willingly came to my apartment undercuts any claim that she was afraid of me.

Complainant sent me a text at 1:12am searching for me, and then we stayed together for 1.5 hours laughing/dancing/kissing/hugging/sexually grinding. She never mentioned any concern to me, voluntarily got into a taxi with me and willingly accompanied me into my apartment at about 2:45am after a night of growing sexual activities. She entered my apartment building and walked up the stairs, smiling, and in good spirits. She seemed relaxed. Her "fear narrative" is also contradicted by: (1) W5, W6 and W8 didn't believe she was afraid of me and believed we grew demonstrably closer as the night wore on; (2) she didn't mention her fear to anyone at any time, including at 1:15am when W2 left the Club, at 1:27am when she sent a text message to W2, or at 2:13am when she texted W1; (3) she didn't attempt to reach W3 or anyone else after it became clear W1 was not responding to her; (4) she didn't ask the taxi driver to drop her off at her apartment, which was only from ▮▮▮▮▮▮▮▮▮▮ and (5) she never left a single audio message for W1 or anyone else expressing her fear. Moreover, according to W5, she made no mention of her fear at about 2:15am when she unequivocally told him that she wanted to stay alone with me.

The Findings accept without question Complainant's other attempts to support her "fear narrative," but these also do not hold up: (1) her explanation for her text to W1 sent in ▮▮▮▮▮▮ at 2:13am -however, this text was sent shortly after she sent her text to W2 in ▮▮▮▮▮▮ at 1:24am and, therefore, the more likely explanation is she simply failed to reset her i-Phone to English; (2) her claim to have retained enough wits to consciously send W1 a recording of my voice -however, W1 admits that they actually later "surmised" that this precise call was "essentially a butt dial"; and (3) her claim that the 16 or 17 calls she made to W1 throughout the night evidence her "fear" -however, W1 admits that Complainant similarly made numerous late night calls to W1 after a different night out and where she later apologized to him (as she does again here) for the numerous "drunk-dials."

This "fear narrative" was not part of her original story: (1) neither Complainant nor W3 mentions her fear when recalling their conversations in their apartment on Saturday morning; (2) neither Complainant nor W3 mentioned her fear to the hospital nurse Saturday afternoon; and (3) neither Complainant, W2 nor W3 mentioned her fear when recalling their discussions on Sunday. *In fact, according to W1, she told him days later that at the time "she didn't think there was any problem in going back to [my] place because [we] live so close and are friends."*

The record is clear that Complainant's "fear narrative" wasn't created until she was alone with W1 on Monday night. According to W1, he looked at her texts/calls to him and "suddenly" *he* decided they had significance. By the time she filed her Incident Report three weeks later on September 17, Complainant's "fear narrative" was central to her story.

Far from demonstrating she was afraid of me, her multiple texts to W1 indicate that she and W1 were sexually intimate the preceding night, she was upset he didn't pursue her and she wanted to get him to invite her over, presumably for another sexually intimate encounter. As she admitted in her texts to W1, "I am just paranoid and insecure…when it comes to intimate connections."

It's bewildering that one would believe that Complainant's multiple calls, "pin drops," and brief recording in the taxi reflect dramatic outreach attempts to a trusted friend because she was

fearful I was a sexual predator. The Findings leave utterly unanswered (as it was unasked) why she simply didn't tell the cabbie to drop her off at her apartment 7 blocks away. Further, there was absolutely no inquiry as to why she would have come with me into my building had she been so concerned I was a threat. The reality is, she was calling the man she was intimate with the night before not because she was scared of me but rather because she clearly would have preferred to have a sexual encounter with him. As she concedes, this was not the first time her call logs reflected such activity. Complainant's "fear narrative" was never questioned by the IT; otherwise, the Findings would have concluded that the second pillar of her narrative is untrue.

