**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOHN DOE,

*Plaintiff*,

v.

COLUMBIA UNIVERSITY,

*Defendant*.

No. 1:20-cv-05019 (LAK)

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK'S**
<u>**MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

Roberta A. Kaplan
Gabrielle E. Tenzer
Rachel Tuchman
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
rtuchman@kaplanhecker.com

September 13, 2021

## <u>TABLE OF CONTENTS</u>

PAGE(S)

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT BACKGROUND ................................................................................ 3

ARGUMENT ................................................................................ 5

I.      Plaintiff's Title IX Claim Fails as a Matter of Law. ....................................... 7

    A.      Plaintiff Fails to Allege Clear Irregularities in the Process. ................... 8

        1.      Alleged Evidentiary Flaws ................................................................ 9

        2.      Alleged Procedural Flaws .................................................................17

    B.      Plaintiff Fails to Allege Any Facts to Support a Minimal Plausible Inference of Gender Bias. ................................................................ 26

        1.      Columbia's GBM Policy and the 2011 Dear Colleague Letter ...................27

        2.      Columbia's Allegedly Gender-Biased Statements and "Anti-Male" Culture ................................................................29

II.     Plaintiff's Contract and Quasi-Contract Claims Should Be Dismissed........................ 33

CONCLUSION ................................................................................ 33

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009) .................................................................. 6, 24

*B.B. v. The New Sch.*,
  No. 17 Civ. 8347, 2018 WL 2316342 (S.D.N.Y. Apr. 30, 2018) ..................................... passim

*Bailey v. N.Y. Law Sch.*,
  No. 16 Civ. 4283, 2017 WL 6611582 (S.D.N.Y. Dec. 27, 2017) .................................... 2, 7, 10

*City of Long Beach v. Total Gas & Power N. Am., Inc.*,
  465 F. Supp. 3d 416 (S.D.N.Y. 2020) .................................................................... 6

*Doe v. Colgate Univ.*,
  760 F. App'x 22 (2d Cir. 2019) .......................................................................... 29

*Doe v. Colgate Univ.*,
  No. 15 Civ. 1069, 2017 WL 4990629 (N.D.N.Y. Oct. 31, 2017) ....................................... 29

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016) ............................................................................. passim

*Doe v. Columbia Univ.*,
  No. 20 Civ. 6770, 2021 WL 3292591 (S.D.N.Y. Aug. 1, 2021) ........................................ 33

*Doe v. NYU*,
  438 F. Supp. 3d 172 (S.D.N.Y. 2020) ................................................................ 26, 29

*Doe v. Purdue Univ.*,
  928 F.3d 652 (7th Cir. 2019) ....................................................................... 8, 27, 31

*Doe v. Univ. of Chi.*,
  No. 16 Civ. 08298, 2017 WL 4163960 (N.D. Ill. Sept. 20, 2017) ..................................... 28

*Doe v. Univ. of Denver*,
  952 F.3d 1182 (10th Cir. 2020) ......................................................................... 29

*Doe v. Vassar Coll.*,
  No. 19 Civ. 9601, 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019) ...................................... 32

*Feibleman v. Trs. of Columbia Univ.*,
  No. 19 Civ. 4327, 2020 WL 882429 (S.D.N.Y. Feb. 24, 2020) ....................................... 21

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409, 134 S. Ct. 2459 (2014) ................................................................. 3

*Haug v. State Univ. of N.Y. at Potsdam*,
   32 N.Y.3d 1044 (2018) ...................................................................................... 18

*Heller v. Bedford Cent. Sch. Dist.*,
   144 F. Supp. 3d 596 (S.D.N.Y. 2015) .............................................................. 5, 6

*Heller v. Bedford Cent. Sch. Dist.*,
   665 F. App'x 49 (2d Cir. 2016) ........................................................................... 5

*Menaker v. Hofstra Univ.*,
   935 F.3d 20 (2d Cir. 2019) .......................................................................... passim

*Orkin v. Swiss Confederation*,
   444 F. App'x 469 (2d Cir. 2011) ....................................................................... 25

*Orkin v. Swiss Confederation*,
   770 F. Supp. 2d 612 (S.D.N.Y. 2011) .............................................................. 24

*Roskin-Frazee v. Columbia Univ.*,
   474 F. Supp. 3d 618 (S.D.N.Y. 2019) .............................................................. 32

*Roskin-Frazee v. Columbia Univ.*,
   No. 17 Civ. 2032, 2018 WL 6523721 (S.D.N.Y. Nov. 26, 2018) ...................... 32

*Thomas v. Westchester Cnty. Health Care Corp.*,
   232 F. Supp. 2d 273 (S.D.N.Y. 2002) ................................................................ 5

*Yusuf v. Vassar Coll.*,
   35 F.3d 709 (2d Cir. 1994) .......................................................................... passim

## RULES

Federal Rule of Civil Procedure 12(b)(6) ............................................................. 1, 3

## OTHER AUTHORITIES

Columbia Univ., *Gender-Based Misconduct Prevention and Response 2017-18 Annual
   Report* (2018), http://www.columbia.edu/cu/studentconduct/documents/Gender-
   BasedMisconductPreventionandResponse2017-2018.pdf ........................................ 24

Columbia Univ., *Student Gender-Based Misconduct Prevention and Response 2018-19 Annual Report* (2019), https://sexualrespect.columbia.edu/files/sri/content/student_gender-based_misconduct_prevention_and_response_2018-2019.pdf. ................................. 24

Kate Taylor, *Mattress Protest at Columbia Continues into Graduation Event*, N.Y. Times (May 19, 2015), https://www.nytimes.com/2015/05/20/nyregion/mattress-protest-at-columbia-university-continues-into-graduation-event.html. ..................... 32

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. ............................... 26

Regina A. Schuller, *et al.*, *Judgments of Sexual Assault: The Impact of Complainant Emotional Demeanor, Gender, and Victim Stereotypes*, 13 New Crim. L. Rev. 759 (2010)... 15

Sammy Caiola, *How Rape Affects Memory And The Brain, And Why More Police Need To Know About This*, NPR (Aug. 22, 2021), https://www.npr.org/sections/health-shots/2021/08/22/1028236197/how-rape-affects-memory-and-the-brain-and-why-more-police-need-to-know-about-thi. ............................................................................. 11

Defendant The Trustees of Columbia University in the City of New York ("Columbia" or the "University") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Complaint (ECF 51) pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

On June 9, 2021, the parties appeared before this Court to present oral argument on Columbia's motion to dismiss Plaintiff's original complaint (ECF 25). In its motion, Columbia argued that in order to survive a motion to dismiss, Plaintiff was required to allege specific facts supporting what the Second Circuit has characterized as a "minimal plausible inference" that the University's actions were motivated by gender bias against Plaintiff because he is a man. *See, e.g.*, *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016). More specifically, Columbia argued that Plaintiff had not met, and could not meet, his burden to plausibly plead that (1) "gender [was] a motivating factor in the decision to discipline" him, *id.* at 53 (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)), or (2) there was "a clearly irregular investigative or adjudicative process," *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019).

The Court, however, never decided that motion. Instead, the Court posed the following question to Plaintiff's counsel at the June 9 hearing: "Are you prepared to stand on this complaint with the understanding that there will not be leave to amend if I dismiss it? Or, do you want to amend?" June 9 Hr'g Tr. (ECF 44) at 27:6-9. After some equivocation, Plaintiff's counsel accepted the Court's invitation to amend the complaint.

There was also discussion at the June 9 hearing about whether the Investigative Report (ECF 51-2, or "Pl.'s Ex. B") from Plaintiff's underlying gender-based misconduct ("GBM") proceeding should be made part of the record and could be "properly considered" on Columbia's motion to dismiss. ECF 44 at 46:19-21, 47:7-11. Counsel for Columbia explained that "it would

be prudent" to submit the Investigative Report, as well as the Hearing Panel and Appeal Panel decisions, since those documents are "clearly incorporated by reference" and "would shed a lot of light" on the discussion during the hearing about the evidentiary and procedural "irregularities" alleged by Plaintiff. *Id.* at 45:8-13. In fact, after counsel read aloud an excerpt of the Investigative Report to clarify how the parties' expert reports had actually been treated in the underlying GBM proceeding, the Court seemed to agree, stating, "That puts a rather different light on it, doesn't it?" *Id.* at 46:13-14.

The Court's assessment of the value of the Investigative Report turned out to be spot on. The Investigative Report clearly demonstrates Plaintiff's failure to plausibly allege a "clearly irregular investigative or adjudicative process" sufficient to satisfy the pleading standard in *Doe v. Columbia* and *Menaker*, especially since the Court "'is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.'" *B.B. v. The New Sch.*, No. 17 Civ. 8347, 2018 WL 2316342, at *6 (S.D.N.Y. Apr. 30, 2018). With the Investigative Report and other key documents from the GBM proceeding part of the record, Plaintiff can no longer mischaracterize the underlying proceeding to create purported procedural or evidentiary "irregularities" that are plainly contradicted by the GBM records and need not be taken as true for the purpose of deciding this motion. *See, e.g.*, *id.*; *Bailey v. N.Y. Law Sch.*, No. 16 Civ. 4283, 2017 WL 6611582, at *7 (S.D.N.Y. Dec. 27, 2017). Indeed, despite dozens of new paragraphs, it remains the case that Plaintiff has failed to plausibly allege that his GBM proceeding was clearly irregular, was somehow motivated by his gender, or even resulted in an erroneous outcome.

The gravamen of an erroneous outcome claim "is that the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F.3d at 715. But at bottom, Plaintiff's

case amounts to nothing more than a request that this Court sit as some kind of super-appellate tribunal over Columbia's finding, supported by the testimony of 14 individuals, 35 exhibits, hundreds of supporting documents, not to mention affirmed on appeal by Columbia, that Plaintiff violated University policy when he used physical force to engage in non-consensual sexual intercourse with a fellow graduate student. Here, of course, the question is not whether Plaintiff sexually assaulted his fellow classmate, but rather whether Plaintiff has plausibly alleged "a clearly irregular investigative or adjudicative process."[1] Plaintiff's effort to relitigate his GBM proceeding before this Court does not meet the standard for pleading a Title IX claim, and the Amended Complaint should now be dismissed with prejudice pursuant to Rule 12(b)(6). *See, e.g.*, *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425, 134 S. Ct. 2459, 2471 (2014) (describing a 12(b)(6) motion as "one important mechanism for weeding out meritless claims").