**Part IV:** *Complainant would have gone home if she were afraid*. The inherent lack of logic in Complainant's narrative should have been explored more aggressively by the IT. Nonetheless, when the IT did seek to clarify why, if she was so scared of me, she chose to ride in a cab with me, Complainant immediately changed her story. Now, to align her claims with her actual conduct she asserted she was only "really scared" of the situation, but somehow no longer scared of me - even though the "situation" was limited to being alone with me in a taxi heading to my apartment. She even claims she felt "safer with [me]" than going home to her cousin. By shifting her "fear" from me to the situation, perhaps she believed it was less illogical for her to go home with me instead of being dropped off at her home where her cousin was physically present. Moreover, it's difficult to reconcile my specific account of our sexual activities in the taxi with Complainant's "denials" - even though she only states that she doesn't "recall" kissing or other sexual activities occurring in the taxi, not that none occurred. Nevertheless, it is inconceivable that we'd engage in the types of observed sexual behavior in the public confines of the Club, but then have a completely platonic ride in the private confines of the backseat of a taxi ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ all the way to my apartment on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**Part V**: *Complainant and I voluntarily consented to sexual intercourse; and agree we engaged in multiple sexual activities in multiple rooms in multiple beds in my apartment*. After kissing, hugging, dancing, sexually grinding and staying exclusively together at the Club for almost 1.5 hours after 1:15am, Complainant (▮ years old) and I (▮ years old) voluntarily and mutually agreed to go back to my apartment at about 2:30am in the morning. I provided a very detailed account of our sexual activities and candidly admitted experiencing temporary erectile dysfunction. After kicking off our shoes, we moved to the couch and began kissing. Then we moved to my bedroom continuing sexual foreplay in my small bed. When I asked if she wanted to move to ▮▮▮▮▮▮ bedroom where the bed was larger, she immediately agreed because she understood that the larger bed was more conducive to comfortable sexual intercourse. After switching beds, we engaged in vaginal intercourse, first with me on top and then with Complainant rolling on top. We switched positions and had sexual intercourse from behind with Complainant up on all-fours. We engaged in mutual oral sex at the same time, and eventually resumed intercourse in the missionary position. We even discussed birth control before I ejaculated. Any reasonable person would have believed she was an enthusiastic consensual partner. We fell asleep in ▮▮▮▮▮▮▮ bedroom.

Complainant alleged that due to her "blackout," she only had three clear memories. She remembered being with me in two separate beds in two separate rooms and having sexual intercourse in two different positions. However, I didn't lift her onto the bed *up* in an all-fours crawling position. We were already on the bed and just naturally moved into a new position. Further, Complainant's own description of her body positioning confirms she was an active and engaged participant. For instance, she states she "just remember[ed] being like on all fours" on top of the bed. This description alone speaks to the fact she was acting under her own power. She

was not passively on her back or on her stomach where she couldn't twist away. She was supporting and positioning herself to enable the consensual encounter to unfold.

Complainant's third "clear" memory is an exchange with me as we walked from my bedroom to ▇▇▇▇▇ bedroom about what we were doing. She doesn't, however, allege that her words were shouted or spoken with anger or otherwise in a raised voice or confrontational tone, and she doesn't remember crying. She also fails to remember my responses; surely I would have responded in some way. In any event, I don't agree that any such conversations occurred.

The Complainant claims that she said "no" with words and actions. I dispute this allegation. She expressed her consent verbally and she expressed her consent by her conduct in numerous ways, multiple times. She verbally consented both before we had sexual intercourse and verbally consented again as we finished. After engaging in foreplay crowded in a small bed, she verbally consented to switch to ▇▇▇▇▇ bedroom because she unambiguously understood that its larger bed was more conducive to comfortable sexual intercourse. She said "yes" again when I asked if she was on birth control and she said "yes" again when I asked whether I could "finish inside her." Verbal consent was unequivocally communicated numerous times.

She also unequivocally consented through her conduct in numerous ways, including by accepting my invitation to go home with me at 2:30am after a night of kissing and sexual grinding on a dance floor; by mutually and enthusiastically participating in sexual activities at the Club and in the taxi; and then by willingly and enthusiastically engaging in sexual activities with me in my apartment in two different beds in two different rooms and in multiple different positions (including mutual oral sex and sexual intercourse with her on top). Indeed, she never said "no" or anything similar to "no" at any time during our entire time together; not one single time. If she had said "no", I would have immediately complied with her wishes and stopped what we were doing. We were good friends, we go to the same school, and I have personal integrity and respect for women. The idea that I would sexually assault Complainant is an abhorrent accusation. To believe such an allegation with all the evidence pointing the other way is wrong.

Importantly, none of this behavior is contradicted by Complainant. She simply says she doesn't recall any of these interactions. In fact, the consensual nature of our interactions is corroborated by her own statements and course of conduct.