## RELEVANT BACKGROUND

Because this Court is already familiar with the facts of this case, Columbia incorporates the factual background summarized in its prior briefing here. *See* ECF 25 at 3-6; *see also* ECF 32. Although Plaintiff's Amended Complaint adds more than 65 new paragraphs, the core factual allegations—and the fatal flaws—of Plaintiff's original complaint remain the same.

The vast majority of Plaintiff's new allegations relate to what Plaintiff characterizes as Columbia's supposed "anti-male gender biased, victim-oriented, trauma-informed process reflecting the mantras of believe all women and rape culture." ¶ 291.[2] But these new allegations all have the same fundamental shortcoming: they have absolutely no relationship to Plaintiff

---

[1] *See, e.g.*, ECF 44 at 39:16-20 (Court: "Would [the question for the trier of fact] be could a reasonable hearing panel and investigator have reached the conclusion they did given the record they had or would it involve a re-trial, in effect, of the allegations?").

[2] References to "¶ __" are to paragraphs of the Amended Complaint, ECF 51.

specifically or the GBM proceeding at issue in this case. Plaintiff's new allegations include, for example, a description of events that occurred on Columbia's campus more than two years prior to Plaintiff's GBM proceeding, ¶¶ 35-38; changes in Department of Education policy that began during the course of Plaintiff's proceeding in late 2017 and continued to develop after his proceeding had concluded, ¶¶ 41-50; details about prior and subsequent versions of Columbia's Gender-Based Misconduct Policy and Procedures for Students ("GBM Policy") (with only a single paragraph about the GBM Policy that actually applies to Plaintiff's proceeding), ¶¶ 17-18, 21, 40, 51; and descriptions of social media posts addressing topics like the #MeToo movement and "rape culture" which the Amended Complaint attributes to "Columbia" but then acknowledges, in footnotes, were actually posted by independent persons and entities, including Sexual Violence Response ("SVR"), a division of Columbia Health unrelated to Columbia's GBM Office, ¶¶ 52-80; *see also* Def.'s Ex. A at 13, 15 (explaining that SVR is a confidential resource for students to access support after experiencing sexual misconduct). As discussed in detail below, these new allegations bear no relation to Plaintiff's GBM proceeding and therefore do nothing as a legal matter to salvage Plaintiff's claims of gender bias. *See Doe v. Columbia*, 831 F.3d at 53 (gender must be a "motivating factor in the decision to discipline" plaintiff).

The rest of Plaintiff's new allegations consist primarily of descriptions of the contents of the Investigative Report, ¶¶ 142-145, 147-148, two different response documents submitted by Plaintiff during the underlying GBM proceeding, ¶¶ 132-134, 152-154, and the expert reports submitted by the parties in the underlying proceeding, ¶¶ 145, 268, 270, 272-273. Far from supporting Plaintiff's claims of procedural or evidentiary irregularities, however, these allegations—and the Investigative Report in particular—demonstrate the comprehensive, unbiased, and evidence-based investigative process carried out by Columbia, resulting in a finding

that Plaintiff was responsible for sexual assault. Indeed, as now evidenced by Plaintiff's Amended Complaint and the exhibits he has attached to it, the record compiled by Columbia in the underlying proceeding included: (1) the testimony of both parties; (2) the testimony of 12 other witnesses; (3) an analysis of the credibility of each of those parties and witnesses; (4) hundreds of pages of documents (including photographs, call logs, social media and text messages, emails, a recording of Plaintiff's voice from the night in question, receipts from the evening, and medical records, including Roe's hospital report and photographs of Roe's bruising);[3] not to mention (5) expert reports submitted by both Plaintiff and Roe. *See, e.g.*, ¶¶ 125-27, 141, 149, 214, 233; Pl.'s Ex. B.

## ARGUMENT

As discussed with the Court at the June 9 hearing, a complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. *See, e.g.*, *Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 604-05 (S.D.N.Y. 2015), *aff'd*, 665 F. App'x 49 (2d Cir. 2016); *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275-76 (S.D.N.Y. 2002); June 9 Hr'g Tr. (ECF 44) at 47. Even where a document is not incorporated by reference, a court may nevertheless consider it on a motion to dismiss where the complaint relies "on the terms and effect" of the document, rendering the document "integral" to the complaint. *Heller*, 144 F. Supp. 3d at 604-05. While Plaintiff attaches three documents to the Amended Complaint as exhibits, there are several other key documents that he quotes from and cites repeatedly, as well as relies on for core contentions. As a result, those documents, too, are incorporated by reference. They include:

- ***Columbia's GBM Policy (Def.'s Ex. A):*** Plaintiff relies on the GBM Policy throughout the

---

[3] "John Doe" and "Jane Roe" are pseudonyms for the names of Plaintiff and the non-party student complainant, respectively. *See* ECF 28.

Amended Complaint, including as the basis for his contract and quasi-contract claims.[4] *See, e.g.*, ¶¶ 40, 162, 300-15.

- ***The Incident Report (Def.'s Ex. B):*** Plaintiff refers to and quotes from Roe's Incident Report in an effort to undermine Roe's credibility. *See, e.g.*, ¶¶ 121-22, 177-78, 184, 187, 192, 204, 207-10, 238, 243, 245.

- ***The Hearing Panel Decision (Def.'s Ex. C):*** Plaintiff challenges and paraphrases the Hearing Panel decision in claiming his GBM proceeding was rushed and unfair. *See, e.g.*, ¶¶ 156-57, 165, 284, 288.

- ***The Appeal Panel Decision (Def.'s Ex. D):*** Plaintiff challenges the Appeal Panel's decisionmaking and paraphrases its decision. *See, e.g.*, ¶¶ 4, 135, 162-66, 230.

All of these documents may be considered at the pleading stage even though they were not attached to the Amended Complaint. *See, e.g.*, *Heller*, 144 F. Supp. 3d at 604-05; *see also* June 9 Hr'g Tr. (ECF 44) at 16:11-16, 21:15-22:9, 29:6-12, 31:4-16, 32:10-34:6, 37:10-19 (discussing Columbia's GBM Policy, Appeal Panel decision, Investigative Report, and Hearing Panel decision); *id.* at 45:8-47:25 (discussing documents incorporated by reference in the complaint).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *City of Long Beach v. Total Gas & Power N. Am., Inc.*, 465 F. Supp. 3d 416, 439-40 (S.D.N.Y. 2020) (Kaplan, J.) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)). In contrast, a complaint "that offers labels and conclusions or . . . naked assertion[s] devoid of further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (internal quotation marks omitted).

---

[4] Copies of the GBM Policy (Ex. A), Incident Report (Ex. B), Hearing Panel decision (Ex. C), and Appeal Panel decision (Ex. D) are all attached to the September 13, 2021 Declaration of Rachel L. Tuchman ("Tuchman Declaration" or "Tuchman Decl."). Exhibits to the Tuchman Declaration are cited to as "Def.'s Ex. __."

Here, as discussed in detail below and as evidenced by the Appendix attached to this motion, many of Plaintiff's allegations are implausible on their face since they "are contradicted by other matters asserted or relied upon or incorporated by reference" in the Amended Complaint—namely, the Investigative Report and other materials from the GBM proceeding. *B.B.*, 2018 WL 2316342, at *6. Where a plaintiff does not "cast doubt on the authenticity or veracity of" such materials (and Plaintiff has not done so here) and cannot explain a "conflict between his allegations and the exhibits," the "contradicted allegations are implausible" and "will not defeat a motion to dismiss." *Id.*; *see also Bailey*, 2017 WL 6611582, at *7 ("If a plaintiff's own pleadings are contradicted by matters in [documents that may be considered at the pleading stage], the Court need not reconcile this difference or accept the plaintiff's pleadings as true." (collecting cases)).[5]

## I.      Plaintiff's Title IX Claim Fails as a Matter of Law.

To successfully plead an erroneous outcome claim under Title IX, a plaintiff must plausibly allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"; and (2) "a causal connection between the flawed outcome and gender bias," *i.e.*, "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *See Yusuf*, 35 F.3d at 715.

In the absence of direct evidence of gender bias, a plaintiff may establish a "minimal plausible inference of such discrimination," *Doe v. Columbia*, 831 F.3d at 56, circumstantially by alleging "a clearly irregular investigative or adjudicative process . . . amid criticism for reacting inadequately to allegations of sexual misconduct by members of one sex," *Menaker*, 935 F.3d at

---

[5] Columbia respectfully submits that in Title IX cases like this where the bulk of the plaintiff's allegations concern purported evidentiary/procedural irregularities in the university process, it would be sensible for key documents from the underlying proceeding, like the Investigative Report here, to be considered by the court as incorporated by reference since otherwise, there would be no practical way to determine whether the plaintiff's allegations satisfy the minimal plausibility threshold.

33. As discussed in Columbia's original motion to dismiss, ECF 25 at 8-9, while the Second Circuit standard refers to a "minimal inference," it still requires a plaintiff to plead with plausibility both (1) "a clearly irregular investigative or adjudicative process," as well as (2) the fact that "gender [was] a motivating factor in the decision to discipline," *Menaker*, 935 F.3d at 31-33. Plaintiff attempts (unsuccessfully) to establish a minimal plausible inference of gender bias by alleging various evidentiary and procedural "irregularities" with his GBM proceeding, combined with purported pressure on Columbia regarding complaints of sexual misconduct against men. Unlike in Plaintiff's oft-cited case of *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019), Plaintiff here has not alleged any "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715. Rather, as discussed in the next section, the statements by "Columbia" included in the Amended Complaint have nothing to do with Plaintiff or his case.

And now that Plaintiff has attached the Investigative Report to his Amended Complaint, it is abundantly clear that none of the "irregularities" he alleges were actually irregularities at all. As discussed below, the Court can—and should—grant Columbia's motion on that basis alone.