**Part VI**: *Complainant's memory is inaccurate and unreliable*. Complainant concedes that at the Club her "memory becomes…blackout with like glimpses of memory." She further concedes that after leaving the Club her "memory becomes less clear." She has no recollection of important details, such as how she entered my apartment, how her underwear came off, what other sexual activities took place, the use (or discussion) of a condom, and how the sexual interactions concluded. She also asserts that I threw her phone as she was attempting to place a call, yet concedes, "I don't even know if that's a real memory anymore."[1]

---

[1] *The Findings exclude Dr. Fromme's report on memory loss, as well as Dr. Hammer' report on bruising, because the experts were paid. Courts consider expert reports and the issue of payment goes to the weight given to the reports. My experts have impressive qualifications (please review them) and reviewed the entire Report. Further, given their established expertise, these reports are inherently helpful to the Hearing Panel who must draw conclusions about medical and scientific issues. In contrast, Ms. Smith reviewed only the photos/hospital records and is a self-described victims advocate throughout the internet. Thus, Ms. Smith's report should be discounted.*

No objective, reasonable fact-finder should decide in an individual's favor where such a person herself concedes that her memories of critical moments are "glimpses" and are "weird." No fact finder could have confidence that, despite Complainant's assertion that these memories are "really clear," she has no memory of specific details. Nevertheless, the Findings include no meaningful effort to reconcile the fact that Complainant expressed an inability to determine which of her memories are real. Instead, the Findings incredibly conclude that these concessions serve as corroborative evidence, her "fragments" are therefore inherently credible and thus her "memories" should be credited. The Findings do not make it clear how it determined which of Complainant's memories are real. The Findings also apply a double standard. The Complainant's account is considered genuine because she cannot remember what happened, but my account is considered untruthful in the few places where I cannot recall specific details.

**Part VII:** *I did not use physical force and did not cause Complainant's bruises*. Complainant unequivocally testified that she "did not specifically recall physical force being used by [me]." R18. Complainant originally said in her Incident Report that "I remember trying to fight him off but not being able to"; however, her later testimony to the IT was different, as she stated that her "strategy" was to not physically resist. Instead, Complainant said she tried to use words to reason with me - that we were friends and I had a girlfriend. Notwithstanding this fundamental change in her story, the Findings did not question Complainant's credibility on this critical point.

According to the Findings, Complainant made only two specific claims relating to physical force: (1) she was pushed onto the bed and (2) at one point she placed her hands on my chest and I pinned down her arms and hands above and to the side of her head. Other than these two instances, Complainant did not claim to the IT that physical force was used by me at any time throughout the entire morning we were alone. I deny each of these claims and there is no evidence that the Complainant has bruises on her hands or wrists.

The Findings conclude that I lack credibility because I don't know how Complainant acquired her bruises. Complainant also doesn't know how or when she acquired her bruises. In fact, she was surprised to see her bruises, as was I. She also doesn't accuse me of any behavior that could have caused her bruises, not one single time. Surely Complainant would remember something, anything about how she acquired her bruises if I beat her. Complainant doesn't remember any pertinent facts related to her bruising because there are none; I didn't cause her bruises. It is particularly noteworthy that the Findings place the burden of explaining the bruises on me, even though neither I, nor the Complainant knew where the bruises came from and even though the bruises do not match her allegations.

Complainant also claimed that she believed she could fight me off in a normal moment, but she was just so weak and confused and disoriented. Indeed, she also stated that she wore her dress throughout the sexual encounter. Yet, there's no testimony from Complainant or W3 that the dress was torn, stretched or compromised in any fashion that would suggest she tried to fight off an assault or that our sexual intercourse was anything other than consensual. Complainant's entire narrative is inconsistent with her allegation that this was a bruising sexual assault.

It's also unclear whether W1 caused Complainant's bruising the previous night (particularly the one on her thigh) and whether two sexual encounters in two nights caused her vaginal sensitivity and light bleeding. Notwithstanding these uncertainties, the IT failed to ask follow-up questions. The Complainant also refused to answer my four questions. The Findings make no mention of how these uncertainties affect her credibility. The IT didn't even question Complainant's credibility as a result of her exaggerated and inconsistent claims to her friends that I beat her.

7

The Findings also refer to the scientific fact that Complainant's bruises changed to "green," "brown" or "purple" over five days as they healed from August 26 to September 1, 2017. However, the Findings ignore the fact that a full seven of Complainant's bruises (including the one on her thigh) *already* contained "green," "brown" or "purple" within them on Saturday afternoon, August 26, according to the nurse's written report of Complainant's first visit to Lenox Hill. LHMR 108. Thus, using the same science behind the Findings' logic, whatever caused at least these seven bruises *already* occurred before we went back to my apartment early Saturday morning, which was less than 12 hours before her hospital visit.