### A.     Plaintiff Fails to Allege Clear Irregularities in the Process.

The Second Circuit has been explicit about the robust showing that is required to successfully plead a "clearly irregular" process for purposes of an erroneous outcome claim under Title IX: "[W]e emphasize that our standard requires *clear* irregularities to raise an inference of bias . . . . *[M]inimal irregularities* (absent other indicia of bias) do not suffice to suggest discrimination." *Menaker*, 935 F.3d at 34 n.50 (second emphasis added). In *Menaker*, the plaintiff plausibly pled "clear irregularities" where Hofstra had allegedly "completely disregarded" the process set forth in its own harassment policy, including failing to interview witnesses, not

allowing the plaintiff to respond in writing, and not producing a written determination.[6] *Id.* at 34. This pleading standard may also be satisfied where a plaintiff plausibly alleges that "'the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence)'" or "where decision-makers choose 'to accept an unsupported accusatory version over [that of the accused], and decline[] even to explore the testimony of [the accused's] witnesses.'" *Id.* (first and third alterations in original) (quoting *Doe v. Columbia*, 831 F.3d at 57).

Here, however, as discussed further below, the documents incorporated by reference in the Amended Complaint could hardly make it clearer that Columbia followed the terms of its own GBM Policy in adjudicating Roe's complaint, *compare id.*, interviewed multiple witnesses, *compare id.*, allowed plaintiff to respond in writing, *compare id.*, and produced a lengthy written report, *compare id.* There is nothing to suggest that anyone at Columbia believed any of Roe's allegations to be "a ploy," *compare id.*, and no plausible allegation that the investigators, Hearing Panel, or Appeal Panel either formed conclusions against the substantial weight of the evidence or declined to consider the testimony of Plaintiff's witnesses, *compare id.*

### 1.    Alleged Evidentiary Flaws

Plaintiff alleges the following supposed evidentiary defects that he claims demonstrate a gender-biased process and erroneous outcome:

"Blackout Memory Loss." Plaintiff alleges that Jane Roe "had 'blackout memory loss'" and therefore needed to "recreate[] the events of the early morning" with the help of her friends. ¶ 175. By contrast, Plaintiff claims that his own recollection of the relevant events was "clear" and

---

[6] The plaintiff in *Menaker* also alleged that he was terminated by defendant even though a top-level university administrator "*knew* that at least one of the accusations . . . was false and believed the complaint to be a 'ploy.'" *Id.* at 34 (emphasis in original).

his account "comprehensive and coherent," as well as "consistent" with the evidentiary record. ¶ 174. Thus, Plaintiff essentially alleges that it was "clearly irregular" for Columbia to consider, let alone credit, Roe's memories of what happened over his own account.[7]

Because Plaintiff's allegations about Roe's memory on the night in question are contradicted by the Investigative Report (and the Incident Report), however, the Court need not accept them as true. *B.B.*, 2018 WL 2316342, at *6; *see also Bailey*, 2017 WL 6611582, at *7. According to the Investigative Report, Roe did tell the investigators that after Plaintiff "'tried to kiss'" her at the dance club, "her 'memory becomes . . . blackout with like glimpses of memory.'" Pl.'s Ex. B at 13. But she did not have "virtually no recollection of the evening[]," as the Amended Complaint alleges. ¶ 175. Rather, according to the Investigative Report, Roe recalled being on the dance floor with Plaintiff and feeling him dancing behind her, which made her "'a little bit uncomfortable.'" Pl.'s Ex. B at 13. She also recalled feeling scared and uncomfortable riding together with Plaintiff in the cab after they left the club. *Id.*

Indeed, Roe consistently testified to the Columbia investigators that she had three distinct memories from inside Plaintiff's apartment that night. *Id.* at 13-14; Def.'s Ex. B at 2. First, Roe remembered being in a bedroom, wearing no underwear, on "'all fours'" and thinking "'What is this? How did I get here?'" Pl.'s Ex. B at 14; Def.'s Ex. B at 2. She remembered saying, "'No, no. We're friends,'" followed by Plaintiff inserting his penis into her vagina while she thought, "'Oh my God, I'm being raped.'" Pl.'s Ex. B at 14. Second, Roe remembered being in a different space and asking Plaintiff, "'Why are you doing this?'" to which he replied "something along the lines of, "'I've always wanted this.'" *Id.*; Def.'s Ex. B at 2. And third, Roe remembered being in

---

[7] Far from "admit[ing] that she had . . . recreated" an "after-the-fact story" with "the help" of several friends, *see, e.g.*, ¶¶ 3, 175, 251, Roe specifically told investigators she "'didn't want to mention things [she] wasn't 100% certain about,'" and that she had "'been really careful about not speculating'" and "'[didn't] add anything [she didn't] remember,'" Pl.'s Ex. B at 16, which the investigative team noted in its credibility assessment of Roe, *id.* at 59.

Plaintiff's bedroom, on her back, with Plaintiff on top of her, thinking to herself, "'What the fuck is happening?'" and putting her hands up to push Plaintiff away, but having him pin her arms down while having vaginal intercourse with her.[8] *Id.* at 15; *see also* Def.'s Ex. B at 2. Such recollections on the part of Roe are not inconsistent with what many victims of sexual assault experience,[9] and the Columbia investigators concluded that the fact that they were "fragmented" did not render Roe's memories "unreliable or incredible," particularly as the details were "generally reasonable and logical" and "often corroborated by other documentary evidence and witness statements." Pl.'s Ex. B at 66.

    <u>Sexual Activities at the Club.</u> Plaintiff contends that it was a "fundamental pillar" of Roe's Incident Report," that "there were no consensual sexual activities between her and [Plaintiff]" at the dance club, ¶ 177, prior to the sexual assault in Plaintiff's apartment. As an initial matter, no such "pillar" is evidenced anywhere in the body of the Incident Report, which barely discusses anything that occurred at the dance club. *See* Def.'s Ex. B; *see also* ¶ 178.

    But Plaintiff goes further, alleging that "three eyewitnesses (Witness #5, Witness #6 and Witness #8) observed Jane Roe and [Plaintiff] mutually and consensually kissing, hugging and/or touching, and Jane Roe voluntarily grinding sexually against [Plaintiff] on the dance floor." ¶ 181.[10] For starters, according to the plain terms of Columbia's GBM Policy, whether there was

---

[8] Although Plaintiff alleges that Roe "confessed" that she did not "'even know if [one of the three things at the apartment she says she remembers is] a real memory anymore,'" ¶ 250 (alteration in original), that was not what Roe told the investigators. Rather, the Investigative Report quotes Roe as saying, "'I have had this memory that keeps coming back to me of him taking my phone and throwing it. Like him taking it from me and throwing it. Because I was calling. But other than that, I don't know. I don't even know if that's a real memory anymore.'" Pl.'s Ex. B at 16.

[9] Sammy Caiola, *How Rape Affects Memory And The Brain, And Why More Police Need To Know About This*, NPR (Aug. 22, 2021), https://www.npr.org/sections/health-shots/2021/08/22/1028236197/how-rape-affects-memory-and-the-brain-and-why-more-police-need-to-know-about-thi.

[10] Here and elsewhere, Plaintiff describes various witnesses as "eyewitnesses" or "after-the-fact witnesses." *See also, e.g.*, ¶¶ 260-65. However, neither Plaintiff nor Roe pointed to any other person who witnessed the alleged sexual assault.

any consensual "sexual activity" between Plaintiff and Roe at a public dance club is not necessarily relevant to whether Plaintiff later sexually assaulted Roe in the privacy of his apartment using physical force. *See* Def.'s Ex. A at 8 ("[P]revious consent for sexual behavior is not consent to sexual activity at another time."). Nevertheless, as the Hearing Panel noted, Plaintiff's allegations "[c]onflate information provided by witnesses," Def.'s Ex. C at 2, and are flatly contradicted by the Investigative Report.

For example, according to the Investigative Report, Witnesses 5 and 6 did not see Plaintiff and Roe kissing. Pl.'s Ex. B at 44-46. Witness 8 reported seeing Plaintiff kiss Roe, but specifically noted that "'it seemed to [him] like [Plaintiff] was the one trying to kiss [Roe] more than the contrary'" and that the "'way [Plaintiff] started dancing with her and then kissed her,'" "'[h]e was trying something.'" *Id.* at 50 (first alteration in original). Only Witness 5 reported seeing Plaintiff and Roe hugging, but said it "'seemed like what best friends would do if they're out clubbing together.'" *Id.* at 45. And Witnesses 5 and 6 specifically said they did *not* see Plaintiff and Roe engaging in any sexual activity at the dance club. *Id.* at 44, 46. Only Witness 6 thought that the two may have been "'grinding'" while dancing together. *Id.* at 45. But that is all consistent with what Roe told the Columbia investigators: that after Witness 2 left the club around 1:15 a.m., Plaintiff got physically close to Roe—his "'crotch [was] really tight up against [her] body'" and Plaintiff "'tried to kiss'" Roe. *Id.* at 12-13; *see also* Def.'s Ex. B at 2. Given the record as reflected in the Investigative Report, it would not be reasonable to infer that Witnesses 5, 6, and 8's statements to the investigators support Plaintiff's claim of "consensual sexualized activities" at the club, particularly since they do not conflict with Roe's statements to the investigators.