I don't know why Complainant's bruises are not easily visible in the photographs (her thigh bruise was not photographed). Perhaps the lighting in the photograph is not sharp enough or there's no color; perhaps she used one of the products readily available over the internet to cover up bruises. It's unclear, but we know as a scientific fact that the cause of her green/brown/purple bruises was something that happened more than 12 hours before. In any event, whatever type of event/incident that caused Complainant's green/brown/purple bruises as of August 26 likely also triggered her very similar green/brown/purple bruises in the very same locations on September 1. Whatever this type of repeating trigger was, it couldn't have been me because I wasn't alone with Complainant before August 26. Nevertheless, the IT didn't question Complainant on why she already had green/brown/purple bruises on August 26.

As indicated, I don't know how Complainant acquired her bruises. When questioned by the IT, I was as surprised as Complainant was to see them (even though the Findings do not reflect my surprise) and I could only guess how she acquired them. However, I unequivocally deny the Findings' assertion that Complainant acquired her bruises while she was with me (other than perhaps the one on her shoulder that looks like it's from the gas valve) and deny the Findings' statement that I strongly believed Complainant acquired her bruises by bumping into furniture. When questioned by the IT and given my surprise, I could only guess what happened. This is the reason I later asked follow-up questions relating to their source. The Complainant's refusal to hear my submitted questions prevented the cause of her bruises from being determined.

**Part VIII:** *The shoe, the gas valve and the bedroom prove that the Findings searched for ways to discredit me.* The Findings spend a full page assailing my credibility for being "deliberately untruthful" in stating Complainant was wearing "high-heels" (because it implies capacity). Despite the Findings saying 6 times I said "high-heels," the Findings show I said she was wearing "heels," clarified as "shoes that had some height." In any event, Complainant is fairly tall, her shoes had open backs and open straps in the front and looked like heeled shoes from my vantage point. It was an innocent error too easily refutable for someone to want to fabricate. Apparently my not knowing what kind of shoes she was wearing played a major role in the Findings' conclusion that I was not credible. It's noteworthy that the Findings felt the need to use something this minor to assail my credibility.

The Findings misrepresent what I said in assailing my credibility on the gas valve. I testified that someone must've bumped into the gas valve to cause the gas leak but never said, as the Findings suggest (F67), that Complainant must have bumped it repeatedly or hit her thigh. Dr. Hammers testified that Complainant's shoulder bruise matches the gas valve, and it could have happened from one bump, which corroborates my narrative.

The Findings found credible Complainant's assertion that we had our second sexual intercourse and fell asleep in my bedroom (R15, fn 15), and assailed my credibility for asserting otherwise. I never said sexual intercourse was impossible in my bed; I only said the bed in █████

8

bedroom was larger. We had intercourse and slept in ▬▬▬▬ bedroom. Had we spent the night in my bedroom, we might be dead from the gas leak (unless one gives credence to the Findings' preposterous speculation (F61) that I might have opened the gas valve after Complainant left, endangering myself and everyone in the building).

**Part IX:** *Complainant's narrative that my apartment had the appearance of a "violent scene" the next morning is contradicted by the objective facts*. Complainant claimed that a "violent scene" awaited her the next morning when she woke up; that her belongings were scattered around my apartment. Had IT questioned her on this point, they would have found that (i) there was an "after-party" mess created by her group of friends the prior evening and (ii) her belongings were exactly where she left them earlier that morning - one shoe where she kicked it off near my front door, one shoe a few feet away by my bedroom, her phone on the couch where we started making out and her backpack in my bedroom where she left it. There was no "violent scene" or "scattered" belongings.

**Part X:** *Complainant's course of conduct later that same morning is not consistent with a bruising sexual assault; her texts to W1 prove a completely different story*. Complainant's conduct and texts later the same morning reveal that her allegations are questionable. Indeed, her conduct and texts prove she was continuing her pursuit of W1.

Complainant's text record shows that at 10:33am she stopped walking home to review her messages and then translated for W1 her prior night's ▬▬▬▬ text ("In ▬▬▬▬ it says: can I come over?"). Given the precise timing of her texts (only about 30 minutes after leaving my apartment while supposedly extremely distraught), Complainant presented her current mental state by adding to the end of her text two happy, smiling emoji faces, one tearing with laughter. She then texted W1 "Sorry. I'm so sorry", which is an embarrassed apology for once again sending numerous texts/calls to W1 after another night out without him.