"Consent" to Sexual Activity. Plaintiff alleges that the evidence in the GBM proceeding demonstrated Roe's consent to the sexual intercourse at Plaintiff's apartment. ¶¶ 205-13. But

although Plaintiff alleges that Roe "never said 'no' or anything similar to 'no' at any time during their entire time together," ¶ 213, he himself later acknowledges that she "'remember[ed] saying "no,"'" ¶ 250. Indeed, according to the Investigative Report, Roe told the investigators exactly that: namely, that "rather than try to fight [Plaintiff] off, she said, 'No, no. We're friends. What about your girlfriend?'" and "'kept repeating "No, we're friends."'" Pl.'s Ex. B at 14.[11]

Not surprisingly, Plaintiff also takes Roe's own statements out of context. For example, Plaintiff alleges that "Roe's own description of her body positioning"—that she "got up on all fours" in the bed—"confirmed she was an active and engaged participant" because she "was supporting and positioning herself up on all fours to enable the consensual encounter to unfold." ¶ 208. But what Roe *actually* told the GBM Office was that "she thought [Plaintiff] 'pushed [her] on the bed, and [she] got up on all fours'" to "try to crawl away," that she "'did not want this to be happening,'" and that "[Plaintiff] 'was in charge of everything and doing everything.'" Pl.'s Ex. B at 14; Def.'s Ex. B at 2. Thus, Plaintiff's allegations are contradicted by materials incorporated in the Amended Complaint and need not be taken as true for purposes of this motion to dismiss.[12]

<u>Roe's Bruises.</u> Plaintiff alleges that "the evidence did not support [the] finding that [Plaintiff] caused [Roe's] bruises," specifically emphasizing that Roe "testified that she did not know what caused her specific bruises."[13] ¶¶ 214, 216. But once again, as the Investigative Report

---

[11] While Plaintiff acknowledges what he characterizes as Roe's "strategy" of "reason[ing] verbally" with him, ¶ 215, Plaintiff fails to mention that, according to the plain language of the Investigative Report, Roe told the Columbia investigators that she said, "'No,'" Pl.'s Ex. B at 14.

[12] Similarly, what Plaintiff describes as "a verbal exchange in conversational tones about what they were doing," ¶ 209, is described in the Incident Report and Investigative Report as Roe asking Plaintiff "'Why are you doing this? I don't understand what's happening, why are you doing this?'" to which Plaintiff "replied something along the lines of, 'I've always wanted this.'" Pl.'s Ex. B at 14; Def.'s Ex. B at 2.

[13] By alleging that "Roe unequivocally testified in the investigation that she 'did not specifically recall physical force being used by [Plaintiff],'" ¶ 215, Plaintiff again mischaracterizes Roe's statements. According to the Investigative Report, Roe "did not specifically recall physical force being used by the [Plaintiff] *other than recalling he threw her onto the bed in the guest bedroom and pinned down her arms and hands in the [Plaintiff's] bedroom*." Pl.'s Ex. B at 18 (emphasis added); *see also* ¶ 214 (acknowledging Roe's two claims of physical force).

makes clear, the evidence *did* support the finding that Plaintiff caused Roe's bruises. Specifically, the Columbia investigative team noted that photographs from just before and just after Roe's time with Plaintiff that night—photographs that showed no bruises *prior* to Roe's time with Plaintiff and extensive bruising on Roe's arms, shoulder, neck, face, and thigh *after* her time with Plaintiff—"particularly supported [the] conclusion, that [Roe] sustained the injuries while the two were together." Pl.'s Ex. B at 61-62, 82. As the Investigative Report explains:

> It is apparent in these photographs that, at the time they were taken, [Roe] did not have any bruising or other visible physical injuries to her arms, neck, or face. Additionally, one of the photographs appears to have been taken in the [dance club], and [Roe] did not have any visible injuries in the photograph. This corroborated [Roe's] assertion that she sustained her injuries that night after the [dance club] while at [Plaintiff's] apartment.

*Id*. at 61-62. Moreover, the first person to see Roe the morning of the assault, Witness 3:

> corroborated seeing bruising on [Roe's] arms, shoulders, neck and face, and confirmed taking pictures of those injuries while in the hospital. See Exhibit #13. Significantly, Witness #3 also corroborated the large bruise on [Roe's] inner left thigh that was photographed by the SAFE nurse at Lenox Hill Hospital but left undocumented by Witness #3.

*Id.* at 65. Based on the evidence, the investigative team concluded that:

> [I]t is clear to the Investigative Team that [Roe] sustained significant physical injury while with [Plaintiff]. While [Roe] was unable to specifically remember how and when she sustained those injuries, the circumstantial evidence of the documented bruising and injuries were deemed not only significant by the Investigative Team, but were clearly sustained while with [Plaintiff], a conclusion that seems inevitable given all other gathered information. The photographs from before and after her time with [Plaintiff] that night particularly supported this conclusion, that [Roe] sustained the injuries while the two were together. . . .
>
> Additionally, the Investigative Team finds no basis to conclude that the injuries were the result of rough but consensual sex. The severity of the bruising is readily apparent upon a review of Exhibit #13. The Investigative Team concluded that the size and extent of the injuries, coupled with their location on [Roe's] body, is most likely the result of a nonconsensual forcible sexual assault.

*Id.* at 81-82.

Roe's Inconsistent Behavior. In the Amended Complaint, Plaintiff boldly alleges that Roe's behavior was somehow "inconsistent with a violent sexual assault." ¶ 226. Specifically, Plaintiff asserts that "Roe would not be texting happy, smiling emojis if she were emotionally distraught at this moment after leaving the scene of a sexual assault." ¶ 229. These allegations assume, of course, that all victims of sexual assault respond in the same, predictable way. It is well established, however, that the behavior of a victim after a sexual assault "can be quite variable and is not a behavioral cue to deception." Regina A. Schuller, *et al.*, *Judgments of Sexual Assault: The Impact of Complainant Emotional Demeanor, Gender, and Victim Stereotypes*, 13 New Crim. L. Rev. 759, 768 (2010).

Perhaps more troubling than Plaintiff's misconceptions about the behavior of sexual assault victims are his blatant mischaracterizations of Roe's interactions with Witness 3 when she arrived back at her own apartment after the assault. In the Amended Complaint, Plaintiff alleges that Roe returned to her apartment, "sat with [Witness 3] for a few moments," "went alone into her room ready to rest and take a nap," and only indicated that she had been sexually assaulted because of "the pressure [Witness 3] placed on Jane Roe." ¶¶ 231, 233. But that is not what the Investigative Report actually says. According to the Report, both Roe and Witness 3 told investigators that Roe was upset upon returning to her apartment and cried before either of them raised the suggestion of sexual assault. As Roe told the investigators:

> Upon seeing [Roe], Witness #3 first exclaimed, "Hey!" She then looked at [Roe] and immediately asked, "Are you ok?" Rather than respond, [Roe] "just started crying." Witness #3 "kept asking, 'What happened?' [but [Roe]] couldn't say anything." [Roe] reportedly "just kept saying like, 'Everything was fine, and then all of a sudden it wasn't fine.'"

Pl.'s Ex. B at 16. Witness 3 similarly explained to the investigators:

> From the first look at her I saw something was wrong. Something in her face, her look. I got scared for a moment there. She was in a state of like shock or panic kind of, or a mix of both in a way. She looked at me with a bit of blank eyes. . . . I asked

15

her, 'Are you ok?' She didn't really answer me initially. Since it was summer she wasn't wearing a lot. I saw big bruises on her arms. . . . I started to ask her, I started thinking. I didn't even ask her where she was but she started crying at that time.

*Id.* at 39.

<u>"Fear Narrative."</u> Plaintiff alleges that any statement by Roe that she was afraid of Plaintiff "is contradicted by the preponderance of the evidence and is clearly false." ¶ 184. But according to the Investigative Report, there was substantial evidence that Roe felt uncomfortable about returning to Plaintiff's apartment. For example, according to the Investigative Report, Roe: (1) made 16 phone and Facetime calls to her future boyfriend before and during the cab ride with Plaintiff to his apartment, Pl.'s Ex. B at 13; (2) texted her future boyfriend "Can I come" in a language her future boyfriend did not understand, *id.* at 13, 80; (3) shared her location with her future boyfriend before getting in the cab and again near Plaintiff's apartment, *id.* at 13; and (4) explained feeling her "'brain being so slow,'" but that she "'just thought if [she] could just go to [her future boyfriend] [she] would know [she was] safe,'" *id.* Even if the recording of Plaintiff's voice that Roe sent to her future boyfriend that night was inadvertent or "'essentially a butt dial,'" ¶ 198, Roe told the investigators that she "'remember[ed] making the decision instead of deleting it, to send it'" and "'thinking like, "It's good to send this. It's good to have this."'" Pl.'s Ex. B at 13-14. Additionally, Plaintiff told the investigators that at some point during the cab ride, at a red light, Roe actually got out of the car, but then got back in after Plaintiff asked her, "'What are you doing? Are you ok?'" *Id.* at 25.

All of this evidence gathered as part of the GBM investigation suggested to the investigators that Roe felt afraid or uncomfortable. *Id.* at 82. Columbia crediting Roe's assessment of her own emotional state—what Plaintiff pejoratively refers to as Roe's "fear narrative," *e.g.* ¶ 176—clearly does not reflect Columbia forming "a conclusion in favor of [one] side (without an apparent reason based in the evidence)" or choosing to accept "an unsupported accusatory version

over [that of the accused]." *Menaker*, 935 F.3d at 34 (internal quotations and citations omitted).[14]

State of Plaintiff's Apartment. Plaintiff alleges that "[t]he Columbia investigation team found great significance in Jane Roe's account that [Plaintiff's] apartment had the appearance of a 'violent scene' the next morning." ¶ 221. But this allegation, too, is plainly contradicted by the materials now incorporated by reference. As an initial matter, nowhere in the Incident Report or the Investigative Report did Roe refer to Plaintiff's apartment as a "violent scene." *See* Def.'s Ex. B; Pl.'s Ex. B. Indeed, Roe specifically told investigators that her "'stuff was everywhere'" in Plaintiff's apartment, but that "'[i]t didn't look like there had been a break-in or a fight or anything, it was just messy.'" Pl.'s Ex. B at 15. Moreover, in discussing its assessment of whether Plaintiff used physical force to engage in non-consensual sexual intercourse with Roe, the investigative team did not reference any mess in Plaintiff's apartment following the alleged assault, let alone any claim that it resembled a "violent scene." *See* Pl.'s Ex. B at 81-83.