Complainant also decided while walking home "to just go into [her] bed and not talk about what occurred the previous night." Thus, after entering her home with her shoes in her hands (because of the "crazy" blisters on her feet), disheveled hair, little sleep and probably with a pained look on her face from walking multiple Manhattan blocks with blistered feet, Complainant sat with W3 for a few moments, said nothing initially according to W3 and then went alone into her room ready to take a nap. At this precise moment in time, Complainant was exactly where she planned to be – alone in her bed having said nothing to W3. Her testimony is inconsistent with W3's testimony because it confuses the timing and order in which her discussions with W3 occurred.

Then, at 10:53am, Complainant sent a text to W1 which is even more revealing. While finally alone in her bed likely before W3 convinced her to go to the hospital, Complainant asked W1: "You wanna hang out today?" She didn't elaborate further other than to say she really wanted to see him, but her breezy request at this precise moment to "hang out" with W1 later the same day is not consistent with her subsequent allegations that she was the victim of a bruising sexual assault only a few hours before. Instead, her conduct is entirely consistent with her admitted plan to take a nap and continue pursuing W1, her non-exclusive boyfriend at the time. Further, since Complainant also testified that the idea of going to the hospital "wasn't something that had crossed her mind," her breezy text to W1 makes sense only if she desired to do just that – take a nap, shower and then "hang out" with W1 later that same day.

It's unclear why the IT didn't question Complainant on her happy emojis, stated intent and lighthearted tone as they are inconsistent with her alleged current state of mind.

9

**Part XI:** *My course of conduct over the next few days is consistent with caring for a friend with whom I just had an intimate encounter*. My course of conduct during Saturday and Sunday is also instructive. I tried contacting Complainant to see how she was; I communicated with W2 with the same objectives; I called my older sister to get her insight. At all times, my conduct was consistent with caring for a friend with whom I just had a consensual intimate encounter. After speaking with my sister and using hindsight, it isn't difficult to understand why Complainant regretted having sex with me. She likely focused on the two one-night sexual encounters with two non-exclusive friends on two consecutive nights and was likely disheartened by the possibility of having no future romantic prospects with either one of us. Indeed, I drafted but didn't send a friendly, gentle note where I voice my concern for her feelings and my respect for her decision to distance herself. My girlfriend (W12) testified that my conduct is entirely consistent with my personality.

**Part XII:** *Great pressure was placed on Complainant to report her allegations*. The question arises why Complainant would put herself through the ordeal of reporting the incident. The Report concludes that if an individual makes a sexual assault claim and goes through the arduous process, "it is hard to fathom" that the allegations are not true. R61. This statement conveys a fundamental and absolute bias against me; and in this case, the allegations are **not** true – Complainant was in no way thinking that she had been assaulted because it did not occur. Consequently, she didn't intend to file an Incident Report when she returned home that morning, but the situation quickly spiraled out of her control.

The Findings completely undervalue the well-intended, but misplaced, pressure W3 placed on Complainant. W3 made assumptions about what happened and then convinced Complainant down a path she didn't want to pursue, not because she was a reticent victim, but rather she knew our interactions were wholly consensual. It was W3 who researched local hospitals. It was W3 who convinced her to go by focusing her on her "own health and safety." It was W3, not Complainant, who told the nurse that Complainant was the victim of a sexual assault. One cannot fairly dismiss this reality and simply ignore all the objective facts that support my innocence by cavalierly asserting that the mere reporting process of her claim corroborates that claim.

The critical moment arrived when Complainant believed she was going to the hospital for her "own health and safety," not to report a sexual assault. At this moment, she didn't anticipate she was starting down a path that would inevitably lead her to file an Incident Report. However, the pressure to report the incident that began with W3 intensified when W3 told the hospital nurse that Complainant was the victim of a sexual assault; then the pressure intensified again when Complainant, W2 and W3 recreated the events on Sunday; and then the pressure intensified yet again when Complainant and W1 recreated the events on Monday night. Thereafter, the pressure must have become acutely extreme once she told her mother and other friends (including at least W4, W7 and W9) that she was raped and beaten. Under these circumstances, she undoubtedly was subjected to overwhelming pressure to file an Incident Report. That is, if Complainant's recreated narrative were true (which it is not), then everyone she told would expect that she file an Incident Report. By September 17, 2017, there was no going back to the private moments alone in her room before W3 convinced Complainant to go to the hospital for her "own health and safety" - she now needed to file the Incident Report to maintain her credibility.

*************

This Response proves that the required burden of proof to find against me has not been met.