### 2.   Alleged Procedural Flaws

In addition to his implausible allegations of purported "evidentiary flaws," Plaintiff provides a longer list of alleged "procedural flaws," many of which are merely repackaged versions of the same "evidentiary flaws" discussed above. *See, e.g.*, ¶¶ 249, 260-65. As discussed below, none of these alleged procedural flaws amounts to anything remotely resembling the type of "clear

---

[14] While Plaintiff alleges that the Columbia investigators' determination that Roe felt afraid of Plaintiff "is clearly false" because, among other things, Roe stayed at the club with Plaintiff after her friends had left and agreed to go to Plaintiff's apartment, ¶¶ 184-94, none of this contradicts Roe's explanation that she "thought that she would be 'safer with [Plaintiff]' than going home alone," Pl.'s Ex. B at 13, a sentiment that is consistent with her future roommate's recollection, *id.* at 37. This evidence, along with the text messages, audio recording, phone calls, and location updates that Roe sent to her future boyfriend, supported the investigators' conclusion that "as the night progressed she became increasingly afraid of [Plaintiff.]" *Id.* at 82.

irregularity" sufficient to allege an erroneous outcome claim in any event.[15]

"Presumption" of Roe's Credibility. Plaintiff alleges that the Columbia investigators "shifted the burden of proof to [him] by explicitly presuming that Jane Roe was truthful," ¶¶ 242-44, and "failed to analyze critically Jane Roe's credibility," ¶¶ 245-53. Ignoring the nearly eight pages of the Investigative Report dedicated exclusively to a credibility assessment of Roe, Pl.'s Ex. B at 59-66, including analysis about whether Roe had "a motive to lie," *id.* at 60-61, Plaintiff cherry-picks *one* sentence from the Report and attempts to twist it into a credibility "presumption." ¶ 242. That sentence reads as follows: "Finally, it is hard to fathom why the Complainant would subject herself to a long and invasive forensic examination, report the allegations to the University, and participate in a months-long disciplinary process as a result of that report if she merely engaged in consensual sex but regretted it afterwards." *Id.* at 61. No reasonable reading of that sentence— either by itself or in the context of the eight-page credibility assessment of Roe—reflects either a presumption that Roe was truthful or shifts the burden of proof to Plaintiff to prove that she was not. Nor should the Court credit Plaintiff's vague, unsupported allegation that the Dean somehow "explicitly believed" in a credibility presumption that never existed. ¶ 242.[16]

Plaintiff similarly alleges that the investigators improperly shifted the burden to Plaintiff to prove that he did not cause Roe's bruises. ¶ 266. But, as discussed above, the Investigative Report identified significant circumstantial evidence that Plaintiff had, in fact, caused Roe's bruises. *See* Pl.'s Ex. B at 81-83. Accordingly, it would be unreasonable to infer that there was any

---

[15] Disagreements with the weighing of evidence and credibility assessments, which is all that Plaintiff's allegations boil down to, are more appropriately addressed through an Article 78 proceeding, not a federal Title IX claim. *See, e.g., Haug v. State Univ. of N.Y. at Potsdam*, 32 N.Y.3d 1044 (2018) (considering, in an Article 78 proceeding, whether a university's disciplinary finding was supported by substantial evidence).

[16] Plaintiff's similar claim that Columbia failed to "critically analyze" supposed "inconsistencies" in Roe's story, ¶¶ 245-53, is yet another failed attempt to recharacterize his alleged evidentiary flaws as a purported credibility presumption. This alleged procedural flaw fails for the same reasons discussed above. *See also* Def.'s Ex. D at 2.

"shifting of the burden" to Plaintiff.

Plaintiff's Lack of Credibility. Plaintiff further alleges that the Columbia investigative team made a "presumption" that Plaintiff lacked credibility. ¶¶ 254-55. But just as it did with Roe, the investigative team engaged in a detailed credibility analysis for Plaintiff addressing each of the five factors set forth in Columbia's GBM Policy for assessing credibility: "consistency or inconsistency of accounts of events over time; demeanor during interviews; motive to lie; any corroborating evidence; and reasonable and logical statements and details." Def.'s Ex. A at 26; *see also* Pl.'s Ex. B at 57, 66-71; ¶ 144. In fact, the investigative team found that Plaintiff's consistency and demeanor actually contributed to his credibility, that he had no more than the "obvious possible motivation to lie to avoid sanctioning," and that there were "various pieces of evidence that corroborated aspects of [Plaintiff's] narrative." *See* Pl.'s Ex. B at 66-69; ¶ 147.

Nevertheless, as explained in the Investigative Report, there were several contradictions that caused the Columbia investigative team to find "[Plaintiff's] account to be less credible than [Roe's] narrative." Pl.'s Ex. B at 71. Plaintiff complains that the investigators "assail[ed]" his credibility with the "minor" point that he had mistaken the sandals Roe was wearing that night for heels. ¶ 256. But the investigative team explained in the Report why this point mattered to them:

> Normally, this minor detail would not factor significantly into [Plaintiff's] overall credibility. . . . However, given [Plaintiff's] insistent and repeated assertions on a detail directly related to a central issue to be resolved in this case – [Roe's] possible incapacitation – the Investigative Team deemed this to be a more substantial detail that detracted from the Investigative Team's assessment of [Plaintiff's] overall credibility. If [Roe] was in fact wearing high heeled shoes and still able to walk without difficulty or stumble, this would be evidence that she was not incapacitated that night. [Plaintiff's] insistence on the high heels and [Roe's] ability to walk without difficulty, despite evidence contradicting this contention, suggested to the Investigative Team that he was deliberately untruthful about this point. This reflected an intention to deceive regarding a topic as important as [Roe's] ability to provide affirmative consent. His misstatement appeared deliberate to the Investigative Team largely because he was so insistent on repeating that she had heels on, but then admitted that he could not recall what she wore that night when

19

he [was] challenged on this topic.

Pl.'s Ex. B at 70. Indeed, according to the Investigative Report, it was Plaintiff's insistence that he had complete recall of that night, but his inability to remember how Roe had sustained her bruises, *id.* at 71, or how the gas leak in his apartment had occurred, *id.* at 68, that caused the investigative team to further question Plaintiff's credibility.[17]

Moreover, the Investigative Report points to evidence suggesting that Plaintiff was in fact intoxicated that night, even though he claimed he was not and "stressed that he never had any 'memory loss' from drinking alcohol." Pl.'s Ex. B at 70. As explained in the Investigative Report, the "seeming contradiction between [Plaintiff's] stated level of intoxication to the Investigative Team, and the way he was portrayed through witness accounts, photographs from the night, and the audio recording, detracted from the Investigative Team's assessment of his credibility." *Id.* at 70-71.

Finally, contrary to his assertion, ¶ 258, the investigators did not attack Plaintiff's "credibility about where he said sexual intercourse occurred" that night, as between his bedroom and the other bedroom in the apartment. That point is nowhere to be found in the Investigative Report's credibility assessment for Plaintiff. *See* Pl.'s Ex. B at 66-71.

Experts. As discussed at the hearing before this Court on June 9, ECF 44 at 35:10-37:3, Plaintiff complains that his expert reports were not given more weight, ¶ 271, alleging that the investigators "turn[ed] a blind eye" and failed to address "the underlying issues raised by the expert reports" in the Investigation Report, ¶ 273. Once again, however, those allegations are flatly

---

[17] According to its written decision, the Hearing Panel further found that Plaintiff's contradiction of his own witnesses' statements "underscored the Investigative Team's concerns about [Plaintiff's] credibility and called into question the accuracy and plausibility of [his] narrative." Def.'s Ex. C at 3. Specifically, the Hearing Panel pointed to Plaintiff telling the investigators that his "girlfriend/Witness #12 incurs bruises after consensual sex on p. 29 [of the Investigative Report], which she then denied on p. 56 [of the Report], before clarifying that [Plaintiff] meant hickies in an email to the Investigative Team (Exhibit #22)." *Id.*

contradicted by the Investigative Report itself, which contains a separate section entitled "Summary and Analysis of Reports Submitted by Parties." Pl.'s Ex. B at 57-59. In that section of the Report, the investigators conclude that the expert report(s) of each party bolstered the account of the party who submitted it, thereby calling into question the probative value of *all* of the expert reports. *Id.*; *see also* ¶ 145 (acknowledging same). Moreover, Columbia's GBM Policy does not contemplate the submission of expert reports as a general matter, *see* Def.'s Ex. A, although they were obviously submitted here. Thus, as Plaintiff himself acknowledges, "the Columbia investigation team has considerable discretion to accept, or not, expert reports." ¶ 272; *see also* Def.'s Ex. A at 25 ("The Investigative Team will not interview witnesses whose sole purpose is to provide . . . specialized expertise about a particular subject area."). Plaintiff's allegation that the investigative team "turn[ed] a blind eye" to the expert reports and that that constituted a clear procedural irregularity is therefore implausible. *See Feibleman v. Trs. of Columbia Univ.*, No. 19 Civ. 4327, 2020 WL 882429, at *9 n.13 (S.D.N.Y. Feb. 24, 2020) ("Although Plaintiff also takes issue with Columbia's refusal to allow his expert report, that alone does not support an inference of impropriety. [He] has not cited any part of the GBMP that allows for outside experts, nor is there any allegation that Doe was allowed to retain an expert.").

<u>Cross Examination.</u> Plaintiff alleges that it was a procedural flaw for Columbia "not [to] permit [him] to question Jane Roe." ¶ 274; *see also* ¶¶ 275-77. But neither Plaintiff nor Roe was entitled to cross-examination under the applicable GBM Policy, which states as follows: "The Complainant and the Respondent will not be permitted to ask or submit questions at the hearing." Def.'s Ex. A at 30. As a result, Plaintiff's inability to question Roe could not possibly rise to the level of a "clearly irregular" adjudicative process. *Menaker*, 935 F.3d at 33; *B.B.*, 2018 WL 2316342, at *4, *9 (dismissing a Title IX erroneous outcome claim despite allegations that Plaintiff

was not permitted to cross-examine the other party, in part, because the school did "not permit cross-examination by either party").

Nor, as Plaintiff asserts, was it clearly irregular to have Plaintiff submit questions after being provided with a factual summary of the Report. ¶ 274. Rather, that is exactly the process called for by Columbia's GBM Policy: "The Complainant and Respondent will be required to submit a written list of all proposed questions to the Investigative Team no later than 1 day before the scheduled Pre-Determination Conference, so the questions can be considered and discussed during the Conference. *Questions should be related to the factual summary and should not be duplicative or seek a restatement of a fact that has already been included in the factual summary*." Def.'s Ex. A at 27-28 (emphasis added).

But there is more. Plaintiff actually concedes that the Hearing Panel *did* ask and Roe *did* answer the questions that he timely submitted. ¶ 277. Plaintiff was not allowed to submit *additional* questions to the Hearing Panel just prior to the hearing, *id.*, because that is expressly forbidden by the GBM Policy itself. *See* Def.'s Ex. A at 27 ("the Pre-[D]etermination Conference will be each party's *final* opportunity to provide questions for the Investigative Team to ask of any other individual involved") (emphasis in original); *id.* at 30 ("The Complainant and the Respondent will not be permitted to ask or submit questions at the hearing."); ¶ 277 (acknowledging same).

<u>"Form and Layout."</u> Plaintiff's claim that the "form and layout" of the Investigative Report "burie[s] the investigation deficiencies" barely merits a response. ¶¶ 278-79. The 83-page Investigative Report includes a list of 35 exhibits, an executive summary, a list of each of the 16 interviews conducted and when each was conducted, a detailed list of hundreds of documents and materials examined, a section setting forth the applicable GBM Policy definitions, a factual summary of each witness's statements and evidence submitted to the investigators, and a findings

and analysis section which itself includes a summary and analysis of the expert reports, detailed credibility assessments of each of the witnesses, a thorough analysis of all the evidence, and recommended findings. *See generally* Pl.'s Ex. B. It could hardly be more implausible that the "form and layout" of Columbia's report could possibly constitute a "clear irregularity" for purposes of Title IX.

    <u>Miscellaneous Issues.</u> While Plaintiff complains about other aspects of Columbia's GBM process, *see* ¶¶ 280-94, many of his allegations are simply regurgitations of other allegations in the Amended Complaint, and none reflects any departure from Columbia's GBM Policy that could possibly constitute a "clearly irregular process." For example, Plaintiff claims that a 50-page written response that he provided after reviewing the "draft report" was not considered or addressed. *See* ¶¶ 131, 280-82. According to Columbia's GBM Policy, however, all that is permitted after a party reviews the factual summary (which Plaintiff refers to as the "draft report," ¶¶ 126, 279, 281-82) is "to provide correction to typos in the factual summary, including correction of names and/or dates, or other minor factual errors. [Parties] also can argue that the factual summary is inaccurate; identify additional witnesses to be interviewed; and ensure that all relevant information is included." Def.'s Ex. A at 27; *see also* ¶ 282 (confirming that this is what Plaintiff was told at the time). And while Plaintiff takes issue with matters of timing and page limitations, nothing he points to is inconsistent with the process laid out in the GBM Policy, or so egregious as to constitute a "clearly irregular process." Plaintiff, like all other complainants and respondents involved in a GBM proceeding at Columbia—including Roe—was required to submit his written response to the final Investigative Report within 10 pages and two days in advance of the hearing, as is specifically called for in the Policy. *See* ¶¶ 283-84; Def.'s Ex. A at 29. Similarly, although Plaintiff questions the Hearing Panel's ability to reach a determination after having a day to review

the Investigative Report and a day to deliberate following the hearing, ¶ 284, the GBM Policy itself provides that "[t]he Hearing Panel will generally render a decision within 3 days after the conclusion of a hearing." Def.'s Ex. A at 30.[18]

Plaintiff also makes generalized allegations that Columbia's GBM process is biased toward complainants, who he claims are invariably women, and that this somehow constitutes a "procedural flaw." ¶¶ 289-94. But Columbia's GBM Policy and processes are completely gender-neutral and symmetrical. Under the GBM Policy, respondents and complainants (whether men or women) get the same support and resources; the same opportunities to provide, review, and challenge the evidence; and neither has a burden of proof. Def.'s Ex. A at 26 ("The Investigative Team bears the burden of showing evidence to support its recommendation regarding responsibility."). Plaintiff's conclusory allegations that "Columbia has demonstrated a pattern of inherent and systematic gender bias and discrimination against accused male students," and that male respondents "are invariably found guilty, regardless of the sufficiency of the evidence," ¶¶ 293-94, are exactly the kind of vague, generalized allegations that a court is entitled to discount in connection with a motion to dismiss.[19] *See, e.g.*, *Orkin v. Swiss Confederation*, 770 F. Supp. 2d

---

[18] Plaintiff's claim that Roe made "inflammatory allegations" to the Hearing Panel that she had not made to the investigators, ¶ 287, does not satisfy *Menaker* since he does not specify what those allegations were (other than the accusation that she had been raped). And Plaintiff's generalized contentions that her allegations were "not questioned," "simply presumed to be true," and "severely prejudicial," *id.*, because they—like many of Plaintiff's allegations—are devoid of any specific factual context or support, need not be considered in connection with a motion to dismiss. *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (holding that a court must distinguish between facts, on the one hand, and "mere conclusory statements" or legal conclusions on the other hand and that the latter must be disregarded).

[19] Even assuming for purposes of this motion that all respondents are male, the publicly available data contradicts Plaintiff's assertions in this regard. For example, Columbia's Student Gender-Based Misconduct Prevention and Response 2018-19 Annual Report makes it clear that in the period between July 1, 2018, and June 30, 2019, in three cases involving sexual assault, there was one finding by Columbia of no responsibility and no findings of responsibility. Columbia Univ., *Student Gender-Based Misconduct Prevention and Response 2018-19 Annual Report* 20 (2019), https://sexualrespect.columbia.edu/files/sri/content/student_gender-based_misconduct_prevention_and_response_2018-2019.pdf. Similarly, in the corresponding report for 2017-18, there were six findings of no responsibility, two findings of responsibility, and one instance where a respondent accepted responsibility or indicated no contest. Columbia Univ., *Gender-Based Misconduct Prevention and Response 2017-18 Annual Report* 19 (2018),

612, 616 (S.D.N.Y. 2011), *aff'd*, 444 F. App'x 469 (2d Cir. 2011 ("[T]he Court is not bound by conclusory assertions of fact or law."); *see also B.B.*, 2018 WL 2316342, at *7 ("Absent any factual detail of past cases involving sexual assault, and the gender composition of accusers and the accused, such allegation is too conclusory.").

Sanction. Other than noting that it took the Dean only four days, including over the Easter holiday weekend, to review the file and impose the sanction of expulsion,[20] ¶ 296, Plaintiff makes no allegations in support of his implausible claim that he received an "unduly severe penalty" simply because of his gender, ¶¶ 295, 297. As the Appeal Panel explained, the GBM Policy requires the consideration of several criteria, including the impact on Roe as well as the specific misconduct at issue.[21] Def.'s Ex. D at 4. The Appeal Panel confirmed that expulsion was warranted here because, among other things, Plaintiff's conduct had a significant impact on Roe, his violent sexual assault was "abhorrent" and "reckless," and he "exhibit[ed] an obliviousness to the evidence that [he] used force in order to have sex with [Roe]." Def.'s Ex. D at 5, 6 (noting "[w]e find that this case is among the most violent and the least ambiguous of the cases that we have seen as Panel members"). In light of the finding of responsibility for a claim of non-consensual vaginal intercourse by use of physical force, the fact that Plaintiff had no prior disciplinary history and "believed he had consent for the sexual conduct that occurred," ¶ 295, did not render the sanction

---

http://www.columbia.edu/cu/studentconduct/documents/Gender-BasedMisconductPreventionandResponse2017-2018.pdf; *see also* ¶ 53 (citing to a corresponding annual report from 2019-2020).

[20] According to the GBM Policy, the "Sanctioning Officer . . . will render a sanctioning decision within 3 days following the receipt of the Hearing Panel's determination." Def.'s Ex. A at 31.

[21] Under the GBM Policy, factors relevant to imposing a sanction include: "the specific gender-based misconduct at issue (such as penetration, touching under clothing, touching over clothing, unauthorized recording, etc.); the circumstances accompanying the lack of consent (such as force, threat, coercion, incapacitation, etc.); the Respondent's state of mind (intentional, knowing, bias-motivated, reckless, negligent, etc.); sanctions imposed in other matters involving similar conduct; the impact of the offense on the Complainant; the Respondent's prior disciplinary history; and the safety of the University community." Def.'s Ex. A at 31.

unduly severe.[22]

### B.    Plaintiff Fails to Allege Any Facts to Support a Minimal Plausible Inference of Gender Bias.

Plaintiff's Title IX claim fails for yet another reason: his allegations of "criticism" against or "pressure" on the University "for reacting inadequately to allegations of sexual misconduct by members of one sex" are insufficient to create a plausible inference of bias on the basis of sex. *Menaker*, 935 F.3 at 33.

Plaintiff's allegations of "pressure" on the University to discriminate on the basis of gender in GBM proceedings generally fall into two categories: (1) allegations that Columbia's GBM Policy is biased against men because it is "victim-centered," including because the 2011 Dear Colleague Letter ("DCL")[23] encouraged all universities to minimize the burden on complainants, resulting in a purportedly universal "gender-biased" process; and (2) allegations that "Columbia made various statements and holds various beliefs about rape culture and the #MeToo movement, thereby evidencing supposed anti-male bias. To repeat, these allegations are entirely divorced from Plaintiff or the GBM proceeding at issue and are offered instead to support Plaintiff's broad, generalized assertion of the existence at Columbia of an "anti-male gender biased, victim-oriented, trauma-informed process reflecting the mantras of believe all woman and rape culture." ¶ 291. Yet none of Plaintiff's allegations, separately or together, support a minimal plausible inference of gender bias here. *See, e.g.*, *Doe v. NYU*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020), *appeal dismissed* (June 8, 2020) (concluding plaintiff's "conclusory" allegations were "insufficient to establish a 'plausible inference of sex discrimination'" because they "neither establishe[d] that [the

---

[22] For all of these same reasons, Plaintiff's Title IX claim can also be dismissed on the ground that his allegations do not "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" sufficient to plead an erroneous outcome claim. *Yusuf*, 35 F.3d at 715; *see also B.B.*, 2018 WL 2316342, at *5-6.

[23] *See* Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* (Apr. 4, 2011), https://www2.ed.gov/about/ offices/list/ocr/letters/colleague-201104.pdf.

university] was under public criticism during the pendency of the underlying investigations and proceedings" nor that the defendants had "knowledge of the purported criticisms") (citation omitted); *B.B.*, 2018 WL 2316342, at *8 (concluding that plaintiff failed to allege gender bias, in part because he failed to allege anything specific about "the Title IX investigators or members of the Disciplinary Review Panel to suggest they held anti-male biases" in his proceeding).

### 1.   Columbia's GBM Policy and the 2011 Dear Colleague Letter

In the Amended Complaint, Plaintiff alleges that Columbia has a "victim-centered," "trauma-informed" approach to its GBM Policy that is biased against men because it presumes that they are always guilty. *See* ¶¶ 52-60. Such allegations are obviously inconsistent with the many procedural protections afforded under the GBM Policy to accused respondents regardless of their gender, *see* Def.'s Ex. A at 17-34, and the Court need not take them as true. *See B.B.*, 2018 WL 2316342, at *6. Under Columbia's GBM Policy, respondents and complainants get the same support and resources; the same opportunities to provide, review, and challenge the evidence; etc. Def.'s Ex. A at 17-34.

Attempting to bolster his allegations of a "victim-centered" process, Plaintiff points to Columbia's compliance with the now-rescinded DCL. While it is true that the DCL "ushered in a more rigorous approach to campus sexual misconduct allegations," *Doe v. Purdue Univ.*, 928 F.3d at 668, by providing specific guidance to schools regarding Title IX's requirements as they relate to the adjudication of sexual misconduct claims, Plaintiff's allegation that the now-rescinded DCL and its accompanying guidance put so much pressure on colleges to address sexual assault in a gender-biased way that there is automatically anti-male gender bias in this (and arguably every) case adjudicated pursuant to that guidance is plainly implausible. *See generally* ¶¶ 11-34.

Significantly, Plaintiff's theory of gender discrimination (and each of his allegations in this regard) would pertain not only to Columbia, but to nearly every single college and university in

the United States. Essentially, Plaintiff asks this Court to infer that Columbia's disciplinary decision in his case was motivated by gender bias simply because the University's GBM Policy at the time complied with federal Title IX guidance—guidance that Plaintiff acknowledges was "binding on regulated parties" such as Columbia. ¶ 24. That would mean, as a practical matter, that a male plaintiff could adequately plead gender bias in any and every Title IX erroneous outcome case, regardless of the underlying circumstances of the Title IX investigation, the policies of the school or university, or what the charges actually were.

Contrary to Plaintiff's contentions, the plain language of the DCL is gender neutral, using the terms "complainants" and "alleged perpetrators," not "female victims" and male respondents. *Compare* DCL, *with* ¶¶ 23, 290. Plaintiff's unsupported allegation that "[i]n response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as Columbia, limited procedural protections afforded to *male* students, such as John Doe, in sexual misconduct cases," ¶ 34 (emphasis added), not only lacks plausibility, but is flatly contradicted by the relevant documents. Like the DCL, the procedural protections in Columbia's GBM Policy implementing the DCL are completely neutral as to gender. *See* Def.'s Ex. A at 3 ("The Policy applies regardless of a person's gender, gender identity, gender expression, sex, . . . or other protected status.").

For these reasons, courts have repeatedly and sensibly rejected Plaintiff's argument that the DCL alone is sufficient, holding that compliance with the DCL cannot support a plausible inference of gender bias for purposes of a motion to dismiss a Title IX claim. *See* ECF 25 at 11 (collecting cases). This is so because a "[u]niversity's adoption of positions recommended by the federal government does not in turn suggest that the [u]niversity did so because of gender bias— all it plausibly suggests is that the [u]niversity sought to comply with OCR's recommendations." *Doe v. Univ. of Chi.*, No. 16 Civ. 08298, 2017 WL 4163960, at *5 (N.D. Ill. Sept. 20, 2017); *see*

*also Doe v. Univ. of Denver*, 952 F.3d 1182, 1192 (10th Cir. 2020).

Moreover, Plaintiff's GBM proceedings in this case occurred *after* the DCL was rescinded by the Trump administration in September 2017. *See* ¶¶ 41-46. Thus, even assuming Columbia was under pressure as a result of the DCL during the Obama administration, it clearly makes no sense to assume that Columbia was still "under pressure" to discriminate against male Title IX respondents after the DCL was rescinded by President Trump. *See, e.g.*, *Doe v. NYU*, 438 F. Supp. at 186. Moreover, Columbia's continued compliance with the GBM Policy it had in place for the academic year in which Plaintiff's GBM proceeding occurred (2017-18), or the fact that Columbia did not immediately revise its GBM Policy when the DCL was rescinded in September 2017, cannot possibly establish discriminatory motive either. *See, e.g.*, *Doe v. Colgate Univ.*, No. 15 Civ. 1069, 2017 WL 4990629, at *13 (N.D.N.Y. Oct. 31, 2017) (explaining that a university's compliance with a prior governing version of the DCL does not establish a Title IX violation, it "simply demonstrates that OCR can from time to time change its interpretation of a statute") (internal quotation marks and citation omitted), *aff'd*, 760 F. App'x 22 (2d Cir. 2019).

### 2.    Columbia's Allegedly Gender-Biased Statements and "Anti-Male" Culture

Plaintiff's Amended Complaint collects dozens of new allegations about actions purportedly taken and beliefs purportedly held by "Columbia" over the last decade that are supposedly anti-male. ¶¶ 52-80. These beliefs, however, are not attributable to Columbia as a whole, or even to the GBM Office in particular, but rather to the people and organizations who made them. In other words, Plaintiff conflates various entities and misrepresents assorted social media posts in an effort to concoct a false picture of Columbia—a large university with more than 15 separate graduate schools, thousands of undergraduate and graduate students (many of whom

are male, along with Columbia's many male administrators, faculty, and staff), dedicated to principles of freedom of thought and speech—as a wildly anti-male institution.

To illustrate further, in certain parts of the Amended Complaint, "Columbia" means the institution as a whole—the "elite private Ivy League University." ¶ 7. In other parts, it means Columbia's GBM Office, which is "responsible for investigating and adjudicating reports of gender-based misconduct involving students, and coordinating the disciplinary process when necessary." Def.'s Ex. A at 14.[24] But in paragraphs 56 through 78, when the Amended Complaint refers to "Columbia," its footnotes reveal that Plaintiff means neither Columbia as a whole nor the GBM Office in particular. Instead, the vast majority of "Columbia's" actions and beliefs in those paragraphs are sourced to Facebook posts made by Sexual Violence Response ("SVR"), a division of Columbia Health (unrelated to the GBM Office) that supports survivors of sexual violence.[25] See, e.g., ¶¶ 63-77 nn.16-17, 19-28, 32, 35-38, 40-42, 44, 46-68, 70-87. Other allegations similarly attribute social media posts from other groups and organizations—but again not the GBM Office— to "Columbia." ¶¶ 59, 61, 68, 69.[26] And many allegations also mischaracterize the source material. ¶¶ 57, 61, 64, 68, 70-72, 75-77. The clear intent is to create the false impression that the same

---

[24] See, e.g., ¶ 121 ("Roe made a sexual misconduct complaint (Incident Report) to Columbia"); ¶ 124 (Plaintiff was notified "of the Columbia investigation"); ¶ 156 ("Columbia hearing panel held a 'hearing'").

[25] For example, Paragraph 67 is just one of dozens of examples illustrating the Amended Complaint's misleading conflation of "SVR" and "Columbia." That paragraph alleges: "In Columbia's eyes, 'No dystopic [sic] fiction can trump what has been done to women.'" ¶ 67 (alteration in original). The Amended Complaint then provides a footnote: "Sexual Violence Response, facebook post,[] 3/16/2018." Id. n.25. The footnote continues: "CU shared an article from msmagazine.com, 'A Red Dystopia,' and quoted: 'The dystopic [sic] futures dreamed up by writers . . . have historical precedent. No dystopic [sic] fiction can trump what has been done to women.' CU added, '#womenshistorymonth.'" Id. (alterations in original). This footnote itself makes it clear that SVR, not "CU" (i.e., Columbia), shared the article and added the hashtag. Moreover, the quotation itself comes from a msmagazine.com article posted by SVR.

[26] To give another example, Plaintiff alleges that "Columbia" "published" that "[m]isogyny has been openly tolerated by American society and its culture, writ large for a very long time." ¶ 69 & n.45. But according to the Amended Complaint, that statement was made not by Columbia, or any group or organization, but rather by a Columbia adjunct professor of International and Public Affairs. See id. It clearly has nothing to do with whether Columbia, as an institution, is biased against men. And it goes without saying that Columbia is not in the habit of policing the speech of its professors or other members of the Columbia community.

"Columbia" office that investigated and adjudicated allegations of Plaintiff's GBM Policy violations also made numerous social media posts addressing the #MeToo movement and topics such as "toxic masculinity" and "rape culture." *See generally* ¶¶ 63-77. The Court need not accept as true Plaintiff's allegations attributing what he contends are "anti-male" positions to "Columbia" when the Amended Complaint itself actually sources those positions to SVR and other groups, or mischaracterizes the source material. *B.B.*, 2018 WL 2316342, at *6.[27]

Plaintiff alleges no facts to explain why the actions of SVR are relevant to Plaintiff's GBM proceeding or this case. Out-of-circuit cases that address whether articles shared by university officials involved in the plaintiff's disciplinary proceeding support an inference of gender bias do not apply here. For example, unlike the Amended Complaint in this case, the complaint in *Doe v. Purdue* accurately attributed the Facebook post to the group that actually posted it, did not improperly attribute the content of the article to the university at large, and linked the posting group's director—a Title IX coordinator who drafted the complainant's statement—to the proceeding at issue. *See* Compl. ¶ 20, *Doe v. Purdue Univ.*, No. 17 Civ. 33 (N.D. Ind. Jan. 24, 2017), ECF 1. The Seventh Circuit found this link "pertinent." *See* 928 F.3d at 669-70. Here, Plaintiff's allegations regarding various social media posts and articles bear no connection to his GBM proceeding. Indeed, Plaintiff does not allege that anyone from SVR or any other groups or individuals who published or shared articles was involved in his GBM proceeding in any way. Plaintiff's disconnected allegations about social media posts and articles that purportedly show gender bias, though numerous, do not support a plausible inference that gender bias played any role in connection with Plaintiff's GBM proceeding.

---

[27] Moreover, many of Plaintiff's allegations about social media posts or statements purportedly connected to "Columbia" do not pertain to the period relevant to Plaintiff's GBM proceeding. *See, e.g.*, ¶¶ 57 nn.3 & 4, 58 nn.5 & 7-8, 64 n.17, 65 nn.19 & 20, 68 nn.33 & 34, 69 nn.35 & 39 (citing social media posts and articles from 2019-20); *see also* ¶¶ 58 n.6, 60 nn.10-12, 61 n.14, 68 nn.27-28 & 31, 69 n.45 (citing social media posts and articles from 2011-15).

As for Plaintiff's allegation that Columbia was under pressure "to vigorously prosecute males accused of sexual assault" because of "[t]he publicized case of Emma Sulkowicz," ¶ 35, the supposed pressure created by Ms. Sulkowicz occurred in 2014 and 2015—two years prior to the incident in this case.[28] *See* ¶¶ 36-37. Courts in this Circuit have recognized that for purposes of Title IX, the alleged public pressure must be within the timeframe of the underlying proceeding to give rise to an inference of gender bias. *See, e.g.*, *Doe v. Vassar Coll.*, No. 19 Civ. 9601, 2019 WL 6222918, at *11 (S.D.N.Y. Nov. 21, 2019) (finding no inference of gender bias after comparing the case's five-year gap between pressure and proceeding to *Doe v. Columbia*'s "matter of months"); *see also Doe v. Columbia*, 831 F.3d at 50 (identifying public criticism just a few months prior to the disciplinary hearing).

Finally, Doe alleges that Columbia was under pressure because of a series of articles in 2017 about other Title IX lawsuits against the University.[29] ¶ 39. But as the Second Circuit has recognized, "[p]ress coverage of sexual assault at a university does not automatically give rise to an inference that a male who is terminated because of allegations of inappropriate or unprofessional conduct is the victim of [sex] discrimination." *Menaker*, 935 F.3d at 33 (alteration in original). This is especially so when the articles have no bearing on and nothing to do with either the plaintiff or any individuals involved in his proceeding. *See Doe v. Columbia*, 831 F.3d at 51 (discussing press coverage of criticism of Columbia for its handling of gender-based misconduct claims as relevant when they involved the same investigator in the case at issue). Judge Woods's

---

[28] In fact, Ms. Sulkowicz graduated from Columbia College in May 2015. Kate Taylor, *Mattress Protest at Columbia Continues into Graduation Event*, N.Y. Times (May 19, 2015), https://www.nytimes.com/2015/05/20/nyregion/ mattress-protest-at-columbia-university-continues-into-graduation-event.html.

[29] One case discussed in these articles brought by a female complainant was dismissed twice. *Roskin-Frazee v. Columbia Univ.*, No. 17 Civ. 2032, 2018 WL 6523721, at *1 (S.D.N.Y. Nov. 26, 2018); *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 3d 618, 620 (S.D.N.Y. 2019). The other articles cited relate to a faculty member who retired and did not involve alleged student-student misconduct. It thus would be implausible to assume that that litigation or the articles put any undue pressure on the University to be biased in favor of female complainants in the GBM process.

recent decision in *Doe v. Columbia University*, No. 20 Civ. 6770, 2021 WL 3292591 (S.D.N.Y. Aug. 1, 2021), is not to the contrary. There, the court relied on the case-specific fact that there was an article in a campus publication published *during* the proceedings that discussed the proceeding itself. *See id.* at *27. Judge Woods therefore determined that this fact, "taken together" with others, was sufficient to allege gender bias.[30] *Id.* Here, there is no allegation of similar, *specific* pressure at the time of Plaintiff's proceeding.

II.     **Plaintiff's Contract and Quasi-Contract Claims Should Be Dismissed.**

For the reasons discussed in Columbia's motion to dismiss Plaintiff's original complaint, ECF 25 at 21-23; ECF 32 at 10, Plaintiff's state law claims also fail and should be dismissed.

## CONCLUSION

For the foregoing reasons, Columbia respectfully requests that the Court dismiss the Amended Complaint in its entirety, with prejudice.

Dated: September 13, 2021                            Respectfully submitted,

By:

Roberta A. Kaplan
Gabrielle E. Tenzer
Rachel Tuchman
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
rtuchman@kaplanhecker.com

*Attorneys for Defendant*

---

[30] It is worth noting that unlike in this case, the investigative reports and other key documents from the four separate Columbia GBM proceedings at issue in that case were not before Judge Woods as incorporated by reference. *Cf. id.*

**APPENDIX: Comparison of Alleged Evidentiary & Procedural Flaws to Incorporated Materials**

| Am. Compl. ¶ | Alleged Flaws | Incorporated Materials |
|---|---|---|
| 175 | Roe had "blackout memory loss" and "admitted that she had therefore recreated the events of the early morning" with her friends. | Roe testified to distinct memories and did not admit to recreating events. Pl.'s Ex. B at 13-15; Def.'s Ex. B at 2. |
| 177, 181 | Roe contended, as a "fundamental pillar" of her report and narrative, that there were no consensual sexualized activities between her and Plaintiff at the dance club, but the "investigation record" including "three eyewitnesses" contradicted her narrative. | This "fundamental pillar" is nowhere in the Incident Report or Investigative Report, Pl.'s Ex. B; Def.'s Ex. B, and testimony from Roe and three eyewitnesses at the club does not support Plaintiff's claim. Pl.'s Ex. B at 12-13, 44-45, 46, and 50. |
| 186, 188, 190, 195 | "Jane Roe's 'fear narrative' was not created until she was alone with her future boyfriend, on Monday night, August 28." | Substantial evidence showed Roe was uncomfortable returning to Plaintiff's apartment. Pl.'s Ex. B at 13, 25, 33-34, 62-63, 82. |
| 208, 209, 213, 215 | The evidence, including Roe's own statements, showed she consented to sexual intercourse. | Roe testified that she was attempting to crawl away from Plaintiff, Pl.'s Ex. B at 4, 14; Def.'s Ex. B at 2, she said "no," Pl.'s Ex. B at 14, and Plaintiff "threw her onto the bed in the guest bedroom and pinned down her arms and hands," Pl.'s Ex. B at 18. *See also* Pl.'s Ex. B at 14 (Roe's testimony concerning the "conversation" about their encounter). |
| 214 | "[T]he evidence did not support finding that [Plaintiff] caused [Roe's] bruises." | *See* Pl.'s Ex. B at 61-62, 82 (evidence supporting the finding that Plaintiff caused Roe's bruises). |
| 233 | Roe only indicated she had been sexually assaulted due to pressure from Witness 3. | Roe and Witness 3 testified that Roe was upset when she returned to her apartment and cried before either of them raised the suggestion of sexual assault. Pl.'s Ex. B at 16-17, 39. |
| 221 | "The Columbia investigation team found great significance in Jane Roe's account that [Plaintiff]'s apartment had the appearance of a 'violent scene.'" | Roe never described Plaintiff's apartment as a "violent scene." *See generally* Pl.'s Ex. B; Def.'s Ex. B; *see also* Pl.'s Ex. B at 15, 81-83. |

| 242, 246 | Columbia investigators "presume[ed]" that Jane Roe was truthful" and "failed to analyze critically Jane Roe's credibility." | The Investigative Report includes a detailed and lengthy assessment of Roe's credibility. Pl.'s Ex. B at 59-66. |
|---|---|---|
| 254-258 | Columbia investigators "presumed" that Plaintiff lacked credibility and "assail[ed]" his credibility based on minor points in his testimony. | The Investigative Report includes a detailed and lengthy assessment of Plaintiff's credibility. Pl.'s Ex. B at 66-71; *see also id.* at 70 (significance of "high heels" testimony); *id.* at 67-68 (significance of "gas valve" testimony); *id.* at 79 (testimony regarding location where sexual activity occurred not part of credibility assessment). |
| 271-72 | Plaintiff's expert reports were not given the weight they were due. | The Investigative Report includes the expert reports and an analysis of the reports, Pl.'s Ex. B at 57-59, even though the GBM Policy does not require it, Def.'s Ex. A at 25. |
| 274-77 | Columbia did not permit Plaintiff to question Roe or to submit additional questions at the hearing. | The GBM Policy prohibits either party from asking or submitting questions at the hearing. Def.'s Ex. A at 27-28, 30. |
| 146, 278-79 | The "form and layout" of the Investigative Report and draft Investigative Report "burie[s] the investigation deficiencies." | *See* Pl.'s Ex. B (Investigative Report). |
| 131, 280-82 | Plaintiff's 50-page written response to the "draft report" was not considered or addressed. | The GBM Policy provides clear instructions on what a party is permitted to submit. Def.'s Ex. A at 27. |
| 283 | Plaintiff was only given five days and 10 single-spaced pages to respond to the report. | The GBM Policy requires a written response be no more than 10 single-spaced pages and be submitted at least two days in advance of the hearing. Def.'s Ex. A at 29. |
| 284 | The Hearing Panel rushed to judgment after spending one day deliberating after the hearing. | Under the GBM policy, the Hearing Panel will render a decision within 3 days of a hearing. Def.'s Ex. A at 30. |
| 295-96 | Plaintiff received an "unduly severe penalty." | The Appeal Panel considered the applicable criteria in confirming the sanction. Def.'s Ex. A at 31; Def.'s Ex. D at 5. |